No. 25-1312

IN THE

# United States Court of Appeals for the Fourth Circuit

INTERNATIONAL PAINTERS AND ALLIED TRADES INDUSTRY, *et al.*,

*Plaintiffs-Appellees*,

v.

FLORIDA GLASS OF TAMPA BAY, INC., *et al.*,

*Defendants-Appellants*.

On appeal from the United States District Court
for the District of Maryland, No. 1:23-cv-00045-SAG,
Hon. Stephanie A. Gallagher

### BRIEF FOR APPELLANTS

JOSEPH E. SIMMONS
NORTON ROSE FULBRIGHT US LLP
2200 Ross Avenue, Suite 3600
Dallas, TX 75201
(214) 855-8000

PETER B. SIEGAL
GREGORY J. OSSI
NORTON ROSE FULBRIGHT US LLP
799 9th Street NW, Suite 1000
Washington, DC 20001
(202) 662-4663
peter.siegal@nortonrosefulbright.com

May 22, 2025

*Counsel for Appellants*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1(a), Appellants API Commercial Architectural Products, Inc., API Commercial Installation, Inc., American Products Production Company of Pinellas County, Inc., American Products, Inc., Ceraclad South, LLC, Charles & Thomas Properties, LLC, Fenwall, LLC, Florida Glass of Tampa Bay, Inc., JCM Properties LLC, Muraco & Mullan Properties, Inc., and Specialty Metals Installation, LLC hereby state as follows:

API Commercial Architectural Products, Inc., a dissolved corporation, does not have a parent corporation and there is no publicly held corporation owning 10% or more of its stock.

API Commercial Installation, Inc., a dissolved corporation, does not have a parent corporation and there is no publicly held corporation owning 10% or more of its stock.

American Products Production Company of Pinellas County, Inc. does not have a parent corporation and there is no publicly held corporation owning 10% or more of its stock.

American Products, Inc. does not have a parent corporation and there is no publicly held corporation owning 10% or more of its stock.

Ceraclad South, LLC is a dissolved limited liability company. Its members are Joseph C. Muraco and Kevin T. Mullan.

i

Charles & Thomas Properties, LLC is a limited liability company. Its members are Joseph C. Muraco and Kevin T. Mullan.

Fenwall, LLC is a limited liability company. Its members are Joseph C. Muraco and Kevin T. Mullan.

Florida Glass of Tampa Bay, Inc., a dissolved corporation, does not have a parent corporation and there is no publicly held corporation owning 10% or more of its stock.

JCM Properties LLC is a limited liability company. Its members are Joseph C. Muraco and Kevin T. Mullan.

Muraco & Mullan Properties, Inc. does not have a parent corporation and there is no publicly held corporation owning 10% or more of its stock.

Specialty Metals Installation, LLC is a limited liability company. Its members are Joseph C. Muraco and Kevin T. Mullan.

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ........................................................i

TABLE OF AUTHORITIES ...............................................................iv

INTRODUCTION ....................................................................1

JURISDICTION.....................................................................5

STATEMENT OF ISSUES ...........................................................5

STATEMENT OF THE CASE......................................................6

      A.    Legal Background. ........................................................6

      B.    Factual Background. ....................................................8

         1.    The Proof Of Claim. ..........................................8

         2.    The Fund's Lawsuit. .........................................11

      C.    The District Court's Decision. ..................................12

SUMMARY OF ARGUMENT ...................................................14

STANDARD OF REVIEW .......................................................15

ARGUMENT ......................................................................16

    I.    The District Court Erred As A Matter Of Law In Creating An
Impossible-To-Satisfy Arbitration Requirement That Would
Nullify The Statute Of Limitations. ...................................16

    II.    The District Court Erred As A Matter Of Law In Concluding
That The Proof Of Claim Did Not Trigger The Limitations
Period.................................................................21

      A.    The Proof Of Claim Was A Notice/Demand. ........................21

      B.    The Proof Of Claim Demanded The Full Amount Owed,
As A Matter Of Law And Undisputed Fact. .........................27

    III.    The Court Should Enter Final Judgment In American Products'
Favor.................................................................31

CONCLUSION ....................................................................32

STATEMENT REGARDING ORAL ARGUMENT

CERTIFICATE OF COMPLIANCE

ADDENDUM OF STATUTES

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*53rd St., LLC v. U.S. Bank Nat'l Ass'n*,
  8 F.4th 74 (2d Cir. 2021) ...................................................................31

*Am. Classic Voyages Co., In re*,
  405 F.3d 127 (3d Cir. 2005) ..............................................................22

*Bay Area Laundry & Dry Cleaning Pension Tr. Fund v. Ferbar Corp.*
  *of Cal., Inc.*,
  522 U.S. 192 (1997).......................................................................passim

*Bd. of Trs. of Dist. No. 15 Machinists' Pension Fund v. Kahle Eng'g*
  *Corp.*,
  43 F.3d 852 (3d Cir. 1994) ...................................................................3

*Bd. of Trs. of Trucking Emps. of N. Jersey Welfare Fund, Inc.-Pension*
  *Fund v. Gotham Fuel Corp.*,
  860 F. Supp. 1044 (D.N.J. 1993) ..........................................................3

*Bd. of Trs. of Trucking Emps. of N. Jersey Welfare Fund, Inc.-Pension*
  *Fund v. Kero Leasing Corp.*,
  377 F.3d 288 (3d Cir. 2004) ............................................................passim

*Central States, Se. & Sw. Areas Pension Fund v. Basic Am. Indus.,*
  *Inc.*,
  252 F.3d 911 (7th Cir. 2001) ..........................................................passim

*Central States, Se. & Sw. Areas Pension Fund v. Slotky*,
  956 F.2d 1369 (7th Cir. 1992) .......................................................20, 22

*Centric Corp., In re*,
  901 F.2d 1514 (10th Cir. 1990) .....................................................16, 19

*Chicago Truck Drivers v. El Paso Co.*,
  525 F.3d 591 (7th Cir. 2008) ........................................................passim

*Consol. Pioneer Mortg. Entities, In re*,
  91 F.3d 151 (9th Cir. 1996) ................................................................23

*Cooper/Ports Am., LLC v. Sec'y of Def.*,
  959 F.3d 1373 (Fed. Cir. 2020) .....................................................25, 29

*Davis v. McLaughlin*,
  816 F.2d 671, 1987 WL 36012 (4th Cir. 1987)..................................31

*Gibson v. Parish*,
  360 F. App'x 974 (10th Cir. 2010) .....................................................31

iv

*Giroux Bros. Transp. Co. v. New England Teamsters*,
   73 F.3d 1 (1st Cir. 1996) ................................................................. 20, 21

*I.L.G.W.U. Nat. Ret. Fund v. Meredith Grey, Inc.*,
   190 F.R.D. 324 (S.D.N.Y. 1999) .............................................................. 3

*Indep. Lift Truck Builders Union v. Hyster Co.*,
   2 F.3d 233 (7th Cir. 1993) ..................................................................... 16

*Joyce v. Clyde Sandoz Masonry*,
   871 F.2d 1119 (D.C. Cir. 1989) ............................................................... 3

*Keyes Law Firm, LLC v. Napoli*,
   120 F.4th 139 (4th Cir. 2024) ................................................................ 17

*LHD Realty Corp., In re*,
   726 F.2d 327 (7th Cir. 1984) ................................................................. 31

*M.J. Waterman & Assocs., Inc., In re*,
   227 F.3d 604 (6th Cir. 2000) ................................................................. 22

*McDonald v. Centra, Inc.*,
   946 F.2d 1059 (4th Cir. 1991) .......................................................... 16, 23

*Mid-Am. Salt, LLC v. Morris Cnty. Coop. Pricing Council*,
   964 F.3d 218 (3d Cir. 2020) ................................................................. 25

*Musacchio v. United States*,
   577 U.S. 237 (2016) ............................................................................... 5

*Nikoloutsos, In re*,
   199 F.3d 233 (5th Cir. 2000) ................................................................. 22

*Nortex Trading Corp. v. Newfield*,
   311 F.2d 163 (2d Cir. 1962) .................................................................. 31

*United States ex rel. Oberg v. Penn. Higher Ed. Assistance Agency*,
   804 F.3d 646 (4th Cir. 2015) ................................................................. 15

*Reynolds v. C.I.R.*,
   861 F.2d 469 (6th Cir. 1988) ........................................................... 22, 24

*S & G Inv. Inc. v. Home Fed. Sav. & Loan Ass'n*,
   505 F.2d 370 (D.C. Cir. 1974) ............................................................... 31

*Sec. Mut. Life Ins. Co. of New York v. Contemporary Real Est.
   Assocs.*,
   979 F.2d 329 (3d Cir. 1992) ................................................................. 31

*Simmons, In re*,
   765 F.2d 547 (5th Cir. 1985) ................................................................. 30

v

*Trs. of the Chicago Truck Drivers, Helpers & Warehouse Workers Union (Indep.) Pension Fund v. Central Transport, Inc.*,
888 F.2d 1161 (7th Cir. 1989) ....................................................22

**Rules and Statutes**

11 U.S.C. § 507(a)(5) ...........................................................9

11 U.S.C. § 1129(b) ...........................................................27

28 U.S.C. § 1291 ...............................................................5

29 U.S.C. § 1132(g)(2).................................................passim

29 U.S.C. § 1144(d) ...........................................................28

29 U.S.C. § 1399 ........................................................20, 21

29 U.S.C. § 1399(b)(1)....................................................6, 26

29 U.S.C. § 1399(b)(2)(A) ...................................................11

29 U.S.C. § 1399(c)(5) ...............................................1, 7, 30

29 U.S.C. § 1399(c)(5)(B) .....................................................7

29 U.S.C. § 1401 ...............................................................18

29 U.S.C. § 1401(a) ....................................................6, 18, 20

29 U.S.C. § 1401(a)(1)................................................11, 17, 21

29 U.S.C § 1401(b)(1)........................................................18

29 U.S.C. § 1451(a)(1) .........................................................7

29 U.S.C. § 1451(c) ............................................................5

29 U.S.C. § 1451(f) ............................................................1

29 U.S.C. § 1451(f)(1) .........................................................7

Fed. R. Civ. P. 56(a)..........................................................15

**Other Authorities**

49 Fed. Reg. 22642 (May 31, 1984) ......................................7

## INTRODUCTION

The Employee Retirement Income Security Act ("ERISA"), as amended by the Multiemployer Pension Plan Amendments Act of 1980 (the "MPPAA"), "requires employers who withdraw from underfunded multiemployer pension plans to pay a 'withdrawal liability.'" *Bay Area Laundry & Dry Cleaning Pension Tr. Fund v. Ferbar Corp. of Cal., Inc.*, 522 U.S. 192, 195 (1997) (citing 29 U.S.C. §§ 1381-1461). Typically, such payments are made in installments, according to a yearslong payment schedule that must be set by the pension fund's trustees according to a complex statutory formula. *Id.* In certain circumstances, however, the payment obligation may be accelerated, causing the entire liability to become due immediately. 29 U.S.C. § 1399(c)(5).

Any suit to recover an unpaid liability under the statute is subject to the MPPAA's statute of limitations, 29 U.S.C. § 1451(f). Pursuant to that provision, suit must be brought within six years from the time a cause of action accrues. *Id.* When payments are due in installments, the cause of action for any missed installment accrues only on that installment's due date. *E.g.*, *Bay Area Laundry*, 522 U.S. at 206. However, when "[an] employer repudiate[s] its withdrawal liability by [withdrawing from the plan] and filing for bankruptcy," a demand for payment creates an immediate cause of action for the *entire* liability, and any suit brought more than six years thereafter is "barred." *Chicago Truck Drivers v. El*

*Paso Co.*, 525 F.3d 591, 602 (7th Cir. 2008) (citing *Central States, Se. & Sw. Areas Pension Fund v. Basic Am. Indus., Inc.*, 252 F.3d 911 (7th Cir. 2001) ("*Basic American*")).

That straightforward rule should have resolved this case. Here, appellees (a pension fund and its fiduciary, hereinafter referred to as the "Fund") seek to recover certain withdrawal liability payments they say they are owed by appellant Florida Glass of Tampa Bay, Inc. ("Florida Glass") and the other defendants (collectively, "American Products"), all of whom are in Florida Glass's control group and are thus treated as a single entity under the MPPAA. However, long before this case began, Florida Glass withdrew from the Fund and filed for bankruptcy. In that bankruptcy—and undisputedly more than six years before the Fund initiated this action—the Fund filed a proof of claim demanding full, immediate payment of the entire amount of Florida Glass's withdrawal liability, thus triggering the statute of limitations. The Fund even received a cash distribution from Florida Glass's bankruptcy based on its proof of claim.

The district court should therefore have ruled that this suit is time-barred. But instead, in the order on review, it granted summary judgment in the Fund's favor on the theory that American Products could not establish its statute of limitations defense. That decision, every aspect of which is reviewed de novo, is legally erroneous for two principal reasons.

2

First, the court erred in determining that American Products had to arbitrate—and could not ask the court to decide—whether the limitations period was triggered. As the opinion below acknowledges, "the question of the statute of limitations is for the Court, *not* an arbitrator." JA161 (emphasis added). Indeed, courts routinely resolve the very question the district court believed was beyond its reach.[1] Moreover, as the district court further recognized, JA162, its ruling renders nonsensical the statute Congress enacted, because the deadline to arbitrate expires mere months after a fund's claim accrues, while a statute of limitations defense cannot exist until six years later at the earliest (*i.e.*, when a suit is brought outside the limitations period). By forcing employers to arbitrate that defense years before they could possibly know it will ever exist, the decision on review effectively eliminates the statute of limitations and places withdrawal liability alongside murder and genocide in the exceedingly narrow category of claims for which there is never any time bar at all.

---

[1] *See, e.g.*, *Basic American*, 252 F.3d at 918-19; *Truck Drivers*, 525 F.3d at 602; *Bd. of Trs. of Trucking Emps. of N. Jersey Welfare Fund, Inc.-Pension Fund v. Kero Leasing Corp.*, 377 F.3d 288, 295 (3d Cir. 2004); *Bd. of Trs. of Dist. No. 15 Machinists' Pension Fund v. Kahle Eng'g Corp.*, 43 F.3d 852, 858 (3d Cir. 1994); *Joyce v. Clyde Sandoz Masonry*, 871 F.2d 1119, 1127 n.6 (D.C. Cir. 1989); *I.L.G.W.U. Nat. Ret. Fund v. Meredith Grey, Inc.*, 190 F.R.D. 324, 327-28 (S.D.N.Y. 1999); *Bd. of Trs. of Trucking Emps. of N. Jersey Welfare Fund, Inc.-Pension Fund v. Gotham Fuel Corp.*, 860 F. Supp. 1044, 1049 (D.N.J. 1993).

Second, perhaps recognizing that its arbitrability ruling could not possibly be correct, the district court went on to wrongly conclude, on the merits and in the alternative, that the proof of claim did not trigger the statute of limitations. That conclusion rested principally on the Fund's own lawyers' after-the-fact testimony that they subjectively—and undisputedly incorrectly—believed no money was owed as of the time they filed the proof of claim. But what matters is what the Fund and its lawyers *did*, not what they secretly believed or intended. And the law is clear that (i) a proof of claim in a Chapter 11 bankruptcy is a notice of liability and demand for payment "by definition," and (ii) when, as here, it is filed after "[an] employer repudiate[s] its withdrawal liability by [withdrawing from the plan] and filing for bankruptcy," it triggers the statute of limitations for the entire liability as a matter of law. *Truck Drivers*, 525 F.3d at 598, 602. Moreover, additional undisputed facts confirm that whatever the Fund or its lawyers may have idiosyncratically, erroneously believed they were doing, what they actually did was request, receive, and willingly accept payment based not on any installment plan, but on the entire amount Florida Glass owed if acceleration occurred: $1,577,168. JA100.

The Fund's proof of claim thus triggered the statute of limitations for the entire amount of withdrawal liability the Fund seeks here, and this case should

have been rejected as time-barred. American Products respectfully requests that the judgment be reversed and judgment entered in American Products' favor.

## JURISDICTION

Subject to the statute of limitations defense (which is likely non-jurisdictional in any event, *see, e.g.*, *Musacchio v. United States*, 577 U.S. 237, 246 (2016)), the district court had subject-matter jurisdiction under 29 U.S.C. § 1451(c). American Products timely appealed from the judgment, the fee award, and all other orders and judgments encompassed therein. JA176. Pursuant to 28 U.S.C. § 1291, this Court has subject-matter jurisdiction to review those orders and judgments.

## STATEMENT OF ISSUES

1.      Whether the district court erred in imposing an impossible-to-satisfy arbitration requirement that, if it existed, would in practice eliminate the statute of limitations Congress enacted for MPPAA claims.

2.      Whether the district court erred in concluding, in clear conflict with on-point circuit court precedent, that the statute of limitations was not triggered when the Fund sought immediate payment of Florida Glass's entire, accelerated withdrawal liability in Florida Glass's Chapter 11 bankruptcy.

## STATEMENT OF THE CASE

### A.    Legal Background.

As noted, the MPPAA requires employers who withdraw from certain multiemployer pension plans to pay withdrawal liability. *E.g.*, *Bay Area Laundry*, 522 U.S. at 195 (citing 29 U.S.C. §§ 1381-1461). "The Act does not," however, "call upon the employer to propose the amount of withdrawal liability," which is calculated according to a complex statutory formula that depends on information typically within the plan's control and, in the first instance, generally involves a multiyear installment-payment schedule. *Id.* at 197. "Rather, [the statute] places the calculation burden on the plan's trustees." *Id.* Specifically, "[a]s soon as practicable" after the employer's withdrawal from the plan, the trustees "shall notify the employer of the amount of liability[] and the schedule for liability payments" and "demand payment in accordance with the schedule." 29 U.S.C. § 1399(b)(1); *see also, e.g.*, *Bay Area Laundry*, 522 U.S. at 197. If any dispute arises "concerning a determination made under section 1381 through 1399" of ERISA, which pertain principally to whether withdrawal has occurred and how much liability is owed, it must be arbitrated. 29 U.S.C. § 1401(a). The deadline to arbitrate depends on the specific circumstances, but it is never more than a few months after the notification and demand occurs. *Id.*

A plan is also permitted to accelerate the payment obligation—*i.e.*, to scrap the payment schedule and "require immediate payment"—upon any event that "indicates a substantial likelihood" that the employer "will be unable to pay its withdrawal liability." 29 U.S.C. § 1399(c)(5)(B); JA048 ¶ 33(e). An employer's bankruptcy qualifies as such an event. *E.g.*, 49 Fed. Reg. 22642, 22644 (May 31, 1984) ("Such a substantial likelihood would exist, for example, when an employer declares bankruptcy . . . .").

A plan "adversely affected by the act or omission of any" employer is entitled to sue. 29 U.S.C. § 1451(a)(1). As relevant here, the plan must do so within "6 years after the date on which the cause of action arose." *Id.* § 1451(f)(1). After that, such an action "may not be brought." *Id.*

Typically, when payments are owed according to the schedule, "each missed payment creates a separate cause of action with its own six-year limitations period." *E.g.*, *Bay Area Laundry*, 522 U.S. at 202. However, it is undisputed that when (as in the case of acceleration) a cause of action accrues for the *entire* "outstanding amount of an employer's withdrawal liability," 29 U.S.C. § 1399(c)(5), it triggers the statute of limitations for that full amount. *E.g.*, *Bd. of Trs. of Trucking Emps. of N. Jersey Welfare Fund, Inc.-Pension Fund v. Kero Leasing Corp.*, 377 F.3d 288, 295 (3d Cir. 2004) ("*Trucking Employees*"); *Basic American*, 252 F.3d at 917-18. The Seventh Circuit has squarely held that such a

7

cause of action immediately accrues when an employer withdraws from a plan and files for bankruptcy—thus anticipatorily repudiating any obligation to make installment payments—and a fund serves on it a demand. *Truck Drivers*, 525 F.3d at 602; *Basic American*, 252 F.3d at 917-18.

### B.    Factual Background.

#### 1.    The Proof Of Claim.

The Fund is an ERISA-governed multiemployer pension plan. JA043 ¶ 2. Florida Glass is a former contributing employer to the Fund. JA044 ¶ 5. The other appellees are or were under common control with Florida Glass and are thus treated as a single contributing employer for ERISA and MPPAA purposes. JA044 ¶ 6.

In 2015, Florida Glass ceased having an obligation to contribute to the Fund. JA044 ¶ 8. In August 2016, Florida Glass filed for bankruptcy. JA044 ¶ 10. On **November 10, 2016**,[2] the Fund filed a proof of claim in the bankruptcy for the entire amount of withdrawal liability Florida Glass (and thus American Products) owed: $1,577,168. JA047 ¶ 27; JA099-101. In a payment schedule attached to the proof of claim, the Fund described that amount as the "Immediate payment" amount and made clear that an entirely different amount, $1,627,538, would be the

---

[2] For ease of reference, critical dates appear in bold.

amount owed under a "Monthly payment . . . scenario." JA102. As the Fund has

conceded (and as is indisputable), the only due date for any payment outlined in

the schedule was the "Immediate payment" demand; no due dates were provided

for any installments. Dkt. 52 at 10.[3]

The proof of claim contains no indication that the Fund sought only

whatever payments would have come due under a payment schedule—much less

that it was not seeking any payment at all. To the contrary, on the first page, the

Fund stated that it was "the current creditor" with respect to the claim and that all

"notices and payments" should be sent to its lawyer, Matthew Tokarsky at

Jennings Sigmond, P.C. JA099. It further stated that a portion of its claim was

entitled to priority (*i.e.*, that it should be paid *before* any holders of typical

unsecured claims) pursuant to Section 507(a)(5) of the bankruptcy code, which

provides such treatment to "allowed unsecured claims for contributions to an

employee benefit plan arising from services rendered within 180 days before the

date of the filing of the petition or the date of the cessation of the debtor's business,

whichever occurs first." 11 U.S.C. § 507(a)(5). When it calculated the amount it

believed was entitled to priority, the Fund did so based on a lump-sum payment,

not based on any installments. JA102-103 ($248,410 figure used to calculate

_____

[3] "Dkt." refers to district court docket entries not included in the Joint Appendix.

priority amount drawn from column H of table used to calculate lump-sum liability).

On page two of the proof of claim, in response to the eighth of twelve questions the claim form contained ("What is the basis of the claim?"), the Fund stated that its claim was for "Contingent Statutory Withdrawal Liability." JA100. The Fund did not (in the proof of claim, an attachment, or anywhere else) specify what was "contingent" about the existence or amount of withdrawal liability for which it was seeking payment. *See* JA099-104. Nor did it state that it was not seeking immediate payment of the amount it claimed (which, again, the Fund described in the claim itself as an "Immediate payment" amount, JA102). The Fund has since claimed that the supposed contingency was based on its and its lawyers' subjective, unstated belief that Florida Glass had not yet withdrawn from the Fund. Dkt. 48-1 at 33; Dkt. 52 at 20-23. But that purported belief was never expressed, and the Fund has since admitted not only that it was wrong, but that a simple review of the filings on the bankruptcy court's docket would have so confirmed. Dkt. 52 at 22 n.13; JA148-149.

It is undisputed that if there had been sufficient funds in Florida Glass's bankruptcy estate, the Fund would have been paid the entire amount of its claim: $1,577,168. JA111. However, as routinely occurs in bankruptcy, the estate of the debtor (here Florida Glass) did not have enough money to pay creditors' claims in

full, so pro rata distributions were made instead. JA050 ¶ 46. The distributions the Fund thus received totaled roughly $50,000. JA050 ¶ 46. The Fund accepted those distributions without objection or complaint. JA051 ¶ 48.

### 2. The Fund's Lawsuit.

Assuming the proof of claim triggered the statute of limitations, the statute lapsed six years later, on **November 10, 2022**. Well prior to that date, on March 16, 2022, American Products received various documents from the Fund purporting to assess the same withdrawal liability that was the subject of the proof of claim. JA052-053 ¶¶ 61-63. Then, on April 14 of the same year, American Products sent a letter to the Fund pursuant to 29 U.S.C. § 1399(b)(2)(A) requesting review of the March 2022 demand. JA053 ¶ 65. No party initiated arbitration, or took any other relevant actions, before the deadline to do so expired. *See* 29 U.S.C. § 1401(a)(1) (setting forth deadline).

The Fund then brought this action on **January 9, 2023**—undisputedly more than six years *after* it filed the proof of claim. JA054 ¶ 74. Here, the Fund undisputedly seeks the same withdrawal liability that was the subject of its proof of claim, along with other associated monetary relief such as liquidated damages and attorneys' fees. JA054 ¶ 74; JA017-021.

C.    **The District Court's Decision.**

The parties cross-moved for summary judgment, with the dispute centered almost entirely on whether the proof of claim triggered the statute of limitations. The district court issued an order (the "Order") siding with the Fund on that issue and, after ordering and receiving briefing on damages, entered final judgment in the Fund's favor. JA152; JA175.[4]

The Order rests on two alternative grounds. First, it concludes that although "the question of the statute of limitations is for the Court, not an arbitrator," resolving it would nevertheless "invade the province reserved to arbitration by the MPPAA." JA161-162. That is because, the Order says, the question whether the proof of claim "constituted a notice and demand for withdrawal liability and an acceleration of that demand," and thus triggered the statute of limitations, is an issue that needed to be arbitrated in the first instance. JA161. In so concluding, the Order recognizes "the practical conundrum" it creates, which stems from the fact that employers "ha[ve] no reason to seek an arbitrator's ruling" that notice/demand/and acceleration occurred until they are actually sued outside the

---

[4] The parties also disputed whether, even if this lawsuit is time-barred, the Fund is entitled to certain monetary relief under 29 U.S.C. § 1132(g)(2). The district court (finding that the suit was not time-barred) did not reach that issue, which is addressed below in Argument III. *See infra* at 31-32.

six-year statute of limitations, at which time it will invariably be too late to arbitrate. JA162.

Next, the Order goes on to reach the very issues it says would "invade" the arbitrator's "province." JA162. Over a page and a half of analysis, it concludes that the statute of limitations was not triggered because, in its view, the proof of claim was not a notice, demand, or acceleration. JA163-164. On the notice/demand issue, it reasons that (i) the proof of claim was filed in bankruptcy, rather than sent to each individual appellant; (ii) the proof of claim was labeled "contingent"; and (iii) Florida Glass did not respond to it by requesting review of its withdrawal liability, as American Products later would in 2022. JA163. On the acceleration issue, it reasons that (i) the proof of claim attached a payment schedule; and (ii) before issuing it, the Fund had assertedly failed to follow its own, internal written guidelines for accelerating a debt. JA163. As to both issues, the Order states without reasoning or citation that American Products' "potentially valid criticisms of the Fund's conduct in the bankruptcy," including the Fund's failure to set forth what was supposedly contingent about its claim and the Fund's willing acceptance of a cash distribution from the bankruptcy court it now insists it never sought, are irrelevant. JA164.

After granting the Fund's motion for summary judgment and denying American Products', the district court requested and received further briefing on

13

attorneys' fees, then entered final judgment for the amount of withdrawal liability plus other, ancillary monetary relief. JA175. American Products timely appealed. JA176.

## SUMMARY OF ARGUMENT

The judgment should be reversed, and judgment should be entered in American Products' favor.

First, the Order errs as a matter of law in concluding that only an arbitrator can resolve whether the statute of limitations was triggered. If—as is undisputed—the statute of limitations is an issue for the court rather than an arbitrator, then it is nonsensical to say that a court can never decide whether that statute began to run. That is especially so given the Catch-22 the Order admits it creates, the effect of which would be to entirely eliminate the six-year statute of limitations Congress placed in the MPPAA.

Second, on the merits, the proof of claim triggered the statute, and the Order's contrary conclusion is erroneous. As clear, unanimous precedent recognizes, the statute is triggered *as a matter of law* by any proof of claim filed in Chapter 11 bankruptcy after an employer's withdrawal. That conclusion is reinforced by the proof of claim here, which is unambiguous in demanding the "immediate payment" amount of American Products' asserted liability. The Fund's contrary arguments, which focus principally on matters (such as the Fund's

14

lawyers' subjective beliefs and intentions) that were undisputedly not apparent from the proof of claim itself, are largely irrelevant.

Third, this Court should enter judgment in American Products' favor. Beyond the two issues just mentioned, the only other disputed matter in this case pertains to the Fund's assertion that *even if its action is time-barred*, it is still entitled to damages and other financial remedies under 29 U.S.C. § 1132(g)(2). That assertion is wrong. As the statute makes clear, the remedies in question are available only in actions "in which a judgment *in favor of the plan* is awarded." *Id.* (emphasis added). That straightforward issue is no bar to entry of judgment in American Products' favor.

## STANDARD OF REVIEW

The Court reviews the district court's rulings on summary judgment "*de novo*, applying the same standard as the trial court and without deference to the trial court." *United States ex rel. Oberg v. Penn. Higher Ed. Assistance Agency*, 804 F.3d 646, 653 (4th Cir. 2015). Summary judgment is appropriate if, and only if, "'there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Id.* (quoting Fed. R. Civ. P. 56(a)).

## ARGUMENT

### I.   The District Court Erred As A Matter Of Law In Creating An Impossible-To-Satisfy Arbitration Requirement That Would Nullify The Statute Of Limitations.

The Order errs in concluding that any party seeking to raise a limitations defense must first arbitrate the question whether the statute was triggered. The time to arbitrate invariably expires years before the statute of limitations, and "a failure to arbitrate does not waive a defense that the employer does not yet have." *In re Centric Corp.*, 901 F.2d 1514, 1518 (10th Cir. 1990); *see also Trucking Employees*, 377 F.3d at 301 (fund cannot "bypass the MPPAA's limitations provision" by arguing that the employer failed to arbitrate when the arbitrable issue was raised for the first time in the fund's complaint); *McDonald v. Centra, Inc.*, 946 F.2d 1059, 1063 (4th Cir. 1991) (arbitration requirement is not a jurisdictional bar, and does not apply when resort to arbitration "would be futile"). The Order's contrary conclusion is erroneous, and the Catch-22 it creates would effectively repeal the statute of limitations Congress enacted.

As the Order acknowledges, it is "entirely correct that the question of the statute of limitations is for the Court, not an arbitrator." JA161. That should have been the end of the analysis. When Congress assigns to a court the power to resolve an issue, subsidiary issues necessary to the resolution go along with that delegation. *See, e.g.*, *Indep. Lift Truck Builders Union v. Hyster Co.*, 2 F.3d 233,

236 (7th Cir. 1993) (holding that a court with the power to resolve an issue must resolve it, and if the issue overlaps with questions otherwise assigned to the arbitrator, "so be it"); *cf. Keyes Law Firm, LLC v. Napoli*, 120 F.4th 139, 144 (4th Cir. 2024) ("[W]hen a court has jurisdiction it has a right to settle every question which occurs in the case."). It is thus nonsensical to say, as the Order does, that although courts are empowered to assess compliance with the statute of limitations, they can never determine the date on which it was triggered. That is why courts routinely resolve the very issues the district court believed it could not reach. *E.g.*, *Trucking Employees*, 377 F.3d at 301 (applying MPPAA statute of limitations to bar claim despite "presumption of correctness" of fund's allegations ordinarily resulting from employer's failure to arbitrate); *see also supra* at 3 n.1 (citing cases).

Moreover, the subsidiary issue in question here—American Products' contention that the proof of claim triggered the statute of limitations—has never been arbitrable in the first place. The MPPAA's arbitration requirement applies only to "dispute[s] . . . concerning *a determination made* under sections 1381 through 1399" of the statute, 29 U.S.C § 1401(a)(1) (emphasis added), which principally govern whether withdrawal has occurred and how much liability is owed. Neither the Fund nor the district court has ever offered any support for their apparent conclusion that the present dispute—in which the Fund's position is that

17

it *did not* send a notice/demand or acceleration—implicates any "determination" at all, much less one "made under" any provision section 1401 enumerates.

If left in place, the Order would render the statute nonfunctional. An employer can reasonably be expected to arbitrate if it believes a purported notice/demand or acceleration is *in*valid. But where an employer believes it has received a *valid* notice/demand/acceleration—or that the Fund has done something else to trigger the limitations period—there is no "determination" to challenge and thus nothing to arbitrate. Indeed, the statute unambiguously provides that if no arbitration is initiated, the notice/demand/acceleration is *deemed effective* as a matter of law anyway. *E.g.*, *Truck Drivers*, 525 F.3d at 595 ("If an employer fails to demand arbitration, the assessment becomes 'due and owing on the schedule set forth by the plan sponsor.'") (quoting 29 U.S.C § 1401(b)(1)).

In nevertheless ruling as it does, the Order effectively eliminates the limitations period Congress enacted for MPPAA claims against employers. The facts of this case illustrate the point, though they are in no way unique. Here, the deadline to arbitrate issues surrounding the proof of claim was *in 2017*, *see* 29 U.S.C. § 1401(a), at which time American Products of course had no idea the Fund would bring an untimely lawsuit against it *in 2023*. Thus, as even the Order recognizes, American Products *did not have* a limitations defense at any time when it could have initiated arbitration, and thus (in the Order's own words) "would

18

have had no reason to seek an arbitrator's ruling" until many years after the deadline to do so expired. JA162. Put differently, American Products could have complied with the rule the Order purports to establish only if it were clairvoyant. And even if it had been, the resulting arbitration would have been absurd: American Products would have taken the position 'you triggered the statute of limitations,' and at the time (years before the limitations period expired), there would have been no reason for the Fund to disagree.

Despite recognizing the "practical conundrum" it thus creates, JA162, the Order does nothing to resolve it. Instead, the Order merely hypothesizes that American Products could have arbitrated "upon receipt of the Fund's notice and demand *in 2022*." JA162 (emphasis added). But there was no more reason to arbitrate in 2022 than in 2016 or 2017. The statute of limitations bars *lawsuits*, not mere demands for payment, and in any event, the statute did not lapse until *2023*. Thus, the first and only time American Products had any reason to assert that the proof of claim triggered the statute was *after it was sued*, in 2023, at a time that was undisputedly outside the deadline to arbitrate anything. Nor, in all events, is there any support for the notion that issues surrounding the *2016* proof of claim could have been raised in an arbitration initiated *in 2022*. It is thus inescapable that the Order requires the impossible. In so doing, it contravenes the clear holdings of other courts in similar circumstances. *See, e.g.*, *Centric*, 901 F.2d at 1518;

19

*Trucking Employees*, 377 F.3d at 301 (refusing to impose arbitration requirement regarding an issue not raised by fund until after limitations period expired); *Central States, Se. & Sw. Areas Pension Fund v. Slotky*, 956 F.2d 1369, 1373 (7th Cir. 1992) (refusing to impose arbitration requirement on "people who had absolutely no reason to believe" arbitration was warranted).

The Order is also wrong in vaguely hypothesizing that the way out of the thicket it creates might be to "equitabl[y] toll[]" the arbitration deadline—*i.e.*, to hold that a party sued outside the arbitration deadline may nevertheless initiate arbitration. JA162. The statutory deadline to arbitrate is unambiguous, and its outer limit is mere months. 29 U.S.C. § 1401(a). There is no support whatsoever for the notion that it can be extended by years, decades, or even centuries merely to accommodate the incorrect conclusion that courts are somehow incapable of determining whether the statute of limitations was triggered. Nothing in the Order remotely suggests otherwise.

The lone case the Order cites on this issue, *Giroux Brothers Transportation Co. v. New England Teamsters*, further refutes its conclusion. *See* JA161 (citing 73 F.3d 1, 4 (1st Cir. 1996)). In *Giroux*, the First Circuit held only that an employer's contention that a *notice/demand* was untimely—not that a *lawsuit* was untimely—was committed to the arbitrator. Moreover, it so concluded precisely because the timeliness of a notice/demand—unlike that of a lawsuit—"turns *solely*" on section

20

1399 (one of the statutes enumerated in the arbitration provision, 29 U.S.C.

§ 1401(a)(1)) and is thus completely independent of the statute of limitations.

*Giroux*, 73 F.3d at 3-4. *Giroux* is thus self-distinguishing. And still further, unlike

the decision on review, *Giroux* creates no "practical conundrum," because an

employer who receives an untimely or otherwise invalid

notice/demand/acceleration has something to challenge. By contrast, and as

explained, an employer who receives a *valid* notice/demand/acceleration (or other

document triggering the statute of limitations) is in no such position and has no

bone to pick unless and until they are sued more than six years later.

## II.    The District Court Erred As A Matter Of Law In Concluding That The Proof Of Claim Did Not Trigger The Limitations Period.

The Order also errs as a matter of law in concluding that the proof of claim

did not trigger the limitations period. That conclusion is reviewed de novo and

should be reversed.

### A.    The Proof Of Claim Was A Notice/Demand.

The Order wrongly concludes that the proof of claim was not even a notice

of liability and demand for payment. But the only requirements for a

notice/demand are that it "notify the employer of the amount of the liability[] and

the schedule for liability payments" and "demand payment in accordance with the

schedule." 29 U.S.C. § 1399. As the Seventh Circuit has squarely held, a proof of

claim filed in a Chapter 11 bankruptcy meets those requirements "*by definition*."

21

*Truck Drivers*, 525 F.3d at 598 (emphasis added); *see also, e.g.*, *Slotky*, 956 F.2d at 1375; *Trs. of the Chicago Truck Drivers, Helpers & Warehouse Workers Union (Indep.) Pension Fund v. Central Transport, Inc.*, 888 F.2d 1161, 1162 (7th Cir. 1989).

That clear legal rule resolves this issue. The specifics of the proof of claim here reinforce the point. As the Order acknowledges, the proof of claim included a payment schedule, which stated expressly on its face the amount owed. JA102. The Fund argued below that it would be "mere[] speculat[ion]" to conclude "that the reason the Fund filed the Proof of Claim was to receive payment." Dkt. 52 at 18. But again, "a proof of claim is, *by definition*, a demand for payment." *Truck Drivers*, 525 F.3d at 598 (emphasis added); *see also In re Am. Classic Voyages Co.*, 405 F.3d 127, 131 (3d Cir. 2005) (to qualify as a proof of claim, a document *must* "contain[] a demand by the creditor"); *In re M.J. Waterman & Assocs., Inc.*, 227 F.3d 604, 609 (6th Cir. 2000) (same); *In re Nikoloutsos*, 199 F.3d 233, 236 (5th Cir. 2000) (same). Moreover, having *in fact accepted* payment from Florida Glass's estate based on the proof of claim, the Fund is in no position to deny the point. *See, e.g.*, *Reynolds v. C.I.R.*, 861 F.2d 469, 473 (6th Cir. 1988) ("[W]hen a bankruptcy court—which must protect the interests of all creditors—approves a payment from the bankruptcy estate on the basis of a party's assertion of a given position, that . . . is sufficient 'judicial acceptance' to estop the party from later

advancing an inconsistent position."); *In re Consol. Pioneer Mortg. Entities*, 91 F.3d 151 (9th Cir. 1996) (creditors were "estopped from contending that the bankruptcy court impermissibly classified their claim as unsecured because they stipulated in the bankruptcy court that they were willing to accept an unsecured proof of claim").

The bases on which the Order concludes otherwise do not withstand scrutiny. To begin, that the proof of claim was filed in the bankruptcy court rather than "sent to the Defendants," JA163, is irrelevant. Again, a Chapter 11 proof of claim for withdrawal liability, which is *legally required to be sent to the debtor*, constitutes a notice and demand *as a matter of law*. *E.g.*, *Truck Drivers*, 525 F.3d at 598 (holding that Chapter 11 proof of claim constitutes notice/demand in part because, "[i]n a typical Chapter 11 bankruptcy, the debtor continues to control the business as debtor-in-possession, so notice to the debtor-in-possession is, strictly speaking, notice to the employer").[5] Moreover, the Order itself acknowledges both that Florida Glass was "privy to the . . . filings" in its own Chapter 11 bankruptcy," and that notice to Florida Glass "constitute[d] notice to all members" of its control group. JA162 n.2 (quoting *McDonald*, 946 F.2d at 1062). There was thus no reason

---

[5] Although Florida Glass's bankruptcy was ultimately converted from Chapter 11 to Chapter 7, that did not occur until well after the proof of claim was filed. *See, e.g.*, JA047 ¶¶ 26-27; JA050 ¶ 41.

(much less any requirement) to send the proof of claim to each appellant separately.

It is also inconsequential that "Florida Glass did not respond" to the proof of claim "by requesting review of its withdrawal liability," as it later did in response to the communications it received from the Fund in 2022. JA163. Nothing American Products did *in 2022* could possibly bear on whether a proof of claim filed half a decade earlier triggered the statute. And indeed, if Florida Glass's decision not to challenge the proof of claim were relevant at all, it would support precisely the opposite conclusion from the one the Order reaches. That is because, as explained, the statute expressly provides that an unchallenged notice/demand automatically becomes effective. *See supra* at 18.

The proof of claim's offhand mention that the "basis of the claim" was "Contingent Statutory Withdrawal Liability," JA100, also did not transform the Fund's demand for money into something else. Again, "a proof of claim is, *by definition*, a demand for payment," *Truck Drivers*, 525 F.3d at 598 (emphasis added), and a party that *accepted* the payment demanded is in particularly poor position to argue otherwise, *Reynolds*, 861 F.2d at 473.

Moreover, as the Order recognizes, the proof of claim does not even "specif[y] the nature" of whatever contingency it might have been referring to, JA164, and the nature of that purported contingency would have been impossible

for any observer to glean. Indeed, the Fund now admits the "contingent" designation *was not even accurate*. Specifically, the Fund claims the supposed contingency stemmed from its lawyers' mistaken assumption that, as a result of certain provisions unique to employers in the building and construction industry, Florida Glass's withdrawal liability had not yet been triggered. Dkt. 48-1 at 33; Dkt. 52 at 20-23. As the Fund has now admitted, not only was that assumption incorrect, but the very documents that led it to conclude the assumption was incorrect *were posted on the Florida Glass bankruptcy docket* the month before the Fund filed its proof of claim. Dkt. 52 at 22 n.13; JA148-149. Put differently, no one reviewing the proof of claim could possibly have determined why the Fund's lawyers designated the withdrawal liability contingent, and even if they had, they would have concluded the contingency was satisfied.

The Fund's lawyers' idiosyncratic, unstated, and ultimately erroneous view that Florida Glass's withdrawal liability was not owed at the time is thus legally irrelevant. *E.g.*, *Mid-Am. Salt, LLC v. Morris Cnty. Coop. Pricing Council*, 964 F.3d 218, 225 (3d Cir. 2020) ("[T]he notice afforded by a document, not the litigant's motivation in filing it, determines the document's sufficiency as a notice."); *Cooper/Ports Am., LLC v. Sec'y of Def.*, 959 F.3d 1373, 1379 (Fed. Cir. 2020) ("It is well established that a notice is judged by objective standards.") (citing cases); Dkt. 52 at 22-23 (Fund's concession in district court). So is the

unexplained, erroneous 'contingent' designation that resulted from it. Instead, what matters is that—as the Fund alleged and the Order found—Florida Glass *had in fact withdrawn* from the Fund in 2015, JA018 ¶ 23; JA158, triggering the Fund's statutory obligation to provide notice/demand "[a]s soon as practicable," 29 U.S.C. § 1399(b)(1).

Anyone reviewing the proof of claim could thus easily have concluded that the *existence* of liability was not contingent—again, anyone who reviewed the bankruptcy docket would have known it was not—and that the passing mention of contingency referred instead to something else, such as the amount owed, which could change if (among other possibilities) another member of the control group made a payment. The vague, unexplained, and offhand reference to contingency would not have made clear to anyone—and *did not* make clear to the trustee, JA112-113—what the Fund now claims, which is that due to the Fund's own lawyers' lack of diligence, what appeared on its face to be a demand for payment was in fact something else. And the Order's suggestion that the Fund's claim was eventually paid because "because of a failure [on the Trustee's part] to recognize the unspecified contingency or to investigate whether the contingency had been satisfied," JA163, reflects a categorical failure to understand what really happened, which is that—as is now undisputed—there was never any contingency in the first place.

**B.    The Proof Of Claim Demanded The Full Amount Owed, As A Matter Of Law And Undisputed Fact.**

As the Seventh Circuit has held, "when [an] employer repudiate[s] its withdrawal liability by ceasing operations and filing for bankruptcy," a claim "accrue[s] for purposes of the statute of limitations" upon any subsequent demand for payment, and any suit brought more than six years thereafter is "barred." *Truck Drivers*, 525 F.3d at 602 (citing *Basic American*, 252 F.3d at 915-18). That principle applies with full force here. The Fund was "free to sue for anticipatory repudiation" as soon as (i) Florida Glass "disabled itself," via its bankruptcy filing, from paying the full amount of its withdrawal liability; and (ii) the Fund triggered that liability by filing its notice/demand. *Basic American*, 252 F.3d at 918-19. At that point, there was no possibility of scheduled installment payments, which are fundamentally incompatible with bankruptcy, as evidenced by the lump-sum payout the Fund ultimately received. *Id.* (explaining that a bankrupt debtor "[can]not make . . . installment payments without violating the absolute priority rule of 11 U.S.C. § 1129(b)"). Thus, any demand for payment was necessarily a demand for the full amount owed.

The Fund's only response below was to deride *Basic American* as "irreconcilable with *Bay Area Laundry*." Dkt. 52 at 17. But *Basic American* was issued four years *after Bay Area Laundry* and fully accounts for it. As *Basic American* explains, *Bay Area Laundry* "did not in[volve] bankruptcy." 252 F.3d at

27

915. And while it is of course true that (as *Bay Area Laundry* holds) a fund may generally choose between installment payments and acceleration, the bankruptcy context makes such a choice impossible. As explained, the bankruptcy code simply forecloses any installment payment plan. To the extent that presents a conflict between ERISA and the bankruptcy law, ERISA itself makes clear that bankruptcy law prevails. *See* 29 U.S.C. § 1144(d).

In concluding that the proof of claim did not trigger the limitations period, JA163-164, the Order asks the wrong questions and reaches the wrong answers. It is irrelevant, for instance, that the proof of claim "attached a 19-month payment schedule." JA163. As *Basic American* explains, the MPPAA *requires* a fund "to formulate an installment plan" and provide it to the employer *whether or not* it is accelerating. *Basic American*, 252 F.3d at 918. Moreover, as noted, the schedule the Fund attached here refutes any notion that installment payments were contemplated, not only for the as-a-matter-of-law reasons already stated, but also because the amount of the Fund's proof of claim matched only the schedule's "immediate payment" amount—*i.e.*, the *accelerated* payment amount—not any one of the installments, and not the total amount that would have been owed under the installment plan. Indeed, as the Fund itself has admitted, the schedule did not even list a due date for the first installment payment, Dkt. 52 at 10; the only payment demanded was the "immediate" one.

28

Also irrelevant, according to both common sense and established precedent, are the Fund's various claims about its subjective intentions, none of which were known to anyone but the Fund and its lawyers. For instance, the Fund and the Order made much of the Fund's claim that it failed to follow its own "Rules and Regulations" for accelerating and/or did not authorize its lawyers to do so. JA163. But if the proof of claim *purported* to demand full payment—which it did—such internal issues are obviously beside the point. *E.g.*, *Cooper/Ports*, 959 F.3d at 1379.

In concluding otherwise, the Order misconstrues *Bay Area Laundry*'s offhand statement that an employer need make only monthly payments unless "the plan *properly* exercises the acceleration option." JA163 (quoting 522 U.S. at 202) (emphasis added). To begin, any contention that the acceleration was *improper* was at most an arbitrable issue lost years ago by the failure to arbitrate it. And in all events, post-*Bay Area Laundry* authority confirms that the question whether a fund has "*effectively* exercised its right to accelerate" is entirely separate from, and "not relevant" to, the distinct question of "at what point in time a claim for withdrawal liability first accrued *for purposes of the statute of limitations*." *Truck Drivers*, 525 F.3d at 602 (emphasis added). A claim can accrue for limitations purposes without becoming a slam dunk, and if the Fund's lawyers jumped the gun in demanding

full payment before the Fund wanted them to or approved doing so, that is between the Fund and its lawyers.

In all events, the proof of claim constitutes an acceleration on its face. The Fund has never disputed that when Florida Glass filed for bankruptcy, the Fund (at minimum) became *entitled* to accelerate. *See supra* at 7; Dkt. 48-1 at 27-34; Dkt. 52 at 14-18. Once that entitlement arose, all acceleration required was that the Fund demand "immediate payment of the outstanding amount of . . . withdrawal liability." 29 U.S.C. § 1399(c)(5). That is precisely what the proof of claim did. It listed an "immediate payment" amount and a (greater) monthly payment amount, and it claimed only the immediate payment amount. JA100; JA102. It also provided a monthly payment schedule, but its claim was for only the immediate payment amount, and it did not even list a due date for any monthly payments. It stated that it was a "current creditor" with respect to the entire amount of the claim, and directed that all "notices and payments" should be sent to its lawyer. JA099. It asserted priority for part of its claim, which it calculated based on a lump-sum payment, not based on any installments. JA100; JA102-103. And (as if that were not enough) it then accepted a distribution from the bankruptcy court that bore no relation to any installment obligation set forth in the schedule. JA050-051 ¶¶ 46, 48. As ample authority makes clear, filing a proof of claim is "tantamount to the filing of a complaint in a civil action" for the entire amount of the claim, *see In re*

*Simmons*, 765 F.2d 547, 552 (5th Cir. 1985); *Gibson v. Parish*, 360 F. App'x 974, 979 (10th Cir. 2010) (similar); *Nortex Trading Corp. v. Newfield*, 311 F.2d 163, 164 (2d Cir. 1962) (similar), which is itself "a sufficient affirmative action to exercise a payee's option to accelerate." *See Davis v. McLaughlin*, 816 F.2d 671, 1987 WL 36012, at *1 (4th Cir. 1987).[6] That is precisely what happened here.

The proof of claim thus triggered the statute. The Order's contrary conclusion was error.

## III. The Court Should Enter Final Judgment In American Products' Favor.

As noted, there was one additional issue disputed below but never reached by the district court: whether, *even if this lawsuit is time-barred*, the Fund is entitled to certain monetary relief under 29 U.S.C. § 1132(g)(2). That issue is easily resolvable and does not warrant a remand. Section 1132(g)(2) applies only to actions "in which a judgment *in favor of the plan* is awarded." (emphasis added). No such judgment can be entered if this suit is time-barred. Accordingly, if the Court concludes that the suit is time-barred, it should enter judgment in

---

[6] *See S & G Inv. Inc. v. Home Fed. Sav. & Loan Ass'n*, 505 F.2d 370, 381-82 (D.C. Cir. 1974) ("The commencement of an action for the principal sum is sufficient in itself to show that the holder exercised its option to accelerate the payment of the principal.") (citing cases); *see also 53rd St., LLC v. U.S. Bank Nat'l Ass'n*, 8 F.4th 74, 78 (2d Cir. 2021) (similar); *Sec. Mut. Life Ins. Co. of New York v. Contemporary Real Est. Assocs.*, 979 F.2d 329, 330 (3d Cir. 1992) (similar); *In re LHD Realty Corp.*, 726 F.2d 327, 331 (7th Cir. 1984) (similar).

American Products' favor and order a full refund of the amounts already paid, plus interest,[7] with no offset for any supposed section 1132(g)(2) amounts. At minimum, any remand to the district court should provide instructions for that court to enter such a judgment forthwith.

## CONCLUSION

American Products respectfully requests that the judgment be reversed and judgment entered in American Products' favor.

Respectfully submitted,

*/s/ Peter B. Siegal*

| | |
|---|---|
| JOSEPH E. SIMMONS | PETER B. SIEGAL |
| NORTON ROSE FULBRIGHT US LLP | GREGORY J. OSSI |
| 2200 Ross Avenue, Suite 3600 | NORTON ROSE FULBRIGHT US LLP |
| Dallas, TX 75201 | 799 9th Street, N.W., Suite 1000 |
| (214) 855-8000 | Washington, D.C. 20001 |
| | (202) 662-4663 |
| | peter.siegal@nortonrosefulbright.com |
| May 22, 2025 | *Counsel for Appellants* |

---

[7] Under the MPPAA, an employer must make withdrawal liability payments during the pendency of any dispute. The parties agree that pursuant to that obligation, and prior to entry of judgment, American Products paid $1,230,000 in withdrawal liability and interest, all of which will be due back to American Products if and when judgment is entered in American Products' favor. JA167; JA175.

## STATEMENT REGARDING ORAL ARGUMENT

American Products respectfully requests oral argument. This appeal presents important issues arising at the intersection of two notoriously complex areas of law—ERISA and the bankruptcy code—and the district court's decision departs from all prior on-point court of appeals precedent. Moreover, unless reversed, the decision on review would in practice invalidate a duly enacted federal statute. American Products respectfully submits that oral argument would assist the Court in considering the issues raised.

## CERTIFICATE OF COMPLIANCE

I certify that the foregoing document complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 7,545 words, excluding the items exempted by Fed. R. App. P. 32(f). This document complies with the typeface and type style requirements of Federal Rule of Appellate Procedure 32(a)(5) and (6) because it has been prepared in a proportionally spaced typeface using 14-point Times New Roman font.

May 22, 2025

/s/ Peter B. Siegal
Peter B. Siegal
NORTON ROSE FULBRIGHT US LLP
799 9th Street NW, Suite 1000
Washington, DC 20001
(202) 662-4663
peter.siegal@nortonrosefulbright.com

*Counsel for Appellants*

## ADDENDUM

**Statutes**                                                           **Page**

11 U.S.C. § 507 ....................................................................A2

11 U.S.C. § 1129 ................................................................A11

28 U.S.C. § 1291 ................................................................A21

29 U.S.C. § 1132 ................................................................A23

29 U.S.C. § 1144 ................................................................A31

29 U.S.C. § 1399 ................................................................A35

29 U.S.C. § 1401 ................................................................A38

29 U.S.C. § 1451 ................................................................A42


**Regulations**                                                        **Page**

49 Fed. Reg. 22642 (May 31, 1984) ...................................A44

cured claim to the extent of the value of his collateral; and he has an unsecured claim for the balance of his claim. The subsection also provides for the valuation of claims which involve setoffs under section 553. While courts will have to determine value on a case-by-case basis, the subsection makes it clear that valuation is to be determined in light of the purpose of the valuation and the proposed disposition or use of the subject property. This determination shall be made in conjunction with any hearing on such disposition or use of property or on a plan affecting the creditor's interest. To illustrate, a valuation early in the case in a proceeding under sections 361–363 would not be binding upon the debtor or creditor at the time of confirmation of the plan. Throughout the bill, references to secured claims are only to the claim determined to be secured under this subsection, and not to the full amount of the creditor's claim. This provision abolishes the use of the terms "secured creditor" and "unsecured creditor" and substitutes in their places the terms "secured claim" and "unsecured claim."

Subsection (b) codifies current law by entitling a creditor with an oversecured claim to any reasonable fees (including attorney's fees), costs, or charges provided under the agreement under which the claim arose. These fees, costs, and charges are secured claims to the extent that the value of the collateral exceeds the amount of the underlying claim.

Subsection (c) also codifies current law by permitting the trustee to recover from property the value of which is greater than the sum of the claims secured by a lien on that property the reasonable, necessary costs and expenses of preserving, or disposing of, the property. The recovery is limited to the extent of any benefit to the holder of such claim.

Subsection (d) provides that to the extent a secured claim is not allowed, its lien is void unless the holder had neither actual notice nor knowledge of the case, the lien was not listed by the debtor in a chapter 9 or 11 case or such claim was disallowed only under section 502(e).

HOUSE REPORT NO. 95–595

Subsection (d) permits liens to pass through the bankruptcy case unaffected. However, if a party in interest requests the court to determine and allow or disallow the claim secured by the lien under section 502 and the claim is not allowed, then the lien is void to the extent that the claim is not allowed. The voiding provision does not apply to claims disallowed only under section 502(e), which requires disallowance of certain claims against the debtor by a codebtor, surety, or guarantor for contribution or reimbursement.

### Editorial Notes

#### AMENDMENTS

2005—Subsec. (a). Pub. L. 109–8, § 327, designated existing provisions as par. (1) and added par. (2).

Subsec. (b). Pub. L. 109–8, § 712(d)(1), inserted "or State statute" after "agreement".

Subsec. (c). Pub. L. 109–8, § 712(d)(2), inserted ", including the payment of all ad valorem property taxes with respect to the property" before period at end.

1984—Subsec. (b). Pub. L. 98–353, § 448(a), inserted "for" after "provided".

Subsec. (d)(1). Pub. L. 98–353, § 448(b), substituted "such claim was disallowed only under section 502(b)(5) or 502(e) of this title" for "a party in interest has not requested that the court determine and allow or disallow such claim under section 502 of this title".

Subsec. (d)(2). Pub. L. 98–353, § 448(b), substituted "such claim is not an allowed secured claim due only to the failure of any entity to file a proof of such claim under section 501 of this title" for "such claim was disallowed only under section 502(e) of this title".

### Statutory Notes and Related Subsidiaries

#### EFFECTIVE DATE OF 2005 AMENDMENT

Amendment by Pub. L. 109–8 effective 180 days after Apr. 20, 2005, and not applicable with respect to cases commenced under this title before such effective date, except as otherwise provided, see section 1501 of Pub. L. 109–8, set out as a note under section 101 of this title.

#### EFFECTIVE DATE OF 1984 AMENDMENT

Amendment by Pub. L. 98–353 effective with respect to cases filed 90 days after July 10, 1984, see section 552(a) of Pub. L. 98–353, set out as a note under section 101 of this title.

## § 507. Priorities

(a) The following expenses and claims have priority in the following order:

(1) First:

(A) Allowed unsecured claims for domestic support obligations that, as of the date of the filing of the petition in a case under this title, are owed to or recoverable by a spouse, former spouse, or child of the debtor, or such child's parent, legal guardian, or responsible relative, without regard to whether the claim is filed by such person or is filed by a governmental unit on behalf of such person, on the condition that funds received under this paragraph by a governmental unit under this title after the date of the filing of the petition shall be applied and distributed in accordance with applicable nonbankruptcy law.

(B) Subject to claims under subparagraph (A), allowed unsecured claims for domestic support obligations that, as of the date of the filing of the petition, are assigned by a spouse, former spouse, child of the debtor, or such child's parent, legal guardian, or responsible relative to a governmental unit (unless such obligation is assigned voluntarily by the spouse, former spouse, child, parent, legal guardian, or responsible relative of the child for the purpose of collecting the debt) or are owed directly to or recoverable by a governmental unit under applicable nonbankruptcy law, on the condition that funds received under this paragraph by a governmental unit under this title after the date of the filing of the petition be applied and distributed in accordance with applicable nonbankruptcy law.

(C) If a trustee is appointed or elected under section 701, 702, 703, 1104, 1202, or 1302, the administrative expenses of the trustee allowed under paragraphs (1)(A), (2), and (6) of section 503(b) shall be paid before payment of claims under subparagraphs (A) and (B), to the extent that the trustee administers assets that are otherwise available for the payment of such claims.

(2) Second, administrative expenses allowed under section 503(b) of this title, unsecured claims of any Federal reserve bank related to loans made through programs or facilities authorized under section 13(3) of the Federal Reserve Act (12 U.S.C. 343),[1] and any fees and

---

[1] See References in Text note below.

charges assessed against the estate under chapter 123 of title 28.

(3) Third, unsecured claims allowed under section 502(f) of this title.

(4) Fourth, allowed unsecured claims, but only to the extent of $10,000[2] for each individual or corporation, as the case may be, earned within 180 days before the date of the filing of the petition or the date of the cessation of the debtor's business, whichever occurs first, for—

(A) wages, salaries, or commissions, including vacation, severance, and sick leave pay earned by an individual; or

(B) sales commissions earned by an individual or by a corporation with only 1 employee, acting as an independent contractor in the sale of goods or services for the debtor in the ordinary course of the debtor's business if, and only if, during the 12 months preceding that date, at least 75 percent of the amount that the individual or corporation earned by acting as an independent contractor in the sale of goods or services was earned from the debtor.

(5) Fifth, allowed unsecured claims for contributions to an employee benefit plan—

(A) arising from services rendered within 180 days before the date of the filing of the petition or the date of the cessation of the debtor's business, whichever occurs first; but only

(B) for each such plan, to the extent of—

(i) the number of employees covered by each such plan multiplied by $10,000;[2] less

(ii) the aggregate amount paid to such employees under paragraph (4) of this subsection, plus the aggregate amount paid by the estate on behalf of such employees to any other employee benefit plan.

(6) Sixth, allowed unsecured claims of persons—

(A) engaged in the production or raising of grain, as defined in section 557(b) of this title, against a debtor who owns or operates a grain storage facility, as defined in section 557(b) of this title, for grain or the proceeds of grain, or

(B) engaged as a United States fisherman against a debtor who has acquired fish or fish produce from a fisherman through a sale or conversion, and who is engaged in operating a fish produce storage or processing facility—

but only to the extent of $4,000[2] for each such individual.

(7) Seventh, allowed unsecured claims of individuals, to the extent of $1,800[2] for each such individual, arising from the deposit, before the commencement of the case, of money in connection with the purchase, lease, or rental of property, or the purchase of services, for the personal, family, or household use of such individuals, that were not delivered or provided.

(8) Eighth, allowed unsecured claims of governmental units, only to the extent that such claims are for—

(A) a tax on or measured by income or gross receipts for a taxable year ending on or before the date of the filing of the petition—

(i) for which a return, if required, is last due, including extensions, after three years before the date of the filing of the petition;

(ii) assessed within 240 days before the date of the filing of the petition, exclusive of—

(I) any time during which an offer in compromise with respect to that tax was pending or in effect during that 240-day period, plus 30 days; and

(II) any time during which a stay of proceedings against collections was in effect in a prior case under this title during that 240-day period, plus 90 days; or

(iii) other than a tax of a kind specified in section 523(a)(1)(B) or 523(a)(1)(C) of this title, not assessed before, but assessable, under applicable law or by agreement, after, the commencement of the case;

(B) a property tax incurred before the commencement of the case and last payable without penalty after one year before the date of the filing of the petition;

(C) a tax required to be collected or withheld and for which the debtor is liable in whatever capacity;

(D) an employment tax on a wage, salary, or commission of a kind specified in paragraph (4) of this subsection earned from the debtor before the date of the filing of the petition, whether or not actually paid before such date, for which a return is last due, under applicable law or under any extension, after three years before the date of the filing of the petition;

(E) an excise tax on—

(i) a transaction occurring before the date of the filing of the petition for which a return, if required, is last due, under applicable law or under any extension, after three years before the date of the filing of the petition; or

(ii) if a return is not required, a transaction occurring during the three years immediately preceding the date of the filing of the petition;

(F) a customs duty arising out of the importation of merchandise—

(i) entered for consumption within one year before the date of the filing of the petition;

(ii) covered by an entry liquidated or reliquidated within one year before the date of the filing of the petition; or

(iii) entered for consumption within four years before the date of the filing of the petition but unliquidated on such date, if the Secretary of the Treasury certifies that failure to liquidate such entry was due to an investigation pending on such date into assessment of antidumping or countervailing duties or fraud, or if information needed for the proper appraisement or classification of such merchandise was not available to the appropriate customs officer before such date; or

[2] See Adjustment of Dollar Amounts notes below.

(G) a penalty related to a claim of a kind specified in this paragraph and in compensation for actual pecuniary loss.

An otherwise applicable time period specified in this paragraph shall be suspended for any period during which a governmental unit is prohibited under applicable nonbankruptcy law from collecting a tax as a result of a request by the debtor for a hearing and an appeal of any collection action taken or proposed against the debtor, plus 90 days; plus any time during which the stay of proceedings was in effect in a prior case under this title or during which collection was precluded by the existence of 1 or more confirmed plans under this title, plus 90 days.

(9) Ninth, allowed unsecured claims based upon any commitment by the debtor to a Federal depository institutions regulatory agency (or predecessor to such agency) to maintain the capital of an insured depository institution.

(10) Tenth, allowed claims for death or personal injury resulting from the operation of a motor vehicle or vessel if such operation was unlawful because the debtor was intoxicated from using alcohol, a drug, or another substance.

(b) If the trustee, under section 362, 363, or 364 of this title, provides adequate protection of the interest of a holder of a claim secured by a lien on property of the debtor and if, notwithstanding such protection, such creditor has a claim allowable under subsection (a)(2) of this section arising from the stay of action against such property under section 362 of this title, from the use, sale, or lease of such property under section 363 of this title, or from the granting of a lien under section 364(d) of this title, then such creditor's claim under such subsection shall have priority over every other claim allowable under such subsection.

(c) For the purpose of subsection (a) of this section, a claim of a governmental unit arising from an erroneous refund or credit of a tax has the same priority as a claim for the tax to which such refund or credit relates.

(d) An entity that is subrogated to the rights of a holder of a claim of a kind specified in subsection (a)(1), (a)(4), (a)(5), (a)(6), (a)(7), (a)(8), or (a)(9) of this section is not subrogated to the right of the holder of such claim to priority under such subsection.

(Pub. L. 95–598, Nov. 6, 1978, 92 Stat. 2583; Pub. L. 98–353, title III, §§350, 449, July 10, 1984, 98 Stat. 358, 374; Pub. L. 101–647, title XXV, §2522(d), Nov. 29, 1990, 104 Stat. 4867; Pub. L. 103–394, title I, §108(c), title II, §207, title III, §304(c), title V, §501(b)(3), (d)(11), Oct. 22, 1994, 108 Stat. 4112, 4123, 4132, 4142, 4145; Pub. L. 109–8, title II, §§212, 223, title VII, §§705, 706, title XIV, §1401, title XV, §1502(a)(1), Apr. 20, 2005, 119 Stat. 51, 62, 126, 214, 216; Pub. L. 111–203, title XI, §1101(b), July 21, 2010, 124 Stat. 2115; Pub. L. 111–327, §2(a)(15), Dec. 22, 2010, 124 Stat. 3559; Pub. L. 116–260, div. FF, title X, §1001(i), Dec. 27, 2020, 134 Stat. 3221.)

HISTORICAL AND REVISION NOTES

LEGISLATIVE STATEMENTS

Section 507(a)(3) of the House amendment represents a compromise dollar amount and date for the priority between similar provisions contained in H.R. 8200 as passed by the House and the Senate amendments. A similar compromise is contained in section 507(a)(4).

Section 507(a)(5) represents a compromise on amount between the priority as contained in H.R. 8200 as passed by the House and the Senate amendment. The Senate provision for limiting the priority to consumers having less than a fixed gross income is deleted.

Section 507(a)(6) of the House amendment represents a compromise between similar provisions contained in H.R. 8200 as passed by the House and the Senate amendment.

Section 507(b) of the House amendment is new and is derived from the compromise contained in the House amendment with respect to adequate protection under section 361. Subsection (b) provides that to the extent adequate protection of the interest of a holder of a claim proves to be inadequate, then the creditor's claim is given priority over every other allowable claim entitled to distribution under section 507(a). Section 507(b) of the Senate amendment is deleted.

Section 507(c) of the House amendment is new. Section 507(d) of the House amendment prevents subrogation with respect to priority for certain priority claims. Subrogation with respect to priority is intended to be permitted for administrative claims and claims arising during the gap period.

Priorities: Under the House amendment, taxes receive priority as follows:

First. Administration expenses: The amendment generally follows the Senate amendment in providing expressly that taxes incurred during the administration of the estate share the first priority given to administrative expenses generally. Among the taxes which receives first priority, as defined in section 503, are the employees' and the employer's shares of employment taxes on wages earned and paid after the petition is filed. Section 503(b)(1) also includes in administration expenses a tax liability arising from an excessive allowance by a tax authority of a "quickie refund" to the estate. (In the case of Federal taxes, such refunds are allowed under special rules based on net operating loss carrybacks (sec. 6411 of the Internal Revenue Code [title 26]).

An exception is made to first priority treatment for taxes incurred by the estate with regard to the employer's share of employment taxes on wages earned from the debtor before the petition but paid from the estate after the petition has been filed. In this situation, the employer's tax receives either sixth priority or general claim treatment.

The House amendment also adopts the provisions of the Senate amendment which include in the definition of administrative expenses under section 503 any fine, penalty (including "additions to tax" under applicable tax laws) or reduction in credit imposed on the estate.

Second. "Involuntary gap" claims: "Involuntary gap" creditors are granted second priority by paragraph (2) of section 507(a). This priority includes tax claims arising in the ordinary course of the debtor's business or financial affairs after he has been placed involuntarily in bankruptcy but before a trustee is appointed or before the order for relief.

Third. Certain taxes on prepetition wages: Wage claims entitled to third priority are for compensation which does not exceed $2,000 and was earned during the 90 days before the filing of the bankruptcy petition or the cessation of the debtor's business. Certain employment taxes receive third priority in payment from the estate along with the payment of wages to which the taxes relate. In the case of wages earned before the filing of the petition, but paid by the trustee (rather than by the debtor) after the filing of the petition, claims or the employees' share of the employment taxes (withheld income taxes and the employees' share of the social security or railroad retirement tax) receive third priority to the extent the wage claims themselves are entitled to this priority.

In the case of wages earned from and paid by the debtor before the filing of the petition, the employer's

share of the employment taxes on these wages paid by the debtor receives sixth priority or, if not entitled to that priority, are treated only as general claims. Under the House amendment, the employer's share of employment taxes on wages earned by employees of the debtor, but paid by the trustee after the filing of the bankruptcy petition, will also receive sixth priority to the extent that claims for the wages receive third priority. To the extent the claims for wages do not receive third priority, but instead are treated only as general claims, claims for the employer's share of the employment taxes attributable to those wages will also be treated as general claims. In calculating the amounts payable as general wage claims, the trustee must pay the employer's share of employment taxes on such wages.

Sixth priority. The House amendment modifies the provisions of the House bill and Senate amendment in the case of sixth priority taxes. Under the amendment, the following Federal, State and local taxes are included in the sixth priority:

First. Income and gross receipts taxes incurred before the date of the petition for which the last due date of the return, including all extensions of time granted to file the return, occurred within 3 years before the date on which the petition was filed, or after the petition date. Under this rule, the due date of the return, rather than the date on which the taxes were assessed, determines the priority.

Second. Income and gross receipts taxes assessed at any time within 240 days before the petition date. Under this rule, the date on which the governmental unit assesses the tax, rather than the due date of the return, determines the priority.

If, following assessment of a tax, the debtor submits an offer in compromise to the governmental unit, the House amendment provides that the 240-day period is to be suspended for the duration of the offer and will resume running after the offer is withdrawn or rejected by the governmental unit, but the tax liability will receive priority if the title 11 petition is filed during the balance of the 240-day period or during a minimum of 30 days after the offer is withdrawn or rejected. This rule modifies a provision of the Senate amendment dealing specifically with offers in compromise. Under the modified rule, if, after the assessment, an offer in compromise is submitted by the debtor and is still pending (without having been accepted or rejected) at the date on which a title 11 petition is filed, the underlying liability will receive sixth priority. However, if an assessment of a tax liability is made but the tax is not collected within 240 days, the tax will not receive priority under section 507(a)(6)(A)(i) and the debtor cannot revive a priority for that tax by submitting an offer in compromise.

Third. Income and gross receipts taxes not assessed before the petition date but still permitted, under otherwise applicable tax laws, to be assessed. Thus, for example, a prepetition tax liability is to receive sixth priority under this rule if, under the applicable statute of limitations, the tax liability can still be assessed by the tax authority. This rule also covers situations referred to in section 507(a)(6)(B)(ii) of the Senate amendment where the assessment or collection of a tax was prohibited before the petition date pending exhaustion of judicial or administrative remedies, except that the House amendment eliminates the 300-day limitation of the Senate bill. So, for example, if before the petition a debtor was engaged in litigation in the Tax Court, during which the Internal Revenue Service from assessing or collecting the tax, and if the tax court decision is made in favor of the Service before the petition under title 11 is filed, thereby lifting the restrictions on assessment and collection, the tax liability will receive sixth priority even if the tax authority does not make an assessment within 300 days before the petition (provided, of course, that the statute of limitations on assessment has not expired by the petition date).

In light of the above categories of the sixth priority, and tax liability of the debtor (under the Internal Rev-

enue Code [title 26] or State or local law) as a transferee of property from another person will receive sixth priority without the limitations contained in the Senate amendment so long as the transferee liability had not been assessed by the tax authority by the petition date but could still have been assessed by that date under the applicable tax statute of limitations or, if the transferee liability had been assessed before the petition, the assessment was made no more than 240 days before the petition date.

Also in light of the above categories, the treatment of prepetition tax liabilities arising from an excessive allowance to the debtor of a tentative carryback adjustment, such as a ''quickie refund'' under section 6411 of the Internal Revenue Code [title 26] is revised as follows: If the tax authority has assessed the additional tax before the petition, the tax liability will receive priority if the date of assessment was within 240 days before the petition date. If the tax authority had not assessed the additional tax by the petition, the tax liability will still receive priority so long as, on the petition date, assessment of the liability is not barred by the statute of limitations.

Fourth. Any property tax assessed before the commencement of the case and last payable without penalty within 1 year before the petition, or thereafter.

Fifth. Taxes which the debtor was required by law to withhold or collect from others and for which he is liable in any capacity, regardless of the age of the tax claims. This category covers the so-called ''trust fund'' taxes, that is, income taxes which an employer is required to withhold from the pay of his employees, and the employees' share of social security taxes.

In addition, this category includes the liability of a responsible officer under the Internal Revenue Code (sec. 6672) [title 26] for income taxes or for the employees' share of social security taxes which that officer was responsible for withholding from the wages of employees and paying to the Treasury, although he was not himself the employer. This priority will operate when a person found to be a responsible officer has himself filed in title 11, and the priority will cover the debtor's responsible officer liability regardless of the age of the tax year to which the tax relates. The U.S. Supreme Court has interpreted present law to require the same result as will be reached under this rule. *U.S. v. Sotelo*, 436 U.S. 268 (1978) [98 S.Ct. 1795, 56 L.Ed.2d 275, rehearing denied 98 S.Ct. 3126, 438 U.S. 907, 57 L.Ed.2d 1150].

This category also includes the liability under section 3505 of the Internal Revenue Code [26 U.S.C. 3505] of a taxpayer who loans money for the payment of wages or other compensation.

Sixth. The employer's share of employment taxes on wages paid before the petition and on third-priority wages paid postpetition by the estate. The priority rules under the House amendment governing employment taxes can thus be summarized as follows: Claims for the employees' shares of employment taxes attributable to wages both earned and paid before the filing of the petition are to receive sixth priority. In the case of employee wages earned, but not paid, before the filing of the bankruptcy petition, claims for the employees' share of employment taxes receive third priority to the extent the wages themselves receive third priority. Claims which relate to wages earned before the petition, but not paid before the petition (and which are not entitled to the third priority under the rule set out above), will be paid as general claims. Since the related wages will receive no priority, the related employment taxes would also be paid as nonpriority general claims.

The employer's share of the employment taxes on wages earned and paid before the bankruptcy petition will receive sixth priority to the extent the return for these taxes was last due (including extensions of time) within 3 years before the filing of the petition, or was due after the petition was filed. Older tax claims of this nature will be payable as general claims. In the case of wages earned by employees before the petition, but ac-

tually paid by the trustee (as claims against the estate) after the title 11 case commenced, the employer's share of the employment taxes on third priority wages will be payable as sixth priority claims and the employer's taxes on prepetition wages which are treated only as general claims will be payable only as general claims. In calculating the amounts payable as general wage claims, the trustee must pay the employer's share of employment taxes on such wages. The House amendment thus deletes the provision of the Senate amendment that certain employer taxes receive third priority and are to be paid immediately after payment of first priority wages and the employees' shares of employment taxes on those wages.

In the case of employment taxes relating to wages earned and paid after the petition, both the employees' shares and the employer's share will receive first priority as administration expenses of the estate.

Seventh. Excise taxes on transactions for which a return, if required, is last due, under otherwise applicable law or under any extension of time to file the return, within 3 years before the petition was filed, or thereafter. If a return is not required with regard to a particular excise tax, priority is given if the transaction or event itself occurred within 3 years before the date on which the title 11 petition was filed. All Federal, State or local taxes generally considered or expressly treated as excises are covered by this category, including sales taxes, estate and gift taxes, gasoline and special fuel taxes, and wagering and truck taxes.

Eighth. Certain unpaid customs duties. The House amendment covers in this category duties on imports entered for consumption within 1 year before the filing of the petition, but which are still unliquidated on the petition date; duties covered by an entry liquidated or reliquidated within 1 year before the petition date; and any duty on merchandise entered for consumption within 4 years before the petition but not liquidated on the petition date, if the Secretary of the Treasury or his delegate certifies that duties were not liquidated because of possible assessment of antidumping or countervailing duties or fraud penalties.

For purposes of the above priority rules, the House amendment adopts the provision of the Senate bill that any tax liability which, under otherwise applicable tax law, is collectible in the form of a "penalty", is to be treated in the same manner as a tax liability. In bankruptcy terminology, such tax liabilities are referred to as pecuniary loss penalties. Thus, any tax liability which under the Internal Revenue Code [title 26] or State or local tax law is payable as a "penalty," in addition to the liability of a responsible person under section 6672 of the Internal Revenue Code [26 U.S.C. 6672] will be entitled to the priority which the liability would receive if it were expressly labeled as a "tax" under the applicable tax law. However, a tax penalty which is punitive in nature is given subordinated treatment under section 726(a)(4).

The House amendment also adopts the provision of the Senate amendment that a claim arising from an erroneous refund or credit of tax, other than a "quickie refund," is to receive the same priority as the tax to which the refund or credit relates.

The House amendment deletes the express provision of the Senate amendment that a tax liability is to receive sixth priority if it satisfies any one of the subparagraphs of section 507(a)(6) even if the liability fails to satisfy the terms of one or more other subparagraphs. No change of substance is intended by the deletion, however, in light of section 102(5) of the House amendment, providing a rule of construction that the word "or" is not intended to be exclusive.

The House amendment deletes from the express priority categories of the Senate amendment the priority for a debtor's liability as a third party for failing to surrender property or to pay an obligation in response to a levy for taxes of another, and the priority for amounts provided for under deferred payment agreements between a debtor and the tax authority.

The House amendment also adopts the substance of the definition in section 346(a) the Senate amendment

of when taxes are to be considered "incurred" except that the House amendment applies these definitions solely for purposes of determining which category of section 507 tests the priority of a particular tax liability. Thus, for example, the House amendment contains a special rule for the treatment of taxes under the 45-day exception to the preference rules under section 547 and the definitions of when a tax is incurred for priority purposes are not to apply to such preference rules. Under the House amendment, for purposes of the priority rules, a tax on income for a particular period is to be considered "incurred" on the last day of the period. A tax on or measured by some event, such as the payment of wages or a transfer by reason of death or gift, or an excise tax on a sale or other transaction, is to be considered "incurred" on the date of the transaction or event.

SENATE REPORT NO. 95–989

Section 507 specifies the kinds of claims that are entitled to priority in distribution, and the order of their priority. Paragraph (1) grants first priority to allowed administrative expenses and to fees and charges assessed against the estate under chapter 123 [§ 1911 et seq.] of title 28. Taxes included as administrative expenses under section 503(b)(1) of the bill generally receive the first priority, but the bill makes certain qualifications: Examples of these specially treated claims are the estate's liability for recapture of an investment tax credit claimed by the debtor before the title 11 case (this liability receives sixth priority) and the estate's employment tax liabilities on wages earned before, but paid after, the petition was filed (this liability generally receives the same priority as the wages).

"Involuntary gap" creditors, granted first priority under current law, are granted second priority by paragraph (2). This priority, covering claims arising in the ordinary course of the debtor's business or financial affairs after a title 11 case has begun but before a trustee is appointed or before the order for relief, includes taxes incurred during the conduct of such activities.

Paragraph (3) expands and increases the wage priority found in current section 64a(2) [section 104(a)(2) of former title 11]. The amount entitled to priority is raised from $600 to $1,800. The former figure was last adjusted in 1926. Inflation has made it nearly meaningless, and the bill brings it more than up to date. The three month limit of current law is retained, but is modified to run from the earlier of the date of the filing of the petition or the date of the cessation of the debtor's business. The priority is expanded to cover vacation, severance, and sick leave pay. The bill adds to the third priority so-called "trust fund" taxes, that is, withheld income taxes and the employees' share of the social security or railroad retirement taxes, but only to the extent that the wages on which taxes are imposed are themselves entitled to third priority.

The employer's share, the employment tax and the employer's share of the social security or railroad retirement tax on third priority compensation, is also included in the third priority category, but only if, and to the extent that the wages and related trust fund taxes have first been paid in full. Because of the claimants urgent need for their wages in the typical cases, the employer's taxes should not be paid before the wage claims entitled to priority, as well as the related trust fund taxes, are fully paid.

Paragraph (4) overrules *United States v. Embassy Restaurant*, 359 U.S. 29 (1958), which held that fringe benefits were not entitled to wage priority status. The bill recognizes the realities of labor contract negotiations, where fringe benefits may be substituted for wage demands. The priority granted is limited to claims for contributions to employee benefit plans such as pension plans, health or life insurance plans, and others, arising from services rendered within 120 days before the commencement of the case or the date of cessation of the debtor's business, whichever occurs first. The dollar limit placed on the total of all contributions payable under this paragraph is equal to the difference

between the maximum allowable priority under paragraph (3), $1,800, times the number of employees covered by the plan less the actual distributions under paragraph (3) with respect to these employees.

Paragraph (5) is a new priority for consumer creditors—those who have deposited money in connection with the purchase, lease, or rental of property, or the purchase of services, for their personal, family, or household use, that were not delivered or provided. The priority amount is not to exceed $600. In order to reach only those persons most deserving of this special priority, it is limited to individuals whose adjustable gross income from all sources derived does not exceed $20,000. See Senate Hearings, testimony of Prof. Vern Countryman, at pp. 848–849. The income of the husband and wife should be aggregated for the purposes of the $20,000 limit if either or both spouses assert such a priority claim.

The sixth priority is for certain taxes. Priority is given to income taxes for a taxable year that ended on or before the date of the filing of the petition, if the last due date of the return for such year occurred not more than 3 years immediately before the date on which the petition was filed (§507(a)(6)(A)(i)). For the purposes of this rule, the last due date of the return is the last date under any extension of time to file the return which the taxing authority may have granted the debtor.

Employment taxes and transfer taxes (including gift, estate, sales, use and other excise taxes) are also given sixth priority if the transaction or event which gave rise to the tax occurred before the petition date, provided that the required return or report of such tax liabilities was filed or was last due after the petition date (§507(a)(6)(A)(ii)). The employment taxes covered under this rule are the employer's share of the social security and railroad retirement taxes and required employer payments toward unemployment insurance.

Priority is given to income taxes and other taxes of a kind described in section 507(a)(6)(A)(i) and (ii) which the Federal, State, or local tax authority had assessed within 3 years after the last due date of the return, that is, including any extension of time to file the return, if the debtor filed in title 11 within 240 days after the assessment was made (§507(a)(6)(B)(i)). This rule may bring into the sixth priority the debtor's tax liability for some taxable years which would not qualify for priority under the general three-year rule of section 507(a)(6)(A).

The third priority category also includes taxes which the tax authority was barred by law from assessing or collecting at any time during the 300 days before the petition under title 11 was filed (§507(a)(6)(B)(ii)). In the case of certain Federal taxes, this preserves a priority for tax liabilities for years more than three years before the filing of the petition where the debtor and the Internal Revenue Service were negotiating over an audit of the debtor's returns or were engaged in litigation in the Tax Court. In such situations, the tax law prohibits the service's right to assess a tax deficiency until ninety days after the service sends the taxpayer a deficiency letter or, if the taxpayer files a petition in the Tax Court during that 90-day period, until the outcome of the litigation. A similar priority exists in present law, except that the taxing authority is allowed no time to assess and collect the taxes after the restrictions on assessment (discussed above) are lifted. Some taxpayers have exploited this loophole by filing in bankruptcy immediately after the end of the 90-day period or immediately after the close of Tax Court proceedings. The bill remedies this defect by preserving a priority for taxes the assessment of which was barred by law by giving the tax authority 300 days within which to make the assessment after the lifting of the bar and then to collect or file public notice of its tax lien. Thus, if a taxpayer files a title 11 petition at any time during that 300-day period, the tax deficiency will be entitled to priority. If the petition is filed more than 300 days after the restriction on assessment was lifted,

the taxing authority will not have priority for the tax deficiency.

Taxes for which an offer in compromise was withdrawn by the debtor, or rejected by a governmental unit, within 240 days before the petition date (§507(a)(6)(B)(iii)) will also receive sixth priority. This rule closes a loophole under present law under which, following an assessment of tax, some taxpayers have submitted a formal offer in compromise, dragged out negotiations with the taxing authority until the tax liability would lose priority under the three-year priority period of present law, and then filed in bankruptcy before the governmental unit could take collection steps.

Also included are certain taxes for which no return or report is required by law (§507(a)(6)(C)), if the taxable transaction occurred within three years before the petition was filed.

Taxes (not covered by the third priority) which the debtor was required by law to withhold or collect from others and for which he is liable in any capacity, regardless of the age of the tax claims (§507(a)(6)(D)) are included. This category covers the so-called "trust fund" taxes, that is, income taxes which an employer is required to withhold from the pay of his employees, the employees' shares of social security and railroad retirement taxes, and also Federal unemployment insurance. This category also includes excise taxes which a seller of goods or services is required to collect from a buyer and pay over to a taxing authority.

This category also covers the liability of a responsible corporate officer under the Internal Revenue Code [title 26] for income taxes or for the employees' share of employment taxes which, under the tax law, the employer was required to withhold from the wages of employees. This priority will operate where a person found to be a responsible officer has himself filed a petition under title 11, and the priority covers the debtor's liability as an officer under the Internal Revenue Code, regardless of the age of the tax year to which the tax relates.

The priority rules under the bill governing employment taxes can be summarized as follows: In the case of wages earned and actually paid before the petition under title 11 was filed, the liability for the employees' share of the employment taxes, regardless of the prepetition year in which the wages were earned and paid. The employer's share of the employment taxes on all wages earned and paid before the petition receive sixth priority; generally, these taxes will be those for which a return was due within three years before the petition. With respect to wages earned by employees before the petition but actually paid by the trustee after the title 11 case commenced, taxes required to be withheld receives the same priority as the wages themselves. Thus, the employees' share of taxes on third priority wages also receives third priority. Taxes on the balance of such wages receive no priority and are collectible only as general claims because the wages themselves are payable only as general claims and liability for the taxes arises only to the extent the wages are actually paid. The employer's share of employment taxes on third priority wages earned before the petition but paid after the petition was filed receives third priority, but only if the wages in this category have first been paid in full. Assuming there are sufficient funds to pay third priority wages and the related employer taxes in full, the employer's share of taxes on the balance of wage payments becomes a general claim (because the wages themselves are payable as general claims). Both the employees' and the employer's share of employment taxes on wages earned and paid after the petition was filed receive first priority as administrative expenses.

Also covered by this sixth priority are property taxes required to be assessed within 3 years before the filing of the petition (§507(a)(6)(E)).

Taxes attributable to a tentative carryback adjustment received by the debtor before the petition was filed, such as a "quickie refund" received under section

6411 of the Internal Revenue Code [title 26] (§ 507(a)(6)(F)) are included. However, the tax claim against the debtor will rein a prepetition loss year for which the tax return was last due, including extensions, within 3 years before the petition was filed.

Taxes resulting from a recapture, occasioned by a transfer during bankruptcy, of a tax credit or deduction taken during an earlier tax year (§ 507(a)(6)(G)) are included. A typical example occurs when there is a sale by the trustee of depreciable property during the case and depreciation deductions taken in prepetition years are subject to recapture under section 1250 of the Code [title 26].

Taxes owed by the debtor as a transferee of assets from another person who is liable for a tax, if the tax claim against the transferor would have received priority within 1 year before the date of the petition filed by the transferee (§ 507(a)(6)(H)), are included.

Also included are certain tax payments required to have been made during the 1 year immediately before the petition was filed, where the debtor had previously entered into a deferred payment agreement (including an offer in compromise) to pay an agreed liability in periodic installments but had become delinquent in one or more installments before the petition was filed (§ 507(a)(6)(I)). This priority covers all types of deferred or part payment agreements. The priority covers only installments which first became due during the 1 year before the petition but which remained unpaid at the date of the petition. The priority does not come into play, however, if before the case began or during the case, the debtor and the taxing authority agree to a further extension of time to pay the delinquent amounts.

Certain tax-related liabilities which are not true taxes or which are not collected by regular assessment procedures (§ 507(a)(6)(J)) are included. One type of liability covered in this category is the liability under section 3505 of the Internal Revenue Code [title 26] of a lender who pays wages directly to employees of another employer or who supplies funds to an employer for the payment of wages. Another is the liability under section 6332 of the Internal Revenue Code [title 26], of a person who fails to turn over money or property of the taxpayer in response to a levy. Since the taxing authority must collect such a liability from the third party by suit rather than normal assessment procedures, an extra year is added to the normal 3-year priority periods. If a suit was commenced by the taxing authority within the four-year period and before the petition was filed, the priority is also preserved, provided that the suit had not terminated more than 1 year before the date of the filing of the petition.

Also included are certain unpaid customs duties which have not grown unreasonably "stale" (§ 507(a)(6)(K)). These include duties on imports entered for consumption with 3 years before the filing of the petition if the duties are still unliquidated on the petition date. If an import entry has been liquidated (in general, liquidation is in an administrative determination of the value and tariff rate of the item) or reliquidated, within two years of the filing of the petition the customs liability is given priority. If the Secretary of the Treasury certifies that customs duties were not liquidated because of an investigation into possible assessment of antidumping or countervailing duties, or because of fraud penalties, duties not liquidated for this reason during the five years before the importer filed under title 11 also will receive priority.

Subsection (a) of this section also provides specifically that interest on sixth priority tax claims accrued before the filing of the petition is also entitled to sixth priority.

Subsection (f) of this section provides that any fine or penalty which represents compensation for actual pecuniary loss of a governmental unit, and which involves a tax liability entitled to sixth priority, is to receive the same priority.

Subsection (b) also provides that a claim arising from an erroneous refund or credit of tax is to be given the same priority as the tax to which the refund or credit relates.

## Editorial Notes

### References in Text

Section 13(3) of the Federal Reserve Act, referred to in subsec. (a)(2), is classified to section 343(3) of Title 12, Banks and Banking.

### Amendments

2020—Subsec. (d). Pub. L. 116–260, § 1001(i)(2), inserted ", (a)(8)" after "(a)(7)" and struck out "or subparagraphs (A) through (E) and (G) of subsection (a)(8)" after "(a)(9)" and "or subparagraph" after "such subsection".

Pub. L. 116–260, § 1001(i)(1), struck out ", (a)(8)" after "(a)(7)" and inserted "or subparagraphs (A) through (E) and (G) of subsection (a)(8)" after "(a)(9)" and "or subparagraph" after "such subsection".

2010—Subsec. (a)(2). Pub. L. 111–203 inserted "unsecured claims of any Federal reserve bank related to loans made through programs or facilities authorized under section 13(3) of the Federal Reserve Act (12 U.S.C. 343)," after "this title,".

Subsec. (a)(8)(A)(ii)(II). Pub. L. 111–327 substituted "; or" for period at end.

2005—Subsec. (a)(1). Pub. L. 109–8, § 212(9), added par. (1). Former par. (1) redesignated (2).

Subsec. (a)(2). Pub. L. 109–8, § 212(2), (3), redesignated par. (1) as (2) and substituted "Second" for "First". Former par. (2) redesignated (3).

Subsec. (a)(3). Pub. L. 109–8, § 212(2), (4), redesignated par. (2) as (3) and substituted "Third" for "Second". Former par. (3) redesignated (4).

Subsec. (a)(4). Pub. L. 109–8, § 1401, which directed amendment of par. (4), "as amended by section 212", by substituting "$10,000" for "$4,000" and "180" for "90" in introductory provisions, effective Apr. 20, 2005, was executed to this par., which was par. (3), to reflect the probable intent of Congress, notwithstanding that the redesignation of this par. as (4) by Pub. L. 109–8, § 212(2), was effective 180 days after Apr. 20, 2005. See Effective Date of 2005 Amendment notes below.

Pub. L. 109–8, § 212(2), (5), redesignated par. (3) as (4) and substituted "Fourth" for "Third" in introductory provisions and a period for semicolon at end. Former par. (4) redesignated (5).

Subsec. (a)(5). Pub. L. 109–8, § 212(2), (6), redesignated par. (4) as (5) and substituted "Fifth" for "Fourth" in introductory provisions. Former par. (5) redesignated (6).

Subsec. (a)(5)(B)(i). Pub. L. 109–8, § 1401(2), which directed amendment of par. (5), "as amended by section 212", by substituting "$10,000" for "$4,000", effective Apr. 20, 2005, was executed to this par., which was par. (4), to reflect the probable intent of Congress, notwithstanding that the redesignation of this par. as (5) by Pub. L. 109–8, § 212(2), was effective 180 days after Apr. 20, 2005. See Effective Date of 2005 Amendment notes below.

Subsec. (a)(5)(B)(ii). Pub. L. 109–8, § 1502(a)(1)(A)(i), substituted "paragraph (4)" for "paragraph (3)".

Subsec. (a)(6). Pub. L. 109–8, § 212(2), (7), redesignated par. (5) as (6) and substituted "Sixth" for "Fifth" in introductory provisions. Former par. (6) redesignated (7).

Subsec. (a)(7). Pub. L. 109–8, § 212(1), (2), (8), redesignated par. (6) as (7) and substituted "Seventh" for "Sixth", and struck out former par. (7) which read as follows: "Seventh, allowed claims for debts to a spouse, former spouse, or child of the debtor, for alimony to, maintenance for, or support of such spouse or child, in connection with a separation agreement, divorce decree or other order of a court of record, determination made in accordance with State or territorial law by a governmental unit, or property settlement agreement, but not to the extent that such debt—

"(A) is assigned to another entity, voluntarily, by operation of law, or otherwise; or

"(B) includes a liability designated as alimony, maintenance, or support, unless such liability is actually in the nature of alimony, maintenance or support."

Subsec. (a)(8). Pub. L. 109–8, § 705(2), inserted at end "An otherwise applicable time period specified in this paragraph shall be suspended for any period during which a governmental unit is prohibited under applicable nonbankruptcy law from collecting a tax as a result of a request by the debtor for a hearing and an appeal of any collection action taken or proposed against the debtor, plus 90 days; plus any time during which the stay of proceedings was in effect in a prior case under this title or during which collection was precluded by the existence of 1 or more confirmed plans under this title, plus 90 days."

Subsec. (a)(8)(A). Pub. L. 109–8, § 705(1)(A), inserted "for a taxable year ending on or before the date of the filing of the petition" after "gross receipts" in introductory provisions.

Subsec. (a)(8)(A)(i). Pub. L. 109–8, § 705(1)(B), struck out "for a taxable year ending on or before the date of the filing of the petition" before "for which a return".

Subsec. (a)(8)(A)(ii). Pub. L. 109–8, § 705(1)(C), added cl. (ii) and struck out former cl. (ii) which read as follows: "assessed within 240 days, plus any time plus 30 days during which an offer in compromise with respect to such tax that was made within 240 days after such assessment was pending, before the date of the filing of the petition; or".

Subsec. (a)(8)(B). Pub. L. 109–8, § 706, substituted "incurred" for "assessed".

Subsec. (a)(8)(D). Pub. L. 109–8, § 1502(a)(1)(A)(ii), substituted "paragraph (4)" for "paragraph (3)".

Subsec. (a)(10). Pub. L. 109–8, § 223, added par. (10).

Subsec. (b). Pub. L. 109–8, § 1502(a)(1)(B), substituted "subsection (a)(2)" for "subsection (a)(1)".

Subsec. (d). Pub. L. 109–8, § 1502(a)(1)(C), substituted "subsection (a)(1)" for "subsection (a)(3)".

1994—Subsec. (a)(3). Pub. L. 103–394, § 207, amended par. (3) generally. Prior to amendment, par. (3) read as follows: "Third, allowed unsecured claims for wages, salaries, or commissions, including vacation, severance, and sick leave pay—

"(A) earned by an individual within 90 days before the date of the filing of the petition or the date of the cessation of the debtor's business, whichever occurs first; but only

"(B) to the extent of $2,000 for each such individual."

Subsec. (a)(4)(B)(i). Pub. L. 103–394, § 108(c)(1), substituted "$4,000" for "$2,000".

Subsec. (a)(5). Pub. L. 103–394, §§ 108(c)(2), 501(b)(3), substituted "section 557(b)" for "section 557(b)(1)" after "grain, as defined in" and "section 557(b)" for "section 557(b)(2)" after "facility, as defined in" in subpar. (A) and "$4,000" for "$2,000" in concluding provisions.

Subsec. (a)(6). Pub. L. 103–394, § 108(c)(3), substituted "$1,800" for "$900".

Subsec. (a)(7). Pub. L. 103–394, § 304(c)(3), added par. (7). Former par. (7) redesignated (8).

Subsec. (a)(8). Pub. L. 103–394, § 304(c)(2), redesignated par. (7) as (8) and substituted "Eighth" for "Seventh". Former par. (8) redesignated (9).

Subsec. (a)(9). Pub. L. 103–394, §§ 304(c)(1), 501(d)(11)(A), redesignated par. (8) as (9) and substituted "Ninth" for "Eighth" and "a Federal depository institutions regulatory agency (or predecessor to such agency)" for "the Federal Deposit Insurance Corporation, the Resolution Trust Corporation, the Director of the Office of Thrift Supervision, the Comptroller of the Currency, or the Board of Governors of the Federal Reserve System, or their predecessors or successors,".

Subsec. (d). Pub. L. 103–394, § 501(d)(11)(B), substituted "(a)(6), (a)(7), (a)(8), or (a)(9)" for "or (a)(6)".

1990—Subsec. (a)(8). Pub. L. 101–647 added par. (8).

1984—Subsec. (a)(3). Pub. L. 98–353, § 449(a)(1), inserted a comma after "severance".

Subsec. (a)(4). Pub. L. 98–353, § 449(a)(2), substituted "an employee benefit plan" for "employee benefit plans" in provisions preceding subpar. (A).

Subsec. (a)(4)(B)(i). Pub. L. 98–353, § 449(a)(3), inserted "each" after "covered by".

Subsec. (a)(5). Pub. L. 98–353, § 350(3), added par. (5). Former par. (5) redesignated (6).

Subsec. (a)(6). Pub. L. 98–353, § 350(1), redesignated former par. (5) as (6) and substituted "Sixth" for "Fifth". Former par. (6) redesignated (7).

Subsec. (a)(7). Pub. L. 98–353, §§ 350(2), 449(a)(4), redesignated former par. (6) as (7), substituted "Seventh" for "Sixth", and inserted "only" after "units,".

Subsec. (c). Pub. L. 98–353, § 449(b), substituted "has the same priority" for "shall be treated the same".

## Statutory Notes and Related Subsidiaries

### Effective Date of 2020 Amendment

Pub. L. 116–260, div. FF, title X, § 1001(i)(2), Dec. 27, 2020, 134 Stat. 3221, provided that the amendment made by section 1001(i)(2) is effective on the date that is 1 year after Dec. 27, 2020.

### Effective Date of 2010 Amendment

Amendment by Pub. L. 111–203 effective 1 day after July 21, 2010, except as otherwise provided, see section 4 of Pub. L. 111–203, set out as an Effective Date note under section 5301 of Title 12, Banks and Banking.

### Effective Date of 2005 Amendment

Pub. L. 109–8, title XIV, § 1406, Apr. 20, 2005, 119 Stat. 215, as amended by Pub. L. 111–327, § 3, Dec. 22, 2010, 124 Stat. 3563, provided that:

"(a) EFFECTIVE DATE.—Except as provided in subsection (b), this title [amending this section and sections 523, 548, 1104, and 1114 of this title and enacting provisions set out as a note under section 523 of this title] and the amendments made by this title shall take effect on the date of the enactment of this Act [Apr. 20, 2005].

"(b) APPLICATION OF AMENDMENTS.—

"(1) IN GENERAL.—Except as provided in paragraph (2), the amendments made by this title shall apply only with respect to cases commenced under title 11 of the United States Code on or after the date of the enactment of this Act [Apr. 20, 2005].

"(2) AVOIDANCE PERIOD.—The amendment made by section 1402(1) [amending section 548 of this title] shall apply only with respect to cases commenced under title 11 of the United States Code more than 1 year after the date of the enactment of this Act."

Amendment by sections 212, 223, 705, 706, and 1502(a)(1) of Pub. L. 109–8 effective 180 days after Apr. 20, 2005, and not applicable with respect to cases commenced under this title before such effective date, except as otherwise provided, see section 1501 of Pub. L. 109–8, set out as a note under section 101 of this title.

### Effective Date of 1994 Amendment

Amendment by Pub. L. 103–394 effective Oct. 22, 1994, and not applicable with respect to cases commenced under this title before Oct. 22, 1994, see section 702 of Pub. L. 103–394, set out as a note under section 101 of this title.

### Effective Date of 1984 Amendment

Amendment by Pub. L. 98–353 effective with respect to cases filed 90 days after July 10, 1984, see section 552(a) of Pub. L. 98–353, set out as a note under section 101 of this title.

## Court Rules and Judicial Documents

### Adjustment of Dollar Amounts

The dollar amounts specified in this section were adjusted by notices of the Judicial Conference of the United States pursuant to section 104 of this title as follows:

By notice dated Jan. 31, 2022, 87 F.R. 6625, effective Apr. 1, 2022, in subsec. (a)(4), dollar amount "13,650" was

adjusted to "15,150"; in subsec. (a)(5)(B)(i), dollar amount "13,650" was adjusted to "15,150"; in subsec. (a)(6), dollar amount "6,725" was adjusted to "7,475"; and, in subsec. (a)(7), dollar amount "3,025" was adjusted to "3,350". See notice of the Judicial Conference of the United States set out as a note under section 104 of this title.

By notice dated Feb. 5, 2019, 84 F.R. 3488, effective Apr. 1, 2019, in subsec. (a)(4), dollar amount "12,850" was adjusted to "13,650"; in subsec. (a)(5)(B)(i), dollar amount "12,850" was adjusted to "13,650"; in subsec. (a)(6)(B) [sic], dollar amount "6,325" was adjusted to "6,725"; and, in subsec. (a)(7), dollar amount "2,850" was adjusted to "3,025".

By notice dated Feb. 16, 2016, 81 F.R. 8748, effective Apr. 1, 2016, in subsec. (a)(4), dollar amount "12,475" was adjusted to "12,850"; in subsec. (a)(5)(B)(i), dollar amount "12,475" was adjusted to "12,850"; in subsec. (a)(6)(B) [sic], dollar amount "6,150" was adjusted to "6,325"; and, in subsec. (a)(7), dollar amount "2,775" was adjusted to "2,850".

By notice dated Feb. 12, 2013, 78 F.R. 12089, effective Apr. 1, 2013, in subsec. (a)(4), dollar amount "11,725" was adjusted to "12,475"; in subsec. (a)(5), dollar amount "11,725" was adjusted to "12,475"; in subsec. (a)(6), dollar amount "5,775" was adjusted to "6,150"; and, in subsec. (a)(7), dollar amount "2,600" was adjusted to "2,775".

By notice dated Feb. 19, 2010, 75 F.R. 8747, effective Apr. 1, 2010, in subsec. (a)(4), dollar amount "10,950" was adjusted to "11,725"; in subsec. (a)(5), dollar amount "10,950" was adjusted to "11,725"; in subsec. (a)(6), dollar amount "5,400" was adjusted to "5,775"; and, in subsec. (a)(7), dollar amount "2,425" was adjusted to "2,600".

By notice dated Feb. 7, 2007, 72 F.R. 7082, effective Apr. 1, 2007, in subsec. (a)(4), dollar amount "10,000" was adjusted to "10,950"; in subsec. (a)(5), dollar amount "10,000" was adjusted to "10,950"; in subsec. (a)(6), dollar amount "4,925" was adjusted to "5,400"; and, in subsec. (a)(7), dollar amount "2,225" was adjusted to "2,425".

[Pub. L. 109–8 redesignated pars. (3) to (6) of subsec. (a) as pars. (4) to (7), respectively, and amended certain dollar amounts. See 2005 Amendment notes above.]

By notice dated Feb. 18, 2004, 69 F.R. 8482, effective Apr. 1, 2004, in subsec. (a)(3), dollar amount "4,650" was adjusted to "4,925"; in subsec. (a)(4)(B)(i), dollar amount "4,650" was adjusted to "4,925"; in subsec. (a)(5), dollar amount "4,650" was adjusted to "4,925"; and, in subsec. (a)(6), dollar amount "2,100" was adjusted to "2,225".

By notice dated Feb. 13, 2001, 66 F.R. 10910, effective Apr. 1, 2001, in subsec. (a)(3), dollar amount "4,300" was adjusted to "4,650"; in subsec. (a)(4)(B)(i), dollar amount "4,300" was adjusted to "4,650"; in subsec. (a)(5), dollar amount "4,300" was adjusted to "4,650"; and, in subsec. (a)(6), dollar amount "1,950" was adjusted to "2,100".

By notice dated Feb. 3, 1998, 63 F.R. 7179, effective Apr. 1, 1998, in subsec. (a)(3), dollar amount "4,000" was adjusted to "4,300"; in subsec. (a)(4)(B)(i), dollar amount "4,000" was adjusted to "4,300"; in subsec. (a)(5), dollar amount "4,000" was adjusted to "4,300"; and, in subsec. (a)(6), dollar amount "1,800" was adjusted to "1,950".

## § 508. Effect of distribution other than under this title

If a creditor of a partnership debtor receives, from a general partner that is not a debtor in a case under chapter 7 of this title, payment of, or a transfer of property on account of, a claim that is allowed under this title and that is not secured by a lien on property of such partner, such creditor may not receive any payment under this title on account of such claim until each of the other holders of claims on account of

which such holders are entitled to share equally with such creditor under this title has received payment under this title equal in value to the consideration received by such creditor from such general partner.

(Pub. L. 95–598, Nov. 6, 1978, 92 Stat. 2585; Pub. L. 109–8, title VIII, §802(d)(7), Apr. 20, 2005, 119 Stat. 146.)

### Historical and Revision Notes

#### legislative statements

Section 508(b) of the House amendment is new and provides an identical rule with respect to a creditor of a partnership who receives payment from a partner, to that of a creditor of a debtor who receives a payment in a foreign proceeding involving the debtor.

#### senate report no. 95–989

This section prohibits a creditor from receiving any distribution in the bankruptcy case if he has received payment of a portion of his claim in a foreign proceeding, until the other creditors in the bankruptcy case in this country that are entitled to share equally with that creditor have received as much as he has in the foreign proceeding.

### Editorial Notes

#### Amendments

2005—Pub. L. 109–8 designated subsec. (b) as entire section and struck out subsec. (a) which read as follows: "If a creditor receives, in a foreign proceeding, payment of, or a transfer of property on account of, a claim that is allowed under this title, such creditor may not receive any payment under this title on account of such claim until each of the other holders of claims on account of which such holders are entitled to share equally with such creditor under this title has received payment under this title equal in value to the consideration received by such creditor in such foreign proceeding."

### Statutory Notes and Related Subsidiaries

#### Effective Date of 2005 Amendment

Amendment by Pub. L. 109–8 effective 180 days after Apr. 20, 2005, and not applicable with respect to cases commenced under this title before such effective date, except as otherwise provided, see section 1501 of Pub. L. 109–8, set out as a note under section 101 of this title.

## § 509. Claims of codebtors

(a) Except as provided in subsection (b) or (c) of this section, an entity that is liable with the debtor on, or that has secured, a claim of a creditor against the debtor, and that pays such claim, is subrogated to the rights of such creditor to the extent of such payment.

(b) Such entity is not subrogated to the rights of such creditor to the extent that—

(1) a claim of such entity for reimbursement or contribution on account of such payment of such creditor's claim is—

(A) allowed under section 502 of this title;

(B) disallowed other than under section 502(e) of this title; or

(C) subordinated under section 510 of this title; or

(2) as between the debtor and such entity, such entity received the consideration for the claim held by such creditor.

(c) The court shall subordinate to the claim of a creditor and for the benefit of such creditor an

USCA4 Appeal: 25-1312    Doc: 26    Filed: 05/22/2025    Pg: 52 of 91

Effective Date of 1984 Amendment

Amendment by Pub. L. 98–353 effective with respect to cases filed 90 days after July 10, 1984, see section 552(a) of Pub. L. 98–353, set out as a note under section 101 of this title.

## § 1128. Confirmation hearing

(a) After notice, the court shall hold a hearing on confirmation of a plan.

(b) A party in interest may object to confirmation of a plan.

(Pub. L. 95–598, Nov. 6, 1978, 92 Stat. 2635.)

Historical and Revision Notes

Senate Report No. 95–989

[Section 1129 (enacted as section 1128)] Subsection (a) requires that there be a hearing in every case on the confirmation of the plan. Notice is required.

Subsection (b) permits any party in interest to object to the confirmation of the plan. The Securities and Exchange Commission and indenture trustees, as parties in interest under section 1109, may object to confirmation of the plan.

## § 1129. Confirmation of plan

(a) The court shall confirm a plan only if all of the following requirements are met:

(1) The plan complies with the applicable provisions of this title.

(2) The proponent of the plan complies with the applicable provisions of this title.

(3) The plan has been proposed in good faith and not by any means forbidden by law.

(4) Any payment made or to be made by the proponent, by the debtor, or by a person issuing securities or acquiring property under the plan, for services or for costs and expenses in or in connection with the case, or in connection with the plan and incident to the case, has been approved by, or is subject to the approval of, the court as reasonable.

(5)(A)(i) The proponent of the plan has disclosed the identity and affiliations of any individual proposed to serve, after confirmation of the plan, as a director, officer, or voting trustee of the debtor, an affiliate of the debtor participating in a joint plan with the debtor, or a successor to the debtor under the plan; and

(ii) the appointment to, or continuance in, such office of such individual, is consistent with the interests of creditors and equity security holders and with public policy; and

(B) the proponent of the plan has disclosed the identity of any insider that will be employed or retained by the reorganized debtor, and the nature of any compensation for such insider.

(6) Any governmental regulatory commission with jurisdiction, after confirmation of the plan, over the rates of the debtor has approved any rate change provided for in the plan, or such rate change is expressly conditioned on such approval.

(7) With respect to each impaired class of claims or interests—

(A) each holder of a claim or interest of such class—

(i) has accepted the plan; or

(ii) will receive or retain under the plan on account of such claim or interest property of a value, as of the effective date of the plan, that is not less than the amount that such holder would so receive or retain if the debtor were liquidated under chapter 7 of this title on such date; or

(B) if section 1111(b)(2) of this title applies to the claims of such class, each holder of a claim of such class will receive or retain under the plan on account of such claim property of a value, as of the effective date of the plan, that is not less than the value of such holder's interest in the estate's interest in the property that secures such claims.

(8) With respect to each class of claims or interests—

(A) such class has accepted the plan; or

(B) such class is not impaired under the plan.

(9) Except to the extent that the holder of a particular claim has agreed to a different treatment of such claim, the plan provides that—

(A) with respect to a claim of a kind specified in section 507(a)(2) or 507(a)(3) of this title, on the effective date of the plan, the holder of such claim will receive on account of such claim cash equal to the allowed amount of such claim;

(B) with respect to a class of claims of a kind specified in section 507(a)(1), 507(a)(4), 507(a)(5), 507(a)(6), or 507(a)(7) of this title, each holder of a claim of such class will receive—

(i) if such class has accepted the plan, deferred cash payments of a value, as of the effective date of the plan, equal to the allowed amount of such claim; or

(ii) if such class has not accepted the plan, cash on the effective date of the plan equal to the allowed amount of such claim;

(C) with respect to a claim of a kind specified in section 507(a)(8) of this title, the holder of such claim will receive on account of such claim regular installment payments in cash—

(i) of a total value, as of the effective date of the plan, equal to the allowed amount of such claim;

(ii) over a period ending not later than 5 years after the date of the order for relief under section 301, 302, or 303; and

(iii) in a manner not less favorable than the most favored nonpriority unsecured claim provided for by the plan (other than cash payments made to a class of creditors under section 1122(b)); and

(D) with respect to a secured claim which would otherwise meet the description of an unsecured claim of a governmental unit under section 507(a)(8), but for the secured status of that claim, the holder of that claim will receive on account of that claim, cash payments, in the same manner and over the same period, as prescribed in subparagraph (C).

(10) If a class of claims is impaired under the plan, at least one class of claims that is impaired under the plan has accepted the plan,

determined without including any acceptance of the plan by any insider.

(11) Confirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan.

(12) All fees payable under section 1930 of title 28, as determined by the court at the hearing on confirmation of the plan, have been paid or the plan provides for the payment of all such fees on the effective date of the plan.

(13) The plan provides for the continuation after its effective date of payment of all retiree benefits, as that term is defined in section 1114 of this title, at the level established pursuant to subsection (e)(1)(B) or (g) of section 1114 of this title, at any time prior to confirmation of the plan, for the duration of the period the debtor has obligated itself to provide such benefits.

(14) If the debtor is required by a judicial or administrative order, or by statute, to pay a domestic support obligation, the debtor has paid all amounts payable under such order or such statute for such obligation that first become payable after the date of the filing of the petition.

(15) In a case in which the debtor is an individual and in which the holder of an allowed unsecured claim objects to the confirmation of the plan—

(A) the value, as of the effective date of the plan, of the property to be distributed under the plan on account of such claim is not less than the amount of such claim; or

(B) the value of the property to be distributed under the plan is not less than the projected disposable income of the debtor (as defined in section 1325(b)(2)) to be received during the 5-year period beginning on the date that the first payment is due under the plan, or during the period for which the plan provides payments, whichever is longer.

(16) All transfers of property under the plan shall be made in accordance with any applicable provisions of nonbankruptcy law that govern the transfer of property by a corporation or trust that is not a moneyed, business, or commercial corporation or trust.

(b)(1) Notwithstanding section 510(a) of this title, if all of the applicable requirements of subsection (a) of this section other than paragraph (8) are met with respect to a plan, the court, on request of the proponent of the plan, shall confirm the plan notwithstanding the requirements of such paragraph if the plan does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the plan.

(2) For the purpose of this subsection, the condition that a plan be fair and equitable with respect to a class includes the following requirements:

(A) With respect to a class of secured claims, the plan provides—

(i)(I) that the holders of such claims retain the liens securing such claims, whether the property subject to such liens is retained by the debtor or transferred to another entity, to the extent of the allowed amount of such claims; and

(II) that each holder of a claim of such class receive on account of such claim deferred cash payments totaling at least the allowed amount of such claim, of a value, as of the effective date of the plan, of at least the value of such holder's interest in the estate's interest in such property;

(ii) for the sale, subject to section 363(k) of this title, of any property that is subject to the liens securing such claims, free and clear of such liens, with such liens to attach to the proceeds of such sale, and the treatment of such liens on proceeds under clause (i) or (iii) of this subparagraph; or

(iii) for the realization by such holders of the indubitable equivalent of such claims.

(B) With respect to a class of unsecured claims—

(i) the plan provides that each holder of a claim of such class receive or retain on account of such claim property of a value, as of the effective date of the plan, equal to the allowed amount of such claim; or

(ii) the holder of any claim or interest that is junior to the claims of such class will not receive or retain under the plan on account of such junior claim or interest any property, except that in a case in which the debtor is an individual, the debtor may retain property included in the estate under section 1115, subject to the requirements of subsection (a)(14) of this section.

(C) With respect to a class of interests—

(i) the plan provides that each holder of an interest of such class receive or retain on account of such interest property of a value, as of the effective date of the plan, equal to the greatest of the allowed amount of any fixed liquidation preference to which such holder is entitled, any fixed redemption price to which such holder is entitled, or the value of such interest; or

(ii) the holder of any interest that is junior to the interests of such class will not receive or retain under the plan on account of such junior interest any property.

(c) Notwithstanding subsections (a) and (b) of this section and except as provided in section 1127(b) of this title, the court may confirm only one plan, unless the order of confirmation in the case has been revoked under section 1144 of this title. If the requirements of subsections (a) and (b) of this section are met with respect to more than one plan, the court shall consider the preferences of creditors and equity security holders in determining which plan to confirm.

(d) Notwithstanding any other provision of this section, on request of a party in interest that is a governmental unit, the court may not confirm a plan if the principal purpose of the plan is the avoidance of taxes or the avoidance of the application of section 5 of the Securities Act of 1933. In any hearing under this subsection, the governmental unit has the burden of proof on the issue of avoidance.

(e) In a small business case, the court shall confirm a plan that complies with the applicable

provisions of this title and that is filed in accordance with section 1121(e) not later than 45 days after the plan is filed unless the time for confirmation is extended in accordance with section 1121(e)(3).

(Pub. L. 95–598, Nov. 6, 1978, 92 Stat. 2635; Pub. L. 98–353, title III, §512, July 10, 1984, 98 Stat. 386; Pub. L. 99–554, title II, §§225, 283(v), Oct. 27, 1986, 100 Stat. 3102, 3118; Pub. L. 100–334, §2(b), June 16, 1988, 102 Stat. 613; Pub. L. 103–394, title III, §304(h)(7), title V, §501(d)(32), Oct. 22, 1994, 108 Stat. 4134, 4146; Pub. L. 109–8, title II, §213(1), title III, §321(c), title IV, §438, title VII, §710, title XII, §1221(b), title XV, §1502(a)(8), Apr. 20, 2005, 119 Stat. 52, 95, 113, 127, 196, 216; Pub. L. 111–327, §2(a)(35), Dec. 22, 2010, 124 Stat. 3561.)

HISTORICAL AND REVISION NOTES

LEGISLATIVE STATEMENTS

Section 1129 of the House amendment relates to confirmation of a plan in a case under chapter 11. Section 1129(a)(3) of the Senate amendment adopts the position taken in the Senate amendment and section 1129(a)(5) takes the position adopted in the House bill. Section 1129(a)(7) adopts the position taken in the House bill in order to insure that the dissenting members of an accepting class will receive at least what they would otherwise receive under the best interest of creditors test; it also requires that even the members of a class that has rejected the plan be protected by the best interest of creditors test for those rare cramdown cases where a class of creditors would receive more on liquidation than under reorganization of the debtor. Section 1129(a)(7)(C) is discussed in connection with section 1129(b) and section 1111(b). Section 1129(a)(8) of the House amendment adopts the provision taken in the House bill which permits confirmation of a plan as to a particular class without resort to the fair and equitable test if the class has accepted a plan or is unimpaired under the plan.

Section 1129(a)(9) represents a compromise between a similar provision contained in the House bill and the Senate amendment. Under subparagraph (A) claims entitled to priority under section 507(a)(1) or (2) are entitled to receive cash on the effective date of the plan equal to the amount of the claim. Under subparagraph (B) claims entitled to priority under section 507(a)(3), (4), or (5), are entitled to receive deferred cash payments of a present value as of the effective date of the plan equal to the amount of the claims if the class has accepted the plan or cash payments on the effective date of the plan otherwise. Tax claims entitled to priority under section 507(a)(6) of different governmental units may not be contained in one class although all claims of one such unit may be combined and such unit may be required to take deferred cash payments over a period not to exceed 6 years after the date of assessment of the tax with the present value equal to the amount of the claim.

Section 1129(a)(10) is derived from section 1130(a)(12) of the Senate amendment.

Section 1129(b) is new. Together with section 1111(b) and section 1129(a)(7)(C), this section provides when a plan may be confirmed, notwithstanding the failure of an impaired class to accept the plan under section 1129(a)(8). Before discussing section 1129(b) an understanding of section 1111(b) is necessary. Section 1111(b)(1), the general rule that a secured claim is to be treated as a recourse claim in chapter 11 whether or not the claim is nonrecourse by agreement or applicable law. This preferred status for a nonrecourse loan terminates if the property securing the loan is sold under section 363 or is to be sold under the plan.

The preferred status also terminates if the class of which the secured claim is a part elects application of section 1111(b)(2). Section 1111(b)(2) provides that an al-

lowed claim is a secured claim to the full extent the claim is allowed rather than to the extent of the collateral as under section 506(a). A class may elect application of paragraph (2) only if the security is not of inconsequential value and, if the creditor is a recourse creditor, the collateral is not sold under section 363 or to be sold under the plan. Sale of property under section 363 or under the plan is excluded from treatment under section 1111(b) because of the secured party's right to bid in the full amount of his allowed claim at any sale of collateral under section 363(k) of the House amendment.

As previously noted, section 1129(b) sets forth a standard by which a plan may be confirmed notwithstanding the failure of an impaired class to accept the plan.

Paragraph (1) makes clear that this alternative confirmation standard, referred to as "cram down," will be called into play only on the request of the proponent of the plan. Under this cramdown test, the court must confirm the plan if the plan does not discriminate unfairly, and is "fair and equitable," with respect to each class of claims or interests that is impaired under, and has not accepted, the plan. The requirement of the House bill that a plan not "discriminate unfairly" with respect to a class is included for clarity; the language in the House report interpreting that requirement, in the context of subordinated debentures, applies equally under the requirements of section 1129(b)(1) of the House amendment.

Although many of the factors interpreting "fair and equitable" are specified in paragraph (2), others, which were explicated in the description of section 1129(b) in the House report, were omitted from the House amendment to avoid statutory complexity and because they would undoubtedly be found by a court to be fundamental to "fair and equitable" treatment of a dissenting class. For example, a dissenting class should be assured that no senior class receives more than 100 percent of the amount of its claims. While that requirement was explicitly included in the House bill, the deletion is intended to be one of style and not one of substance.

Paragraph (2) provides guidelines for a court to determine whether a plan is fair and equitable with respect to a dissenting class. It must be emphasized that the fair and equitable requirement applies only with respect to dissenting classes. Therefore, unlike the fair and equitable rule contained in chapter X [chapter 10 of former title 11] and section 77 of the Bankruptcy Act [section 205 of former title 11] under section 1129(b)(2), senior accepting classes are permitted to give up value to junior classes as long as no dissenting intervening class receives less than the amount of its claims in full. If there is no dissenting intervening class and the only dissent is from a class junior to the class to which value have been given up, then the plan may still be fair and equitable with respect to the dissenting class, as long as no class senior to the dissenting class has received more than 100 percent of the amount of its claims.

Paragraph (2) contains three subparagraphs, each of which applies to a particular kind of class of claims or interests that is impaired and has not accepted the plan. Subparagraph (A) applies when a class of secured claims is impaired and has not accepted the plan. The provision applies whether or not section 1111(b) applies. The plan may be crammed down notwithstanding the dissent of a secured class only if the plan complies with clause (i), (ii), or (iii).

Clause (i) permits cramdown if the dissenting class of secured claims will retain its lien on the property whether the property is retained by the debtor or transferred. It should be noted that the lien secures the allowed secured claim held by such holder. The meaning of "allowed secured claim" will vary depending on whether section 1111(b)(2) applies to such class.

If section 1111(b)(2) applies then the "electing" class is entitled to have the entire allowed amount of the debt related to such property secured by a lien even if

the value of the collateral is less than the amount of the debt. In addition, the plan must provide for the holder to receive, on account of the allowed secured claims, payments, either present or deferred, of a principal face amount equal to the amount of the debt and of a present value equal to the value of the collateral.

For example, if a creditor loaned $15,000,000 to a debtor secured by real property worth $18,000,000 and the value of the real property had dropped to $12,000,000 by the date when the debtor commenced a proceeding under chapter 11, the plan could be confirmed notwithstanding the dissent of the creditor as long as the lien remains on the collateral to secure a $15,000,000 debt, the face amount of present or extended payments to be made to the creditor under the plan is at least $15,000,000, and the present value of the present or deferred payments is not less than $12,000,000. The House report accompanying the House bill described what is meant by ''present value''.

Clause (ii) is self explanatory. Clause (iii) requires the court to confirm the plan notwithstanding the dissent of the electing secured class if the plan provides for the realization by the secured class of the indubitable equivalents of the secured claims. The standard of ''indubitable equivalents'' is taken from *In re Murel Holding Corp.*, 75 F.2d 941 (2d Cir. 1935) (Learned Hand, Jr.).

Abandonment of the collateral to the creditor would clearly satisfy indubitable equivalence, as would a lien on similar collateral. However, present cash payments less than the secured claim would not satisfy the standard because the creditor is deprived of an opportunity to gain from a future increase in value of the collateral. Unsecured notes as to the secured claim or equity securities of the debtor would not be the indubitable equivalent. With respect to an oversecured creditor, the secured claim will never exceed the allowed claim.

Although the same language applies, a different result pertains with respect to a class of secured claims to which section 1111(b)(2) does not apply. This will apply to all claims secured by a right of setoff. The court must confirm the plan notwithstanding the dissent of such a class of secured claims if any of three alternative requirements is met. Under clause (i) the plan may be confirmed if the class retains a right of setoff or a lien securing the allowed secured claims of the class and the holders will receive payments of a present value equal to the allowed amount of their secured claims. Contrary to electing classes of secured creditors who retain a lien under subparagraph (A)(i)(I) to the extent of the entire claims secured by such lien, nonelecting creditors retain a lien on collateral only to the extent of their allowed secured claims and not to the extent of any deficiency, and such secured creditors must receive present or deferred payments with a present value equal to the allowed secured claim, which in turn is only the equivalent of the value of the collateral under section 506(a).

Any deficiency claim of a nonelecting class of secured claims is treated as an unsecured claim and is not provided for under subparagraph (A). The plan may be confirmed under clause (ii) if the plan proposes to sell the property free and clear of the secured party's lien as long as the lien will attach to the proceeds and will receive treatment under clause (i) or (iii). Clause (iii) permits confirmation if the plan provides for the realization by the dissenting nonelecting class of secured claims of the indubitable equivalent of the secured claims of such class.

Contrary to an ''electing'' class to which section 1111(b)(2) applies, the nonelecting class need not be protected with respect to any future appreciation in value of the collateral since the secured claim of such a class is never undersecured by reason of section 506(a). Thus the lien secures only the value of interest of such creditor in the collateral. To the extent deferred payments exceed that amount, they represent interest. In the event of a subsequent default, the portion of the face amount of deferred payments representing unaccrued interest will not be secured by the lien.

Subparagraph (B) applies to a dissenting class of unsecured claims. The court must confirm the plan notwithstanding the dissent of a class of impaired unsecured claims if the plan provides for such claims to receive property with a present value equal to the allowed amount of the claims. Unsecured claims may receive any kind of ''property,'' which is used in its broadest sense, as long as the present value of the property given to the holders of unsecured claims is equal to the allowed amount of the claims. Some kinds of property, such as securities, may require difficult valuations by the court; in such circumstances the court need only determine that there is a reasonable likelihood that the property given the dissenting class of impaired unsecured claims equals the present value of such allowed claims.

Alternatively, under clause (ii), the court must confirm the plan if the plan provides that holders of any claims or interests junior to the interests of the dissenting class of impaired unsecured claims will not receive any property under the plan on account of such junior claims or interests. As long as senior creditors have not been paid more than in full, and classes of equal claims are being treated so that the dissenting class of impaired unsecured claims is not being discriminated against unfairly, the plan may be confirmed if the impaired class of unsecured claims receives less than 100 cents on the dollar (or nothing at all) as long as no class junior to the dissenting class receives anything at all. Such an impaired dissenting class may not prevent confirmation of a plan by objection merely because a senior class has elected to give up value to a junior class that is higher in priority than the impaired dissenting class of unsecured claims as long as the above safeguards are met.

Subparagraph (C) applies to a dissenting class of impaired interests. Such interests may include the interests of general or limited partners in a partnership, the interests of a sole proprietor in a proprietorship, or the interest of common or preferred stockholders in a corporation. If the holders of such interests are entitled to a fixed liquidation preference or fixed redemption price on account of such interests then the plan may be confirmed notwithstanding the dissent of such class of interests as long as it provides the holders property of a present value equal to the greatest of the fixed redemption price, or the value of such interests. In the event there is no fixed liquidation preference or redemption price, then the plan may be confirmed as long as it provides the holders of such interests property of a present value equal to the value of such interests. If the interests are ''under water'' then they will be valueless and the plan may be confirmed notwithstanding the dissent of that class of interests even if the plan provides that the holders of such interests will not receive any property on account of such interests.

Alternatively, under clause (ii), the court must confirm the plan notwithstanding the dissent of a class of interests if the plan provides that holders of any interests junior to the dissenting class of interests will not receive or retain any property on account of such junior interests. Clearly, if there are no junior interests junior to the class of dissenting interests, then the condition of clause (ii) is satisfied. The safeguards that no claim or interest receive more than 100 percent of the allowed amount of such claim or interest and that no class be discriminated against unfairly will insure that the plan is fair and equitable with respect to the dissenting class of interests.

Except to the extent of the treatment of secured claims under subparagraph (A) of this statement, the House report remains an accurate description of confirmation of section 1129(b). Contrary to the example contained in the Senate report, a senior class will not be able to give up value to a junior class over the dissent of an intervening class unless the intervening class receives the full amount, as opposed to value, of its claims or interests.

One last point deserves explanation with respect to the admittedly complex subject of confirmation. Sec-

tion 1129(a)(7)(C) in effect exempts secured creditors making an election under section 1111(b)(2) from application of the best interest of creditors test. In the absence of an election the amount such creditors receive in a plan of liquidation would be the value of their collateral plus any amount recovered on the deficiency in the case of a recourse loan. However, under section 1111(b)(2), the creditors are given an allowed secured claim to the full extent the claim is allowed and have no unsecured deficiency. Since section 1129(b)(2)(A) makes clear that an electing class need receive payments of a present value only equal to the value of the collateral, it is conceivable that under such a ''cram down'' the electing creditors would receive nothing with respect to their deficiency. The advantage to the electing creditors is that they have a lien securing the full amount of the allowed claim so that if the value of the collateral increases after the case is closed, the deferred payments will be secured claims. Thus it is both reasonable and necessary to exempt such electing class from application of section 1129(a)(7) as a logical consequence of permitting election under section 1111(b)(2).

Section 1131 of the Senate amendment is deleted as unnecessary in light of the protection given a secured creditor under section 1129(b) of the House amendment.

Payment of taxes in reorganizations: Under the provisions of section 1141 as revised by the House amendment, an individual in reorganization under chapter 11 will not be discharged from any debt, including prepetition tax liabilities, which are nondischargeable under section 523. Thus, an individual debtor whose plan of reorganization is confirmed under chapter 11 will remain liable for prepetition priority taxes, as defined in section 507, and for tax liabilities which receive no priority but are nondischargeable under section 523, including no return, late return, and fraud liabilities.

In the case of a partnership or a corporation in reorganization under chapter 11 of title 11, section 1141(d)(1) of the House amendment adopts a provision limiting the taxes that must be provided for in a plan before a plan can be confirmed to taxes which receive priority under section 507. In addition, the House amendment makes dischargeable, in effect, tax liabilities attributable to no return, late return, or fraud situations. The amendment thus does not adopt a shareholder continuity test such as was contained in section 1141(d)(2)(A)(iii) of the Senate amendment. However, the House amendment amends section 1106, relating to duties of the trustee, to require the trustee to furnish, on request of a tax authority and without personal liability, information available to the trustee concerning potential prepetition tax liabilities for unfiled returns of the debtor. Depending on the condition of the debtor's books and records, this information may include schedules and files available to the business. The House amendment also does not prohibit a tax authority from disallowing any tax benefit claimed after the reorganization if the item originated in a deduction, credit, or other item improperly reported before the reorganization occurred. It may also be appropriate for the Congress to consider in the future imposing civil or criminal liability on corporate officers for preparing a false or fraudulent tax return. The House amendment also contemplates that the Internal Revenue Service will monitor the relief from liabilities under this provision and advise the Congress if, and to the extent, any significant tax abuse may be resulting from the provision.

Medium of payment of taxes: Federal, State, and local taxes incurred during the administration period of the estate, and during the ''gap'' period in an involuntary case, are to be paid solely in cash. Taxes relating to third priority wages are to be paid, under the general rules, in cash on the effective date of the plan, if the class has not accepted the plan, in an amount equal to the allowed amount of the claim. If the class has accepted the plan, the taxes must be paid in cash but the payments must be made at the time the wages are paid which may be paid in deferred periodic installments having a value, on the effective date of the plan, equal to the allowed amount of the tax claims.

Prepetition taxes entitled to sixth priority under section 507(a)(6) also must be paid in cash, but the plan may also permit the debtor whether a corporation, partnership, or an individual, to pay the allowed taxes in installments over a period not to exceed 6 years following the date on which the tax authority assesses the tax liability, provided the value of the deferred payments representing principal and interest, as of the effective date of the plan, equals the allowed amount of the tax claim.

The House amendment also modifies the provisions of both bills dealing with the time when tax liabilities of a debtor in reorganization may be assessed by the tax authority. The House amendment follows the Senate amendment in deleting the limitation in present law under which a priority tax assessed after a reorganization plan is confirmed must be assessed within 1 year after the date of the filing of the petition. The House amendment specifies broadly that after the bankruptcy court determines the liability of the estate for a prepetition tax or for an administration period tax, the governmental unit may thereafter assess the tax against the estate, debtor, or successor to the debtor. The party to be assessed will, of course, depend on whether the case is under chapter 7, 11, or 13, whether the debtor is an individual, partnership, or a corporation, and whether the court is determining an individual debtor's personal liability for a nondischargeable tax. Assessment of the tax may only be made, however, within the limits of otherwise applicable law, such as the statute of limitations under the tax law.

Tax avoidance purpose: The House bill provided that no reorganization plan may be approved if the principal purpose of the plan is the avoidance of taxes. The Senate amendment modified the rule so that the bankruptcy court need make a determination of tax avoidance purpose only if it is asked to do so by the appropriate tax authority. Under the Senate amendment, if the tax authority does not request the bankruptcy court to rule on the purpose of the plan, the tax authority would not be barred from later asserting a tax avoidance motive with respect to allowance of a deduction or other tax benefit claimed after the reorganization. The House amendment adopts the substance of the Senate amendment, but does not provide a basis by which a tax authority may collaterally attack confirmation of a plan of reorganization other than under section 1144.

SENATE REPORT NO. 95–989

[Section 1130 (enacted as section 1129)] Subsection (a) enumerates the requirement governing confirmation of a plan. The court is required to confirm a plan if and only if all of the requirements are met.

Paragraph (1) requires that the plan comply with the applicable provisions of chapter 11, such as sections 1122 and 1123, governing classification and contents of plan.

Paragraph (2) requires that the proponent of the plan comply with the applicable provisions of chapter 11, such as section 1125 regarding disclosure.

Paragraph (3) requires that the plan have been proposed in good faith, and not by any means forbidden by law.

Paragraph (4) is derived from section 221 of chapter X [section 621 of former title 11]. It requires that any payment made or promised by the proponent, the debtor, or person issuing securities or acquiring property under the plan, for services or for costs and expenses in, or in connection with the case, or in connection with the plan and incident to the case, be disclosed to the court. In addition, any payment made before confirmation must have been reasonable, and any payment to be fixed after confirmation must be subject to the approval of the court as reasonable.

Paragraph (5) is also derived from section 221 of chapter X [section 621 of former title 11]. It requires the plan to disclose the identity and affiliations of any individual proposed to serve, after confirmation, as a director, officer, or voting trustee of the reorganized

debtor. The appointment to or continuance in one of these offices by the individual must be consistent with the interests of creditors and equity security holders and with public policy. The plan must also disclose the identity of any insider that will be employed or retained by the reorganized debtor, and the nature of any compensation to be paid to the insider.

Paragraph (6) permits confirmation only if any regulatory commission that will have jurisdiction over the debtor after confirmation of the plan has approved any rate change provided for in the plan. As an alternative, the rate change may be conditioned on such approval.

Paragraph (7) provides that in the case of a public company the court shall confirm the plan if it finds the plan to be fair and equitable and the plan either (1) has been accepted by classes of claims or interests as provided in section 1126, or (2), if not so accepted, satisfies the requirements of subsection (b) of this section.

Paragraphs (8) and (9) apply only in nonpublic cases. Paragraph (8) does not apply the fair and equitable standards in two situations. The first occurs if there is unanimous consent of all affected holders of claims and interests. It is also sufficient for purposes of confirmation if each holder of a claim or interest receives or retains consideration of a value, as of the effective date of the plan, that is not less than each would have or receive if the debtor were liquidated under chapter 7 of this title. This standard adapts the test of "best interest of creditors" as interpreted by the courts under chapter XI [chapter 11 of former title 11]. It is given broader application in chapter 11 of this title since a plan under chapter 11 may affect not only unsecured claims but secured claims and stock as well.

Under paragraph (9)(A), if a class of claims or interests has not accepted the plan, the court will confirm the plan if, for the dissenting class and any class of equal rank, the negotiated plan provides in value no less than under a plan that is fair and equitable. Such review and determination are not required for any other classes that accepted the plan.

Paragraph (9)(A) would permit a senior creditor to adjust his participation for the benefit of stockholders. In such a case, junior creditors, who have not been satisfied in full, may not object if, absent the "give-up," they are receiving all that a fair and equitable plan would give them. To illustrate, suppose the estate is valued at $1.5 million and claims and stock are:

| | Claims and stock (millions) | Equity (millions) |
|---|---|---|
| (1) Senior debt ............................... | $1.2 | $1.2 |
| (2) Junior debt ............................... | .5 | .3 |
| (3) Stock | (1) | — |
| Total | 1.7 | 1.5 |

[1] No value.

Under the plan, the senior creditor gives up $100,000 in value for the benefit of stockholders as follows:

| | Millions |
|---|---|
| (1) Senior debt ................................................ | $1.1 |
| (2) Junior debt ................................................ | .3 |
| (3) Stock ................................................ | .1 |
| Total ................................................ | 1.5 |

If the junior creditors dissent, the court may nevertheless confirm the plan since under the fair and equitable standard they had an equity of only $300,000 and the allocation to equity security holders did not affect them.

Paragraph (9)(A) provides a special alternative with respect to secured claims. A plan may be confirmed against a dissenting class of secured claims if the plan or order of confirmation provides for the realization of their security (1) by the retention of the property subject to such security; (2) by a sale of the property and transfer of the claim to the proceeds of sale if the secured creditors were permitted to bid at the sale and set off against the purchase price up to the allowed

amount of their claims; or (3) by such other method that will assure them the realization of the indubitable equivalent of the allowed amount of their secured claims. The indubitable equivalent language is intended to follow the strict approach taken by Judge Learned Hand in *In Re Murel Holding Corp.* 75, F.2d 941 (2nd Cir. 1935).

Paragraph (9)(B) provides that, if a class of claims or interests is excluded from participation under the plan, the court may nevertheless confirm the plan if it determines that no class on a parity with or junior to such participates under the plan. In the previous illustration, no confirmation would be permitted if the negotiated plan would grant a participation to stockholders but nothing for junior creditors. As noted elsewhere, by reason of section 1126(g), an excluded class is a dissenting class under section 1130.

Paragraph (10) states that, to be confirmed, the plan must provide that each holder of a claim under section 507 will receive property, as therein noted, of a value equal to the allowed amount of the claim. There are two exceptions: (A) The holder thereof may agree to a different settlement in part or in whole; (B) where a debtor's business is reorganized under chapter 11, this provision requires that taxes entitled to priority (including administrative claims or taxes) must be paid in cash not later than 120 days after the plan is confirmed, unless the Secretary of the Treasury agrees to other terms or kinds of payment. The bill, as introduced, required full payment in cash within 60 days after the plan is confirmed.

Paragraph (11) requires a determination regarding feasibility of the plan. It is a slight elaboration of the law that has developed in the application of the word "feasible" in Chapter X of the present Act [chapter 10 of former title 11].

Paragraph (12) requires that at least one class must accept the plan, but any claims or interests held by insiders are not to be included for purposes of determining the number and amount of acceptances.

Subsection (b) provides that if, in the case of a public company, the plan meets the requirements of subsection (a) (except paragraphs (8) and (9) which do not apply to such a company), the court is to confirm the plan if the plan or the order of confirmation provides adequate protection for the realization of the value of the claims or interests of each class not accepting the plan. The intent is to incorporate inclusively, as a guide to the meaning of subsection (a) the provisions of section 216(7) ([former] 11 U.S.C. 616(7)) with respect to claims and section 216(8) ([former] 11 U.S.C. 616(8)) with respect to equity security interests.

Under subsection (c) the court may confirm only one plan, unless the order of confirmation has been revoked under section 1144. If the requirements for confirmation are met with respect to more than one plan, the court shall consider the preferences of creditors and stockholders in deciding which plan to confirm.

Subsection (d) provides that the bankruptcy court may not confirm a plan of reorganization if its principal purpose is the avoidance of taxes or the avoidance of section 5 of the Securities Act of 1933 (15 U.S.C. 77e). This rules modifies a similar provision of present law (section 269 of the Bankruptcy Act [section 669 of former title 11]).

HOUSE REPORT NO. 95-595

Paragraph (7) [of subsec. (a)] incorporates the former "best interest of creditors" test found in chapter 11, but spells out precisely what is intended. With respect to each class, the holders of the claims or interests of that class must receive or retain under the plan on account of those claims or interest property of a value, as of the effective date of the plan, that is not less than the amount that they would so receive or retain if the debtor were liquidated under chapter 7 on the effective date of the plan.

In order to determine the hypothetical distribution in a liquidation, the court will have to consider the various subordination provisions of proposed 11 U.S.C.

510, 726(a)(3), 726(a)(4), and the postponement provisions of proposed 11 U.S.C. 724. Also applicable in appropriate cases will be the rules governing partnership distributions under proposed 11 U.S.C. 723, and distributions of community property under proposed 11 U.S.C. 726(c). Under subparagraph (A), a particular holder is permitted to accept less than liquidation value, but his acceptance does not bind the class.

Property under subparagraph (B) may include securities of the debtor. Thus, the provision will apply in cases in which the plan is confirmed under proposed 11 U.S.C. 1129(b).

Paragraph (8) is central to the confirmation standards. It requires that each class either have accepted the plan or be unimpaired.

Paragraph (9) augments the requirements of paragraph (8) by requiring payment of each priority claim in full. It permits payments over time and payment other than in cash, but payment in securities is not intended to be permitted without consent of the priority claimant even if the class has consented. It also permits a particular claimant to accept less than full payment.

Subsection (b) permits the court to confirm a plan notwithstanding failure of compliance with paragraph (8) of subsection (a). The plan must comply with all other paragraphs of subsection (a), including paragraph (9). This subsection contains the so-called cramdown. It requires simply that the plan meet certain standards of fairness to dissenting creditors or equity security holders. The general principle of the subsection permits confirmation notwithstanding nonacceptance by an impaired class if that class and all below it in priority are treated according to the absolute priority rule. The dissenting class must be paid in full before any junior class may share under the plan. If it is paid in full, then junior classes may share. Treatment of classes of secured creditors is slightly different because they do not fall in the priority ladder, but the principle is the same.

Specifically, the court may confirm a plan over the objection of a class of secured claims if the members of that class are unimpaired or if they are to receive under the plan property of a value equal to the allowed amount of their secured claims, as determined under proposed 11 U.S.C. 506(a). The property is to be valued as of the effective date of the plan, thus recognizing the time-value of money. As used throughout this subsection, "property" includes both tangible and intangible property, such as a security of the debtor or a successor to the debtor under a reorganization plan.

The court may confirm over the dissent of a class of unsecured claims, including priority claims, only if the members of the class are unimpaired, if they will receive under the plan property of a value equal to the allowed amount of their unsecured claims, or if no class junior will share under the plan. That is, if the class is impaired, then they must be paid in full or, if paid less than in full, then no class junior may receive anything under the plan. This codifies the absolute priority rule from the dissenting class on down.

With respect to classes of equity, the court may confirm over a dissent if the members of the class are unimpaired, if they receive their liquidation preference or redemption rights, if any, or if no class junior shares under the plan. This, too, is a codification of the absolute priority rule with respect to equity. If a partnership agreement subordinates limited partners to general partners to any degree, then the general principles of paragraph (3) of this subsection would apply to prevent the general partners from being squeezed out.

One requirement applies generally to all classes before the court may confirm under this subsection. No class may be paid more than in full.

The partial codification of the absolute priority rule here is not intended to deprive senior creditor of compensation for being required to take securities in the reorganized debtor that are of an equal priority with the securities offered to a junior class. Under current law, seniors are entitled to compensation for their loss of priority, and the increased risk put upon them by being required to give up their priority will be reflected in a lower value of the securities given to them than the value of comparable securities given to juniors that have not lost a priority position.

Finally, the proponent must request use of this subsection. The court may not confirm notwithstanding nonacceptance unless the proponent requests and the court may then confirm only if subsection (b) is complied with. The court may not rewrite the plan.

A more detailed explanation follows:

The test to be applied by the court is set forth in the various paragraphs of section 1129(b). The elements of the test are new[,] departing from both the absolute priority rule and the best interests of creditors tests found under the Bankruptcy Act [former title 11]. The court is not permitted to alter the terms of the plan. It must merely decide whether the plan complies with the requirements of section 1129(b). If so, the plan is confirmed, if not the plan is denied confirmation.

The procedure followed is simple. The court examines each class of claims or interests designated under section 1123(a)(1) to see if the requirements of section 1129(b) are met. If the class is a class of secured claims, then paragraph (1) contains two tests that must be complied with in order for confirmation to occur. First, under subparagraph (A), the court must be able to find that the consideration given under the plan on account of the secured claim does not exceed the allowed amount of the claim. This condition is not prescribed as a matter of law under section 1129(a), because if the secured claim is compensated in securities of the debtor, a valuation of the business would be necessary to determine the value of the consideration. While section 1129(a) does not contemplate a valuation of the debtor's business, such a valuation will almost always be required under section 1129(b) in order to determine the value of the consideration to be distributed under the plan. Once the valuation is performed, it becomes a simple matter to impose the criterion that no claim will be paid more than in full.

Application of the test under subparagraph (A) also requires a valuation of the consideration "as of the effective date of the plan". This contemplates a present value analysis that will discount value to be received in the future; of course, if the interest rate paid is equivalent to the discount rate used, the present value and face future value will be identical. On the other hand, if no interest is proposed to be paid, the present value will be less than the face future value. For example, consider an allowed secured claim of $1,000 in a class by itself. One plan could propose to pay $1,000 on account of this claim as of the effective date of the plan. Another plan could propose to give a note with a $1,000 face amount due five years after the effective date of the plan on account of this claim. A third plan could propose to give a note in a face amount of $1,000 due five years from the effective date of the plan plus six percent annual interest commencing on the effective date of the plan on account of this claim. The first plan clearly meets the requirements of subparagraph (A) because the amount received on account of the second claim has an equivalent present value as of the effective date of the plan equal to the allowed amount of such claim.

The second plan also meets the requirements of subparagraph (A) because the present value of the five years note as of the effective date of the plan will never exceed the allowed amount of the secured claim; the higher the discount rate, the less present value the note will have. Whether the third plan complies with subparagraph (A) depends on whether the discount rate is less than six percent. Normally, the interest rate used in the plan will be prima facie evidence of the discount rate because the interest rate will reflect an arms length determination of the risk of the security involved and feasibility considerations will tend to understate interest payments. If the court found the discount rate to be greater than or equal to the interest rate used in the plan, then subparagraph (A) would be complied with because the value of the note as of the

effective date of the plan would not exceed the allowed amount of the second claim. If, however, the court found the discount rate to be less than the interest rate proposed under the plan, then the present value of the note would exceed $1,000 and the plan would fail of confirmation. On the other hand, it is important to recognize that the future principal amount of a note in excess of the allowed amount of a secured claim may have a present value less than such allowed amount, if the interest rate under the plan is correspondingly less than the discount rate.

Even if the requirements of subparagraph (A) are complied with, the class of secured claims must satisfy one of the three classes in paragraph (B) in order to pass muster. It is sufficient for confirmation if the class has accepted the plan, or if the claims of the class are unimpaired, or if each holder of a secured claim in the class will receive property of a value as of the effective date of the plan equal to the allowed amount of such claim (unless he has agreed to accept less). It is important to note that under section 506(a), the allowed amount of the secured claim will not include any extent to which the amount of such claim exceeds the value of the property securing such claim. Thus, instead of focusing on secured creditors or unsecured creditors, the statute focuses on secured claims and unsecured claims.

After the court has applied paragraph (1) to each class of secured claims, it then applies paragraph (2) to each class of unsecured claims. Again two separate components must be tested. Subparagraph (A) is identical with the test under section 1129(b)(1)(A) insofar as the holder of an unsecured claim is not permitted to receive property of a value as of the effective date of the plan on account of such claim that is greater than the allowed amount of such claim. In addition, subparagraph (B) requires compliance with one of four conditions. The conditions in clauses (i)–(iii) mirror the conditions of acceptance unimpairment, or full value found in connection with secured claims in section 1129(b)(1)(B).

The condition contained in section 1129(b)(2)(B)(iv) provides another basis for confirming the plan with respect to a class of unsecured claims. It will be of greatest use when an impaired class that has not accepted the plan is to receive less than full value under the plan. The plan may be confirmed under clause (iv) in those circumstances if the class is not unfairly discriminated against with respect to equal classes and if junior classes will receive nothing under the plan. The second criterion is the easier to understand. It is designed to prevent a senior class from giving up consideration to a junior class unless every intermediate class consents, is paid in full, or is unimpaired. This gives intermediate creditors a great deal of leverage in negotiating with senior or secured creditors who wish to have a plan that gives value to equity. One aspect of this test that is not obvious is that whether one class is senior, equal, or junior to another class is relative and not absolute. Thus from the perspective of trade creditors holding unsecured claims, claims of senior and subordinated debentures may be entitled to share on an equal basis with the trade claims. However, from the perspective of the senior unsecured debt, the subordinated debentures are junior.

This point illustrates the lack of precision in the first criterion which demands that a class not be unfairly discriminated against with respect to equal classes. From the perspective of unsecured trade claims, there is no unfair discrimination as long as the total consideration given all other classes of equal rank does not exceed the amount that would result from an exact aliquot distribution. Thus if trade creditors, senior debt, and subordinate debt are each owed $100 and the plan proposes to pay the trade debt $15, the senior debt $30, and the junior debt $0, the plan would not unfairly discriminate against the trade debt nor would any other allocation of consideration under the plan between the senior and junior debt be unfair as to the trade debt as long as the aggregate consideration is less than $30.

The senior debt could take $25 and give up $5 to the junior debt and the trade debt would have no cause to complain because as far as it is concerned the junior debt is an equal class.

However, in this latter case the senior debt would have been unfairly discriminated against because the trade debt was being unfairly over-compensated; of course the plan would also fail unless the senior debt was unimpaired, received full value, or accepted the plan, because from its perspective a junior class received property under the plan. Application of the test from the perspective of senior debt is best illustrated by the plan that proposes to pay trade debt $15, senior debt $25, and junior debt $0. Here the senior debt is being unfairly discriminated against with respect to the equal trade debt even though the trade debt receives less than the senior debt. The discrimination arises from the fact that the senior debt is entitled to the rights of the junior debt which in this example entitle the senior debt to share on a 2:1 basis with the trade debt.

Finally, it is necessary to interpret the first criterion from the perspective of subordinated debt. The junior debt is subrogated to the rights of senior debt once the senior debt is paid in full. Thus, while the plan that pays trade debt $15, senior debt $25, and junior debt $0 is not unfairly discriminatory against the junior debt, a plan that proposes to pay trade debt $55, senior debt $100, and junior debt $1, would be unfairly discriminatory. In order to avoid discriminatory treatment against the junior debt, at least $10 would have to be received by such debt under those facts.

The criterion of unfair discrimination is not derived from the fair and equitable rule or from the best interests of creditors test. Rather it preserves just treatment of a dissenting class from the class's own perspective.

If each class of secured claims satisfies the requirements of section 1129(b)(1) and each class of unsecured claims satisfies the requirements of section 1129(b)(2), then the court must still see if each class of interests satisfies section 1129(b)(3) before the plan may be confirmed. Again, two separate criteria must be met. Under subparagraph (A) if the interest entitles the holder thereof to a fixed liquidation preference or if such interest may be redeemed at a fixed price, then the holder of such interest must not receive under the plan on account of such interest property of a value as of the effective date of the plan greater than the greater of these two values of the interest. Preferred stock would be an example of an interest likely to have liquidation preference or redemption price.

If an interest such as most common stock or the interest of a general partnership has neither a fixed liquidation preference nor a fixed redemption price, then the criterion in subparagraph (A) is automatically fulfilled. In addition subparagraph (B) contains five clauses that impose alternative conditions of which at least one must be satisfied in order to warrant confirmation. The first two clauses contain requirements of acceptance or unimpairment similar to the first two clauses in paragraphs (1)(B) and (2)(B). Clause (iii) is similar to the unimpairment test contained in section 1124(3)(B), except that it will apply to cover the issuance securities of the debtor of a value as of the effective date of the plan equal to the greater of any fixed liquidation preference or redemption price. The fourth clause allows confirmation if junior interests are not compensated under the plan and the fifth clause allows confirmation if there are no junior interests. These clauses recognized that as long as senior classes receive no more than full payment, the objection of a junior class will not defeat confirmation unless a class junior to it is receiving value under the plan and the objecting class is impaired. While a determination of impairment may be made under section 1124(3)(B)(iii) without a precise valuation of the business when common stock is clearly under water, once section 1129(b) is used, a more detailed valuation is a necessary by-product. Thus, if no property is given to a holder of an

A18

interest under the plan, the interest should be clearly worthless in order to find unimpairment under section 1124(3)(B)(iii) and section 1129(a)(8); otherwise, since a class of interests receiving no property is deemed to object under section 1126(g), the more precise valuation of section 1129(b) should be used.

If all of the requirements of section 1129(b) are complied with, then the court may confirm the plan subject to other limitations such as those found in section 1129(a) and (d).

Subsection (c) of section 1129 governs confirmation when more than one plan meets the requirements of the section. The court must consider the preferences of creditors and equity security holders in determining which plan to confirm.

Subsection (d) requires the court to deny confirmation if the principal purpose of the plan is the avoidance of taxes (through use of sections 346 and 1146, and applicable provisions of State law or the Internal Revenue Code [title 26] governing bankruptcy reorganizations) or the avoidance of section 5 of the Securities Act of 1933 [15 U.S.C. 77e] (through use of section 1145).

### Editorial Notes

#### References in Text

Section 5 of the Securities Act of 1933, referred to in subsec. (d), is classified to section 77e of Title 15, Commerce and Trade.

#### Amendments

2010—Subsec. (a)(16). Pub. L. 111–327 substituted "under the plan" for "of the plan".

2005—Subsec. (a)(9)(A). Pub. L. 109–8, § 1502(a)(8)(A), substituted "507(a)(2) or 507(a)(3)" for "507(a)(1) or 507(a)(2)".

Subsec. (a)(9)(B). Pub. L. 109–8, § 1502(a)(8)(B), substituted "507(a)(1)" for "507(a)(3)".

Subsec. (a)(9)(C). Pub. L. 109–8, § 710(2), substituted "regular installment payments in cash—" and cls. (i) to (iii) for "deferred cash payments, over a period not exceeding six years after the date of assessment of such claim, of a value, as of the effective date of the plan, equal to the allowed amount of such claim."

Subsec. (a)(9)(D). Pub. L. 109–8, § 710(1), (3), added subpar. (D).

Subsec. (a)(14). Pub. L. 109–8, § 213(1), added par. (14).

Subsec. (a)(15). Pub. L. 109–8, § 321(c)(1), added par. (15).

Subsec. (a)(16). Pub. L. 109–8, § 1221(b), added par. (16).

Subsec. (b)(2)(B)(ii). Pub. L. 109–8, § 321(c)(2), inserted before period at end ", except that in a case in which the debtor is an individual, the debtor may retain property included in the estate under section 1115 subject to the requirements of subsection (a)(14) of this section".

Subsec. (e). Pub. L. 109–8, § 438, added subsec. (e).

1994—Subsec. (a)(4). Pub. L. 103–394, § 501(d)(32)(A)(i), substituted period for semicolon at end.

Subsec. (a)(9)(B). Pub. L. 103–394, § 304(h)(7)(i), substituted ", 507(a)(6), or 507(a)(7)" for "or 507(a)(6)".

Subsec. (a)(9)(C). Pub. L. 103–394, § 304(h)(7)(ii), substituted "507(a)(8)" for "507(a)(7)".

Subsec. (a)(12). Pub. L. 103–394, § 501(d)(32)(A)(ii), inserted "of title 28" after "section 1930".

Subsec. (d). Pub. L. 103–394, § 501(d)(32)(B), struck out "(15 U.S.C. 77e)" after "Act of 1933".

1988—Subsec. (a)(13). Pub. L. 100–334 added par. (13).

1986—Subsec. (a)(7). Pub. L. 99–554, § 283(v)(1), struck out "of" after "to".

Subsec. (a)(9)(B). Pub. L. 99–554, § 283(v)(2), inserted reference to section 507(a)(6).

Subsec. (a)(9)(C). Pub. L. 99–554, § 283(v)(3), substituted "507(a)(7)" for "507(a)(6)".

Subsec. (a)(12). Pub. L. 99–554, § 225, added par. (12).

1984—Subsec. (a)(1), (2). Pub. L. 98–353, § 512(a)(1), (2), substituted "title" for "chapter".

Subsec. (a)(4). Pub. L. 98–353, § 512(a)(3), amended par. (4) generally. Prior to amendment, par. (4) read as fol-

lows: "(A) Any payment made or promised by the proponent, by the debtor, or by a person issuing securities or acquiring property under the plan, for services or for costs and expenses in, or in connection with, the case, or in connection with the plan and incident to the case, has been disclosed to the court; and (B)(i) any such payment made before confirmation of the plan is reasonable; or (ii) if such payment is to be fixed after confirmation of the plan, such payment is subject to the approval of the court as reasonable."

Subsec. (a)(5)(A)(ii). Pub. L. 98–353, § 512(a)(4), substituted "; and" for the period at the end.

Subsec. (a)(5)(B). Pub. L. 98–353, § 512(a)(5), substituted "the" for "The".

Subsec. (a)(6). Pub. L. 98–353, § 512(a)(6), inserted "governmental" after "Any".

Subsec. (a)(7). Pub. L. 98–353, § 512(a)(7)(A), substituted "of each impaired class of claims or interests" for "each class".

Subsec. (a)(7)(B). Pub. L. 98–353, § 512(a)(7)(B), substituted "holder's" for "creditor's".

Subsec. (a)(8). Pub. L. 98–353, § 512(a)(8), inserted "of claims or interests" after "each class".

Subsec. (a)(10). Pub. L. 98–353, § 512(a)(9), substituted "If a class of claims is impaired under the plan, at least one class of claims that is impaired under the plan has accepted the plan, determined without including any acceptance of the plan by any insider" for "At least one class of claims has accepted the plan, determined without including any acceptance of the plan by any insider holding a claim of such class".

Subsec. (b)(2)(A)(i)(I), (ii). Pub. L. 98–353, § 512(b)(1), substituted "liens" for "lien" wherever appearing.

Subsec. (b)(2)(B)(ii). Pub. L. 98–353, § 512(b)(2), inserted "under the plan" after "retain".

Subsec. (b)(2)(C)(i). Pub. L. 98–353, § 512(b)(3), substituted "interest" for "claim", and "or the value" for "and the value".

Subsec. (d). Pub. L. 98–353, § 512(c), inserted "the application of" and provisions requiring that in any hearing under this subsection, the governmental unit has the burden of proof on the issue of avoidance.

### Statutory Notes and Related Subsidiaries

#### Effective Date of 2005 Amendment

Amendment by section 1221(b) of Pub. L. 109–8 applicable to cases pending under this title on Apr. 20, 2005, or filed under this title on or after Apr. 20, 2005, with certain exceptions, see section 1221(d) of Pub. L. 109–8, set out as a note under section 363 of this title.

Amendment by sections 213(1), 321(c), 438, 710, and 1502(a)(8) of Pub. L. 109–8 effective 180 days after Apr. 20, 2005, and not applicable with respect to cases commenced under this title before such effective date, except as otherwise provided, see section 1501 of Pub. L. 109–8, set out as a note under section 101 of this title.

#### Effective Date of 1994 Amendment

Amendment by Pub. L. 103–394 effective Oct. 22, 1994, and not applicable with respect to cases commenced under this title before Oct. 22, 1994, see section 702 of Pub. L. 103–394, set out as a note under section 101 of this title.

#### Effective Date of 1988 Amendment

Amendment by Pub. L. 100–334 effective June 16, 1988, but not applicable to cases commenced under this title before that date, see section 4 of Pub. L. 100–334, set out as an Effective Date note under section 1114 of this title.

#### Effective Date of 1986 Amendment

Effective date and applicability of amendment by section 225 of Pub. L. 99–554 dependent upon the judicial district involved, see section 302(d), (e) of Pub. L. 99–554, set out as a note under section 581 of Title 28, Judiciary and Judicial Procedure.

Amendment by section 283 of Pub. L. 99–554 effective 30 days after Oct. 27, 1986, see section 302(a) of Pub. L. 99–554.

EFFECTIVE DATE OF 1984 AMENDMENT

Amendment by Pub. L. 98–353 effective with respect to cases filed 90 days after July 10, 1984, see section 552(a) of Pub. L. 98–353, set out as a note under section 101 of this title.

## SUBCHAPTER III—POSTCONFIRMATION MATTERS

### § 1141. Effect of confirmation

(a) Except as provided in subsections (d)(2) and (d)(3) of this section, the provisions of a confirmed plan bind the debtor, any entity issuing securities under the plan, any entity acquiring property under the plan, and any creditor, equity security holder, or general partner in the debtor, whether or not the claim or interest of such creditor, equity security holder, or general partner is impaired under the plan and whether or not such creditor, equity security holder, or general partner has accepted the plan.

(b) Except as otherwise provided in the plan or the order confirming the plan, the confirmation of a plan vests all of the property of the estate in the debtor.

(c) Except as provided in subsections (d)(2) and (d)(3) of this section and except as otherwise provided in the plan or in the order confirming the plan, after confirmation of a plan, the property dealt with by the plan is free and clear of all claims and interests of creditors, equity security holders, and of general partners in the debtor.

(d)(1) Except as otherwise provided in this subsection, in the plan, or in the order confirming the plan, the confirmation of a plan—

(A) discharges the debtor from any debt that arose before the date of such confirmation, and any debt of a kind specified in section 502(g), 502(h), or 502(i) of this title, whether or not—

(i) a proof of the claim based on such debt is filed or deemed filed under section 501 of this title;

(ii) such claim is allowed under section 502 of this title; or

(iii) the holder of such claim has accepted the plan; and

(B) terminates all rights and interests of equity security holders and general partners provided for by the plan.

(2) A discharge under this chapter does not discharge a debtor who is an individual from any debt excepted from discharge under section 523 of this title.

(3) The confirmation of a plan does not discharge a debtor if—

(A) the plan provides for the liquidation of all or substantially all of the property of the estate;

(B) the debtor does not engage in business after consummation of the plan; and

(C) the debtor would be denied a discharge under section 727(a) of this title if the case were a case under chapter 7 of this title.

(4) The court may approve a written waiver of discharge executed by the debtor after the order for relief under this chapter.

(5) In a case in which the debtor is an individual—

(A) unless after notice and a hearing the court orders otherwise for cause, confirmation of the plan does not discharge any debt provided for in the plan until the court grants a discharge on completion of all payments under the plan;

(B) at any time after the confirmation of the plan, and after notice and a hearing, the court may grant a discharge to the debtor who has not completed payments under the plan if—

(i) the value, as of the effective date of the plan, of property actually distributed under the plan on account of each allowed unsecured claim is not less than the amount that would have been paid on such claim if the estate of the debtor had been liquidated under chapter 7 on such date;

(ii) modification of the plan under section 1127 is not practicable; and

(iii) subparagraph (C) permits the court to grant a discharge; and

(C) the court may grant a discharge if, after notice and a hearing held not more than 10 days before the date of the entry of the order granting the discharge, the court finds that there is no reasonable cause to believe that—

(i) section 522(q)(1) may be applicable to the debtor; and

(ii) there is pending any proceeding in which the debtor may be found guilty of a felony of the kind described in section 522(q)(1)(A) or liable for a debt of the kind described in section 522(q)(1)(B);

and if the requirements of subparagraph (A) or (B) are met.

(6) Notwithstanding paragraph (1), the confirmation of a plan does not discharge a debtor that is a corporation from any debt—

(A) of a kind specified in paragraph (2)(A) or (2)(B) of section 523(a) that is owed to a domestic governmental unit, or owed to a person as the result of an action filed under subchapter III of chapter 37 of title 31 or any similar State statute; or

(B) for a tax or customs duty with respect to which the debtor—

(i) made a fraudulent return; or

(ii) willfully attempted in any manner to evade or to defeat such tax or such customs duty.

(Pub. L. 95–598, Nov. 6, 1978, 92 Stat. 2638; Pub. L. 98–353, title III, § 513, July 10, 1984, 98 Stat. 387; Pub. L. 109–8, title III, §§ 321(d), 330(b), title VII, § 708, Apr. 20, 2005, 119 Stat. 95, 101, 126; Pub. L. 111–327, § 2(a)(36), Dec. 22, 2010, 124 Stat. 3561.)

HISTORICAL AND REVISION NOTES

LEGISLATIVE STATEMENTS

Section 1141(d) of the House amendment is derived from a comparable provision contained in the Senate amendment. However, section 1141(d)(2) of the House amendment is derived from the House bill as preferable to the Senate amendment. It is necessary for a corporation or partnership undergoing reorganization to be able to present its creditors with a fixed list of liabilities upon which the creditors or third parties can make intelligent decisions. Retaining an exception for discharge with respect to nondischargeable taxes would leave an undesirable uncertainty surrounding reorganizations that is unacceptable. Section 1141(d)(3) is de-

Sec.
1292.   Interlocutory decisions.
[1293.   Repealed.]
1294.   Circuits in which decisions reviewable.
1295.   Jurisdiction of the United States Court of Appeals for the Federal Circuit.
1296.   Review of certain agency actions.

### Editorial Notes

#### Amendments

1996—Pub. L. 104–331, §3(a)(2), Oct. 26, 1996, 110 Stat. 4069, added item 1296.

1984—Pub. L. 98–620, title IV, §402(29)(C), Nov. 8, 1984, 98 Stat. 3359, struck out item 1296 ''Precedence of cases in the United States Court of Appeals for the Federal Circuit''.

1982—Pub. L. 97–164, title I, §127(b), Apr. 2, 1982, 96 Stat. 39, added items 1295 and 1296.

1978—Pub. L. 95–598, title II, §236(b), Nov. 6, 1978, 92 Stat. 2667, directed the addition of item 1293, ''Bankruptcy appeals'', which amendment did not become effective pursuant to section 402(b) of Pub. L. 95–598, as amended, set out as an Effective Date note preceding section 101 of Title 11, Bankruptcy.

1961—Pub. L. 87–189, §4, Aug. 30, 1961, 75 Stat. 417, struck out item 1293 ''Final decisions of Puerto Rico and Hawaii Supreme Courts''.

## § 1291. Final decisions of district courts

The courts of appeals (other than the United States Court of Appeals for the Federal Circuit) shall have jurisdiction of appeals from all final decisions of the district courts of the United States, the United States District Court for the District of the Canal Zone, the District Court of Guam, and the District Court of the Virgin Islands, except where a direct review may be had in the Supreme Court. The jurisdiction of the United States Court of Appeals for the Federal Circuit shall be limited to the jurisdiction described in sections 1292(c) and (d) and 1295 of this title.

(June 25, 1948, ch. 646, 62 Stat. 929; Oct. 31, 1951, ch. 655, §48, 65 Stat. 726; Pub. L. 85–508, §12(e), July 7, 1958, 72 Stat. 348; Pub. L. 97–164, title I, §124, Apr. 2, 1982, 96 Stat. 36.)

#### Historical and Revision Notes

Based on title 28, U.S.C., 1940 ed., §§225(a), 933(a)(1), and section 1356 of title 48, U.S.C., 1940 ed., Territories and Insular Possessions, and sections 61 and 62 of title 7 of the Canal Zone Code (Mar. 3, 1911, ch. 231, §128, 36 Stat. 1133; Aug. 24, 1912, ch. 390, §9, 37 Stat. 566; Jan. 28, 1915, ch. 22, §2, 38 Stat. 804; Feb. 7, 1925, ch. 150, 43 Stat. 813; Sept. 21, 1922, ch. 370, §3, 42 Stat. 1006; Feb. 13, 1925, ch. 229, §1, 43 Stat. 936; Jan. 31, 1928, ch. 14, §1, 45 Stat. 54; May 17, 1932, ch. 190, 47 Stat. 158; Feb. 16, 1933, ch. 91, §3, 47 Stat. 817; May 31, 1935, ch. 160, 49 Stat. 313; June 20, 1938, ch. 526, 52 Stat. 779; Aug. 2, 1946, ch. 753, §412(a)(1), 60 Stat. 844).

This section rephrases and simplifies paragraphs ''First'', ''Second'', and ''Third'' of section 225(a) of title 28, U.S.C., 1940 ed., which referred to each Territory and Possession separately, and to sections 61 and 62 of the Canal Zone Code, section 933(a)(1) of said title relating to jurisdiction of appeals in tort claims cases, and the provisions of section 1356 of title 48, U.S.C., 1940 ed., relating to jurisdiction of appeals from final judgments of the district court for the Canal Zone.

The district courts for the districts of Hawaii and Puerto Rico are embraced in the term ''district courts of the United States.'' (See definitive section 451 of this title.)

Paragraph ''Fourth'' of section 225(a) of title 28, U.S.C., 1940 ed., is incorporated in section 1293 of this title.

Words ''Fifth. In the United States Court for China, in all cases'' in said section 225(a) were omitted. (See reviser's note under section 411 of this title.)

Venue provisions of section 1356 of title 48, U.S.C., 1940 ed., are incorporated in section 1295 of this title.

Section 61 of title 7 of the Canal Zone Code is also incorporated in sections 1291 and 1295 of this title.

In addition to the jurisdiction conferred by this chapter, the courts of appeals also have appellate jurisdiction in proceedings under Title 11, Bankruptcy, and jurisdiction to review:

(1) Orders of the Secretary of the Treasury denying an application for, suspending, revoking, or annulling a basic permit under chapter 8 of title 27;

(2) Orders of the Interstate Commerce Commission, the Federal Communications Commission, the Civil Aeronautics Board, the Board of Governors of the Federal Reserve System and the Federal Trade Commission, based on violations of the antitrust laws or unfair or deceptive acts, methods, or practices in commerce;

(3) Orders of the Secretary of the Army under sections 504, 505 and 516 of title 33, U.S.C., 1940 ed., Navigation and Navigable Waters;

(4) Orders of the Civil Aeronautics Board under chapter 9 of title 49, except orders as to foreign air carriers which are subject to the President's approval;

(5) Orders under chapter 1 of title 7, refusing to designate boards of trade as contract markets or suspending or revoking such designations, or excluding persons from trading in contract markets;

(6) Orders of the Federal Power Commission under chapter 12 of title 16;

(7) Orders of the Federal Security Administrator under section 371(e) of title 21, in a case of actual controversy as to the validity of any such order, by any person adversely affected thereby;

(8) Orders of the Federal Power Commission under chapter 15B of title 15;

(9) Final orders of the National Labor Relations Board;

(10) Cease and desist orders under section 193 of title 7;

(11) Orders of the Securities and Exchange Commission;

(12) Orders to cease and desist from violating section 1599 of title 7;

(13) Wage orders of the Administrator of the Wage and Hour Division of the Department of Labor under section 208 of title 29;

(14) Orders under sections 81r and 1641 of title 19, U.S.C., 1940 ed., Customs Duties.

The courts of appeals also have jurisdiction to enforce:

(1) Orders of the Interstate Commerce Commission, the Federal Communications Commission, the Civil Aeronautics Board, the Board of Governors of the Federal Reserve System, and the Federal Trade Commission, based on violations of the antitrust laws or unfair or deceptive acts, methods, or practices in commerce;

(2) Final orders of the National Labor Relations Board;

(3) Orders to cease and desist from violating section 1599 of title 7.

The Court of Appeals for the District of Columbia also has jurisdiction to review orders of the Post Office Department under section 576 of title 39 relating to discriminations in sending second-class publications by freight; Maritime Commission orders denying transfer to foreign registry of vessels under subsidy contract; sugar allotment orders; decisions of the Federal Communications Commission granting or refusing applications for construction permits for radio stations, or for radio station licenses, or for renewal or modification of radio station licenses, or suspending any radio operator's license.

Changes were made in phraseology.

### Editorial Notes

#### Amendments

1982—Pub. L. 97–164, §124, inserted ''(other than the United States Court of Appeals for the Federal Cir-

cuit)'' after ''The court of appeals'' and inserted provision that the jurisdiction of the United States Court of Appeals for the Federal Circuit shall be limited to the jurisdiction described in sections 1292(c) and (d) and 1295 of this title.

1958—Pub. L. 85–508 struck out provisions which gave courts of appeals jurisdiction of appeals from District Court for Territory of Alaska. See section 81A of this title which establishes a United States District Court for the State of Alaska.

1951—Act Oct. 31, 1951, inserted reference to District Court of Guam.

#### Statutory Notes and Related Subsidiaries

##### EFFECTIVE DATE OF 1982 AMENDMENT

Amendment by Pub. L. 97–164 effective Oct. 1, 1982, see section 402 of Pub. L. 97–164, set out as a note under section 171 of this title.

##### EFFECTIVE DATE OF 1958 AMENDMENT

Amendment by Pub. L. 85–508 effective Jan. 3, 1959, on admission of Alaska into the Union pursuant to Proc. No. 3269, Jan. 3, 1959, 24 F.R. 81, 73 Stat. c.16 as required by sections 1 and 8(c) of Pub. L. 85–508, see notes set out under section 81A of this title and preceding section 21 of Title 48, Territories and Insular Possessions.

##### TERMINATION OF UNITED STATES DISTRICT COURT FOR THE DISTRICT OF THE CANAL ZONE

For termination of the United States District Court for the District of the Canal Zone at end of the ''transition period'', being the 30-month period beginning Oct. 1, 1979, and ending midnight Mar. 31, 1982, see Paragraph 5 of Article XI of the Panama Canal Treaty of 1977 and sections 2101 and 2201 to 2203 of Pub. L. 96–70, title II, Sept. 27, 1979, 93 Stat. 493, formerly classified to sections 3831 and 3841 to 3843, respectively, of Title 22, Foreign Relations and Intercourse.

### § 1292. Interlocutory decisions

(a) Except as provided in subsections (c) and (d) of this section, the courts of appeals shall have jurisdiction of appeals from:

(1) Interlocutory orders of the district courts of the United States, the United States District Court for the District of the Canal Zone, the District Court of Guam, and the District Court of the Virgin Islands, or of the judges thereof, granting, continuing, modifying, refusing or dissolving injunctions, or refusing to dissolve or modify injunctions, except where a direct review may be had in the Supreme Court;

(2) Interlocutory orders appointing receivers, or refusing orders to wind up receiverships or to take steps to accomplish the purposes thereof, such as directing sales or other disposals of property;

(3) Interlocutory decrees of such district courts or the judges thereof determining the rights and liabilities of the parties to admiralty cases in which appeals from final decrees are allowed.

(b) When a district judge, in making in a civil action an order not otherwise appealable under this section, shall be of the opinion that such order involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation, he shall so state in writing in such order. The Court of Appeals which would have jurisdiction of an appeal of such action may thereupon, in its discretion, permit an appeal to be taken from such order, if application is made to it within ten days after the entry of the order: *Provided, however,* That application for an appeal hereunder shall not stay proceedings in the district court unless the district judge or the Court of Appeals or a judge thereof shall so order.

(c) The United States Court of Appeals for the Federal Circuit shall have exclusive jurisdiction—

(1) of an appeal from an interlocutory order or decree described in subsection (a) or (b) of this section in any case over which the court would have jurisdiction of an appeal under section 1295 of this title; and

(2) of an appeal from a judgment in a civil action for patent infringement which would otherwise be appealable to the United States Court of Appeals for the Federal Circuit and is final except for an accounting.

(d)(1) When the chief judge of the Court of International Trade issues an order under the provisions of section 256(b) of this title, or when any judge of the Court of International Trade, in issuing any other interlocutory order, includes in the order a statement that a controlling question of law is involved with respect to which there is a substantial ground for difference of opinion and that an immediate appeal from that order may materially advance the ultimate termination of the litigation, the United States Court of Appeals for the Federal Circuit may, in its discretion, permit an appeal to be taken from such order, if application is made to that Court within ten days after the entry of such order.

(2) When the chief judge of the United States Court of Federal Claims issues an order under section 798(b) of this title, or when any judge of the United States Court of Federal Claims, in issuing an interlocutory order, includes in the order a statement that a controlling question of law is involved with respect to which there is a substantial ground for difference of opinion and that an immediate appeal from that order may materially advance the ultimate termination of the litigation, the United States Court of Appeals for the Federal Circuit may, in its discretion, permit an appeal to be taken from such order, if application is made to that Court within ten days after the entry of such order.

(3) Neither the application nor the granting of an appeal under this subsection shall stay proceedings in the Court of International Trade or in the Court of Federal Claims, as the case may be, unless a stay is ordered by a judge of the Court of International Trade or of the Court of Federal Claims or by the United States Court of Appeals for the Federal Circuit or a judge of that court.

(4)(A) The United States Court of Appeals for the Federal Circuit shall have exclusive jurisdiction of an appeal from an interlocutory order of a district court of the United States, the District Court of Guam, the District Court of the Virgin Islands, or the District Court for the Northern Mariana Islands, granting or denying, in whole or in part, a motion to transfer an action to the United States Court of Federal Claims under section 1631 of this title.

(B) When a motion to transfer an action to the Court of Federal Claims is filed in a district

made to this part in provisions enacted after September 2, 1974.

(Pub. L. 93–406, title I, §414, Sept. 2, 1974, 88 Stat. 889; Pub. L. 101–239, title VII, §7894(e)(6), (h)(4), Dec. 19, 1989, 103 Stat. 2450, 2451.)

### Editorial Notes

#### References in Text

Section 2003(c)(1)(B) of this Act, referred to in subsec. (d), is section 2003(c)(1)(B) of Pub. L. 93–406, which is set out as an Effective Date; Savings Provisions note under section 4975 of Title 26, Internal Revenue Code.

#### Amendments

1989—Subsec. (c)(2). Pub. L. 101–239, §7894(e)(6), substituted "Internal Revenue Code of 1986" for "Internal Revenue Code of 1954", which for purposes of codification was translated as "title 26" thus requiring no change in text, and substituted "or the corresponding provisions of prior law" for ") or the corresponding provisions of prior law".

Subsec. (e). Pub. L. 101–239, §7894(h)(4), added subsec. (e).

### Statutory Notes and Related Subsidiaries

#### Effective Date of 1989 Amendment

Amendment by Pub. L. 101–239 effective, except as otherwise provided, as if originally included in the provision of the Employee Retirement Income Security Act of 1974, Pub. L. 93–406, to which such amendment relates, see section 7894(i) of Pub. L. 101–239, set out as a note under section 1002 of this title.

### PART 5—ADMINISTRATION AND ENFORCEMENT

### § 1131. Criminal penalties

(a) Any person who willfully violates any provision of part 1 of this subtitle, or any regulation or order issued under any such provision, shall upon conviction be fined not more than $100,000 or imprisoned not more than 10 years, or both; except that in the case of such violation by a person not an individual, the fine imposed upon such person shall be a fine not exceeding $500,000.

(b) Any person that violates section 1149 of this title shall upon conviction be imprisoned not more than 10 years or fined under title 18, or both.

(Pub. L. 93–406, title I, §501, Sept. 2, 1974, 88 Stat. 891; Pub. L. 107–204, title IX, §904, July 30, 2002, 116 Stat. 805; Pub. L. 111–148, title VI, §6601(b), Mar. 23, 2010, 124 Stat. 779.)

### Editorial Notes

#### Amendments

2010—Pub. L. 111–148 designated existing provisions as subsec. (a) and added subsec. (b).

2002—Pub. L. 107–204 substituted "$100,000" for "$5,000", "10 years" for "one year", and "$500,000" for "$100,000".

### Statutory Notes and Related Subsidiaries

#### Regulations

Secretary authorized, effective Sept. 2, 1974, to promulgate regulations wherever provisions of this subchapter call for the promulgation of regulations, see section 1031 of this title.

### § 1132. Civil enforcement

### (a) Persons empowered to bring a civil action

A civil action may be brought—

(1) by a participant or beneficiary—

(A) for the relief provided for in subsection (c) of this section, or

(B) to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan;

(2) by the Secretary, or by a participant, beneficiary or fiduciary for appropriate relief under section 1109 of this title;

(3) by a participant, beneficiary, or fiduciary (A) to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan;

(4) by the Secretary, or by a participant, or beneficiary for appropriate relief in the case of a violation of section 1025(c) or 1032(a) of this title;

(5) except as otherwise provided in subsection (b), by the Secretary (A) to enjoin any act or practice which violates any provision of this subchapter, or (B) to obtain other appropriate equitable relief (i) to redress such violation or (ii) to enforce any provision of this subchapter;

(6) by the Secretary to collect any civil penalty under paragraph (2), (4), (5), (6), (7), (8), or (9) of subsection (c) or under subsection (i) or (*l*);

(7) by a State to enforce compliance with a qualified medical child support order (as defined in section 1169(a)(2)(A) of this title);

(8) by the Secretary, or by an employer or other person referred to in section 1021(f)(1) of this title, (A) to enjoin any act or practice which violates subsection (f) of section 1021 of this title, or (B) to obtain appropriate equitable relief (i) to redress such violation or (ii) to enforce such subsection;

(9) in the event that the purchase of an insurance contract or insurance annuity in connection with termination of an individual's status as a participant covered under a pension plan with respect to all or any portion of the participant's pension benefit under such plan constitutes a violation of part 4 of this title[1] or the terms of the plan, by the Secretary, by any individual who was a participant or beneficiary at the time of the alleged violation, or by a fiduciary, to obtain appropriate relief, including the posting of security if necessary, to assure receipt by the participant or beneficiary of the amounts provided or to be provided by such insurance contract or annuity, plus reasonable prejudgment interest on such amounts;

(10) in the case of a multiemployer plan that has been certified by the actuary to be in endangered or critical status under section 1085 of this title, if the plan sponsor—

(A) has not adopted a funding improvement or rehabilitation plan under that section by the deadline established in such section, or

---

[1] So in original. Probably should be "subtitle".

(B) fails to update or comply with the terms of the funding improvement or rehabilitation plan in accordance with the requirements of such section,

by an employer that has an obligation to contribute with respect to the multiemployer plan or an employee organization that represents active participants in the multiemployer plan, for an order compelling the plan sponsor to adopt a funding improvement or rehabilitation plan or to update or comply with the terms of the funding improvement or rehabilitation plan in accordance with the requirements of such section and the funding improvement or rehabilitation plan; or

(11) in the case of a multiemployer plan, by an employee representative, or any employer that has an obligation to contribute to the plan, (A) to enjoin any act or practice which violates subsection (k) of section 1021 of this title (or, in the case of an employer, subsection (*l*) of such section), or (B) to obtain appropriate equitable relief (i) to redress such violation or (ii) to enforce such subsection.

**(b) Plans qualified under Internal Revenue Code; maintenance of actions involving delinquent contributions**

(1) In the case of a plan which is qualified under section 401(a), 403(a), or 405(a)[2] of title 26 (or with respect to which an application to so qualify has been filed and has not been finally determined) the Secretary may exercise his authority under subsection (a)(5) with respect to a violation of, or the enforcement of, parts 2 and 3 of this subtitle (relating to participation, vesting, and funding), only if—

(A) requested by the Secretary of the Treasury, or

(B) one or more participants, beneficiaries, or fiduciaries, of such plan request in writing (in such manner as the Secretary shall prescribe by regulation) that he exercise such authority on their behalf. In the case of such a request under this paragraph he may exercise such authority only if he determines that such violation affects, or such enforcement is necessary to protect, claims of participants or beneficiaries to benefits under the plan.

(2) The Secretary shall not initiate an action to enforce section 1145 of this title.

(3) Except as provided in subsections (c)(9) and (a)(6) (with respect to collecting civil penalties under subsection (c)(9)), the Secretary is not authorized to enforce under this part any requirement of part 7 against a health insurance issuer offering health insurance coverage in connection with a group health plan (as defined in section 1191b(a)(1) of this title). Nothing in this paragraph shall affect the authority of the Secretary to issue regulations to carry out such part.

**(c) Administrator's refusal to supply requested information; penalty for failure to provide annual report in complete form**

(1) Any administrator (A) who fails to meet the requirements of paragraph (1) or (4) of section 1166[2] of this title, section 1021(e)(1) of this title, section 1021(f) of this title,,[3] section 1025(a)

of this title, or section 1032(a) of this title with respect to a participant or beneficiary, or (B) who fails or refuses to comply with a request for any information which such administrator is required by this subchapter to furnish to a participant or beneficiary (unless such failure or refusal results from matters reasonably beyond the control of the administrator) by mailing the material requested to the last known address of the requesting participant or beneficiary within 30 days after such request may in the court's discretion be personally liable to such participant or beneficiary in the amount of up to $100 a day from the date of such failure or refusal, and the court may in its discretion order such other relief as it deems proper. For purposes of this paragraph, each violation described in subparagraph (A) with respect to any single participant, and each violation described in subparagraph (B) with respect to any single participant or beneficiary, shall be treated as a separate violation.

(2) The Secretary may assess a civil penalty against any plan administrator of up to $1,000 a day from the date of such plan administrator's failure or refusal to file the annual report required to be filed with the Secretary under section 1021(b)(1) of this title. For purposes of this paragraph, an annual report that has been rejected under section 1024(a)(4) of this title for failure to provide material information shall not be treated as having been filed with the Secretary.

(3) Any employer maintaining a plan who fails to meet the notice requirement of section 1021(d) of this title with respect to any participant or beneficiary or who fails to meet the requirements of section 1021(e)(2) of this title with respect to any person or who fails to meet the requirements of section 1082(d)(12)(E)[2] of this title with respect to any person may in the court's discretion be liable to such participant or beneficiary or to such person in the amount of up to $100 a day from the date of such failure, and the court may in its discretion order such other relief as it deems proper.

(4) The Secretary may assess a civil penalty of not more than $1,000 a day for each violation by any person of subsection (j), (k), or (*l*) of section 1021 of this title or section 1144(e)(3) of this title.

(5) The Secretary may assess a civil penalty against any person of up to $1,000 a day from the date of the person's failure or refusal to file the information required to be filed by such person with the Secretary under regulations prescribed pursuant to section 1021(g) of this title.

(6) If, within 30 days of a request by the Secretary to a plan administrator for documents under section 1024(a)(6) of this title, the plan administrator fails to furnish the material requested to the Secretary, the Secretary may assess a civil penalty against the plan administrator of up to $100 a day from the date of such failure (but in no event in excess of $1,000 per request). No penalty shall be imposed under this paragraph for any failure resulting from matters reasonably beyond the control of the plan administrator.

(7) The Secretary may assess a civil penalty against a plan administrator of up to $100 a day from the date of the plan administrator's failure

---

[2] See References in Text note below.
[3] So in original.

or refusal to provide notice to participants and beneficiaries in accordance with subsection (i) or (m) of section 1021 of this title. For purposes of this paragraph, each violation with respect to any single participant or beneficiary shall be treated as a separate violation.

(8) The Secretary may assess against any plan sponsor of a multiemployer plan a civil penalty of not more than $1,100 per day—

(A) for each violation by such sponsor of the requirement under section 1085 of this title to adopt by the deadline established in that section a funding improvement plan or rehabilitation plan with respect to a multiemployer plan which is in endangered or critical status, or

(B) in the case of a plan in endangered status which is not in seriously endangered status, for failure by the plan to meet the applicable benchmarks under section 1085 of this title by the end of the funding improvement period with respect to the plan.

(9)(A) The Secretary may assess a civil penalty against any employer of up to $100 a day from the date of the employer's failure to meet the notice requirement of section 1181(f)(3)(B)(i)(I) of this title. For purposes of this subparagraph, each violation with respect to any single employee shall be treated as a separate violation.

(B) The Secretary may assess a civil penalty against any plan administrator of up to $100 a day from the date of the plan administrator's failure to timely provide to any State the information required to be disclosed under section 1181(f)(3)(B)(ii) of this title. For purposes of this subparagraph, each violation with respect to any single participant or beneficiary shall be treated as a separate violation.

(10) SECRETARIAL ENFORCEMENT AUTHORITY RELATING TO USE OF GENETIC INFORMATION.—

(A) GENERAL RULE.—The Secretary may impose a penalty against any plan sponsor of a group health plan, or any health insurance issuer offering health insurance coverage in connection with the plan, for any failure by such sponsor or issuer to meet the requirements of subsection (a)(1)(F), (b)(3), (c), or (d) of section 1182 of this title or section 1181 or 1182(b)(1) of this title with respect to genetic information, in connection with the plan.

(B) AMOUNT.—

(i) IN GENERAL.—The amount of the penalty imposed by subparagraph (A) shall be $100 for each day in the noncompliance period with respect to each participant or beneficiary to whom such failure relates.

(ii) NONCOMPLIANCE PERIOD.—For purposes of this paragraph, the term "noncompliance period" means, with respect to any failure, the period—

(I) beginning on the date such failure first occurs; and

(II) ending on the date the failure is corrected.

(C) MINIMUM PENALTIES WHERE FAILURE DISCOVERED.—Notwithstanding clauses (i) and (ii) of subparagraph (D):

(i) IN GENERAL.—In the case of 1 or more failures with respect to a participant or beneficiary—

(I) which are not corrected before the date on which the plan receives a notice from the Secretary of such violation; and

(II) which occurred or continued during the period involved;

the amount of penalty imposed by subparagraph (A) by reason of such failures with respect to such participant or beneficiary shall not be less than $2,500.

(ii) HIGHER MINIMUM PENALTY WHERE VIOLATIONS ARE MORE THAN DE MINIMIS.—To the extent violations for which any person is liable under this paragraph for any year are more than de minimis, clause (i) shall be applied by substituting "$15,000" for "$2,500" with respect to such person.

(D) LIMITATIONS.—

(i) PENALTY NOT TO APPLY WHERE FAILURE NOT DISCOVERED EXERCISING REASONABLE DILIGENCE.—No penalty shall be imposed by subparagraph (A) on any failure during any period for which it is established to the satisfaction of the Secretary that the person otherwise liable for such penalty did not know, and exercising reasonable diligence would not have known, that such failure existed.

(ii) PENALTY NOT TO APPLY TO FAILURES CORRECTED WITHIN CERTAIN PERIODS.—No penalty shall be imposed by subparagraph (A) on any failure if—

(I) such failure was due to reasonable cause and not to willful neglect; and

(II) such failure is corrected during the 30-day period beginning on the first date the person otherwise liable for such penalty knew, or exercising reasonable diligence would have known, that such failure existed.

(iii) OVERALL LIMITATION FOR UNINTENTIONAL FAILURES.—In the case of failures which are due to reasonable cause and not to willful neglect, the penalty imposed by subparagraph (A) for failures shall not exceed the amount equal to the lesser of—

(I) 10 percent of the aggregate amount paid or incurred by the plan sponsor (or predecessor plan sponsor) during the preceding taxable year for group health plans; or

(II) $500,000.

(E) WAIVER BY SECRETARY.—In the case of a failure which is due to reasonable cause and not to willful neglect, the Secretary may waive part or all of the penalty imposed by subparagraph (A) to the extent that the payment of such penalty would be excessive relative to the failure involved.

(F) DEFINITIONS.—Terms used in this paragraph which are defined in section 1191b of this title shall have the meanings provided such terms in such section.

(11) The Secretary and the Secretary of Health and Human Services shall maintain such ongoing consultation as may be necessary and appropriate to coordinate enforcement under this subsection with enforcement under section 1320b–14(c)(8)² of title 42.

(12) The Secretary may assess a civil penalty against any sponsor of a CSEC plan of up to $100

a day from the date of the plan sponsor's failure to comply with the requirements of section 1085a(j)(3) of this title to establish or update a funding restoration plan.

**(d) Status of employee benefit plan as entity**

(1) An employee benefit plan may sue or be sued under this subchapter as an entity. Service of summons, subpena, or other legal process of a court upon a trustee or an administrator of an employee benefit plan in his capacity as such shall constitute service upon the employee benefit plan. In a case where a plan has not designated in the summary plan description of the plan an individual as agent for the service of legal process, service upon the Secretary shall constitute such service. The Secretary, not later than 15 days after receipt of service under the preceding sentence, shall notify the administrator or any trustee of the plan of receipt of such service.

(2) Any money judgment under this subchapter against an employee benefit plan shall be enforceable only against the plan as an entity and shall not be enforceable against any other person unless liability against such person is established in his individual capacity under this subchapter.

**(e) Jurisdiction**

(1) Except for actions under subsection (a)(1)(B) of this section, the district courts of the United States shall have exclusive jurisdiction of civil actions under this subchapter brought by the Secretary or by a participant, beneficiary, fiduciary, or any person referred to in section 1021(f)(1) of this title. State courts of competent jurisdiction and district courts of the United States shall have concurrent jurisdiction of actions under paragraphs (1)(B) and (7) of subsection (a) of this section.

(2) Where an action under this subchapter is brought in a district court of the United States, it may be brought in the district where the plan is administered, where the breach took place, or where a defendant resides or may be found, and process may be served in any other district where a defendant resides or may be found.

**(f) Amount in controversy; citizenship of parties**

The district courts of the United States shall have jurisdiction, without respect to the amount in controversy or the citizenship of the parties, to grant the relief provided for in subsection (a) of this section in any action.

**(g) Attorney's fees and costs; awards in actions involving delinquent contributions**

(1) In any action under this subchapter (other than an action described in paragraph (2)) by a participant, beneficiary, or fiduciary, the court in its discretion may allow a reasonable attorney's fee and costs of action to either party.

(2) In any action under this subchapter by a fiduciary for or on behalf of a plan to enforce section 1145 of this title in which a judgment in favor of the plan is awarded, the court shall award the plan—

(A) the unpaid contributions,

(B) interest on the unpaid contributions,

(C) an amount equal to the greater of—

(i) interest on the unpaid contributions, or

(ii) liquidated damages provided for under the plan in an amount not in excess of 20 percent (or such higher percentage as may be permitted under Federal or State law) of the amount determined by the court under subparagraph (A),

(D) reasonable attorney's fees and costs of the action, to be paid by the defendant, and

(E) such other legal or equitable relief as the court deems appropriate.

For purposes of this paragraph, interest on unpaid contributions shall be determined by using the rate provided under the plan, or, if none, the rate prescribed under section 6621 of title 26.

**(h) Service upon Secretary of Labor and Secretary of the Treasury**

A copy of the complaint in any action under this subchapter by a participant, beneficiary, or fiduciary (other than an action brought by one or more participants or beneficiaries under subsection (a)(1)(B) which is solely for the purpose of recovering benefits due such participants under the terms of the plan) shall be served upon the Secretary and the Secretary of the Treasury by certified mail. Either Secretary shall have the right in his discretion to intervene in any action, except that the Secretary of the Treasury may not intervene in any action under part 4 of this subtitle. If the Secretary brings an action under subsection (a) on behalf of a participant or beneficiary, he shall notify the Secretary of the Treasury.

**(i) Administrative assessment of civil penalty**

In the case of a transaction prohibited by section 1106 of this title by a party in interest with respect to a plan to which this part applies, the Secretary may assess a civil penalty against such party in interest. The amount of such penalty may not exceed 5 percent of the amount involved in each such transaction (as defined in section 4975(f)(4) of title 26) for each year or part thereof during which the prohibited transaction continues, except that, if the transaction is not corrected (in such manner as the Secretary shall prescribe in regulations which shall be consistent with section 4975(f)(5) of title 26) within 90 days after notice from the Secretary (or such longer period as the Secretary may permit), such penalty may be in an amount not more than 100 percent of the amount involved. This subsection shall not apply to a transaction with respect to a plan described in section 4975(e)(1) of title 26.

**(j) Direction and control of litigation by Attorney General**

In all civil actions under this subchapter, attorneys appointed by the Secretary may represent the Secretary (except as provided in section 518(a) of title 28), but all such litigation shall be subject to the direction and control of the Attorney General.

**(k) Jurisdiction of actions against the Secretary of Labor**

Suits by an administrator, fiduciary, participant, or beneficiary of an employee benefit plan to review a final order of the Secretary, to restrain the Secretary from taking any action

§ 1132      TITLE 29—LABOR      Page 536

contrary to the provisions of this chapter, or to compel him to take action required under this subchapter, may be brought in the district court of the United States for the district where the plan has its principal office, or in the United States District Court for the District of Columbia.

**(l) Civil penalties on violations by fiduciaries**

(1) In the case of—

(A) any breach of fiduciary responsibility under (or other violation of) part 4 of this subtitle by a fiduciary, or

(B) any knowing participation in such a breach or violation by any other person,

the Secretary shall assess a civil penalty against such fiduciary or other person in an amount equal to 20 percent of the applicable recovery amount.

(2) For purposes of paragraph (1), the term "applicable recovery amount" means any amount which is recovered from a fiduciary or other person with respect to a breach or violation described in paragraph (1)—

(A) pursuant to any settlement agreement with the Secretary, or

(B) ordered by a court to be paid by such fiduciary or other person to a plan or its participants and beneficiaries in a judicial proceeding instituted by the Secretary under subsection (a)(2) or (a)(5).

(3) The Secretary may, in the Secretary's sole discretion, waive or reduce the penalty under paragraph (1) if the Secretary determines in writing that—

(A) the fiduciary or other person acted reasonably and in good faith, or

(B) it is reasonable to expect that the fiduciary or other person will not be able to restore all losses to the plan (or to provide the relief ordered pursuant to subsection (a)(9)) without severe financial hardship unless such waiver or reduction is granted.

(4) The penalty imposed on a fiduciary or other person under this subsection with respect to any transaction shall be reduced by the amount of any penalty or tax imposed on such fiduciary or other person with respect to such transaction under subsection (i) of this section and section 4975 of title 26.

**(m) Penalty for improper distribution**

In the case of a distribution to a pension plan participant or beneficiary in violation of section 1056(e) of this title by a plan fiduciary, the Secretary shall assess a penalty against such fiduciary in an amount equal to the value of the distribution. Such penalty shall not exceed $10,000 for each such distribution.

(Pub. L. 93–406, title I, § 502, Sept. 2, 1974, 88 Stat. 891; Pub. L. 96–364, title III, § 306(b), Sept. 26, 1980, 94 Stat. 1295; Pub. L. 99–272, title X, § 10002(b), Apr. 7, 1986, 100 Stat. 231; Pub. L. 100–203, title IX, §§ 9342(c), 9344, Dec. 22, 1987, 101 Stat. 1330–372, 1330–373; Pub. L. 101–239, title II, § 2101(a), (b), title VII, §§ 7881(b)(5)(B), (j)(2), (3), 7891(a)(1), 7894(f)(1), Dec. 19, 1989, 103 Stat. 2123, 2438, 2442, 2445, 2450; Pub. L. 101–508, title XII, § 12012(d)(2), Nov. 5, 1990, 104 Stat. 1388–573; Pub. L. 103–66, title IV, § 4301(c)(1)–(3), Aug. 10, 1993, 107 Stat. 376; Pub. L. 103–401, §§ 2, 3, Oct. 22, 1994, 108 Stat. 4172; Pub. L. 103–465, title VII, § 761(a)(9)(B)(ii), Dec. 8, 1994, 108 Stat. 5033; Pub. L. 104–191, title I, § 101(b), (e)(2), Aug. 21, 1996, 110 Stat. 1951, 1952; Pub. L. 104–204, title VI, § 603(b)(3)(E), Sept. 26, 1996, 110 Stat. 2938; Pub. L. 105–34, title XV, § 1503(c)(2)(B), (d)(7), Aug. 5, 1997, 111 Stat. 1062; Pub. L. 107–204, title III, § 306(b)(3), July 30, 2002, 116 Stat. 783; Pub. L. 108–218, title I, §§ 102(d), 103(b), 104(a)(2), Apr. 10, 2004, 118 Stat. 602, 603, 606; Pub. L. 109–280, title I, § 103(b)(2), title II, § 202(b), (c), title V, §§ 502(a)(2), (b)(2), 507(b), 508(a)(2)(C), title IX, § 902(f)(2), Aug. 17, 2006, 120 Stat. 816, 884, 885, 940, 941, 949, 951, 1039; Pub. L. 110–233, title I, § 101(e), May 21, 2008, 122 Stat. 886; Pub. L. 110–458, title I, §§ 101(c)(1)(H), 102(b)(1)(H), (I), Dec. 23, 2008, 122 Stat. 5097, 5101; Pub. L. 111–3, title III, § 311(b)(1)(E), Feb. 4, 2009, 123 Stat. 70; Pub. L. 113–97, title I, § 102(b)(6), Apr. 7, 2014, 128 Stat. 1117; Pub. L. 113–235, div. O, title I, § 111(d), Dec. 16, 2014, 128 Stat. 2793; Pub. L. 117–328, div. T, title III, § 342(c), Dec. 29, 2022, 136 Stat. 5378.)

### Editorial Notes

#### References in Text

Section 405(a) of title 26, referred to in subsec. (b)(1), was repealed by Pub. L. 98–369, div. A, title IV, § 491(a), July 18, 1984, 98 Stat. 848.

Paragraphs (1) and (4) of section 1166 of this title, referred to in subsec. (c)(1), were redesignated as pars. (1) and (4) of section 1166(a) of this title by Pub. L. 101–239, title VII, § 7891(d)(1)(A)(ii)(I), Dec. 19, 1989, 103 Stat. 2445.

Section 1082 of this title, referred to in subsec. (c)(3), was repealed and a new section 1082 was enacted by Pub. L. 109–280, title I, § 101(a), (b), Aug. 17, 2006, 120 Stat. 784, and, as so enacted, section 1082 of this title no longer contains a subsec. (d)(12)(E).

Section 1320b–14 of title 42, referred to in subsec. (c)(11), was repealed by Pub. L. 104–226, § 1(a), Oct. 2, 1996, 110 Stat. 3033, and a new section 1320b–14 of title 42, which does not contain a subsec. (c)(8), was enacted by Pub. L. 106–554, § 1(a)(6) [title IX, § 911(a)(1)], Dec. 21, 2000, 114 Stat. 2763, 2763A–583.

This chapter, referred to in subsec. (k), was in the original "this Act", meaning Pub. L. 93–406, known as the Employee Retirement Income Security Act of 1974. Titles I, III, and IV of such Act are classified principally to this chapter. For complete classification of this Act to the Code, see Short Title note set out under section 1001 of this title and Tables.

#### Codification

Another section 306(b)(3) of Pub. L. 107–204 is classified to section 7244(b)(3) of Title 15, Commerce and Trade.

#### Amendments

2022—Subsec. (a)(4). Pub. L. 117–328, § 342(c)(2), substituted "section 1025(c) or 1032(a) of this title" for "1025(c) of this title".

Subsec. (c)(1). Pub. L. 117–328, § 342(c)(1), substituted ", section 1025(a) of this title, or section 1032(a) of this title" for "or section 1025(a) of this title".

2014—Subsec. (a)(11). Pub. L. 113–235 added par. (11).

Subsec. (c)(10) to (12). Pub. L. 113–97 redesignated par. (10) relating to ongoing consultation by the Secretary and the Secretary of Health and Human Services as par. (11) and added par. (12).

2009—Subsec. (a)(6). Pub. L. 111–3, § 311(b)(1)(E)(i), which directed the substitution of "(8), or (9)" for "or (8)", could not be executed because the words "or (8)" did not appear after the amendment by Pub. L. 110–233, § 101(e)(1). See 2008 Amendment note below.

Subsec. (c)(9), (10). Pub. L. 111–3, § 311(b)(1)(E)(ii), added par. (9) and redesignated former par. (9) as (10) relating to Secretarial enforcement authority relating to use of genetic information.

2008—Subsec. (a)(6). Pub. L. 110–233, § 101(e)(1), substituted "(7), (8), or (9)" for "(7), or (8)".

Subsec. (b)(3). Pub. L. 110–233, § 101(e)(2), substituted "Except as provided in subsections (c)(9) and (a)(6) (with respect to collecting civil penalties under subsection (c)(9)), the Secretary" for "The Secretary".

Subsec. (c)(2). Pub. L. 110–458, § 102(b)(1)(H), substituted "1021(b)(1)" for "1021(b)(4)".

Subsec. (c)(4). Pub. L. 110–458, § 101(c)(1)(H), substituted "by any person of subsection (j), (k), or (l) of section 1021 of this title or section 1144(e)(3) of this title." for "by any person of subsection (j), (k), or (l) of section 1021 of this title, section 1082(b)(7)(F)(vi) of this title, or section 1144(e)(3) of this title."

Subsec. (c)(8)(A). Pub. L. 110–458, § 102(b)(1)(I), inserted "plan" after "multiemployer".

Subsec. (c)(9), (10). Pub. L. 110–233, § 101(e)(3), added par. (9) and redesignated former par. (9) as (10).

2006—Subsec. (a)(6). Pub. L. 109–280, § 202(b)(1), substituted "(6), (7), or (8)" for "(6), or (7)".

Subsec. (a)(8) to (10). Pub. L. 109–280, § 202(c), amended subsec. (a) by striking out "or" at end of par. (8), substituting "; or" for period at end of par. (9), and adding par. (10).

Subsec. (c)(1). Pub. L. 109–280, § 508(a)(2)(C), substituted "section 1021(f) of this title, or section 1025(a) of this title" for "or section 1021(f) of this title".

Subsec. (c)(4). Pub. L. 109–280, § 902(f)(2), which directed amendment of par. (4) by substituting ", section 1082(b)(7)(F)(vi) of this title, or section 1144(e)(3) of this title" for "or section 1082(b)(7)(F)(vi) of this title", was executed by making the substitution for "or 1082(b)(7)(F)(iv) of this title", to reflect the probable intent of Congress.

Pub. L. 109–280, § 502(b)(2), which directed amendment of par. (4) by substituting "subsection (j), (k), or (l) of section 1021 of this title" for "section 1021(j) or (k) of this title", was executed by making the substitution for "subsection (j) or (k) of section 1021 of this title", to reflect the probable intent of Congress.

Pub. L. 109–280, § 502(a)(2), substituted "subsection (j) or (k) of section 1021 of this title" for "section 1021(j)".

Pub. L. 109–280, § 103(b)(2), which directed amendment of par. (4) by substituting "section 1021(j) or 1082(b)(7)(F)(iv) of this title" for "section 1082(b)(7)(F)(iv) of this title", was executed by making the substitution for "section 1082(b)(7)(F)(vi) of this title", to reflect the probable intent of Congress.

Subsec. (c)(7). Pub. L. 109–280, § 507(b), substituted "subsection (i) or (m) of section 1021" for "section 1021(i)".

Subsec. (c)(8), (9). Pub. L. 109–280, § 202(b), (3), added par. (8) and redesignated former par. (8) as (9).

2004—Subsec. (c)(1). Pub. L. 108–218, § 103(b), substituted ", section 1021(e)(1) of this title, or section 1021(f) of this title" for "or section 1021(e)(1) of this title".

Subsec. (c)(3). Pub. L. 108–218, § 102(d), inserted "or who fails to meet the requirements of section 1082(d)(12)(E) of this title with respect to any person" after "1021(e)(2) of this title with respect to any person".

Subsec. (c)(4). Pub. L. 108–218, § 104(a)(2), amended par. (4) generally. Prior to amendment, par. (4) read as follows: "The Secretary may assess a civil penalty of not more than $1,000 for each violation by any person of section 1021(f)(1) of this title."

2002—Subsec. (a)(6). Pub. L. 107–204, § 306(b)(3)(A), substituted "(5), (6), or (7)" for "(5), or (6)".

Subsec. (c)(7), (8). Pub. L. 107–204, § 306(b)(3)(B), (C), added par. (7) and redesignated former par. (7) as (8).

1997—Subsec. (a)(6). Pub. L. 105–34, § 1503(d)(7), substituted "(5), or (6)" for "or (5)".

Subsec. (c)(6), (7). Pub. L. 105–34, § 1503(c)(2)(B), added par. (6) and redesignated former par. (6) as (7).

1996—Subsec. (a)(6). Pub. L. 104–191, § 101(e)(2)(A)(i), substituted "under paragraph (2), (4), or (5) of sub-section (c) or under subsection (i) or (l)" for "under subsection (c)(2) or (i) or (l) of this section".

Subsec. (b)(3). Pub. L. 104–204 made technical amendment to reference in original act which appears in text as reference to section 1191b of this title.

Pub. L. 104–191, § 101(b), added par. (3).

Subsec. (c)(1). Pub. L. 104–191, § 101(e)(2)(B), inserted at end "For purposes of this paragraph, each violation described in subparagraph (A) with respect to any single participant, and each violation described in subparagraph (B) with respect to any single participant or beneficiary, shall be treated as a separate violation."

Subsec. (c)(4) to (6). Pub. L. 104–191, § 101(e)(2)(A)(ii), struck out "For purposes of this paragraph, each violation described in subparagraph (A) with respect to any single participant, and each violation described in subparagraph (B) with respect to any single participant or beneficiary, shall be treated as a separate violation. The Secretary and" after "section 1021(f)(1) of this title.", redesignated "the Secretary of Health and Human Services shall maintain such ongoing consultation as may be necessary and appropriate to coordinate enforcement under this subsection with enforcement under section 1320b–14(c)(8) of title 42." as par. (6) and inserted "The Secretary and" before "the Secretary of Health and Human Services", and added par. (5).

1994—Subsec. (a)(9). Pub. L. 103–401, § 2, added par. (9).

Subsec. (l)(3)(B). Pub. L. 103–401, § 3, inserted "(or to provide the relief ordered pursuant to subsection (a)(9))" after "to restore all losses to the plan".

Subsec. (m). Pub. L. 103–465 added subsec. (m).

1993—Subsec. (a)(7), (8). Pub. L. 103–66, § 4301(c)(1), added pars. (7) and (8).

Subsec. (c)(4). Pub. L. 103–66, § 4301(c)(2), added par. (4).

Subsec. (e)(1). Pub. L. 103–66, § 4301(c)(3), substituted in first sentence "fiduciary, or any person referred to in section 1021(f)(1) of this title" for "or fiduciary" and in second sentence "paragraphs (1)(B) and (7) of subsection (a)" for "subsection (a)(1)(B)".

1990—Subsec. (c)(1). Pub. L. 101–508, § 12012(d)(2)(A), inserted "or section 1021(e)(1) of this title" after "section 1166 of this title".

Subsec. (c)(3). Pub. L. 101–508, § 12012(d)(2)(B), inserted "or who fails to meet the requirements of section 1021(e)(2) of this title with respect to any person" after first reference to "beneficiary" and "or to such person" after second reference to "beneficiary".

1989—Subsec. (a)(6). Pub. L. 101–239, § 7881(j)(2), substituted "subsection (c)(2) or (i)" for "subsection (i)".

Pub. L. 101–239, § 2101(b), inserted "or (l)" after "subsection (i)".

Subsec. (b)(1). Pub. L. 101–239, § 7894(f)(1), substituted "respect" for "respct" before "to a violation" in introductory provisions.

Pub. L. 101–239, § 7891(a)(1), substituted "Internal Revenue Code of 1986" for "Internal Revenue Code of 1954", which for purposes of codification was translated as "title 26" thus requiring no change in text.

Subsec. (c)(2). Pub. L. 101–239, § 7881(j)(3), inserted "against any plan administrator" after "civil penalty" and substituted "such plan administrator's" for "a plan administrator's".

Subsec. (c)(3). Pub. L. 101–239, § 7881(b)(5)(B), added par. (3).

Subsec. (g)(2). Pub. L. 101–239, § 7891(a)(1), substituted "Internal Revenue Code of 1986" for "Internal Revenue Code of 1954", which for purposes of codification was translated as "title 26" thus requiring no change in text.

Subsec. (l). Pub. L. 101–239, § 2101(a), added subsec. (l).

1987—Subsec. (c). Pub. L. 100–203, § 9342(c), designated existing provision as par. (1), redesignated as cls. (A) and (B) former cls. (1) and (2), and added par. (2).

Subsec. (i). Pub. L. 100–203, § 9344, amended second sentence generally. Prior to amendment, second sentence read as follows: "The amount of such penalty may not exceed 5 percent of the amount involved (as defined in section 4975(f)(4) of title 26); except that if the transaction is not corrected (in such manner as the

Secretary shall prescribe by regulation, which regulations shall be consistent with section 4975(f)(5) of title 26) within 90 days after notice from the Secretary (or such longer period as the Secretary may permit), such penalty may be in an amount not more than 100 percent of the amount involved.''

1986—Subsec. (c). Pub. L. 99–272 inserted ''(1) who fails to meet the requirements of paragraph (1) or (4) of section 1166 of this title with respect to a participant or beneficiary, or (2)''.

1980—Subsec. (b). Pub. L. 96–364, §306(b)(1), redesignated existing provisions as par. (1)(A) and (B) and added par. (2).

Subsec. (g). Pub. L. 96–364, §306(b)(2), redesignated existing provisions as par. (1), inserted exception for actions under paragraph (2), and added par. (2).

### Statutory Notes and Related Subsidiaries

#### Effective Date of 2014 Amendment

Amendment by Pub. L. 113–235 applicable with respect to plan years beginning after Dec. 31, 2014, see section 111(e) of Pub. L. 113–235, set out as a note under section 1021 of this title.

Amendment by Pub. L. 113–97 applicable to years beginning after Dec. 31, 2013, see section 3 of Pub. L. 113–97, set out as a note under section 401 of Title 26, Internal Revenue Code.

#### Effective Date of 2009 Amendment

Amendment by Pub. L. 111–3 effective Apr. 1, 2009, and applicable to child health assistance and medical assistance provided on or after that date, with certain exceptions, see section 3 of Pub. L. 111–3, set out as an Effective Date note under section 1396 of Title 42, The Public Health and Welfare.

#### Effective Date of 2008 Amendment

Amendment by Pub. L. 110–458 effective as if included in the provisions of Pub. L. 109–280 to which the amendment relates, except as otherwise provided, see section 112 of Pub. L. 110–458, set out as a note under section 72 of Title 26, Internal Revenue Code.

Pub. L. 110–233, title I, §101(f)(2), May 21, 2008, 122 Stat. 888, provided that: ''The amendments made by this section [amending this section and sections 1182 and 1191b of this title] shall apply with respect to group health plans for plan years beginning after the date that is 1 year after the date of enactment of this Act [May 21, 2008].''

#### Effective Date of 2006 Amendment

Amendment by section 103(b)(2) of Pub. L. 109–280 applicable to plan years beginning after Dec. 31, 2007, with collective bargaining exception, see section 103(d) of Pub. L. 109–280, set out as a note under section 1021 of this title.

Amendment by section 202(b), (c) of Pub. L. 109–280 applicable with respect to plan years beginning after 2007, with special rules for certain notices and certain restored benefits, see section 202(f) of Pub. L. 109–280, set out as a note under section 1082 of this title.

Amendment by section 502(a)(2), (b)(2) of Pub. L. 109–280 applicable to plan years beginning after Dec. 31, 2007, see section 502(d) of Pub. L. 109–280, set out as a note under section 4980F of Title 26, Internal Revenue Code.

Amendment by section 507(b) of Pub. L. 109–280 applicable to plan years beginning after Dec. 31, 2006, see section 507(d)(1) of Pub. L. 109–280, set out as a note under section 1021 of this title.

Amendment by section 508(a)(2)(C) of Pub. L. 109–280 applicable to plan years beginning after Dec. 31, 2006, with special rule for collectively bargained agreements that were ratified on or before such date, see section 508(c) of Pub. L. 109–280, set out as a note under section 1025 of this title.

Amendment by section 902(f)(2) effective Aug. 17, 2006, see section 902(g) of Pub. L. 109–280, set out as a note under section 401 of Title 26, Internal Revenue Code.

#### Effective Date of 2004 Amendment

Amendment by section 103(b) of Pub. L. 108–218 applicable to plan years beginning after Dec. 31, 2004, see section 103(d) of Pub. L. 108–218, set out as a note under section 1021 of this title.

#### Effective Date of 2002 Amendment

Amendment by Pub. L. 107–204 effective 180 days after July 30, 2002, see section 7244(c) of Title 15, Commerce and Trade.

#### Effective Date of 1996 Amendments

Amendment by Pub. L. 104–204 applicable with respect to group health plans for plan years beginning on or after Jan. 1, 1998, see section 603(c) of Pub. L. 104–204 set out as a note under section 1003 of this title.

Amendment by Pub. L. 104–191 applicable with respect to group health plans for plan years beginning after June 30, 1997, except as otherwise provided, see section 101(g) of Pub. L. 104–191, set out as a note under section 1181 of this title.

#### Effective Date of 1994 Amendments

Amendment by Pub. L. 103–465 applicable to plan years beginning after Dec. 31, 1994, see section 761(b)(1) of Pub. L. 103–465, set out as a note under section 1056 of this title.

Pub. L. 103–401, §5, Oct. 22, 1994, 108 Stat. 4173, provided that: ''The amendments made by this Act [amending this section] shall apply to any legal proceeding pending, or brought, on or after May 31, 1993.''

#### Effective Date of 1990 Amendment

Amendment by Pub. L. 101–508 applicable to qualified transfers under section 420 of title 26 made after Nov. 5, 1990, see section 12012(e) of Pub. L. 101–508, set out as a note under section 1021 of this title.

#### Effective Date of 1989 Amendment

Pub. L. 101–239, title II, §2101(c), Dec. 19, 1989, 103 Stat. 2123, provided that: ''The amendments made by this section [amending this section] shall apply to any breach of fiduciary responsibility or other violation occurring on or after the date of the enactment of this Act [Dec. 19, 1989].''

Amendment by section 7881(b)(5)(B), (j)(2), (3) of Pub. L. 101–239 effective, except as otherwise provided, as if included in the provision of the Pension Protection Act, Pub. L. 100–203, §§9302–9346, to which such amendment relates, see section 7882 of Pub. L. 101–239, set out as a note under section 401 of Title 26, Internal Revenue Code.

Amendment by section 7891(a)(1) of Pub. L. 101–239 effective, except as otherwise provided, as if included in the provision of the Tax Reform Act of 1986, Pub. L. 99–514, to which such amendment relates, see section 7891(f) of Pub. L. 101–239, set out as a note under section 1002 of this title.

Amendment by section 7894(f)(1) of Pub. L. 101–239 effective, except as otherwise provided, as if originally included in the provision of the Employee Retirement Income Security Act of 1974, Pub. L. 93–406, to which such amendment relates, see section 7894(i) of Pub. L. 101–239, set out as a note under section 1002 of this title.

#### Effective Date of 1987 Amendment

Pub. L. 100–203, title IX, §9342(d), Dec. 22, 1987, 101 Stat. 1330–372, provided that:

''(1) IN GENERAL.—The amendments made by this section [amending this section and sections 1023, 1024, and 1113 of this title] shall apply with respect to reports required to be filed after December 31, 1987.

''(2) REGULATIONS.—The Secretary of Labor shall issue the regulations required to carry out the amendments made by subsection (c) [amending this section] not later than January 1, 1989.''

#### Effective Date of 1986 Amendment

Amendment by Pub. L. 99–272 applicable to plan years beginning on or after July 1, 1986, with special rule for

collective bargaining agreements, see section 10002(d) of Pub. L. 99–272, set out as an Effective Date note under section 1161 of this title.

EFFECTIVE DATE OF 1980 AMENDMENT

Amendment by Pub. L. 96–364 effective Sept. 26, 1980, except as specifically provided, see section 1461(e) of this title.

REGULATIONS

Pub. L. 110–233, title I, §101(f)(1), May 21, 2008, 122 Stat. 888, provided that: ''The Secretary of Labor shall issue final regulations not later than 12 months after the date of enactment of this Act [May 21, 2008] to carry out the amendments made by this section [amending this section and sections 1182 and 1191b of this title].''

Secretary authorized, effective Sept. 2, 1974, to promulgate regulations wherever provisions of this subchapter call for the promulgation of regulations, see section 1031 of this title.

APPLICABILITY OF AMENDMENTS BY SUBTITLES A AND B OF TITLE I OF PUB. L. 109–280

For special rules on applicability of amendments by subtitles A (§§101–108) and B (§§111–116) of title I of Pub. L. 109–280 to certain eligible cooperative plans, PBGC settlement plans, and eligible government contractor plans, see sections 104, 105, and 106 of Pub. L. 109–280, set out as notes under section 401 of Title 26, Internal Revenue Code.

SPECIAL RULE FOR CERTAIN BENEFITS FUNDED UNDER AN AGREEMENT APPROVED BY THE PENSION BENEFIT GUARANTY CORPORATION

For applicability of amendment by section 202(b), (c) of Pub. L. 109–280 to a multiemployer plan that is a party to an agreement that was approved by the Pension Benefit Guaranty Corporation prior to June 30, 2005, and that increases benefits and provides for certain withdrawal liability rules, see section 206 of Pub. L. 109–280, set out as a note under section 412 of Title 26, Internal Revenue Code.

EFFECT OF PUB. L. 103–401 ON OTHER PROVISIONS

Pub. L. 103–401, §4, Oct. 22, 1994, 108 Stat. 4172, provided that: ''Nothing in this Act [amending this section and enacting provisions set out as notes under this section and section 1001 of this title] shall be construed to limit the legal standing of individuals to bring a civil action as participants or beneficiaries under section 502(a) of the Employee Retirement Income Security Act of 1974 (29 U.S.C. 1132(a)), and nothing in this Act shall affect the responsibilities, obligations, or duties imposed upon fiduciaries by title I of the Employee Retirement Income Security Act of 1974 [this subchapter].''

PLAN AMENDMENTS NOT REQUIRED UNTIL JULY 30, 2002

For provisions directing that if any amendment made by section 306(b) of Pub. L. 107–204 requires an amendment to any plan, such plan amendment shall not be required to be made before the first plan year beginning on or after July 30, 2002, see section 7244(b)(3) of Title 15, Commerce and Trade.

PLAN AMENDMENTS NOT REQUIRED UNTIL JANUARY 1, 1994

For provisions setting forth circumstances under which any amendment to a plan required to be made by an amendment made by section 4301 of Pub. L. 103–66 shall not be required to be made before the first plan year beginning on or after Jan. 1, 1994, see section 4301(d) of Pub. L. 103–66, set out as an Effective Date of 1993 Amendment note under section 1021 of this title.

## § 1133. Claims procedure

In accordance with regulations of the Secretary, every employee benefit plan shall—

(1) provide adequate notice in writing to any participant or beneficiary whose claim for benefits under the plan has been denied, setting forth the specific reasons for such denial, written in a manner calculated to be understood by the participant, and

(2) afford a reasonable opportunity to any participant whose claim for benefits has been denied for a full and fair review by the appropriate named fiduciary of the decision denying the claim.

(Pub. L. 93–406, title I, §503, Sept. 2, 1974, 88 Stat. 893.)

### Statutory Notes and Related Subsidiaries

REGULATIONS

Secretary authorized, effective Sept. 2, 1974, to promulgate regulations wherever provisions of this subchapter call for the promulgation of regulations, see section 1031 of this title.

## § 1134. Investigative authority

### (a) Investigation and submission of reports, books, etc.

The Secretary shall have the power, in order to determine whether any person has violated or is about to violate any provision of this subchapter or any regulation or order thereunder—

(1) to make an investigation, and in connection therewith to require the submission of reports, books, and records, and the filing of data in support of any information required to be filed with the Secretary under this subchapter, and

(2) to enter such places, inspect such books and records and question such persons as he may deem necessary to enable him to determine the facts relative to such investigation, if he has reasonable cause to believe there may exist a violation of this subchapter or any rule or regulation issued thereunder or if the entry is pursuant to an agreement with the plan.

The Secretary may make available to any person actually affected by any matter which is the subject of an investigation under this section, and to any department or agency of the United States, information concerning any matter which may be the subject of such investigation; except that any information obtained by the Secretary pursuant to section 6103(g) of title 26 shall be made available only in accordance with regulations prescribed by the Secretary of the Treasury.

### (b) Frequency of submission of books and records

The Secretary may not under the authority of this section require any plan to submit to the Secretary any books or records of the plan more than once in any 12 month period, unless the Secretary has reasonable cause to believe there may exist a violation of this subchapter or any regulation or order thereunder.

### (c) Other provisions applicable relating to attendance of witnesses and production of books, records, etc.

For the purposes of any investigation provided for in this subchapter, the provisions of sections

Schedule, to be considered references to rates payable under specified sections of Title 5, Government Organization and Employees, see section 529 [title I, § 101(c)(1)] of Pub. L. 101–509, set out in a note under section 5376 of Title 5.

## § 1143. Research, studies, and reports

### (a) Authorization to undertake research and surveys

(1) The Secretary is authorized to undertake research and surveys and in connection therewith to collect, compile, analyze and publish data, information, and statistics relating to employee benefit plans, including retirement, deferred compensation, and welfare plans, and types of plans not subject to this chapter.

(2) The Secretary is authorized and directed to undertake research studies relating to pension plans, including but not limited to (A) the effects of this subchapter upon the provisions and costs of pension plans, (B) the role of private pensions in meeting the economic security needs of the Nation, and (C) the operation of private pension plans including types and levels of benefits, degree of reciprocity or portability, and financial and actuarial characteristics and practices, and methods of encouraging the growth of the private pension system.

(3) The Secretary may, as he deems appropriate or necessary, undertake other studies relating to employee benefit plans, the matters regulated by this subchapter, and the enforcement procedures provided for under this subchapter.

(4) The research, surveys, studies, and publications referred to in this subsection may be conducted directly, or indirectly through grant or contract arrangements.

### (b) Omitted

### (c) Cooperation with Congress

The Secretary is authorized and directed to cooperate with the Congress and its appropriate committees, subcommittees, and staff in supplying data and any other information, and personnel and services, required by the Congress in any study, examination, or report by the Congress relating to pension benefit plans established or maintained by States or their political subdivisions.

(Pub. L. 93–406, title I, § 513, Sept. 2, 1974, 88 Stat. 896.)

#### Editorial Notes

##### References in Text

This chapter, referred to in subsec. (a)(1), was in the original "this Act", meaning Pub. L. 93–406, known as the Employee Retirement Income Security Act of 1974. Titles I, III, and IV of such Act are classified principally to this chapter. For complete classification of this Act to the Code, see Short Title note set out under section 1001 of this title and Tables.

##### Codification

Subsec. (b) of this section, which required the Secretary to submit annually a report to Congress on the administration of this subchapter, terminated, effective May 15, 2000, pursuant to section 3003 of Pub. L. 104–66, as amended, set out as a note under section 1113 of Title 31, Money and Finance. See, also, page 123 of House Document No. 103–7.

#### Statutory Notes and Related Subsidiaries

##### Regulations

Secretary authorized, effective Sept. 2, 1974, to promulgate regulations wherever provisions of this subchapter call for the promulgation of regulations, see section 1031 of this title.

## § 1143a. Studies by Comptroller General

### (1) In general

The Comptroller General of the United States may, pursuant to the request of any Member of Congress, study employee benefit plans, including the effects of such plans on employees, participants, and their beneficiaries.

### (2) Access to books, documents, etc.

For the purpose of conducting studies under this section, the Comptroller General, or any of his duly authorized representatives, shall have access to and the right to examine and copy any books, documents, papers, records, or other recorded information—

  (A) within the possession or control of the administrator, sponsor, or employer of and persons providing services to any employee benefit plan, and

  (B) which the Comptroller General or his representative finds, in his own judgment, pertinent to such study.

The Comptroller General shall not disclose the identity of any individual or employer in making any information obtained under this section available to the public.

### (3) Definitions

For purposes of this section, the terms "employee benefit plan", "participant", "administrator", "beneficiary", "plan sponsor", "employee", and "employer" are defined in section 1002 of this title.

### (4) Effective date

The preceding provisions of this section shall be effective on April 7, 1986.

(Pub. L. 99–272, title XI, § 11016(d), Apr. 7, 1986, 100 Stat. 275.)

#### Editorial Notes

##### Codification

Section was enacted as part of the Single-Employer Pension Plan Amendments Act of 1986, and also as part of the Consolidated Omnibus Budget Reconciliation Act of 1985, and not as part of the Employee Retirement Income Security Act of 1974 which comprises this chapter.

## § 1144. Other laws

### (a) Supersedure; effective date

Except as provided in subsection (b) of this section, the provisions of this subchapter and subchapter III shall supersede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan described in section 1003(a) of this title and not exempt under section 1003(b) of this title. This section shall take effect on January 1, 1975.

### (b) Construction and application

(1) This section shall not apply with respect to any cause of action which arose, or any act or omission which occurred, before January 1, 1975.

(2)(A) Except as provided in subparagraph (B), nothing in this subchapter shall be construed to exempt or relieve any person from any law of any State which regulates insurance, banking, or securities.

(B) Neither an employee benefit plan described in section 1003(a) of this title, which is not exempt under section 1003(b) of this title (other than a plan established primarily for the purpose of providing death benefits), nor any trust established under such a plan, shall be deemed to be an insurance company or other insurer, bank, trust company, or investment company or to be engaged in the business of insurance or banking for purposes of any law of any State purporting to regulate insurance companies, insurance contracts, banks, trust companies, or investment companies.

(3) Nothing in this section shall be construed to prohibit use by the Secretary of services or facilities of a State agency as permitted under section 1136 of this title.

(4) Subsection (a) shall not apply to any generally applicable criminal law of a State.

(5)(A) Except as provided in subparagraph (B), subsection (a) shall not apply to the Hawaii Prepaid Health Care Act (Haw. Rev. Stat. §§ 393–1 through 393–51).

(B) Nothing in subparagraph (A) shall be construed to exempt from subsection (a)—

(i) any State tax law relating to employee benefit plans, or

(ii) any amendment of the Hawaii Prepaid Health Care Act enacted after September 2, 1974, to the extent it provides for more than the effective administration of such Act as in effect on such date.

(C) Notwithstanding subparagraph (A), parts 1 and 4 of this subtitle, and the preceding sections of this part to the extent they govern matters which are governed by the provisions of such parts 1 and 4, shall supersede the Hawaii Prepaid Health Care Act (as in effect on or after January 14, 1983), but the Secretary may enter into cooperative arrangements under this paragraph and section 1136 of this title with officials of the State of Hawaii to assist them in effectuating the policies of provisions of such Act which are superseded by such parts 1 and 4 and the preceding sections of this part.

(6)(A) Notwithstanding any other provision of this section—

(i) in the case of an employee welfare benefit plan which is a multiple employer welfare arrangement and is fully insured (or which is a multiple employer welfare arrangement subject to an exemption under subparagraph (B)), any law of any State which regulates insurance may apply to such arrangement to the extent that such law provides—

(I) standards, requiring the maintenance of specified levels of reserves and specified levels of contributions, which any such plan, or any trust established under such a plan, must meet in order to be considered under such law able to pay benefits in full when due, and

(II) provisions to enforce such standards, and

(ii) in the case of any other employee welfare benefit plan which is a multiple employer welfare arrangement, in addition to this subchapter, any law of any State which regulates insurance may apply to the extent not inconsistent with the preceding sections of this subchapter.

(B) The Secretary may, under regulations which may be prescribed by the Secretary, exempt from subparagraph (A)(ii), individually or by class, multiple employer welfare arrangements which are not fully insured. Any such exemption may be granted with respect to any arrangement or class of arrangements only if such arrangement or each arrangement which is a member of such class meets the requirements of section 1002(1) and section 1003 of this title necessary to be considered an employee welfare benefit plan to which this subchapter applies.

(C) Nothing in subparagraph (A) shall affect the manner or extent to which the provisions of this subchapter apply to an employee welfare benefit plan which is not a multiple employer welfare arrangement and which is a plan, fund, or program participating in, subscribing to, or otherwise using a multiple employer welfare arrangement to fund or administer benefits to such plan's participants and beneficiaries.

(D) For purposes of this paragraph, a multiple employer welfare arrangement shall be considered fully insured only if the terms of the arrangement provide for benefits the amount of all of which the Secretary determines are guaranteed under a contract, or policy of insurance, issued by an insurance company, insurance service, or insurance organization, qualified to conduct business in a State.

(7) Subsection (a) shall not apply to qualified domestic relations orders (within the meaning of section 1056(d)(3)(B)(i) of this title), qualified medical child support orders (within the meaning of section 1169(a)(2)(A) of this title), and the provisions of law referred to in section 1169(a)(2)(B)(ii) of this title to the extent they apply to qualified medical child support orders.

(8) Subsection (a) of this section shall not be construed to preclude any State cause of action—

(A) with respect to which the State exercises its acquired rights under section 1169(b)(3) of this title with respect to a group health plan (as defined in section 1167(1) of this title), or

(B) for recoupment of payment with respect to items or services pursuant to a State plan for medical assistance approved under title XIX of the Social Security Act [42 U.S.C. 1396 et seq.] which would not have been payable if such acquired rights had been executed before payment with respect to such items or services by the group health plan.

(9) For additional provisions relating to group health plans, see section 1191 of this title.

**(c) Definitions**

For purposes of this section:

(1) The term "State law" includes all laws, decisions, rules, regulations, or other State action having the effect of law, of any State. A law of the United States applicable only to the District of Columbia shall be treated as a State law rather than a law of the United States.

(2) The term "State" includes a State, any political subdivisions thereof, or any agency or instrumentality of either, which purports to regulate, directly or indirectly, the terms and conditions of employee benefit plans covered by this subchapter.

**(d) Alteration, amendment, modification, invalidation, impairment, or supersedure of any law of the United States prohibited**

Nothing in this subchapter shall be construed to alter, amend, modify, invalidate, impair, or supersede any law of the United States (except as provided in sections 1031 and 1137(b) of this title) or any rule or regulation issued under any such law.

**(e) Automatic contribution arrangements**

(1) Notwithstanding any other provision of this section, this subchapter shall supersede any law of a State which would directly or indirectly prohibit or restrict the inclusion in any plan of an automatic contribution arrangement. The Secretary may prescribe regulations which would establish minimum standards that such an arrangement would be required to satisfy in order for this subsection to apply in the case of such arrangement.

(2) For purposes of this subsection, the term "automatic contribution arrangement" means an arrangement—

(A) under which a participant may elect to have the plan sponsor make payments as contributions under the plan on behalf of the participant, or to the participant directly in cash,

(B) under which a participant is treated as having elected to have the plan sponsor make such contributions in an amount equal to a uniform percentage of compensation provided under the plan until the participant specifically elects not to have such contributions made (or specifically elects to have such contributions made at a different percentage), and

(C) under which such contributions are invested in accordance with regulations prescribed by the Secretary under section 1104(c)(5) of this title.

(3)(A) The plan administrator of an automatic contribution arrangement shall, within a reasonable period before such plan year, provide to each participant to whom the arrangement applies for such plan year notice of the participant's rights and obligations under the arrangement which—

(i) is sufficiently accurate and comprehensive to apprise the participant of such rights and obligations, and

(ii) is written in a manner calculated to be understood by the average participant to whom the arrangement applies.

(B) A notice shall not be treated as meeting the requirements of subparagraph (A) with respect to a participant unless—

(i) the notice includes an explanation of the participant's right under the arrangement not to have elective contributions made on the participant's behalf (or to elect to have such contributions made at a different percentage),

(ii) the participant has a reasonable period of time, after receipt of the notice described in clause (i) and before the first elective contribution is made, to make such election, and

(iii) the notice explains how contributions made under the arrangement will be invested in the absence of any investment election by the participant.

(Pub. L. 93–406, title I, §514, Sept. 2, 1974, 88 Stat. 897; Pub. L. 97–473, title III, §§301(a), 302(b), Jan. 14, 1983, 96 Stat. 2611, 2613; Pub. L. 98–397, title I, §104(b), Aug. 23, 1984, 98 Stat. 1436; Pub. L. 99–272, title IX, §9503(d)(1), Apr. 7, 1986, 100 Stat. 207; Pub. L. 101–239, title VII, §7894(f)(2)(A), (3)(A), Dec. 19, 1989, 103 Stat. 2450, 2451; Pub. L. 103–66, title IV, §4301(c)(4), Aug. 10, 1993, 107 Stat. 377; Pub. L. 104–191, title I, §101(f)(1), Aug. 21, 1996, 110 Stat. 1953; Pub. L. 104–204, title VI, §603(b)(3)(G), Sept. 26, 1996, 110 Stat. 2938; Pub. L. 105–200, title IV, §401(h)(2)(A)(i), (ii), July 16, 1998, 112 Stat. 668; Pub. L. 109–280, title IX, §902(f)(1), Aug. 17, 2006, 120 Stat. 1039.)

**Editorial Notes**

REFERENCES IN TEXT

The Social Security Act, referred to in subsec. (b)(8)(B), is act Aug. 14, 1935, ch. 531, 49 Stat. 620. Title XIX of the Social Security Act is classified generally to subchapter XIX (§1396 et seq.) of chapter 7 of Title 42, The Public Health and Welfare. For complete classification of this Act to the Code, see section 1305 of Title 42 and Tables.

AMENDMENTS

2006—Subsec. (e). Pub. L. 109–280 added subsec. (e).
1998—Subsec. (b)(7). Pub. L. 105–200, §401(h)(2)(A)(ii), substituted "they apply to" for "enforced by".
Pub. L. 105–200, §401(h)(2)(A)(i), amended directory language of Pub. L. 103–66, §4301(c)(4)(A). See 1993 Amendment note below.
1996—Subsec. (b)(9). Pub. L. 104–204 made technical amendment to reference in original act which appears in text as reference to section 1191 of this title.
Pub. L. 104–191 added par. (9).
1993—Subsec. (b)(7). Pub. L. 103–66, §4301(c)(4)(A), as amended by Pub. L. 105–200, §401(h)(1)(A)(i), inserted ", qualified medical child support orders (within the meaning of section 1169(a)(2)(A) of this title), and the provisions of law referred to in section 1169(a)(2)(B)(ii) of this title to the extent enforced by qualified medical child support orders" before period at end.
Subsec. (b)(8). Pub. L. 103–66, §4301(c)(4)(B), added par. (8) and struck out former par. (8) which read as follows: "Subsection (a) of this section shall not apply to any State law mandating that an employee benefit plan not include any provision which has the effect of limiting or excluding coverage or payment for any health care for an individual who would otherwise be covered or entitled to benefits or services under the terms of the employee benefit plan, because that individual is provided, or is eligible for, benefits or services pursuant to a plan under title XIX of the Social Security Act, to the extent such law is necessary for the State to be eligible to receive reimbursement under title XIX of that Act."
1989—Subsec. (b)(5)(C). Pub. L. 101–239, §7894(f)(2)(A), substituted "by such parts 1 and 4 and the preceding sections of this part" for "by such parts".
Subsec. (b)(6)(B). Pub. L. 101–239, §7894(f)(3)(A), substituted "section 1002(1)" for "section 1002(l)".
1986—Subsec. (b)(8). Pub. L. 99–272 added par. (8).
1984—Subsec. (b)(7). Pub. L. 98–397 added par. (7).
1983—Subsec. (b)(5). Pub. L. 97–473, §301(a), added par. (5).
Subsec. (b)(6). Pub. L. 97–473, §302(b), added par. (6).

**Statutory Notes and Related Subsidiaries**

EFFECTIVE DATE OF 1998 AMENDMENT

Pub. L. 105–200, title IV, §401(h)(2)(C), July 16, 1998, 112 Stat. 668, provided that: "The amendments made by

subparagraph (A) [amending this section and section 1169 of this title] shall be effective as if included in the enactment of section 4301(c)(4)(A) of the Omnibus Budget Reconciliation Act of 1993 [Pub. L. 103–66].''

EFFECTIVE DATE OF 1996 AMENDMENTS

Amendment by Pub. L. 104–204 applicable with respect to group health plans for plan years beginning on or after Jan. 1, 1998, see section 603(c) of Pub. L. 104–204, set out as a note under section 1003 of this title.

Amendment by Pub. L. 104–191 applicable with respect to group health plans for plan years beginning after June 30, 1997, except as otherwise provided, see section 101(g) of Pub. L. 104–191, set out as a note under section 1181 of this title.

EFFECTIVE DATE OF 1989 AMENDMENT

Pub. L. 101–239, title VII, §7894(f)(2)(B), Dec. 19, 1989, 103 Stat. 2451, provided that: ''The amendment made by this paragraph [amending this section] shall take effect as if included in section 301 of Public Law 97–473.''

Pub. L. 101–239, title VII, §7894(f)(3)(B), Dec. 19, 1989, 103 Stat. 2451, provided that: ''The amendments made by this paragraph [amending this section] shall take effect as if included in section 302 of Public Law 97–473.''

EFFECTIVE DATE OF 1986 AMENDMENT

Pub. L. 99–272, title IX, §9503(d)(2), Apr. 7, 1986, 100 Stat. 207, provided that:

''(2)(A) Except as provided in subparagraph (B), the amendment made by paragraph (1) [amending this section] shall become effective on October 1, 1986.

''(B) In the case of a plan maintained pursuant to one or more collective bargaining agreements between employee representatives and one or more employers ratified on or before the date of the enactment of this Act [Apr. 7, 1986], the amendment made by paragraph (1) shall become effective on the later of—

''(i) October 1, 1986; or

''(ii) the earlier of—

''(I) the date on which the last of the collective bargaining agreements under which the plan is maintained, which were in effect on the date of the enactment of this Act, terminates (determined without regard to any extension thereof agreed to after the date of the enactment of this Act); or

''(II) three years after the date of the enactment of this Act.''

EFFECTIVE DATE OF 1984 AMENDMENT

Amendment by Pub. L. 98–397 effective Jan. 1, 1985, except as otherwise provided, see section 303(d) of Pub. L. 98–397, set out as a note under section 1001 of this title.

EFFECTIVE DATE OF 1983 AMENDMENT

Pub. L. 97–473, title III, §301(c), Jan. 14, 1983, 96 Stat. 2612, provided that: ''The amendment made by this section [amending this section] shall take effect on the date of the enactment of this Act [Jan. 14, 1983].''

Amendment by section 302(b) of Pub. L. 97–473 effective Jan. 14, 1983, see section 302(c) of Pub. L. 97–473, set out as a note under section 1002 of this title.

REGULATIONS

Secretary authorized, effective Sept. 2, 1974, to promulgate regulations wherever provisions of this subchapter call for the promulgation of regulations, see section 1031 of this title.

PLAN AMENDMENTS NOT REQUIRED UNTIL JANUARY 1, 1994

For provisions setting forth circumstances under which any amendment to a plan required to be made by an amendment made by section 4301 of Pub. L. 103–66 shall not be required to be made before the first plan year beginning on or after Jan. 1, 1994, see section 4301(d) of Pub. L. 103–66, set out as an Effective Date of 1993 Amendment note under section 1021 of this title.

TREATMENT OF OTHER STATE LAWS

Pub. L. 97–473, title III, §301(b), Jan. 14, 1983, 96 Stat. 2612, provided that: ''The amendment made by this section [amending this section] shall not be considered a precedent with respect to extending such amendment to any other State law.''

### § 1144a. Clarification of church welfare plan status under State insurance law

**(a) In general**

For purposes of determining the status of a church plan that is a welfare plan under provisions of a State insurance law described in subsection (b), such a church plan (and any trust under such plan) shall be deemed to be a plan sponsored by a single employer that reimburses costs from general church assets, or purchases insurance coverage with general church assets, or both.

**(b) State insurance law**

A State insurance law described in this subsection is a law that—

(1) requires a church plan, or an organization described in section 414(e)(3)(A) of title 26 and section 1002(33)(C)(i) of this title to the extent that it is administering or funding such a plan, to be licensed; or

(2) relates solely to the solvency or insolvency of a church plan (including participation in State guaranty funds and associations).

**(c) Definitions**

For purposes of this section:

**(1) Church plan**

The term ''church plan'' has the meaning given such term by section 414(e) of title 26 and section 1002(33) of this title.

**(2) Reimburses costs from general church assets**

The term ''reimburses costs from general church assets'' means engaging in an activity that is not the spreading of risk solely for the purposes of the provisions of State insurance laws described in subsection (b).

**(3) Welfare plan**

The term ''welfare plan''—

(A) means any church plan to the extent that such plan provides medical, surgical, or hospital care or benefits, or benefits in the event of sickness, accident, disability, death or unemployment, or vacation benefits, apprenticeship or other training programs, or day care centers, scholarship funds, or prepaid legal services; and

(B) does not include any entity, such as a health insurance issuer described in section 9832(b)(2) of title 26 or a health maintenance organization described in section 9832(b)(3) of title 26, or any other organization that does business with the church plan or organization sponsoring or maintaining such a plan.

**(d) Enforcement authority**

Notwithstanding any other provision of this section, for purposes of enforcing provisions of State insurance laws that apply to a church plan that is a welfare plan, the church plan shall be subject to State enforcement as if the church plan were an insurer licensed by the State.

contribute in that year, or who was subsequently obligated to contribute.

(Pub. L. 93–406, title IV, § 4216, as added Pub. L. 96–364, title I, § 104(2), Sept. 26, 1980, 94 Stat. 1234.)

### Editorial Notes

#### References in Text

Section 1423 of this title, referred to in subsec. (a)(1)(B)(ii), (2)(C), was repealed by Pub. L. 113–235, div. O, title I, § 108(a)(1), Dec. 16, 2014, 128 Stat. 2786.

## § 1397. Application of part in case of certain pre-1980 withdrawals; adjustment of covered plan

(a) For the purpose of determining the amount of unfunded vested benefits allocable to an employer for a partial or complete withdrawal from a plan which occurs after September 25, 1980, and for the purpose of determining whether there has been a partial withdrawal after such date, the amount of contributions, and the number of contribution base units, of such employer properly allocable—

(1) to work performed under a collective bargaining agreement for which there was a permanent cessation of the obligation to contribute before September 26, 1980, or

(2) to work performed at a facility at which all covered operations permanently ceased before September 26, 1980, or for which there was a permanent cessation of the obligation to contribute before that date,

shall not be taken into account.

(b) A plan may, in a manner not inconsistent with regulations, which shall be prescribed by the corporation, adjust the amount of unfunded vested benefits allocable to other employers under a plan maintained by an employer described in subsection (a).

(Pub. L. 93–406, title IV, § 4217, as added Pub. L. 96–364, title I, § 104(2), Sept. 26, 1980, 94 Stat. 1235; amended Pub. L. 98–369, div. A, title V, § 558(b)(1)(A), (B), July 18, 1984, 98 Stat. 899.)

### Editorial Notes

#### Amendments

1984—Subsec. (a). Pub. L. 98–369, § 558(b)(1)(A), (B), substituted "September 25, 1980" for "April 28, 1980" in provisions preceding par. (1) and "September 26, 1980" for "April 29, 1980" in pars. (1) and (2).

## § 1398. Withdrawal not to occur because of change in business form or suspension of contributions during labor dispute

Notwithstanding any other provision of this part, an employer shall not be considered to have withdrawn from a plan solely because—

(1) an employer ceases to exist by reason of—

(A) a change in corporate structure described in section 1369(b) of this title, or

(B) a change to an unincorporated form of business enterprise,

if the change causes no interruption in employer contributions or obligations to contribute under the plan, or

(2) an employer suspends contributions under the plan during a labor dispute involving its employees.

For purposes of this part, a successor or parent corporation or other entity resulting from any such change shall be considered the original employer.

(Pub. L. 93–406, title IV, § 4218, as added Pub. L. 96–364, title I, § 104(2), Sept. 26, 1980, 94 Stat. 1236; amended Pub. L. 99–514, title XVIII, § 1879(u)(4), as added Pub. L. 101–239, title VII, § 7862(b)(1)(C), Dec. 19, 1989, 103 Stat. 2432; Pub. L. 101–239, title VII, § 7893(f), Dec. 19, 1989, 103 Stat. 2447.)

### Editorial Notes

#### Amendments

1989—Par. (1)(A). Pub. L. 101–239, § 7893(f), made identical amendment to that of Pub. L. 99–514, § 1879(u)(4), as added by Pub. L. 101–239, § 7862(b)(1)(C), see below.

Pub. L. 101–239, § 7862(b)(1)(C), added Pub. L. 99–514, § 1879(u)(4), see 1986 Amendment note below.

1986—Par. (1)(A). Pub. L. 99–514, § 1879(u)(4), as added by Pub. L. 101–239, § 7862(b)(1)(C), substituted "section 1369(b) of this title" for "section 1362(d) of this title".

### Statutory Notes and Related Subsidiaries

#### Effective Date of 1989 Amendment

Amendment by section 7862(b)(1)(C) of Pub. L. 101–239 effective as if included in the provision of the Tax Reform Act of 1986, Pub. L. 99–514, to which such amendment relates, see section 7863 of Pub. L. 101–239, set out as a note under section 106 of Title 26, Internal Revenue Code.

Amendment by section 7893(f) of Pub. L. 101–239 effective as if included in the provision of the Single-Employer Pension Plan Amendments Act of 1986, Pub. L. 99–272, title XI, to which such amendment relates, see section 7893(h) of Pub. L. 101–239, set out as a note under section 1002 of this title.

#### Plan Amendments Not Required Until January 1, 1989

For provisions directing that if any amendments made by subtitle A or subtitle C of title XI [§§ 1101–1147 and 1171–1177] or title XVIII [§§ 1800–1899A] of Pub. L. 99–514 require an amendment to any plan, such plan amendment shall not be required to be made before the first plan year beginning on or after Jan. 1, 1989, see section 1140 of Pub. L. 99–514, as amended, set out as a note under section 401 of Title 26, Internal Revenue Code.

## § 1399. Notice, collection, etc., of withdrawal liability

### (a) Furnishing of information by employer to plan sponsor

An employer shall, within 30 days after a written request from the plan sponsor, furnish such information as the plan sponsor reasonably determines to be necessary to enable the plan sponsor to comply with the requirements of this part.

### (b) Notification, demand for payment, and review upon complete or partial withdrawal by employer

(1) As soon as practicable after an employer's complete or partial withdrawal, the plan sponsor shall—

(A) notify the employer of—

(i) the amount of the liability, and

(ii) the schedule for liability payments, and

(B) demand payment in accordance with the schedule.

(2)(A) No later than 90 days after the employer receives the notice described in paragraph (1), the employer—

(i) may ask the plan sponsor to review any specific matter relating to the determination of the employer's liability and the schedule of payments,

(ii) may identify any inaccuracy in the determination of the amount of the unfunded vested benefits allocable to the employer, and

(iii) may furnish any additional relevant information to the plan sponsor.

(B) After a reasonable review of any matter raised, the plan sponsor shall notify the employer of—

(i) the plan sponsor's decision,

(ii) the basis for the decision, and

(iii) the reason for any change in the determination of the employer's liability or schedule of liability payments.

**(c) Payment requirements; amount, etc.**

(1)(A)(i) Except as provided in subparagraphs (B) and (D) of this paragraph and in paragraphs (4) and (5), an employer shall pay the amount determined under section 1391 of this title, adjusted if appropriate first under section 1389 of this title and then under section 1386 of this title over the period of years necessary to amortize the amount in level annual payments determined under subparagraph (C), calculated as if the first payment were made on the first day of the plan year following the plan year in which the withdrawal occurs and as if each subsequent payment were made on the first day of each subsequent plan year. Actual payment shall commence in accordance with paragraph (2).

(ii) The determination of the amortization period described in clause (i) shall be based on the assumptions used for the most recent actuarial valuation for the plan.

(B) In any case in which the amortization period described in subparagraph (A) exceeds 20 years, the employer's liability shall be limited to the first 20 annual payments determined under subparagraph (C).

(C)(i) Except as provided in subparagraph (E), the amount of each annual payment shall be the product of—

(I) the average annual number of contribution base units for the period of 3 consecutive plan years, during the period of 10 consecutive plan years ending before the plan year in which the withdrawal occurs, in which the number of contribution base units for which the employer had an obligation to contribute under the plan is the highest, and

(II) the highest contribution rate at which the employer had an obligation to contribute under the plan during the 10 plan years ending with the plan year in which the withdrawal occurs.

For purposes of the preceding sentence, a partial withdrawal described in section 1385(a)(1) of this title shall be deemed to occur on the last day of the first year of the 3-year testing period described in section 1385(b)(1)(B)(i) of this title.

(ii)(I) A plan may be amended to provide that for any plan year ending before 1986 the amount of each annual payment shall be (in lieu of the amount determined under clause (i)) the average of the required employer contributions under the plan for the period of 3 consecutive plan years (during the period of 10 consecutive plan years ending with the plan year preceding the plan year in which the withdrawal occurs) for which such required contributions were the highest.

(II) Subparagraph (B) shall not apply to any plan year to which this clause applies.

(III) This clause shall not apply in the case of any withdrawal described in subparagraph (D).

(IV) If under a plan this clause applies to any plan year but does not apply to the next plan year, this clause shall not apply to any plan year after such next plan year.

(V) For purposes of this clause, the term "required contributions" means, for any period, the amounts which the employer was obligated to contribute for such period (not taking into account any delinquent contribution for any other period).

(iii) A plan may be amended to provide that for the first plan year ending on or after September 26, 1980, the number "5" shall be substituted for the number "10" each place it appears in clause (i) or clause (ii) (whichever is appropriate). If the plan is so amended, the number "5" shall be increased by one for each succeeding plan year until the number "10" is reached.

(D) In any case in which a multiemployer plan terminates by the withdrawal of every employer from the plan, or in which substantially all the employers withdraw from a plan pursuant to an agreement or arrangement to withdraw from the plan—

(i) the liability of each such employer who has withdrawn shall be determined (or redetermined) under this paragraph without regard to subparagraph (B), and

(ii) notwithstanding any other provision of this part, the total unfunded vested benefits of the plan shall be fully allocated among all such employers in a manner not inconsistent with regulations which shall be prescribed by the corporation.

Withdrawal by an employer from a plan, during a period of 3 consecutive plan years within which substantially all the employers who have an obligation to contribute under the plan withdraw, shall be presumed to be a withdrawal pursuant to an agreement or arrangement, unless the employer proves otherwise by a preponderance of the evidence.

(E) In the case of a partial withdrawal described in section 1385(a) of this title, the amount of each annual payment shall be the product of—

(i) the amount determined under subparagraph (C) (determined without regard to this subparagraph), multiplied by

(ii) the fraction determined under section 1386(a)(2) of this title.

(2) Withdrawal liability shall be payable in accordance with the schedule set forth by the plan sponsor under subsection (b)(1) beginning no

later than 60 days after the date of the demand notwithstanding any request for review or appeal of determinations of the amount of such liability or of the schedule.

(3) Each annual payment determined under paragraph (1)(C) shall be payable in 4 equal installments due quarterly, or at other intervals specified by plan rules. If a payment is not made when due, interest on the payment shall accrue from the due date until the date on which the payment is made.

(4) The employer shall be entitled to prepay the outstanding amount of the unpaid annual withdrawal liability payments determined under paragraph (1)(C), plus accrued interest, if any, in whole or in part, without penalty. If the prepayment is made pursuant to a withdrawal which is later determined to be part of a withdrawal described in paragraph (1)(D), the withdrawal liability of the employer shall not be limited to the amount of the prepayment.

(5) In the event of a default, a plan sponsor may require immediate payment of the outstanding amount of an employer's withdrawal liability, plus accrued interest on the total outstanding liability from the due date of the first payment which was not timely made. For purposes of this section, the term "default" means—

    (A) the failure of an employer to make, when due, any payment under this section, if the failure is not cured within 60 days after the employer receives written notification from the plan sponsor of such failure, and

    (B) any other event defined in rules adopted by the plan which indicates a substantial likelihood that an employer will be unable to pay its withdrawal liability.

(6) Except as provided in paragraph (1)(A)(ii), interest under this subsection shall be charged at rates based on prevailing market rates for comparable obligations, in accordance with regulations prescribed by the corporation.

(7) A multiemployer plan may adopt rules for other terms and conditions for the satisfaction of an employer's withdrawal liability if such rules—

    (A) are consistent with this chapter, and
    (B) are not inconsistent with regulations of the corporation.

(8) In the case of a terminated multiemployer plan, an employer's obligation to make payments under this section ceases at the end of the plan year in which the assets of the plan (exclusive of withdrawal liability claims) are sufficient to meet all obligations of the plan, as determined by the corporation.

**(d) Applicability of statutory prohibitions**

The prohibitions provided in section 1106(a) of this title do not apply to any action required or permitted under this part or to any arrangement relating to withdrawal liability involving the plan.

(Pub. L. 93–406, title IV, §4219, as added Pub. L. 96–364, title I, §104(2), Sept. 26, 1980, 94 Stat. 1236; amended Pub. L. 98–369, div. A, title V, §558(b)(1)(B), July 18, 1984, 98 Stat. 899; Pub. L. 113–235, div. O, title II, §201(a)(7)(B), Dec. 16, 2014, 128 Stat. 2810.)

EDITORIAL NOTES

REFERENCES IN TEXT

This chapter, referred to in subsec. (c)(7)(A), was in the original "this Act", meaning Pub. L. 93–406, known as the Employee Retirement Income Security Act of 1974. Titles I, III, and IV of such Act are classified principally to this chapter. For complete classification of this Act to the Code, see Short Title note set out under section 1001 of this title and Tables.

AMENDMENTS

2014—Subsec. (d). Pub. L. 113–235 inserted "or to any arrangement relating to withdrawal liability involving the plan" before period at end.

1984—Subsec. (c)(1)(C)(iii). Pub. L. 98–369 substituted "September 26, 1980" for "April 29, 1980".

**§ 1400. Approval of amendments**

**(a) Amendment of covered multiemployer plan; procedures applicable**

Except as provided in subsection (b), if an amendment to a multiemployer plan authorized by any preceding section of this part is adopted more than 36 months after the effective date of this section, the amendment shall be effective only if the corporation approves the amendment, or, within 90 days after the corporation receives notice and a copy of the amendment from the plan sponsor, fails to disapprove the amendment.

**(b) Amendment respecting methods for computing withdrawal liability**

An amendment permitted by section 1391(c)(5) of this title may be adopted only in accordance with that section.

**(c) Criteria for disapproval by corporation**

The corporation shall disapprove an amendment referred to in subsection (a) or (b) only if the corporation determines that the amendment creates an unreasonable risk of loss to plan participants and beneficiaries or to the corporation.

(Pub. L. 93–406, title IV, §4220, as added Pub. L. 96–364, title I, §104(2), Sept. 26, 1980, 94 Stat. 1239.)

EDITORIAL NOTES

REFERENCES IN TEXT

For the effective date of this section, referred to in subsec. (a), see 1461(e)(2) of this title.

**§ 1401. Resolution of disputes**

**(a) Arbitration proceedings; matters subject to arbitration, procedures applicable, etc.**

(1) Any dispute between an employer and the plan sponsor of a multiemployer plan concerning a determination made under sections 1381 through 1399 of this title shall be resolved through arbitration. Either party may initiate the arbitration proceeding within a 60-day period after the earlier of—

    (A) the date of notification to the employer under section 1399(b)(2)(B) of this title, or
    (B) 120 days after the date of the employer's request under section 1399(b)(2)(A) of this title.

The parties may jointly initiate arbitration within the 180-day period after the date of the plan sponsor's demand under section 1399(b)(1) of this title.

later than 60 days after the date of the demand notwithstanding any request for review or appeal of determinations of the amount of such liability or of the schedule.

(3) Each annual payment determined under paragraph (1)(C) shall be payable in 4 equal installments due quarterly, or at other intervals specified by plan rules. If a payment is not made when due, interest on the payment shall accrue from the due date until the date on which the payment is made.

(4) The employer shall be entitled to prepay the outstanding amount of the unpaid annual withdrawal liability payments determined under paragraph (1)(C), plus accrued interest, if any, in whole or in part, without penalty. If the prepayment is made pursuant to a withdrawal which is later determined to be part of a withdrawal described in paragraph (1)(D), the withdrawal liability of the employer shall not be limited to the amount of the prepayment.

(5) In the event of a default, a plan sponsor may require immediate payment of the outstanding amount of an employer's withdrawal liability, plus accrued interest on the total outstanding liability from the due date of the first payment which was not timely made. For purposes of this section, the term "default" means—

(A) the failure of an employer to make, when due, any payment under this section, if the failure is not cured within 60 days after the employer receives written notification from the plan sponsor of such failure, and

(B) any other event defined in rules adopted by the plan which indicates a substantial likelihood that an employer will be unable to pay its withdrawal liability.

(6) Except as provided in paragraph (1)(A)(ii), interest under this subsection shall be charged at rates based on prevailing market rates for comparable obligations, in accordance with regulations prescribed by the corporation.

(7) A multiemployer plan may adopt rules for other terms and conditions for the satisfaction of an employer's withdrawal liability if such rules—

(A) are consistent with this chapter, and
(B) are not inconsistent with regulations of the corporation.

(8) In the case of a terminated multiemployer plan, an employer's obligation to make payments under this section ceases at the end of the plan year in which the assets of the plan (exclusive of withdrawal liability claims) are sufficient to meet all obligations of the plan, as determined by the corporation.

**(d) Applicability of statutory prohibitions**

The prohibitions provided in section 1106(a) of this title do not apply to any action required or permitted under this part or to any arrangement relating to withdrawal liability involving the plan.

(Pub. L. 93–406, title IV, § 4219, as added Pub. L. 96–364, title I, § 104(2), Sept. 26, 1980, 94 Stat. 1236; amended Pub. L. 98–369, div. A, title V, § 558(b)(1)(B), July 18, 1984, 98 Stat. 899; Pub. L. 113–235, div. O, title II, § 201(a)(7)(B), Dec. 16, 2014, 128 Stat. 2810.)

EDITORIAL NOTES

REFERENCES IN TEXT

This chapter, referred to in subsec. (c)(7)(A), was in the original "this Act", meaning Pub. L. 93–406, known as the Employee Retirement Income Security Act of 1974. Titles I, III, and IV of such Act are classified principally to this chapter. For complete classification of this Act to the Code, see Short Title note set out under section 1001 of this title and Tables.

AMENDMENTS

2014—Subsec. (d). Pub. L. 113–235 inserted "or to any arrangement relating to withdrawal liability involving the plan" before period at end.

1984—Subsec. (c)(1)(C)(iii). Pub. L. 98–369 substituted "September 26, 1980" for "April 29, 1980".

## § 1400. Approval of amendments

**(a) Amendment of covered multiemployer plan; procedures applicable**

Except as provided in subsection (b), if an amendment to a multiemployer plan authorized by any preceding section of this part is adopted more than 36 months after the effective date of this section, the amendment shall be effective only if the corporation approves the amendment, or, within 90 days after the corporation receives notice and a copy of the amendment from the plan sponsor, fails to disapprove the amendment.

**(b) Amendment respecting methods for computing withdrawal liability**

An amendment permitted by section 1391(c)(5) of this title may be adopted only in accordance with that section.

**(c) Criteria for disapproval by corporation**

The corporation shall disapprove an amendment referred to in subsection (a) or (b) only if the corporation determines that the amendment creates an unreasonable risk of loss to plan participants and beneficiaries or to the corporation.

(Pub. L. 93–406, title IV, § 4220, as added Pub. L. 96–364, title I, § 104(2), Sept. 26, 1980, 94 Stat. 1239.)

EDITORIAL NOTES

REFERENCES IN TEXT

For the effective date of this section, referred to in subsec. (a), see 1461(e)(2) of this title.

## § 1401. Resolution of disputes

**(a) Arbitration proceedings; matters subject to arbitration, procedures applicable, etc.**

(1) Any dispute between an employer and the plan sponsor of a multiemployer plan concerning a determination made under sections 1381 through 1399 of this title shall be resolved through arbitration. Either party may initiate the arbitration proceeding within a 60-day period after the earlier of—

(A) the date of notification to the employer under section 1399(b)(2)(B) of this title, or
(B) 120 days after the date of the employer's request under section 1399(b)(2)(A) of this title.

The parties may jointly initiate arbitration within the 180-day period after the date of the plan sponsor's demand under section 1399(b)(1) of this title.

(2) An arbitration proceeding under this section shall be conducted in accordance with fair and equitable procedures to be promulgated by the corporation. The plan sponsor may purchase insurance to cover potential liability of the arbitrator. If the parties have not provided for the costs of the arbitration, including arbitrator's fees, by agreement, the arbitrator shall assess such fees. The arbitrator may also award reasonable attorney's fees.

(3)(A) For purposes of any proceeding under this section, any determination made by a plan sponsor under sections 1381 through 1399 of this title and section 1405 of this title is presumed correct unless the party contesting the determination shows by a preponderance of the evidence that the determination was unreasonable or clearly erroneous.

(B) In the case of the determination of a plan's unfunded vested benefits for a plan year, the determination is presumed correct unless a party contesting the determination shows by a preponderance of evidence that—

(i) the actuarial assumptions and methods used in the determination were, in the aggregate, unreasonable (taking into account the experience of the plan and reasonable expectations), or

(ii) the plan's actuary made a significant error in applying the actuarial assumptions or methods.

**(b) Alternative collection proceedings; civil action subsequent to arbitration award; conduct of arbitration proceedings**

(1) If no arbitration proceeding has been initiated pursuant to subsection (a), the amounts demanded by the plan sponsor under section 1399(b)(1) of this title shall be due and owing on the schedule set forth by the plan sponsor. The plan sponsor may bring an action in a State or Federal court of competent jurisdiction for collection.

(2) Upon completion of the arbitration proceedings in favor of one of the parties, any party thereto may bring an action, no later than 30 days after the issuance of an arbitrator's award, in an appropriate United States district court in accordance with section 1451 of this title to enforce, vacate, or modify the arbitrator's award.

(3) Any arbitration proceedings under this section shall, to the extent consistent with this subchapter, be conducted in the same manner, subject to the same limitations, carried out with the same powers (including subpena power), and enforced in United States courts as an arbitration proceeding carried out under title 9.

**(c) Presumption respecting finding of fact by arbitrator**

In any proceeding under subsection (b), there shall be a presumption, rebuttable only by a clear preponderance of the evidence, that the findings of fact made by the arbitrator were correct.

**(d) Payments by employer prior and subsequent to determination by arbitrator; adjustments; failure of employer to make payments**

Payments shall be made by an employer in accordance with the determinations made under

this part until the arbitrator issues a final decision with respect to the determination submitted for arbitration, with any necessary adjustments in subsequent payments for overpayments or underpayments arising out of the decision of the arbitrator with respect to the determination. If the employer fails to make timely payment in accordance with such final decision, the employer shall be treated as being delinquent in the making of a contribution required under the plan (within the meaning of section 1145 of this title).

**(e) Procedures applicable to certain disputes**
**(1) In general**

If—

(A) a plan sponsor of a plan determines that—

(i) a complete or partial withdrawal of an employer has occurred, or

(ii) an employer is liable for withdrawal liability payments with respect to the complete or partial withdrawal of an employer from the plan,

(B) such determination is based in whole or in part on a finding by the plan sponsor under section 1392(c) of this title that a principal purpose of a transaction that occurred before January 1, 1999, was to evade or avoid withdrawal liability under this subtitle, and

(C) such transaction occurred at least 5 years before the date of the complete or partial withdrawal,

then the special rules under paragraph (2) shall be used in applying subsections (a) and (d) of this section and section 1399(c) of this title to the employer.

**(2) Special rules**
**(A) Determination**

Notwithstanding subsection (a)(3)—

(i) a determination by the plan sponsor under paragraph (1)(B) shall not be presumed to be correct, and

(ii) the plan sponsor shall have the burden to establish, by a preponderance of the evidence, the elements of the claim under section 1392(c) of this title that a principal purpose of the transaction was to evade or avoid withdrawal liability under this subtitle.

Nothing in this subparagraph shall affect the burden of establishing any other element of a claim for withdrawal liability under this subtitle.

**(B) Procedure**

Notwithstanding subsection (d) and section 1399(c) of this title, if an employer contests the plan sponsor's determination under paragraph (1) through an arbitration proceeding pursuant to subsection (a), or through a claim brought in a court of competent jurisdiction, the employer shall not be obligated to make any withdrawal liability payments until a final decision in the arbitration proceeding, or in court, upholds the plan sponsor's determination.

**(f) Procedures applicable to certain disputes**

(1) IN GENERAL.—If—

(A) a plan sponsor of a plan determines that—

　(i) a complete or partial withdrawal of an employer has occurred, or

　(ii) an employer is liable for withdrawal liability payments with respect to such complete or partial withdrawal, and

(B) such determination is based in whole or in part on a finding by the plan sponsor under section 1392(c) of this title that a principal purpose of any transaction which occurred after December 31, 1998, and at least 5 years (2 years in the case of a small employer) before the date of the complete or partial withdrawal was to evade or avoid withdrawal liability under this subtitle,

then the person against which the withdrawal liability is assessed based solely on the application of section 1392(c) of this title may elect to use the special rule under paragraph (2) in applying subsection (d) of this section and section 1399(c) of this title to such person.

(2) SPECIAL RULE.—Notwithstanding subsection (d) and section 1399(c) of this title, if an electing person contests the plan sponsor's determination with respect to withdrawal liability payments under paragraph (1) through an arbitration proceeding pursuant to subsection (a), through an action brought in a court of competent jurisdiction for review of such an arbitration decision, or as otherwise permitted by law, the electing person shall not be obligated to make the withdrawal liability payments until a final decision in the arbitration proceeding, or in court, upholds the plan sponsor's determination, but only if the electing person—

(A) provides notice to the plan sponsor of its election to apply the special rule in this paragraph within 90 days after the plan sponsor notifies the electing person of its liability by reason of the application of section 1392(c) of this title; and

(B) if a final decision in the arbitration proceeding, or in court, of the withdrawal liability dispute has not been rendered within 12 months from the date of such notice, the electing person provides to the plan, effective as of the first day following the 12-month period, a bond issued by a corporate surety company that is an acceptable surety for purposes of section 1112 of this title, or an amount held in escrow by a bank or similar financial institution satisfactory to the plan, in an amount equal to the sum of the withdrawal liability payments that would otherwise be due under subsection (d) and section 1399(c) of this title for the 12-month period beginning with the first anniversary of such notice. Such bond or escrow shall remain in effect until there is a final decision in the arbitration proceeding, or in court, of the withdrawal liability dispute, at which time such bond or escrow shall be paid to the plan if such final decision upholds the plan sponsor's determination.

(3) DEFINITION OF SMALL EMPLOYER.—For purposes of this subsection—

(A) IN GENERAL.—The term "small employer" means any employer which, for the calendar year in which the transaction referred to in paragraph (1)(B) occurred and for each of the 3 preceding years, on average—

　(i) employs not more than 500 employees, and

　(ii) is required to make contributions to the plan for not more than 250 employees.

(B) CONTROLLED GROUP.—Any group treated as a single employer under subsection (b)(1) of section 1301 of this title, without regard to any transaction that was a basis for the plan's finding under section 1392 of this title, shall be treated as a single employer for purposes of this subparagraph.

(4) ADDITIONAL SECURITY PENDING RESOLUTION OF DISPUTE.—If a withdrawal liability dispute to which this subsection applies is not concluded by 12 months after the electing person posts the bond or escrow described in paragraph (2), the electing person shall, at the start of each succeeding 12-month period, provide an additional bond or amount held in escrow equal to the sum of the withdrawal liability payments that would otherwise be payable to the plan during that period.

(5) The liability of the party furnishing a bond or escrow under this subsection shall be reduced, upon the payment of the bond or escrow to the plan, by the amount thereof.

(Pub. L. 93–406, title IV, § 4221, as added Pub. L. 96–364, title I, § 104(2), Sept. 26, 1980, 94 Stat. 1239; amended Pub. L. 108–218, title II, § 202(a), Apr. 10, 2004, 118 Stat. 608; Pub. L. 109–280, title II, § 204(d)(1), Aug. 17, 2006, 120 Stat. 887; Pub. L. 110–458, title I, § 105(b)(2), Dec. 23, 2008, 122 Stat. 5105.)

### Editorial Notes

#### AMENDMENTS

2008—Subsecs. (e) to (g). Pub. L. 110–458 redesignated subsecs. (f) and (g) as (e) and (f), respectively, and struck out former subsec. (e). Prior to amendment, text read as follows: "If any employer requests in writing that the plan sponsor make available to the employer general information necessary for the employer to compute its withdrawal liability with respect to the plan (other than information which is unique to that employer), the plan sponsor shall furnish the information to the employer without charge. If any employer requests in writing that the plan sponsor make an estimate of such employer's potential withdrawal liability with respect to the plan or to provide information unique to that employer, the plan sponsor may require the employer to pay the reasonable cost of making such estimate or providing such information."

2006—Subsec. (g). Pub. L. 109–280 added subsec. (g).

2004—Subsec. (f). Pub. L. 108–218 added subsec. (f).

### Statutory Notes and Related Subsidiaries

#### EFFECTIVE DATE OF 2008 AMENDMENT

Amendment by Pub. L. 110–458 effective as if included in the provisions of Pub. L. 109–280 to which the amendment relates, except as otherwise provided, see section 112 of Pub. L. 110–458, set out as a note under section 72 of Title 26, Internal Revenue Code.

#### EFFECTIVE DATE OF 2006 AMENDMENT

Pub. L. 109–280, title II, § 204(d)(2), Aug. 17, 2006, 120 Stat. 889, provided that: "The amendments made by this subsection [amending this section] shall apply to any person that receives a notification under section 4219(b)(1) of the Employee Retirement Income Security Act of 1974 [29 U.S.C. 1399(b)(1)] on or after the date of enactment of this Act [Aug. 17, 2006] with respect to a transaction that occurred after December 31, 1998."

Pub. L. 108–218, title II, §202(b), Apr. 10, 2004, 118 Stat. 609, provided that: "The amendments made by this section [amending this section] shall apply to any employer that receives a notification under section 4219(b)(1) of the Employee Retirement Income Security Act of 1974 (29 U.S.C. 1399(b)(1)) after October 31, 2003."

## § 1402. Reimbursements for uncollectible withdrawal liability

### (a) Required supplemental program to reimburse for payments due from employers uncollectible as a result of employer involvement in bankruptcy case or proceedings; program participation, premiums, etc.

By May 1, 1982, the corporation shall establish by regulation a supplemental program to reimburse multiemployer plans for withdrawal liability payments which are due from employers and which are determined to be uncollectible for reasons arising out of cases or proceedings involving the employers under title 11, or similar cases or proceedings. Participation in the supplemental program shall be on a voluntary basis, and a plan which elects coverage under the program shall pay premiums to the corporation in accordance with a premium schedule which shall be prescribed from time to time by the corporation. The premium schedule shall contain such rates and bases for the application of such rates as the corporation considers to be appropriate.

### (b) Discretionary supplemental program to reimburse for payments due from employers uncollectible for other appropriate reasons

The corporation may provide under the program for reimbursement of amounts of withdrawal liability determined to be uncollectible for any other reasons the corporation considers appropriate.

### (c) Payment of cost of program

The cost of the program (including such administrative and legal costs as the corporation considers appropriate) may be paid only out of premiums collected under such program.

### (d) Terms and conditions, limitations, etc., of supplemental program

The supplemental program may be offered to eligible plans on such terms and conditions, and with such limitations with respect to the payment of reimbursements (including the exclusion of de minimis amounts of uncollectible employer liability, and the reduction or elimination of reimbursements which cannot be paid from collected premiums) and such restrictions on withdrawal from the program, as the corporation considers necessary and appropriate.

### (e) Arrangements by corporation with private insurers for implementation of program; election of coverage by participating plans with private insurers

The corporation may enter into arrangements with private insurers to carry out in whole or in part the program authorized by this section and may require plans which elect coverage under the program to elect coverage by those private insurers.

(Pub. L. 93–406, title IV, §4222, as added Pub. L. 96–364, title I, §104(2), Sept. 26, 1980, 94 Stat. 1240.)

## § 1403. Withdrawal liability payment fund

### (a) Establishment of or participation in fund by plan sponsors

The plan sponsors of multiemployer plans may establish or participate in a withdrawal liability payment fund.

### (b) Definitions

For purposes of this section, the term "withdrawal liability payment fund", and the term "fund", mean a trust which—

(1) is established and maintained under section 501(c)(22) of title 26,

(2) maintains agreements which cover a substantial portion of the participants who are in multiemployer plans which (under the rules of the trust instrument) are eligible to participate in the fund,

(3) is funded by amounts paid by the plans which participate in the fund, and

(4) is administered by a Board of Trustees, and in the administration of the fund there is equal representation of—

(A) trustees representing employers who are obligated to contribute to the plans participating in the fund, and

(B) trustees representing employees who are participants in plans which participate in the fund.

### (c) Payments to plan; amount, criteria, etc.

(1) If an employer withdraws from a plan which participates in a withdrawal liability payment fund, then, to the extent provided in the trust, the fund shall pay to that plan—

(A) the employer's unattributable liability,

(B) the employer's withdrawal liability payments which would have been due but for section 1388, 1389, 1399, or 1405 of this title,[1]

(C) the employer's withdrawal liability payments to the extent they are uncollectible.

(2) The fund may provide for the payment of the employer's attributable liability if the fund—

(A) provides for the payment of both the attributable and the unattributable liability of the employer in a single payment, and

(B) is subrogated to all rights of the plan against the employer.

(3) For purposes of this section, the term—

(A) "attributable liability" means the excess, if any, determined under the provisions of a plan not inconsistent with regulations of the corporation, of—

(i) the value of vested benefits accrued as a result of service with the employer, over

(ii) the value of plan assets attributed to the employer, and

(B) "unattributable liability" means the excess of withdrawal liability over attributable liability.

Such terms may be further defined, and the manner in which they shall be applied may be prescribed, by the corporation by regulation.

(4)(A) The trust of a fund shall be maintained for the exclusive purpose of paying—

(i) any amount described in paragraph (1) and paragraph (2), and

---

[1] So in original. Probably should be followed by "and".

(2) For purposes of this section, plan assets include outstanding claims for withdrawal liability (within the meaning of section 1301(a)(12) of this title).

**(c) Amendment of plan by plan sponsor to reduce benefits for conservation of assets; factors applicable**

(1) If, according to the determination made under subsection (b), the value of nonforfeitable benefits exceeds the value of the plan's assets, the plan sponsor shall amend the plan to reduce benefits under the plan to the extent necessary to ensure that the plan's assets are sufficient, as determined and certified in accordance with regulations prescribed by the corporation, to discharge when due all of the plan's obligations with respect to nonforfeitable benefits.

(2) Any plan amendment required by this subsection shall, in accordance with regulations prescribed by the Secretary of the Treasury—

(A) reduce benefits only to the extent necessary to comply with paragraph (1);

(B) reduce accrued benefits only to the extent that those benefits are not eligible for the corporation's guarantee under section 1322a(b) of this title;

(C) comply with the rules for and limitations on benefit reductions under a plan in reorganization, as prescribed in section 1425[1] of this title, except to the extent that the corporation prescribes other rules and limitations in regulations under this section; and

(D) take effect no later than 6 months after the end of the plan year for which it is determined that the value of nonforfeitable benefits exceeds the value of the plan's assets.

**(d) Suspension of benefit payments; determinative factors; powers and duties of plan sponsor; retroactive benefit payments**

(1) In any case in which benefit payments under a plan which is insolvent under paragraph (2)(A) exceed the resource benefit level, any such payments which are not basic benefits shall be suspended, in accordance with this subsection, to the extent necessary to reduce the sum of such payments and such basic benefits to the greater of the resource benefit level or the level of basic benefits, unless an alternative procedure is prescribed by the corporation in connection with a supplemental guarantee program established under section 1322a(g)(2) of this title.

(2) For purposes of this subsection, for a plan year—

(A) a plan is insolvent if—

(i) the plan has been amended to reduce benefits to the extent permitted by subsection (c), and

(ii) the plan's available resources are not sufficient to pay benefits under the plan when due for the plan year; and

(B) "resource benefit level" and "available resources" have the meanings set forth in paragraphs (2) and (3), respectively, of section 1426(b) of this title.

(3) The plan sponsor of a plan which is insolvent (within the meaning of paragraph (2)(A)) shall have the powers and duties of the plan sponsor of a plan in reorganization which is insolvent (within the meaning of section 1426(b)(1) of this title), except that regulations governing the plan sponsor's exercise of those powers and duties under this section shall be prescribed by the corporation, and the corporation shall prescribe by regulation notice requirements which assure that plan participants and beneficiaries receive adequate notice of benefit suspensions.

(4) A plan is not required to make retroactive benefit payments with respect to that portion of a benefit which was suspended under this section, except that the provisions of section 1426(c)(4) and (5) of this title shall apply in the case of plans which are insolvent under paragraph (2)(A), in connection with the plan year during which such section 1341a(d) of this title first became applicable to the plan and every year thereafter, in the same manner and to the same extent as such provisions apply to insolvent plans in reorganization under section 1426 of this title, in connection with insolvency years under such section 1426 of this title.

(Pub. L. 93–406, title IV, §4281, as added Pub. L. 96–364, title I, §104(2), Sept. 26, 1980, 94 Stat. 1261.)

### Editorial Notes

#### References in Text

Section 1425 of this title, referred to in subsec. (c)(2)(C), was repealed by Pub. L. 113–235, div. O, title I, §108(a)(1), Dec. 16, 2014, 128 Stat. 2786.

#### Statutory Notes and Related Subsidiaries

##### Effective Date

Part effective Sept. 26, 1980, except as specifically provided, see section 1461(e) of this title.

### PART 6—ENFORCEMENT

## § 1451. Civil actions

**(a) Persons entitled to maintain actions**

(1) A plan fiduciary, employer, plan participant, or beneficiary, who is adversely affected by the act or omission of any party under this subtitle with respect to a multiemployer plan, or an employee organization which represents such a plan participant or beneficiary for purposes of collective bargaining, may bring an action for appropriate legal or equitable relief, or both.

(2) Notwithstanding paragraph (1), this section does not authorize an action against the Secretary of the Treasury, the Secretary of Labor, or the corporation.

**(b) Failure of employer to make withdrawal liability payment within prescribed time**

In any action under this section to compel an employer to pay withdrawal liability, any failure of the employer to make any withdrawal liability payment within the time prescribed shall be treated in the same manner as a delinquent contribution (within the meaning of section 1145 of this title).

**(c) Jurisdiction of Federal and State courts**

The district courts of the United States shall have exclusive jurisdiction of an action under

---

[1] See References in Text note below.

this section without regard to the amount in controversy, except that State courts of competent jurisdiction shall have concurrent jurisdiction over an action brought by a plan fiduciary to collect withdrawal liability.

**(d) Venue and service of process**

An action under this section may be brought in the district where the plan is administered or where a defendant resides or does business, and process may be served in any district where a defendant resides, does business, or may be found.

**(e) Costs and expenses**

In any action under this section, the court may award all or a portion of the costs and expenses incurred in connection with such action, including reasonable attorney's fees, to the prevailing party.

**(f) Time limitations**

An action under this section may not be brought after the later of—

(1) 6 years after the date on which the cause of action arose, or

(2) 3 years after the earliest date on which the plaintiff acquired or should have acquired actual knowledge of the existence of such cause of action; except that in the case of fraud or concealment, such action may be brought not later than 6 years after the date of discovery of the existence of such cause of action.

**(g) Service of complaint on corporation; intervention by corporation**

A copy of the complaint in any action under this section or section 1401 of this title shall be served upon the corporation by certified mail. The corporation may intervene in any such action.

(Pub. L. 93–406, title IV, § 4301, as added Pub. L. 96–364, title I, § 104(2), Sept. 26, 1980, 94 Stat. 1263.)

**Editorial Notes**

EFFECTIVE DATE

Part effective Sept. 26, 1980, except as specifically provided, see section 1461(e) of this title.

**§ 1452. Penalty for failure to provide notice**

Any person who fails, without reasonable cause, to provide a notice required under this subtitle or any implementing regulations shall be liable to the corporation in an amount up to $100 for each day for which such failure continues. The corporation may bring a civil action against any such person in the United States District Court for the District of Columbia or in any district court of the United States within the jurisdiction of which the plan assets are located, the plan is administered, or a defendant resides or does business, and process may be served in any district where a defendant resides, does business, or may be found.

(Pub. L. 93–406, title IV, § 4302, as added Pub. L. 96–364, title I, § 104(2), Sept. 26, 1980, 94 Stat. 1263.)

**§ 1453. Election of plan status**

**(a) Authority, time, and criteria**

Within one year after September 26, 1980, a multiemployer plan may irrevocably elect, pursuant to procedures established by the corporation, that the plan shall not be treated as a multiemployer plan for any purpose under this chapter or the Internal Revenue Code of 1954, if for each of the last 3 plan years ending prior to the effective date of the Multiemployer Pension Plan Amendments Act of 1980—

(1) the plan was not a multiemployer plan because the plan was not a plan described in section 1002(37)(A)(iii) of this title and section 414(f)(1)(C) of title 26 (as such provisions were in effect on the day before September 26, 1980); and

(2) the plan had been identified as a plan that was not a multiemployer plan in substantially all its filings with the corporation, the Secretary of Labor and the Secretary of the Treasury.

**(b) Requirements**

An election described in subsection (a) shall be effective only if—

(1) the plan is amended to provide that it shall not be treated as a multiemployer plan for all purposes under this chapter and the Internal Revenue Code of 1954, and

(2) written notice of the amendment is provided to the corporation within 60 days after the amendment is adopted.

**(c) Effective date**

An election described in subsection (a) shall be treated as being effective as of September 26, 1980.

(Pub. L. 93–406, title IV, § 4303, as added Pub. L. 96–364, title I, § 108(f), Sept. 26, 1980, 94 Stat. 1270.)

**Editorial Notes**

REFERENCES IN TEXT

This chapter, referred to in subsecs. (a) and (b)(1), was in the original "this Act", meaning Pub. L. 93–406, known as the Employee Retirement Income Security Act of 1974. Titles I, III, and IV of such Act are classified principally to this chapter. For complete classification of this Act to the Code, see Short Title note set out under section 1001 of this title and Tables.

The Internal Revenue Code of 1954, referred to in subsecs. (a) and (b)(1), was redesignated the Internal Revenue Code of 1986 by Pub. L. 99–514, § 2, Oct. 22, 1986, 100 Stat. 2095, and is classified to Title 26, Internal Revenue Code.

For the effective date of the Multiemployer Pension Plan Amendments Act of 1980, referred to in subsec. (a), see section 1461(e) of this title.

SUBTITLE F—TRANSITION RULES AND EFFECTIVE DATES

**Editorial Notes**

CODIFICATION

Pub. L. 96–364, title I, § 104(1), Sept. 26, 1980, 94 Stat. 1217, substituted "Subtitle F—Transition Rules and Effective Dates" for "Subtitle E—Effective Date; Special Rules".

**§ 1461. Effective date; special rules**

(a) The provisions of this subchapter take effect on September 2, 1974.

to the sale, the purchaser's net income shall be reduced by the amount of interest paid with respect to the sale in the fiscal year following the date of determination.

(c) *Information required.* A request for a variance shall contain financial or other information that is sufficient to establish that one of the criteria in §§ 2643.12, 2643.13 or 2643.14(a) is satisfied. A request on the basis of either § 2643.14 (a)(1) or (a)(2) shall also include a copy of the purchaser's audited (or if not available, unaudited) financial statements for the specified time period.

(d) *Limited exemption during pendency of request.* Provided that all of the information required to be submitted is submitted prior to the first day of the first plan year beginning after the sale, a plan may not pending its decision on the variance require a purchaser to post a bond or place an amount in escrow pursuant to section 4204(a)(1)(B). In the event a bond/escrow is not in place pursuant to the preceding sentence, and the plan determines that the request does not qualify for a variance, the purchaser shall comply with section 4204(a)(1)(B) within 30 days after the date on which it receives notice of the plan's decision.

(OMB Control No. 1212–0021 approved through 10/31/86)

§ 2643.12   Pre–January 1, 1931 sales.

The sale of assets was consummated or a legally enforceable contract containing all of the terms and conditions of the sale was signed by the parties, prior to January 1, 1981.

§ 2643.13   De minimis transactions.

The amount of the bond or escrow does not exceed the lesser of $250,000 or two percent of the average total annual contributions made by all employers to the plan, for the purposes of section 412(b)(3)(A) of the Internal Revenue Code, for the three most recent plan years ending before the date of determination. "Contributions made" shall have the same meaning as the term has under § 2642.6(a) of this subchapter. For the purposes of this section, "date of determination" means the date on which the seller ceases covered operations or ceases to have an obligation to contribute for such operations as a result of a sale of assets within the meaning of section 4204(a) of the Act.

§ 2643.14   Net income and net tangible assets tests.

(a) *General.* A variance under this section must satisfy the conditions described in either paragraph (a)(1) or (a)(2).

(1) *Net income test.* The purchaser's average net income after taxes, as defined in paragraph (d) of this section, for its three most recent fiscal years ending before the date of determination (as defined in § 2643.13), reduced by any interest expense incurred with respect to the sale which is payable in the fiscal year following the date of determination, equals or exceeds 150 percent of the amount of the bond or escrow required under section 4204(a)(1)(B).

(2) *Net tangible assets test.* The purchaser's net tangible assets, as defined in paragraph (d) of this section, at the end of the fiscal year preceding the date of determination (as defined in § 2643.13), equal or exceed—

(i) If the purchaser was not obligated to contribute to the plan prior to the sale, the amount of unfunded vested benefits allocable to the seller under section 4211 (with respect to the purchased operations), as of the date of determination; or

(ii) If the purchaser was obligated to contribute to the plan prior to the sale, the sum of the amount of unfunded vested benefits allocable to the purchaser and to the seller under section 4211 (with respect to the purchased operations), each as of the date of determination.

(b) *Special rule when more than one plan is covered by request.* For the purposes of paragraphs (a)(1) and (a)(2), if the transaction involves the assumption by the purchaser of the seller's obligation to contribute to more than one multiemployer plan, then the total amount of the bond/escrow or unfunded vested benefits, as applicable, for all of the plans with respect to which the purchaser has not posted a bond/escrow shall be used to determine whether the applicable test is met.

(c) *Non-applicability of tests in event of purchaser's insolvency.* A purchaser will not qualify for a variance under this subpart pursuant to paragraphs (a)(1) or (a)(2) of this section if, as of the date of the plan's decision on the variance request or the first day of the first plan year beginning after the date of determination, the purchaser is the subject of a petition under Title 11, United States Code, or of a proceeding under similar provisions of state insolvency laws.

(d) *Definitions.* For the purposes of this section—

(1) "Net income after taxes" means revenue minus expenses after taxes (excluding extraordinary and non-recurring income or expenses), as presented in an audited financial statement or, in the absence of such statement, in an unaudited financial statement, each prepared in conformance with generally accepted accounting principles; and

(2) "Net tangible assets" means tangible assets (assets other than licenses, patents copyrights, trade names, trademarks, goodwill, experimental or organizational expenses, unamortized debt discounts and expenses and all other assets which, under generally accepted accounting principles, are deemed intangible) less liabilities (other than pension liabilities). Encumbered assets shall be excluded from "net tangible assets" only to the extent of the amount of the encumbrance.

§ 2643.15   Variances based on other criteria.

When the conditions set forth in Subpart B of this part are not satisfied or when the parties decline to provide to the plan privileged or confidential financial information within the meaning of section 552(b)(4) of the Freedom of Information Act (5 U.S.C. 552), the purchaser or seller may apply to the PBGC for a variance or exemption from the purchaser's bond/escrow and the sale-contract requirements pursuant to Subpart A of this part.

*Effective date.* This part is effective July 2, 1984.

Authority: Secs. 4002(b)(3) and 4201(c), Pub. L. 93–406, 88 Stat. 829, (1974), as amended by secs. 403(1) and 104 (respectively), Pub. L. 96–364, 94 Stat. 1302, and 1221 (1920) (29 U.S.C. 1302(b)(2) and 1384(c)).

Issued at Washington, D.C. on this 25th day of May 1984.

Raymond Donovan,
*Chairman, Board of Directors, Pension Benefit Guaranty Corporation.*

Issued on the date set forth above, pursuant to a resolution of the Board of Directors approving this regulation and authorizing its Chairman to issue same.

Henry Rose,
*Secretary, Pension Benefit Guaranty Corporation.*

[FR Doc. 84–14470 Filed 5–30–84; 8:45 am]
BILLING CODE 7700-01-M

---

**29 CFR Part 2644**

**Notice and Collection of Withdrawal Liability**

**AGENCY:** Pension Benefit Guaranty Corporation.

**ACTION:** Final rule.

**SUMMARY:** This regulation establishes the interest rate to be charged by multiemployer plans on overdue and defaulted withdrawal liability. Under

section 4219(c)(6) of the Employee Retirement Income Security Act, the interest charged on withdrawal liability payments that are overdue or withdrawal liability in default must be at rates based on prevailing market rates for comparable obligations, in accordance with regulations prescribed by the Pension Benefit Guaranty Corporation. The rate set forth in the regulation is based on the average prime rate on short-term commercial loans, as published by the Federal Reserve Board. The effect of this regulation is to prescribe a method for determining interest on withdrawal liability payments that are overdue, withdrawal liability in default and overpayments of withdrawal liability. The regulation also gives plans the authority to adopt alternative rules concerning assessment of interest.

**EFFECTIVE DATE:** July 2, 1984.

**FOR FURTHER INFORMATION CONTACT:** James M. Graham, Attorney, Corporate Planning and Program Development Department (140), 2020 K Street, NW., Washington, D.C. 20006; 202–254–4862. [This is not a toll-free number.]

**SUPPLEMENTARY INFORMATION:**

Background

On February 14, 1983, the Pension Benefit Guaranty Corporation ("PBGC") published a proposed regulation on Notice and Collection of Withdrawal Liability (48 FR 6559). The regulation proposed the interest rate to be charged by multiemployer plans on overdue and defaulted withdrawal liability under section 4219(c)(6) of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"). The regulation also proposed to give plans the authority to adopt another interest rate, as well as certain alternative rules on the assessment of interest. Four written comments were received on the proposal. These comments have been reviewed by PBGC, and PBGC has made changes in the regulation based on some of these comments. In addition, PBGC has made some other changes in the regulation. A discussion of the comments received and the changes made in the final regulation follows.

ERISA section 4219 establishes the rules for notice and collection of withdrawal liability due to a multiemployer plan, including the assessment of interest for overdue and defaulted liability payments. Under section 4219(b) a plan sponsor assesses withdrawal liability by notifying the employer of the amount of the liability and schedule of payments and demanding payment in accordance with the schedule. The first payment is

payable no later than 60 days after the date of the demand, even if the employer requests a review of or appeals the amount of the liability or the schedule of payments (section 4219(c)(2)). Payments are made quarterly or at other intervals specified by plan rules (section 4219(c)(3)).

For overdue withdrawal liability payments, ERISA section 4219(c)(3) requires that interest be assessed from the due date until the date on which the payment is made. In the event of a default, a plan sponsor may, pursuant to section 4219(c)(5), require immediate payment of the outstanding balance of the employer's withdrawal liability plus accrued interest on the total outstanding liability from the due date of the first missed payment. Under section 4219(c)(5)(A), a default occurs if the employer fails to make a withdrawal liability payment within 60 days after notice from the plan sponsor that the payment is overdue. Section 4219(c)(5)(B) provides that plan rules may define "default" to include additional events that indicate a "substantial likelihood that an employer will be unable to pay its withdrawal liability."

ERISA section 4219(c)(6) provides that interest on both overdue and defaulted withdrawal liability is at "rates based on prevailing market rates for comparable obligations" in accordance with PBGC regulations.

The Regulation

Section 2644.2 (a) and (b) of the regulation restates the statutory rules on when a withdrawal liability payment is overdue and when a default occurs. Under § 2644.2(c)(1), no default for non-payment may be declared until the 61st day after the last of: (1) The expiration of the period for requesting plan review; (2) if an employer requests plan review, expiration of the period for requesting arbitration; or (3) when arbitration is timely initiated either by the plan or the employer or both, issuance of the arbitrator's final decision. This limitation does not apply to a default for a reason other than non-payment.

PBGC has selected short-term commercial loans as the "comparable obligations" on which to base the interest rate. Under § 2644.3(b) of the regulation, the interest rate is based on the average prime rate on short-term business loans quoted by large banks, as published by the Federal Reserve Board ("prime rate"). The interest rate for all amounts overdue or in default during each calendar quarter is the prime rate on the fifteenth day of the month (or the next business day, if the fifteenth is not a business day)

preceding the beginning of the quarter. The daily prime rates for a week are reported by the Federal Reserve Board in Statistical Release H.15 ("Selected Interest Rates"), published the following Monday. Section 2644.3(b) provides that the interest rate changes quarterly because, typically, withdrawal liability payments will be made quarterly (ERISA section 4219(c)(3)). PBGC will issue the quarterly interest rates in notices published in the Federal Register, as well as in press releases.

The following chart illustrates what the rates would have been under the regulation for each quarter of 1982 and the first three quarters of 1983 (and the date as of which the prime rate was determined):

| Quarter in which applicable | Rate | Date of prime |
|---|---|---|
| Jan. to Mar. 31, 1982 | 15¾ | Dec. 15, 1981. |
| Apr. 1 to June 30, 1982 | 16½ | Mar. 15, 1982. |
| July 1 to Sept. 30, 1982 | 16½ | June 15, 1982. |
| Oct. 1 to Dec. 31, 1982 | 13½ | Sept. 15, 1982. |
| Jan. 1 to Mar. 31, 1983 | 11½ | Dec. 15, 1982. |
| Apr. 1 to June 30, 1983 | 10½ | Mar. 15, 1983. |
| July 1 to Sept. 30, 1983 | 10½ | June 15, 1983. |

Section 2644.2(d) provides that if an overpayment has occurred, the overpayment must be refunded with interest at the same rate as the rate for overdue withdrawal liability payments.

Section 2644.4 provides that plans may adopt rules which provides for interest on overdue and defaulted withdrawal liability at rates other than that specified in § 2644.3. These rates must reflect "prevailing market rates for comparable obligations." This section also restates the plan's authority to adopt additional grounds for default.

Discussion of Public Comments

One comment expressed support for § 2644.2(c) of the regulation, which provides that no default for non-payment may be declared until the 61st day after the expiration of the time in which plan review may be requested, the expiration of the time in which arbitration may be initiated, or the issuance of an arbitrator's decision, whichever occurs latest. The comment noted that during this interim period of time plans are "well protected" by the accrual of interest on the unpaid amounts.

However, another comment asserted that under the statutes plans have the authority to accelerate the payment of withdrawal liability if there is a default, even though it occurs during arbitration. The comment thus took exception to the provisions of § 2644.2(c). PBGC disagrees with this view. PBGC believes that declaring a default, and thus requiring immediate payment of

withdrawal liability plus interest, is a very serious remedy which ought not to be invoked while an employer is exercising its statutory right to contest the plan's determination. Moreover, the legislative history of the Multiemployer Pension Plan Amendments Act indicates that acceleration should not be allowed during the arbitration process:

> Pending the resolution of the dispute [involving a plan's determination of withdrawal liability], the employer is required to pay withdrawal liability as originally determined by the plan, *but the failure to pay an installment before the arbitration is concluded would not accelerate payment of future installments.* Senate Labor and Human Resources Committee and Finance Committee, Joint Explanation of S. 1076: Multiemployer Pension Plan Amendments Act of 1980, 126 Cong. Rec. S. 10120 (daily ed. July 29, 1980) (emph. added).

However, as one comment pointed out, the regulation does authorize a plan to declare a default prior to the expiration of the time described in § 2644.2(c)(1) for events other than non-payment which the plan has by plan rule determined indicate a "substantial likelihood that an employer will be unable to pay its withdrawal liability" (§ 2644.4). The comment stated that the proposed regulation does not make clear what distinguishes an actual failure to make payment from a "substantial likelihood" of failure to make payment. This comment also requested that PBGC provide guidance to plans on the meaning of "substantial likelihood."

PBGC agrees that some additional guidance on this matter is needed. In terms of a plan's authority to declare a default during arbitration, the regulation distinguishes between an employer's failure to make a payment and a plan determination that there is a substantial likelihood of the employer's inability to pay *its total withdrawal liability.* Such a substantial likelihood would exist, for example, when an employer declares bankruptcy, makes an assignment for the benefit of creditors, or begins liquidating all of its assets; mere failure to make a payment would not necessarily indicate this substantial likelihood of inability to pay the full liability. In the former situations, unlike in the case of a missed payment, a plan's ability to collect withdrawal liability may very well depend on its power to declare a default and accelerate the full liability. Therefore, PBGC believes it is important for the protection of plans that they be able to exercise this power at any time, even during plan review or arbitration. PBGC emphasizes, however, that plan rules establishing additional grounds for default may only include those events

that indicate a substantial likelihood that the employer will be unable to pay its full liability.

A separate comment raised two related issues. First, the comment requested clarification of whether during the pendency of arbitration overdue payments may, for the purposes of section 502(g) of the Act, be considered delinquent contributions under section 515. The comment observed that under section 4221(d), only missed payments after a final arbitration decision are treated as delinquent contributions, but that under section 4301(b), it appears that missed withdrawal liability payments at any time are treated as delinquent contributions. Second, the comment questioned whether it is advisable to permit a plan to sue an employer for missed payments under its payment schedule prior to the conclusion of arbitration. The comment pointed out that there are cases when employers, alleging plan mistake, refuse to pay the amounts due believing that they will be vindicated in arbitration or in court. Thus, the comment argued that the mere deferral of acceleration would be meaningless unless the regulation also prohibited plans from suing employers during the period of arbitration. Another comment also urged PBGC to take a position on this matter, but this comment argued that the regulation should authorize plans to sue to collect scheduled payments during the pendency of arbitration.

PBGC agrees that some clarification is needed concerning the ability of plans to sue during the pendency of arbitration for missed withdrawal liability payments. Under ERISA sections 4219(c)(2) and 4221(d), employers are required to make scheduled payments while a dispute is in arbitration. This requirement protects plans against financial loss with respect to employers who have ceased contributing to a plan. While the provisions of sections 4219 and 4301 are not entirely clear on this point, PBGC believes that it was the intent of Congress to give plans a legal remedy to enforce this requirement, for without a means of enforcement, this protection may be largely illusory. This position is supported by recent court decisions (see, *Commission Drivers Local 187 Pension Fund* v. *Hertz*, 3 EBC 1801 (E.D. Pa. 1982); *Republic Industries, Inc.* v. *Central Pa. Teamsters Pension Fund,* 693 F.2d 290, 298 (3rd Cir. 1982)). As to the other legal questions involved in this matter (*e.g.,* whether courts may assess penalties under section 502(g) on missed payments during the pendency of arbitration), those issues do not relate to the amount of the withdrawal liability

due or the rate of interest to be charged thereon, and thus are beyond the scope of this regulation.

There is an issue, not dealt with in the proposed regulation, concerning how the statutory requirement under ERISA section 4219(c)(5)(A) for a notice of delinquency prior to default operates in the case of joint obligors, *e.g.,* is a notice of delinquency to a subsidiary also notice to the parent corporation? PBGC notes that section 4001(b)(1) provides that all trades or businesses under common control are treated as a single employer for the purposes of Title IV of ERISA. This provision indicates that under ERISA there is a unity of interest in the case of a controlled group of corporations, since the entire group is considered to be a single employer for withdrawal liability and other purposes. Therefore, PBGC believes that a notice of default sent to the contributing entity which is a member of a controlled group of corporations, within the meaning of section 4001(b)(1), constitutes constructive notice to the other members of the same controlled group. Thus, PBGC finds that section 4219(c)(5)(A) does not require notice to the other members of a controlled group.

One comment expressed concern that the proposed regulation would establish only one rate of interest to be charged on overdue and defaulted withdrawal liability payments. The comment stated that "relying almost exclusively" on the prime rate was "inappropriate and contrary to the overall purposes of the statutory provisions." In the opinion of the comment, plans ought not to be tied to a single rate and PBGC should identify other possible variations from that rate. The comment further stated that the prime rate was not the appropriate rate because its use would provide incentive for employers to delay making withdrawal liability payments by providing a generally better interest rate than most employers, especially smaller employers, can get in the marketplace. For that reason, the comment stated that the prime rate would effectively provide "favorable financing terms to delinquent employers." The comment also urged PBGC to identify general economic and financial factors to guide plans in setting alternative interest rates. According to the comment, absent this guidance, a plan would be "unfairly penalized in trying to demonstrate that its interest rate meets the statutory test of 'prevailing. '" On this point, the comment concluded by expressing its support for allowing plans to set their own rules with respect to the rate to be charged.

In response to this comment, PBGC first points out that the regulation does not limit a plan to the rate of interest specified in the regulation. Under § 2644.4 of the regulation, plans are given express authority to adopt rules that provide for interest on overdue and defaulted withdrawal liability at rates other than that specified in § 2644.3. (In addition, PBGC has modified §§ 2644.2(d) and 2644.4 to clarify that plans also have the authority to establish alternative rates of interest for overpayments of withdrawal liability; the rate for overpayments must be the same rate of interest as that established by the plan for overdue withdrawal liability payments.) PBGC disagrees with the implication in this comment that, by establishing the prime rate in the regulation, PBGC has given that rate a certain bias that must be overcome by plans if they desire to establish a different rate. The fact that PBGC has determined that the prime rate satisfies the statutory standards for the interest rate does not constitute a finding that another rate does not satisfy those standards.

Further, PBGC notes that the regulation authorizes plans to establish more than one interest rate. Section 2644.2 provides that plans may vary the rate according to employer creditworthiness. Thus, if there is concern that a particular rate might prove to be unduly favorable to a certain risk class of employers, i.e., employers who would ordinarily have to borrow at a higher rate, then the plan could by rule establish a different rate for that class of employers.

On the point of providing plans with more guidance on the rates they may adopt, PBGC believes that the statutory standards, coupled with the PBGC's interpretation of those standards in the preamble to the proposed regulation, provide plans with sufficient guidance to establish different rates if they so desire.

PBGC disagrees with the assertion that the prime rate is too low. In recent years, the prime rate has come to mean the average rate at which banks loan money to their commercial customers. As PBGC pointed out in the preamble to the proposed regulation, according to the Federal Reserve Board's quarterly survey of Terms of Bank Lending (Statistical Release E.2 (111)) for the past four years, the rates banks actually charge on short-term (less than one year) commercial and industrial loans are only slightly higher than the prime rate at any given period. While it may prove to be favorable for some employers, PBGC believes that the

prime rate approximates the prevailing market rate for most borrowers.

A question has also been raised on whether the interest rate prescribed by the regulation is a nominal rate or an effective rate. In order to clarify this issue, PBGC has added a new paragraph (c) to § 2644.3 (paragraphs (c) and (d) of the proposed regulation have been redesignated (d) and (e)), which provides that the rate under § 2644.3(b) is a nominal rate and gives an explicit rule for calculating the amount of interest due.

In order to clarify a potential ambiguity, PBGC has revised § 2644.3(b) which concerns the date from which interest accrues on overdue and defaulted withdrawal liability payments. As proposed, the provision was subject to an interpretation that in the case of an overdue payment, interest would run from the due date of the payment, but in the case of a default, interest would run from the date of default rather than from the due date of the payment. PBGC did not intend that result. Therefore, PBGC has revised § 2644.3(d) to clarify that in the case of both overdue and defaulted withdrawal liability payments, interest will run from the date on which the payment was originally due.

One comment pointed out an apparent inconsistency between the PBGC proposed regulation and an Internal Revenue Service ("IRS") proposed rule on the question of whether a plan must credit an employer with interest on an overpayment of withdrawal liability. The IRS proposed rule on Refund of Mistaken Contributions (48 FR 10374, March 11, 1983), which was published after the PBGC proposed regulation, provided in relevant part—

Any earnings attributable to the excess contribution or overpayment as a return on investment to the trust may not be returned to the employer. Losses attributable to the excess contribution or overpayment must reduce the amount to be returned (§ 1.401(a)-(3)(2)(ii)(A)).

In contrast, § 2644.2(d) of PBGC's proposed regulation provided that an overpayment must be refunded with interest to the employer. The comment urged that PBGC and IRS coordinate their rulemaking to ensure consistency on this issue.

Both PBGC and IRS recognize the need for consistency on this matter. In a comment filed with the IRS, PBGC indicated that the courts have sustained PBGC's position that interest should accompany a refund to an employer of an overpayment of withdrawal liability (see, *Terson Co.* v. *PBGC*, 3 EBC 2369, 2371 (N.D. Ill. 1982)). PBGC also noted

that this position furthers the Congressional purpose of encouraging payment of withdrawal liability even when the amount of the liability may be in dispute. In response to PBGC's comment, IRS has indicated that it intends to revise its rule to adopt the approach taken in PBGC's regulation.

This same comment went on to state that neither the PBGC nor the IRS approach is appropriate. The comment suggested that a distinction be drawn depending on whether the plan or the employer was responsible for the overpayment. The comment stated that, for example, when the overpayment results from an employer error, there is no justification for requiring the plan to refund the overpayment with interest. However the comment conceded that when the amount of liability assessed by a plan is disputed by an employer, paying interest as part of the refund might be less expensive for the plan than having to go to court to collect the payment. The same comment further stated that if there is interest charged on overpayments, the rate should not be the same as the interest rate for delinquent withdrawal liability, as required by § 2644.2(d); that "the equities are different in the two situations and may require different treatment."

PBGC disagrees with these suggestions. PBGC is not aware of any practical reason for distinguishing between overpayments resulting from employer error as opposed to plan mistake; in either event, the plan has money to which it is not entitled. Further, since the plan presumably has at its disposal all of the information necessary to make the calculations, overpayment will almost always be the result of plan error. In addition, drawing distinctions along the lines suggested by this comment could increase administrative burdens and give rise to costly disputes between employers and plans. Finally, PBGC points out that if an employer pays amounts in excess of what is required under the schedule of payments, the employer is not entitled to any interest on the overpayment. The requirement for interest on overpayments in § 2644.2(d) applies only to "payments made in accordance with the schedule of payments established by the plan sponsor."

PBGC also disagrees with the suggestion that a different interest rate should be charged depending on whether the plan is making or receiving payments. PBGC finds the equities are the same, and that employers are entitled to receive the same rate of interest on refund of overpayments as

they pay on delinquent or defaulted payments. Moreover, paying the same rate of interest on refunds will be an incentive to employers to make prompt payment of withdrawal liability, which is obviously in the plan's best interests.

Another comment disagreed with § 2644.2(d)(2) of the proposed regulation, which permitted the plan to refund an overpayment by applying it against future payments instead of returning it in a lump sum. The comment stated that in any other commercial field, a creditor who overbilled and was paid would be required to refund the excess at once and would not be permitted to apply the amount against future billings. According to the comment, the payment of withdrawal liability will often adversely affect the employer's cash flow, a problem that is not necessarily resolved by payment of interest under § 2644.2(d) since the interest rate may be "substantially lower" than the cost to the withdrawn employer. The comment concluded this point by stating that a plan should not be given the choice of refund method when the plan itself is responsible for the overcharge.

PBGC agrees with this suggested change. Under § 2644.2(d)(1) of the proposed regulation, a lump sum payment was required when an employer overpaid the total amount of withdrawal liability. A revision of the schedule of payments was permitted under § 2644.2(d)(2) only when there was an outstanding balance owed to the plan. However, the annual payment is specifically set by statute (ERISA section 4219(c)(1)(C)(i)), and PBGC finds there is no justification for any change in that payment. If overpayment does occur in connection with the annual payment, the amount overpaid should be refunded to the employer in a lump sum, rather than by changing the amount of future payments.

Moreover, it is the plan and not the employer who calculates the amount of the annual payment. Because an overpayment regarding the annual payment will typically result from plan rather than employer error, the plan ought not to benefit from the mistake by being permitted to revise the schedule of payments rather than provide a lump sum payment. For those reasons, PBGC has dropped paragraphs (d)(1) and (d)(2), and has revised § 2644.2(d) to provide that in the event of overpayment, whether in connection with the total withdrawal liability owed or the annual payment amount, the plan sponsor must refund the overpayment in a lump sum (plus interest).

Another comment characterized as reasonable the provisions of § 2644.4, which would authorize plans to adopt

other rules relating to the collection of overdue and defaulted withdrawal liability if they are consistent with ERISA and operate uniformly with respect to each employer except for variations based on creditworthiness. The comment noted that the section further provides that any variations that plans choose to make based on creditworthiness must themselves be outlined in specific rules, including criteria for measuring creditworthiness. However, according to the comment, many plans negotiate settlements with individual employers on a case-by-case basis and include features such as payments into escrow pending the outcome of litigation and revised interest rates. The comment also pointed out that in other cases, an arbitrator may order that liability be paid in a different way. For those reasons, the comment urged that the regulation provide that the uniformity requirement for plan rules not apply to individual settlements of specific disputes.

PBGC believes that the change suggested by the comment is unnecessary. First, ERISA section 4214(b), which requires that plan rules operate and be applied uniformly, does not apply to a decision in a specific case by an arbitrator under section 4221. Second, nothing in sections 4219(c)(7) and 4224, both of which authorize plans to adopt rules for the satisfaction of an employer's withdrawal liability, prohibits a plan from making an individual settlement with an employer pursuant to a plan rule adopted for that purpose which is consistent with ERISA. Indeed, the legislative history of section 4224 envisions such "practical collection decisions" See, *Congressional Record,* H7899 (Aug. 26, 1980).

Finally, one comment objected to the requirement under § 2644.4(b) of the proposed regulation that plans notify employers and employee organizations of the adoption of plan rules under this regulation. The comment stated that ERISA section 4214(b), which is cited by the proposed regulation as authority for this requirement, is subject to the interpretation that a notice is required only if a plan adopts special rules for allocating liability under section 4211(c) or changing the *de minimis* rule under section 4209. Citing the burden entailed in the special mailing of a notice concerning the delinquent/defaulted liability interest rate and similar items, the comment urged that the notice requirement be deleted. The comment instead suggested that plans be required to notify employers only at the time they withdraw or upon request, and in no event should there be any general notice required if the plan rules "simply

incorporate the presumptive rules of the law and PBGC regulation." Contrary to the comment's opinion, PBGC believes that section 4214(b) requires plans to give notice to employee organizations and contributing employers of any plan rule or amendment adopted pursuant to that provision. Because of this express statutory provision, PBGC has concluded that there is no need to restate the notice requirement and therefore has dropped § 2644.4(b) from the regulation.

**Executive Order 12291 and Regulatory Flexibility Act**

The PBGC has determined that this regulation is not a "major rule" for the purposes of Executive Order 12291, because it will not have an annual effect on the economy of $100 million or more; or create a major increase in costs or prices for consumers, individual industries, or geographic regions; or have significant adverse effects on competition, employment, investment, innovation, or on the ability of United States-based enterprises to compete with foreign-based enterprises in domestic or export markets. ERISA requires that interest be assessed on overdue and defaulted withdrawal liability at rates based on prevailing market rates for comparable obligations. This regulation merely specifies one such rate. Moreover, this regulation does not mandate the use of that particular interest rate; plans may adopt other rates by plan rule.

Under section 605(b) of the Regulatory Flexibility Act, the Pension Benefit Guaranty Corporation certifies that this rule will not have a significant economic impact on a substantial number of small entities. Pension plans with fewer than 100 participants have traditionally been treated as small plans. The proposed regulation affects only multiemployer plans covered by PBGC. Defining "small plans" as those with under 100 participants, such plans represent less than 14 percent of all multiemployer plans covered by PBGC (346 out of 2485). Further, small multiemployer plans represent only .4 percent of all small plans covered by the PBGC, (346 out of 84,288). Approximately 500,000 employers contribute to multiemployer plans, most of them small employers (under 100 employees). PBGC estimates that fewer than 25,000 (5 percent) of these employers will be required to pay withdrawal liability in any year, and an even smaller percentage will have overdue or defaulted withdrawal liability. Therefore compliance with sections 603 and 604 of the Regulatory Flexibility Act is waived.

Federal Register / Vol. 49, No. 106 / Thursday, May 31, 1984 / Rules and Regulations    22647

List of Subjects in 29 CFR Part 2644

Employee benefit plans and pensions.

In consideration of the foregoing, Subchapter F of Chapter XXVI of Title 29, Code of Federal Regulations is amended by adding a new Part 2644 as follows:

## PART 2644—NOTICE AND COLLECTION OF WITHDRAWAL LIABILITY

Sec.
2644.1  Purpose and scope.
2644.2  Overdue and defaulted withdrawal liability; overpayment.
2644.3  Interest on overdue, defaulted and overpaid withdrawal liability.
2644.4  Plan rules concerning overdue and defaulted withdrawal liability.

Authority: Secs. 4002(b)(3) and 4219(c), Pub. L. 93–406, as amended by secs. 403(1) and 104 (respectively), Pub. L. 96–364, 94 Stat. 1203, 1302 and 1236–1238 (1980) (29 U.S.C. 1302(b)(3) and 1399(c)(6)).

### § 2644.1  Purpose and scope.

(a) *Purpose.* The purpose of this part is to establish the interest rate to be charged on overdue, defaulted and overpaid withdrawal liability under section 4219(c)(6) of the Act, and to authorize multiemployer plans to adopt alternative rules concerning assessment of interest and related matters.

(b) *Scope.* This part applies to multiemployer plans covered under section 4021(a) of the Act and not excluded by section 4021(b), and to employers who have withdrawn from such plans after April 28, 1980 (May 2, 1979 for certain employers in the seagoing industry).

### § 2644.2  Overdue and defaulted withdrawal liability; overpayment.

(a) *Overdue withdrawal liability payment.* Except as otherwise provided in rules adopted by the plan in accordance with § 2644.4, a withdrawal liability payment is overdue if it is not paid on the date set forth in the schedule of payments established by the plan sponsor.

(b) *Default.* (1) Except as provided in paragraph (c)(1), "default" means—

(i) The failure of an employer to pay any overdue withdrawal liability payment within 60 days after the employer receives written notification from the plan sponsor that the payment is overdue; and

(ii) Any other event described in rules adopted by the plan which indicates a substantial likelihood that an employer will be unable to pay its withdrawal liability.

(2) In the event of a default, a plan sponsor may require immediate payment of all or a portion of the outstanding amount of an employer's withdrawal liability, plus interest. In the event that the plan sponsor accelerates only a portion of the outstanding amount of an employer's withdrawal liability, the plan sponsor shall establish a new schedule of payments for the remaining amount of the employer's withdrawal liability.

(c) *Plan review or arbitration of liability determination.* The following rules shall apply with respect to the obligation to make withdrawal liability payments during the period for plan review and arbitration and with respect to the failure to make such payments:

(1) A default as a result of failure to make any payments shall not occur until the 61st day after the later of—

(i) Expiration of the period described in section 4219(b)(2)(A) of the Act;

(ii) If the employer requests review under section 4219(b)(2)(A) of the Act of the plan's withdrawal liability determination or the schedule of payments established by the plan, expiration of the period described in section 4221(a)(1) of the Act for initiation of arbitration; or

(iii) If arbitration is timely initiated either by the plan, the employer or both, issuance of the arbitrator's decision.

(2) Any amounts due before the expiration of the period described in paragraph (c)(1) shall be paid in accordance with the schedule established by the plan sponsor. If a payment is not made when due under the schedule, the payment is overdue and interest shall accrue in accordance with the rules and at the same rate set forth in § 2644.3.

(d) *Overpayments.* If the plan sponsor or an arbitrator determines that payments made in accordance with the schedule of payments established by the plan sponsor have resulted in an overpayment of withdrawal liability, the plan sponsor shall refund the overpayment, with interest, in a lump sum. The plan sponsor shall credit interest on the overpayment from the date of the overpayment to the date on which the overpayment is refunded to the employer at the same rate as the rate for overdue withdrawal liability payments, as established under § 2644.3 or by the plan pursuant to § 2644.4.

### § 2644.3  Interest on overdue, defaulted and overpaid withdrawal liability.

(a) *Interest assessed.* The plan sponsor of a multiemployer plan—

(1) Shall assess interest on overdue withdrawal liability payments from the due date, as defined in paragraph (d) of this section, until the date paid, as defined in paragraph (e); and

(2) In the event of a default, may assess interest on any accelerated portion of the outstanding withdrawal liability from the due date, as defined in paragraph (d) of this section, until the date paid, as defined in paragraph (e).

(b) *Interest rate.* Except as otherwise provided in rules adopted by the plan pursuant to § 2644.4, interest under this section shall be charged or credited for each calendar quarter at a rate equal to the average quoted prime rate on short-term commercial loans for the fifteenth day (or next business day if the fifteenth day is not a business day) of the month preceding the beginning of each calendar quarter, as reported by the Board of Governors of the Federal Reserve System in Statistical Release H.15 ("Selected Interest Rates").

(c) *Calculation of interest.* The interest rate under paragraph (b) of this section is the nominal rate for any calendar quarter or portion thereof. The amount of interest due the plan for overdue or defaulted withdrawal liability, or due the employer for overpayment, shall be computed for the number of full quarters, months and days from the due date (or date of overpayment) to the date paid (or date of refund), as follows:

(1) Number of full quarters $\times \dfrac{\text{interest rate for quarter}}{4}$

(2) Number of full months in partial quarter $\times \dfrac{\text{interest rate for quarter}}{12}$

(3) Number of days in partial month $\times \dfrac{\text{interest rate for quarter}}{360}$

(4) Interest due = ((1)+(2)+(3))×overdue/defaulted amount or overpayment

(d) *Due date.* Except as otherwise provided in rules adopted by the plan, the due date from which interest accrues shall be, for an overdue withdrawal liability payment and for an amount of withdrawal liability in default, the date of the missed payment that gave rise to the delinquency or the default.

(e) *Date paid.* Any payment of withdrawal liability shall be deemed to have been paid on the date on which it is received.

### § 2644.4  Plan rules concerning overdue and defaulted withdrawal liability.

Plans may adopt rules relating to overdue and defaulted withdrawal liability, provided that those rules are consistent with the Act. These rules may include, but are not limited to, rules for

A49

**22648**    Federal Register / Vol. 49, No. 106 / Thursday, May 31, 1984 / Rules and Regulations

determining the rate of interest to be charged on overdue, defaulted and overpaid withdrawal liability (provided that the rate reflects prevailing market rates for comparable obligations); rules providing reasonable grace periods during which late payments may be made without interest; additional definitions of default which indicate a substantial likelihood that an employer will be unable to pay its withdrawal liability; and rules pertaining to acceleration of the outstanding balance on default. Plan rules adopted under this section shall be reasonable. Plan rules shall operate and be applied uniformly with respect to each employer, except that the rules may take into account the creditworthiness of an employer. Rules which take into account the creditworthiness of an employer shall state with particularity the categories of creditworthiness the plan will use, the specific differences in treatment accorded employers in different categories, and the standards and procedures for assigning an employer to a category.

*Effective date.* This part is effective July 2, 1984.

Issued at Washington, D.C. on this 25th day of May 1984.

Raymond Donovan,

*Chairman, Board of Directors, Pension Benefit Guaranty Corporation.*

Issued on the date set forth above, pursuant to a resolution of the Board of Directors approving this regulation and authorizing its Chairman to issue same.

Henry Rose,

*Secretary, Pension Benefit Guaranty Corporation.*

[FR Doc. 84-14475 Filed 5-30-84; 8:45 am]

BILLING CODE 7708-01-M

## DEPARTMENT OF DEFENSE

### Department of the Air Force

**32 CFR Parts 1000, 1001, 1003, 1006, 1007, 1008, 1009, 1011, 1012, 1013, 1016, 1017, 1018, 1030, and 1031–1199**

**Air Force Procurement Regulations; Removal of Subchapter**

**AGENCY:** Department of the Air Force, Department of Defense.

**ACTION:** Final rule.

**SUMMARY:** The Department of the Air Force is amending Chapter VII, Title 32 by removing Subchapter W—Air Force Procurement and the following parts: Part 1001—General provisions; Part 1003—Procurement by negotiation; Part 1006—Foreign purchases; Part 1007—

Contract clauses; Part 1008—Funding contract overruns; Part 1009—Patents, data and copyrights; Part 1011—Taxes; Part 1012—Labor; Part 1013—Government property; Part 1016—Procurement forms; Part 1017—Extraordinary contractual actions to facilitate the national defense; Part 1018—Procurement of construction and contracting for architect-engineer services; Part 1030—Appendixes to Headquarters U.S. Air Force Armed Services procurement regulations supplement; and Parts 1031–1199 [Reserved]. These documents are now obsolete. The Federal Acquisition Regulation (FAR) establishes (i) a single regulation for use by all executive agencies in their acquisition of supplies and services with appropriated funds; and (ii) the Federal Acquisition Regulation System consisting of the FAR agency acquisition regulations that implement or supplement the FAR. The FAR and the DOD FAR Supplement (49 FR 11302, March 26, 1984) replaced the Defense Acquisition Regulation (DAR). This action is a result of departmental review in an effort to insure that only current regulations are maintained in the Air Force portion of the Code of Federal Regulations.

**EFFECTIVE DATE:** May 31, 1984.

**FOR FURTHER INFORMATION CONTACT:** Col. McChesney, HQ USAF/RD, Washington, D.C. 20330, telephone (202) 697-9441.

**List of Subjects in 32 CFR Parts 1000, 1001, 1003, 1006, 1007, 1008, 1009, 1011, 1012, 1013, 1016, 1017 1018, 1030, and 1031–1199**

Government procurement, Small business, Canada, Foreign trade, Research, Foods, Safety, Freight, Federal building and facilities, Copyright, Inventions and patents, Tapes, State-Federal relations, Government property, National defense, Labor, Architects, Engineers.

**SUPPLEMENTARY INFORMATION:** Accordingly, 32 CFR is amended by removing Parts 1000, 1001, 1003, 1006, 1007 1008, 1009, 1011, 1012, 1013, 1016, 1017 1018, 1030, 1031–1199 by removing the Subchapter W heading and by reserving Subchapter W.

Authority: 10 U.S.C. 8012.

Winnibel F. Holmes,

*Air Force Federal Register Liaison Officer.*

[FR Doc. 84-14485 Filed 5-30-84; 8:45 am]

BILLING CODE 3910-01-M

## POSTAL SERVICE

### 39 CFR Part 233

**Inspection Service Authority; Mail Covers; Correction**

**AGENCY:** Postal Service.

**ACTION:** Final rule; correction.

**SUMMARY:** This document corrects a final rule on the mail cover authority of postal inspectors that appeared at page 56215 in the Federal Register of Tuesday, December 20, 1983 (48 FR 56215). The action is necessary to correct an error in redesignating a paragraph.

**EFFECTIVE DATE:** January 20, 1984.

**FOR FURTHER INFORMATION CONTACT:** Paul J. Kemp, (202) 245-4638.

**SUPPLEMENTARY INFORMATION:** The following correction is made in FR Doc. 83-33667 appearing on 56215, in the issue of December 20, 1983:

On page 56215, in the middle of column two, in the amendatory language, the clause "redesignate paragraphs (f), (g), (h), and (i) as paragraphs (g), (h), (i), and (j), respectively," is corrected to read "redesignate paragraphs (f), (g), (h), (i), and (j) as paragraphs (g), (h), (i), (j), and (k), respectively,"

(39 U.S.C. 401, 403, 404, 410, 411)

Fred Eggleston,

*Assistant General Counsel, Legislative Division.*

[FR Doc. 84-14510 Filed 5-30-84; 8:45 am]

BILLING CODE 7710-12-M

## ENVIRONMENTAL PROTECTION AGENCY

### 40 CFR Part 180

**[PP 2E2738/R676; PH-FRL 2596-4]**

**Tolerances and Exemptions From Tolerances for Pesticide Chemicals in or on Raw Agricultural Commodities; Diflubenzuron**

**AGENCY:** Environmental Protection Agency (EPA).

**ACTION:** Final rule.

**SUMMARY:** This rule establishes a tolerance for residues of the insecticide diflubenzuron in or on the raw agricultural commodity pasture grass. This regulation is to establish a maximum permissible level for residues of the insecticide in or on the commodity was requested in a petition submitted by the Interregional Research Project No. 4 (IR-4).