No. 25-1312

IN THE

# United States Court of Appeals for the Fourth Circuit

INTERNATIONAL PAINTERS AND ALLIED TRADES INDUSTRY PENSION FUND, *et al.*,

*Plaintiffs-Appellees*,

*v.*

FLORIDA GLASS OF TAMPA BAY, INC., *et al.*,

*Defendants-Appellants*.

On appeal from the United States District Court
for the District of Maryland, No. 1:23-cv-45
(Hon. Stephanie A. Gallagher)

## RESPONSE BRIEF OF APPELLEES

Brian A. Pepicelli, Esquire
Neil J. Gregorio, Esquire
TUCKER ARENSBERG, P.C.
1500 One PPG Place
Pittsburgh, PA  15222
(412) 566-1212
bpepicelli@tuckerlaw.com

## <u>DISCLOSURE STATEMENT</u>

Pursuant to Federal Rule of Appellate Procedure 26.1, Appellees make the following disclosures:

Appellee International Painters and Allied Trades Industry Pension Fund is a multiemployer plan within the meaning of 29 U.S.C. §§1002(37) and 1301(a)(3). It has no parent corporation, and no publicly held corporation owns 10% or more of it.

Appellee Terry Nelson is a fiduciary of the International Painters and Allied Trades Industry Pension Fund. Since he is an individual person, Federal Rule of Appellate Procedure 26.1 does not apply to him.

July 14, 2025

*s/ Brian A. Pepicelli*
Brian A. Pepicelli
*Counsel for Appellees*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................. ii

INTRODUCTION ................................................................. 1

STATEMENT OF ISSUES ................................................................. 5

STATEMENT OF CASE ................................................................. 6

   I.   Relevant MPPAA Background ................................................ 6

   II.  Relevant Bankruptcy Concepts ................................................ 13

   III.  Factual Background ................................................................. 16

   IV.  Procedural Background ................................................................. 23

SUMMARY OF THE ARGUMENT ................................................ 28

ARGUMENT ................................................................. 29

   I.   The limitations defense cannot survive without considering waived issues ................................................................. 29

   II.  The limitations defense fails when considering the merits of the waived issues. ................................................................. 42

       A. The continent proof of claim was not a valid notice and demand under §1399(b)(1). ................................................ 42

       B. This action is timely under the general limitations framework even if the contingent proof of claim was a valid notice and demand under §1399(b)(1). ...................... 50

       C. The contingent proof of claim was not an acceleration of withdrawal liability under §1399(c)(5). ............................... 52

   III.  No refund is due, but an offset would be necessary if so. ........... 60

CONCLUSION ................................................................. 62

## TABLE OF AUTHORITIES

**Cases**

*Am. Prods. Prod. Co. of Pinellas Cnty. v. Armstrong,*
  Case No. 23-CA-001685 (Fla. 13th Jud. Cir.) .................................... 25

*Americold Log., LLC v. New England Teamsters & Trucking Indus.*
  *Pension Fund,* 2023 U.S. Dist. LEXIS 15849 (D. Mass. 2023) ...... 33, 41

*Bay Area Laundry & Dry Cleaning Pension Tr. Fund v. Ferbar Corp.*
  *of California*, 522 U.S. 192 (1997) .............................................. *passim*

*Bd. of Trs. of Dist. No. 15 Machinists' Pension Fund v. Kahle Eng'g*
  *Corp.*, 43 F.3d 852 (3d Cir. 1994) ........................................... 31, 40, 41

*Bd. of Trs. of Sheet Metal Workers' Nat'l Pension Fund. v. BES Servs.*,
  469 F.3d 369 (4th Cir. 2006) ...................................................... *passim*

*Bd. of Trs. of Trucking Empl's of N. Jersey Pension Fund v. Centra,*
  983 F.2d 495 (3d Cir. 1992) .................................................................. 41

*Bd. of Trs. of Trucking Emps. of N. Jersey Welfare Fund, Inc.-Pension*
  *Fund v. Gotham Fuel Corp.*, 860 F. Supp. 1044 (D.N.J. 1993) ........... 31

*Bd. of Trs. of Trucking Emps. of N. Jersey Welfare Fund, Inc.-Pension*
  *Fund v. Kero Leasing Corp.*, 377 F.3d 288 (3d Cir. 2004) ................... 30

*Bldg. Serv. Local 47 Cleaning Contractors Pension Plan v. Grandview*
  *Raceway,* 46 F.3d 1392 (6th Cir. 1995) ............................................... 61

*Ceco Concrete Constr., LLC v. Centennial State Carpenters Pension*
  *Trust*, 821 F.3d 1250 (10th Cir. 2016) ............................................ 9, 10

*Cent. States Pension Fund v. Basic American Indus.,*
  252 F.3d 911 (7th Cir. 2001) ................................................... 31, 54, 57

*Cent. States Pension Fund v. Frate Serv.*,
   2017 U.S. Dist. LEXIS 187489 (N.D. Ill. 2017) ...................................57

*Cent. States Pension Fund v. Lady Baltimore Foods*,
   960 F.2d 1339 (7th Cir. 1992) .........................................................62

*Cent. States Pension Fund v. Nitehawk Exp., Inc.*,
   223 F.3d 483 (7th Cir. 2000) ...........................................................62

*Cent. States Pension Fund v. O'Neill Bros. Transfer & Storage Co.*,
   2009 U.S. Dist. LEXIS 44190 (N.D. Ill. 2009) ...................................57

*Cent. States Pension Fund v. Slotky*,
   956 F.2d 1369 (7th Cir. 1992) .......................................... 14, 18, 44, 54

*Chi. Truck Drivers Pension Fund v. Cent. Transport, Inc.*,
   888 F.2d 1161 (7th Cir. 1989) .........................................................44

*Chi. Truck Drivers Pension Fund v. El Paso, CGP, Co.*,
   525 F.3d 591 (7th Cir. 2008)). ................................................. *passim*

*Connolly v. PBGC*,
   475 U.S. 211, 217 (1986) .............................................................6, 8

*CPT Holdings, Inc. v. Indus. & Allied Emps. Union Pension Plan*,
   *Local 73*, 162 F.3d 405 (6th Cir. 1998).............................................15

*Findlay Truck Line, Inc. v. Cent. States Pension Fund*,
   726 F.3d 738 (6th Cir. 2013) .............................................................8

*Flying Tiger Line v. Teamsters Pension Tr. Fund*,
   830 F.2d 1241 (3d Cir. 1987).................................................33, 34, 42

*Giroux Bros. Transp. v. New England Teamsters & Trucking Indus.*
   *Pension Fund*, 73 F.3d 1 (1st Cir. 1996) .......................................33, 41

iii

*Grady v. A.H. Robins Co.*,
  839 F.2d 198 (4th Cir. 1988) .................................................. 15, 43, 48

*Heavenly Hana LLC v. Hotel Union & Hotel Indus. of Haw. Pension
  Plan,* 891 F.3d 839 (9th Cir. 2018) ....................................................... 49

*I.A.M. Nat'l Pension Fund v. M & K Emple. Sols., LLC*,
  2023 U.S. Dist. LEXIS 165893 (D.D.C. 2023) .................................... 62

*I.L.G.W.U. Nat. Ret. Fund v. Meredith Grey, Inc.*,
  190 F.R.D. 324 (S.D.N.Y. 1999) .......................................................... 31

*In re CD Realty Partners*,
  205 B.R. 651 (Bankr. D. Mass 1997) .................................................... 15

*In re Centric Corp.*,
  901 F.2d 1514 (10th Cir. 1990) ............................................................ 33

*In re Manhattan Jeep Chrysler Dodge, Inc.*,
  599 B.R. 247 (Bankr. S.D.N.Y. 2019) ................................. 16, 18, 44, 49

*In re Premier Auto. Servs.*,
  492 F.3d 274 (4th Cir. 2007) ............................................................... 13

*IUE AFL-CIO Pension Fund v. Barker & Williamson, Inc.*,
  788 F.2d 118 (3d Cir. 1986) ................................................................. 11

*J. Supor & Son Trucking & Rigging Co., Inc. v. Trucking Employees of
  N. Jersey Welfare Fund*, 30 F.4th 179 (3d Cir. 2022) ...................... 8, 56

*Jama v. ICE*,
  543 U.S. 335 (2005) ............................................................................. 35

*Joyce v. Clyde Sandoz Masonry*,
  871 F.2d 1119 (D.C. Cir. 1989) ................................................. 15, 31, 48

*Keyes Law Firm, LLC v. Napoli*,
   120 F.4th 139 (4th Cir. 2024)..............................................................27

*Kiviti v. Bhatt*,
   80 F.4th 520 (4th Cir. 2023)..................................................................14

*Lane v. Nationwide Mut. Ins. Co.*,
   321 Md. 165 (1990)................................................................................54

*Local No. 499, Bd. of Trs. Of the Shopmen's Pension Plan v. Art Iron, Inc.*, 2021 U.S. Dist. LEXIS 12082 (S.D. Ohio 2021)...........................50

*Lomax v. Ortiz-Marquez*,
   590 U.S. 595 (2020) ..............................................................................35

*McDonald v. Centra, Inc.*,
   946 F.2d 1059 (4th Cir. 1991) ....................................... 7, 14, 21, 22, 41

*Milwaukee Brewery Workers' Pension Plan v. Jos. Schlitz Brewing Co.*,
   513 U.S. 414, 416-17 (1995) ......................................................7, 42, 59

*PACE Indus. Union-Mgmt. Pension Fund. v. Singer*,
   2011 U.S. Dist. LEXIS 22875 (E.D.N.Y. 2011).......................52, 54, 57

*RadLAX Gateway Hotel, LLC v. Amalg. Bank*,
   566 U.S. 639 (2012) ..............................................................................57

*Steelworkers Pension Trust v. Renco Group, Inc.*,
   694 Fed. App'x 69 (3d Cir. 2017)................................................. *passim*

*Steelworkers Pension Trust v. Renco Group, Inc.*,
   2021 U.S. App. LEXIS 25748 (3d Cir. 2021)......................................51

*Strategic Outsourcing, Inc. v. Cont'l Cas. Co.*,
  274 Fed. App'x 228 (4th Cir. 2008) ...................................................... 54

*Teamsters Joint Council No. 83 v. Centra, Inc.*,
  947 F.2d 115 (4th Cir. 1991) ....................................................... *passim*

*Trs. of Colo. Pipe Indus. Pension Tr. v. Howard Elec. & Mech., Inc.*,
  909 F.2d 1379 (10th Cir. 1990) ........................................................... 41

*Trs. of Plumbers & Pipefitters Nat'l Pension Fund v. Plumbing Servs.,*
  *Inc.*, 791 F.3d 436 (4th Cir. 2015) ....................................................... 26

*UFCW Local One Pension Fund v. Enivel Props. LLC*,
  791 F.3d 369 (2d Cir. 2015) ................................................................... 8

*United States ex rel. Taylor v. Boyko*,
  39 F.4th 177 (4th Cir. 2022) ................................................................ 36

*Van Sant v. Nu-Way Printing*,
  2020 U.S. Dist. LEXIS 119755 (D. Ore. 2020) .................................... 29

**Statutes**

11 U.S.C. §362(a) ................................................................................. 14
11 U.S.C. §501 ..................................................................................... 14
11 U.S.C. §502(a) ..................................................................... 14, 21, 45
11 U.S.C. §502(b)(1) ............................................................................ 15
11 U.S.C. §524(e) ................................................................................. 14
11 U.S.C. §727(a)(1) ...................................................................... 14, 22
29 U.S.C. §186(c)(5)(B) .......................................................................... 6
29 U.S.C. §1132(g)(2) ......................................................... 24, 27, 61, 62
29 U.S.C. §1132(g)(2)(D) ..................................................................... 27
29 U.S.C. §1301(a)(3) ............................................................................. 6
29 U.S.C. §1301(a)(10)(A) ..................................................................... 6
29 U.S.C. §1301(b)(1) ............................................................................. 9
29 U.S.C. §1383 ..................................................................................... 9

29 U.S.C. §1383(a) .................................................................. 9

29 U.S.C. §1383(b) .................................................................. 9

29 U.S.C. §1451(a)(1) ............................................................ 16

29 U.S.C. §1383(b)(2)(B)(ii) ................................................... 9

29 U.S.C. §1383(e) ................................................................ 10

29 U.S.C. §1399(b)(1) ................................................... *passim*

29 U.S.C. §1399(b)(2) ............................................................ 21

29 U.S.C. §1399(c)(2) ............................................................ 51

29 U.S.C. §1399(c)(5) .................................................... *passim*

29 U.S.C. §1401(a)(1) .......................................... 2, 21, 29, 34

29 U.S.C. §1401(a)(3)(A) ....................................................... 35

29 U.S.C. §1401(b)(1) ........................................... 21, 36, 37, 39

29 U.S.C. §1451(f) ............................................................. 5, 11

## Other Authorities

5 Collier Bankruptcy Practice Guide P 84.01 (2025) ............................ 13

4 Corbin on Contracts, § 989 (1951) ......................................... 54

## Rules

Fed.R.Bankr.P. 3001(c) ......................................................... 48

## <u>INTRODUCTION</u>

When looking at the four corners of the complaint, this action is unquestionably timely. In March 2022, Appellee International Painters and Allied Trades Industry Pension (the "Fund") assessed Appellants (collectively, the "Controlled Group") for withdrawal liability. Under the statute's "pay now, dispute later" rule, the Controlled Group's first installment payment was due in May 2022. The Fund filed the complaint less than one year later, in January 2023. Based on that simple analysis, the Fund's complaint is not time-barred.

A simple analysis, however, does not help the Controlled Group evade its pension liabilities to the Fund, so it offers a much more convoluted one. The Controlled Group asserts the limitations period was triggered several years prior, based on something not even referenced in the complaint: a November 2016 bankruptcy proof of claim for "Contingent Statutory Withdrawal Liability." For a long list of reasons, the Controlled Group's reliance on the contingent proof of claim is misplaced. But for these introductory purposes, the big picture suffices.

After being assessed for withdrawal liability in March 2022, the Controlled Group committed an unforced error. It failed to demand

1

arbitration within the statutory deadline. That fatal error resulted in the
Controlled Group waiving all defenses relating to the assessment. And it
left the Controlled Group with two options. Option One was to accept
defeat and pay its withdrawal liability. Option Two was to construct an
artificial limitations defense and try to confuse the District Court. The
Controlled Group, to no avail, chose Option Two.

In a thorough and well-reasoned opinion, the District Court rejected
the limitations defense on both procedural and substantive grounds.
Initially, the District Court ruled that, although the limitations defense
is not subject to mandatory arbitration, it depends entirely on two issues
that *are* subject to arbitration, *i.e.*, whether the proof of claim was (1) a
notice and demand under 29 U.S.C. §1399(b)(1), and (2) an acceleration
of withdrawal liability under 29 U.S.C. §1399(c)(5) (meaning that it
required immediate payment of the entire amount rather than
installments). *See* 29 U.S.C. §1401(a)(1). Because the Controlled Group
waived those arbitrable §1399 issues, the District Court blocked the
Controlled Group from relying on them for purposes of its limitations
defense. And without those waived issues, the limitations defense fails.

The District Court also, in the alternative, addressed the merits of

2

the waived §1399 issues, finding each to be factually unsupported and legally baseless. The Controlled Group alleges that it has always viewed the contingent proof of claim as a valid demand for accelerated withdrawal liability under §§1399(b)(1) and 1399(c)(5). It also says it consciously chose to forego all challenges to the contingent proof of claim, including to the fact of liability (was liability actually triggered?) and the amount of liability (was the liability calculated correctly?). But now, due to the passage of time, the Controlled Group insists it should no longer be forced to pay a liability that it previously decided not to challenge. That is a fine spin, but it is bereft of factual support.

At no point prior to the initiation of this lawsuit did the Controlled Group ever signal to the Fund that it believed the contingent proof of claim was a demand for accelerated withdrawal liability which it was deciding not to challenge. In fact, in an April 2022 letter, the Controlled Group took the opposite position. It *denied* that withdrawal liability was ever triggered. This letter is particularly revealing because it was sent before the Controlled Group ever had reason to pretend the contingent proof of claim was "something it was not—a notice and demand for withdrawal liability or an acceleration of withdrawal liability." (JA164).

It came before the Controlled Group waived arbitration and before November 2022, *i.e.,* the Controlled Group's self-imposed limitations deadline.

Even after being sued in this case, the Controlled Group continued to deny that withdrawal liability was ever triggered. It also began to challenge the amount of the withdrawal liability. It raised these challenges in *three* separate venues: (1) an untimely arbitration demand, (2) a retaliatory and preempted lawsuit for abuse of process against the Fund and undersigned counsel in Hillsborough County, Florida, and (3) baseless injunction proceedings in the District Court.

This conduct flatly refutes any notion that the Controlled Group viewed the continent proof of claim as a demand for accelerated withdrawal liability which it decided not to challenge. The Controlled Group is merely trying to rewrite history to avoid paying what it owes. The limitations defense is one big illogical contrivance. The District Court properly rejected it. The Court should affirm.

4

# STATEMENT OF ISSUES

The sole issue presented is whether the District Court properly concluded that this action is not time-barred under 29 U.S.C. §1451(f).

## STATEMENT OF CASE

### I.    Relevant MPPAA Background

Multiemployer pension plans are regulated by the Employee Retirement Income Security Act of 1974 ("ERISA"), as amended by the Multiemployer Pension Protection Amendments Act of 1980 ("MPPAA"). These plans are created when multiple employers agree to contribute to a single pension plan on behalf of their union employees pursuant to one or more collective bargaining agreements.  29 U.S.C. §1301(a)(3). They cover union employees (participants) and related family members (beneficiaries), but they are not run by the union. They are separate legal entities that, by law, must be jointly administered by an equal number of employer trustees and union trustees.[1]  29 U.S.C. §186(c)(5)(B).

**A.**    Withdrawal liability only applies to multiemployer pension plans that are underfunded, *i.e.,* those that do not have enough assets to pay their participants and beneficiaries 100% of the retirement benefits they have been promised. *Connolly v. PBGC*, 475 U.S. 211, 217 (1986). When ERISA was passed in 1974, such underfunding was already a

---

[1]  The term "plan sponsor" is used throughout MPPAA. It refers to a plan's joint board of trustees. 29 U.S.C. §1301(a)(10)(A).

widespread problem across the multiemployer pension plan industry. But, after ERISA's passage, the situation became even worse because "ERISA did not adequately protect multiemployer pension plans from the adverse consequences of individual employers terminating their participation in such plans and leaving behind unfunded vested benefits." *Bd. of Trs. of Sheet Metal Workers' Nat'l Pension Fund. v. BES Servs.*, 469 F.3d 369, 374 (4th Cir. 2006). In fact, ERISA had the unintended consequence of "encourag[ing] an employer to withdraw from a financially shaky plan," which exacerbated the "plan's financial troubles," potentially "trigger[ing] a stampede for the exit doors, thereby ensuring the plan's demise." *Milwaukee Brewery Workers' Pension Plan v. Jos. Schlitz Brewing Co.*, 513 U.S. 414, 416-17 (1995).

"With passage of the MPPAA, a withdrawing employer was required to pay its proportionate share of the plan's unfunded vested benefits, calculated as the difference between the present value of the vested benefits and the current value of the plan's assets." *McDonald v. Centra, Inc.*, 946 F.2d 1059, 1062 (4th Cir. 1991). "The consequent liability of a withdrawal 'safeguards the [remaining] participants in multiemployer plans by requiring a withdrawing employer to fund its fair

7

share of the plan obligations incurred during its association with the plan.'" *Id.* (quoting *Connolly*, 475 U.S. at 225). Stated differently, withdrawal liability protects plans from those "free riders who withdrew early, sticking remaining employers with a much higher bill." *J. Supor & Son Trucking & Rigging Co., Inc. v. Trucking Empls. of N. Jersey Welfare Fund*, 30 F.4th 179, 180 (3d Cir. 2022).

**B.**    A practical dilemma to MPPAA's scheme, however, is that withdrawing employers are often "undercapitalized or financially precarious companies," which creates collectability challenges for the plans. *Findlay Truck Line, Inc. v. Cent. States Pension Fund*, 726 F.3d 738, 754 (6th Cir. 2013). Mindful of this reality, Congress included in MPPAA "broad provisions that disregard the usual legal barriers between affiliated, but legally distinct businesses," which are designed to "ensure the viability of multiemployer pension plans against the failure of a contributing employer." *UFCW Local One Pension Fund v. Enivel Props. LLC*, 791 F.3d 369, 371 (2d Cir. 2015).

"The MPPAA's definition of an 'employer' encompasses not merely the entity making contributions to the pension plan, but all 'trades and businesses' that are under 'common control' along with that entity."

8

*Teamsters Joint Council No. 83 v. Centra, Inc.*, 947 F.2d 115, 120 (4th Cir. 1991) ("Teamsters 83") (quoting 29 U.S.C. §1301(b)(1)). "It is established law that each member of a control group is jointly and severally liable under ERISA for withdrawal liability generated by any member's activities." *Id.* (citations omitted); *see also Ceco Concrete Constr., LLC v. Centennial State Carpenters Pension Trust*, 821 F.3d 1250, 1253 (10th Cir. 2016) ("The term 'employer' is used throughout the MPPAA … [and] is synonymous with common-control group.").

**C.**     In general, an employer triggers a complete withdrawal when it either: (1) permanently ceases to have an obligation to contribute to the plan, or (2) permanently ceases all covered operations under the plan.  29 U.S.C. §1383(a). However, different (and narrower) rules apply to building and construction industry ("BCI") employers. *Id.*, §1383(b). A BCI employer faces withdrawal liability only if it (or a member of its controlled group) engages in previously covered work within five years after the withdrawal. *Id.*, §1383(b)(2)(B)(ii); *Ceco Concrete*, 812 F.3d at 1262.

When a BCI employer triggers withdrawal liability, the withdrawal is deemed to have occurred as of the *earlier* date of the withdrawal from

9

the plan, not as of the subsequent triggering event during the five-year post-withdrawal period. 29 U.S.C. §1383(e). The statute is set up this way because the amount of an employer's withdrawal liability is based on its contributions to the plan in prior years. *Ceco Concrete,* 821 F.3d at 1262. "If the triggering event happened years after cessation, there would be no contributions in the prior year on which to base calculations." *Id.*

**D.** "The MPPAA contains detailed dispute resolution provisions," *Teamsters 83*, 947 F.2d at 118 n.4, which govern "the usual (and routine) process of calculation, notification, schedule, possible request for review or arbitration, and payment." *Bay Area Laundry & Dry Cleaning Pension Tr. Fund v. Ferbar Corp. of California*, 522 U.S. 192, 202 (1997) (citation omitted). This scheme "is a significant part of Congress' efforts to shore up the financial stability of multiemployer pension plans." *BES,* 469 F.3d at 374.

Arbitration is required for *any* dispute relating to a withdrawal liability determination under §§1381-1399.[2] 29 U.S.C. §1401(a)(1).

---

[2] That, of course, includes the parties' two disputes in this case on which the Controlled Group's limitations defense hinges: whether the contingent proof of claim was (1) a notice and demand under §1399(b)(1), and (2) an acceleration under §1399(c)(5).

10

"Failure to follow this specified process will lead to dismissal" of all arbitrable claims and defenses that an employer "seeks to raise for the first time in federal court about its withdrawal liability[.]" *BES*, 469 F.3d at 375-76. "[T]he result, though seemingly harsh, is but a self-inflicted wound"; it "is neither onerous, nor inconsistent with the objectives of ERISA and the MPPAA—maximum protection of pension plan participants." *IUE AFL-CIO Pension Fund v. Barker & Williamson, Inc.*, 788 F.2d 118, 129 (3d Cir. 1986).

**E.**    MPPAA's statute of limitations provision states, in pertinent part, that a withdrawal liability collection action "may not be brought after … 6 years after the date on which the cause of action arose." 29 U.S.C. §1451(f). The general rule is that a cause of action for withdrawal liability does not arise until "two events have transpired." *Bay Area, Inc.*, 522 U.S. at 202. "First, the [plan sponsor] must calculate the debt, set a schedule of payments, and demand payment pursuant to §1399(b)(1)." *Id.* "Second, the employer must default on an installment due and payable under the [plan sponsor's] schedule." *Id.* "Only then has the employer violated an obligation owed under the Act." *Id.* When both events have transpired, "each missed payment creates a separate cause of action with

11

its own six-year limitations period." *Id.* at 195.

A narrow exception to the general framework applies when "the plan properly exercises the acceleration option" under §1399(c)(5). *Id.* at 202. In that situation, the limitations period runs from the date of acceleration. *Id.*

To accelerate means to "require immediate payment of the outstanding amount of an employer's withdrawal liability, plus accrued interest on the total outstanding liability from the due date of the first payment which was not timely made."[3] 29 U.S.C. §1399(c)(5) (emphasis added). Because "the statutory acceleration provision is by its terms permissive," courts do not assume or infer that an acceleration occurred. *Bay Area*, 522 U.S. at 208. "Trustees confronting a delinquent employer may accelerate if they decide such a course is in the best interests of the plan, but they need not do so to preserve the plan's right to recover future

---

[3] The circumstances in which a plan may accelerate against an employer are limited to either (1) a missed-payment default, where the employer misses and then fails to cure a payment within 60 days after receiving notice of the delinquency, or (2) an insecurity default, where the plan's trustees conclude that an event defined in the plan rules has occurred which indicates a substantial likelihood that an employer will be unable to pay its withdrawal liability. 29 U.S.C. §§1399(c)(5)(A)-(B). In this case, the Controlled Group pretends that the second situation involving an insecurity default occurred.

payments." *Id.* Thus, whether the plan has the option to accelerate is not dispositive; if the plan "refrains from exercising the acceleration option, the limitations period on a particular payment runs from the date that payment comes due." *Id*. at 208-09.

## II.   Relevant Bankruptcy Concepts

A brief overview of some key bankruptcy concepts is also appropriate, as the Controlled Group's limitations defense turns on the legal significance of a "contingent" proof of claim.

**A.**   As discussed below, the underlying bankruptcy proceeding was filed under Chapter 11 and was later converted to a Chapter 7 proceeding. "The purpose of Chapter 11 reorganization is to assist financially distressed business enterprises by providing them with breathing space in which to return to a viable state."[4] *In re Premier Auto. Servs.*, 492 F.3d 274, 284 (4th Cir. 2007). Upon the bankruptcy court's

---

[4]   While a Chapter 11 debtor generally keeps possession and control of its operations during the bankruptcy process, a trustee may "be appointed for cause under section 1104(a), including fraud, dishonesty, incompetence or gross mismanagement, or when it is in the best interests of the estate." 5 Collier Bankruptcy Practice Guide P 84.01 (2025). "Thus, judicial displacement of the debtor in possession is rare." *Id.* Even so, the underlying bankruptcy here was one of those rare cases requiring a Chapter 11 trustee. (JA49 ¶40).

confirmation of the Chapter 11 reorganization plan, the debtor may receive a discharge of its debts, including any withdrawal liability that may be due to a multiemployer plan. *McDonald*, 946 F.2d at 1065. Non-bankrupt members of the debtor's controlled group, however, receive no discharge. *Id.*; *see also* 11 U.S.C. §524(e). Each member remains liable to the plan for the withdrawal liability obligations of the debtor. *Id.*

The purpose of Chapter 7 is quite different. Rather than seeking to reorganize and emerge from the bankruptcy, the debtor ceases all business operations, the bankruptcy court appoints a trustee, and the trustee "identifies and liquidates the debtor's assets." *Kiviti v. Bhatt*, 80 F.4th 520, 526 (4th Cir. 2023). Corporate debtors receive no discharge. 11 U.S.C. §727(a)(1).

**B.**    In both Chapter 11 and Chapter 7 bankruptcies, creditors may file proofs of claim against the debtor.[5] 11 U.S.C. §501. Absent an objection to a creditor's proof of claim, the claim is "deemed allowed" by operation of bankruptcy law. *Id.*, §502(a).

---

[5]  Collection efforts against the debtor outside of this claims process are generally prohibited by virtue of the Bankruptcy Code's automatic stay provision at 11 U.S.C. §362(a). The automatic stay, however, does not apply to non-bankrupt controlled group members of the debtor. *See, e.g., Cent. States Pension Fund v. Slotky*, 956 F.2d 1369, 1376 (7th Cir. 1992).

14

A claim is not objectionable merely because it is "contingent or unmatured." *Id.*, §502(b)(1). A claim is "contingent" if it "depends upon a future uncertain event." *Grady v. A.H. Robins Co.*, 839 F.2d 198, 202 (4th Cir. 1988). In the withdrawal liability context, an obvious example of a contingent claim is a withdrawal by a BCI employer, since its withdrawal liability is contingent upon "a post hoc (and belated) determination" that may not be able to occur "until as much as five years after what the parties eventually determine to have been the date of complete withdrawal." *Joyce v. Clyde Sandoz Masonry*, 871 F.2d 1119, 1123-24 (D.C. Cir. 1989).

Courts are split as to whether claims for contingent withdrawal liability are discharged in Chapter 11 bankruptcies. *Compare In re CD Realty Partners,* 205 B.R. 651, 658-60 & n. 10 (Bankr. D. Mass 1997) (holding "yes" and collecting other cases so holding), *with CPT Holdings, Inc. v. Indus. & Allied Emps. Union Pension Plan, Local 73*, 162 F.3d 405, 409 (6th Cir. 1998) (holding "no"). So, when an employer files for Chapter 11 bankruptcy, "it is difficult to understand why" its multiemployer plan would ever "take the risk" of not filing a contingent proof of claim for withdrawal liability. *In re Manhattan Jeep Chrysler Dodge, Inc.*, 599 B.R.

15

247, 253 (Bankr. S.D.N.Y. 2019). Even if the plan does not think liability has been triggered yet, the most "pruden[t]" course is to file a contingent proof of claim "to ensure that its rights [are] protected." *Id.* Nothing "bar[s a plan] from doing so." *Id.* And not filing the contingent proof of claim could result in the plan's unripe (or then-unknown) withdrawal liability claim against the debtor/employer being discharged via the bankruptcy process. *Id.* at 254.

## III. Factual Background

**A.** The Fund is an ERISA-regulated multiemployer pension plan; it is administered by a Board of Trustees that is composed of an equal number of employer and union representatives, and it is maintained for the purpose of providing retirement and related benefits to eligible participants and beneficiaries. (JA43 ¶¶2-3). Appellee Terry Nelson initiated this action in his fiduciary capacity on behalf of the Fund in accordance with 29 U.S.C. §1451(a)(1). (JA43 ¶4).

Appellant Florida Glass of Tampa Bay, Inc. ("Florida Glass") is a former contributing employer to the Fund. (JA44 ¶5). All other Appellants are or were under common control with Florida Glass within the meaning of relevant statutory and regulatory provisions, (JA44 ¶6),

16

meaning they and Florida Glass (together, the Controlled Group) are treated as a "single employer" for purposes of MPPAA's withdrawal liability provisions. 29 U.S.C. §1301(b)(1); *Teamsters 83*, 947 F.2d at 120.

**B.** Florida Glass, which was a BCI employer, withdrew from the Fund in 2015. (JA44 ¶¶7-9). At that time, the Fund had not determined that Florida Glass or the Controlled Group triggered withdrawal liability under MPPAA's special BCI rules. Rather, as discussed below, the Fund did not make those determinations until 2022. (JA51-52 ¶¶54-57).

**C.** On August 9, 2016, Florida Glass filed for Chapter 11 bankruptcy. (JA44 ¶10). The bankruptcy court set a deadline for creditors to file proofs of claim by November 28, 2016. (JA46 ¶25).

Within that deadline, on November 10, 2016, the Fund's outside counsel (the law firm Jennings Sigmond) filed two proofs of claim against Florida Glass: one for delinquent contributions, and a second for "Contingent Statutory Withdrawal Liability." (JA47 ¶26). These filings were made by an associate attorney of Jennings Sigmond who did not work on withdrawal liability matters, aside from filing tag-along contingent proofs of claim in bankruptcies when also filing proofs of claim for delinquent contributions. (JA47-48 ¶29). The filings were no different

17

than hundreds of other filings that Jennings Sigmond prepared and submitted on the Fund's behalf in bankruptcies against other bankrupt employers under similar circumstances. (JA45 ¶¶13-18; JA81-84).

**1.** Only the proof of claim for "Contingent Statutory Withdrawal Liability" is at issue in this case. Jennings Sigmond filed it for the undisputed purpose of *preserving* a potential claim for withdrawal liability in the future, to the extent that it were later determined that withdrawal liability has been triggered.[6] (JA46 ¶24).

**2.** The Fund's Trustees were not consulted about the contingent proof of claim before it was filed. (JA48 ¶30). They also did not take a vote or make any determinations that withdrawal liability had in fact been triggered by the Controlled Group. (JA48 ¶30).

Nor did the Trustees vote to accelerate against the Controlled Group under the Fund's insecurity-default rules prior to the contingent proof of claim's filing. (JA92). Consistent with the structure of

---

[6] As just discussed, the concern was indeed legitimate. *See Manhattan Jeep*, 599 B.R. at 253-54 ("Certainly prudence should have dictated that the Fund act promptly [with the filing of a contingent proof of claim] so as to ensure that its rights were protected."); *see also Slotky*, 956 F.2d at 1372, 1375, 1377 (recognizing that the plan's proof of claim from September 1987 was filed "in order to preserve its rights").

18

§1399(c)(5), the Fund's insecurity-default rules are discretionary. The rules identify four different scenarios in which "[t]he Trustees *may* declare a default on payment of Withdrawal Liability." (JA48 ¶33; emphasis added). The only scenario that could have applied at the time of the filing of the contingent proof of claim was the catchall provision, (§11.28(e)), but it is undisputed that the Fund's Trustees have never used that provision to accelerate against an employer or an employer's controlled group during the relevant period. (JA49 ¶34).

**3.** The only Appellant referenced in the contingent proof of claim was Florida Glass. (JA48 ¶31). The other members of the Controlled Group did not receive any direct correspondence from the Fund or Jennings Sigmond regarding a potential claim for withdrawal liability. (JA49 ¶35). Indeed, at this time, neither the Fund nor Jennings Sigmond had investigated whether Florida Glass was under common control with any other entities, including the other Appellants. (JA48 ¶32).

**4.** Given that no investigation or determination had been made as to liability at that point, the Fund filed the proof of claim as *contingent*. (JA47 ¶27c; JA100). The Fund also: (a) checked "Yes" when asked if "amount include[s] interest or other charges"; (b) attached calculations

19

showing how the overall amount of the contingent withdrawal liability was calculated and what the payment schedule would be if a withdrawal were triggered, *i.e.,* either (i) a lump-sum payment of $1,577,168, or (ii) 19 monthly payments, totaling $1,627,538 (of which $50,370 was interest); and (c) stated that a portion of the contingent claim, $202,324.87, was entitled to priority under 11 U.S.C. §507(a)(5)(A).[7] (JA47 ¶¶27-28; JA99-104).

**5.** The words "demand(s)," "default," and "accelerate(s)" are noticeably absent from the contingent proof of claim and its attachments. (JA99-104). Nevertheless, the Controlled Group now insists, years later, that the contingent proof of claim was a "valid" notice and demand for accelerated withdrawal liability. (Doc. 26, "Br.," 18). The Controlled Group, however, cites no evidence in support of that bald assertion, and it did not construe the document as such at the time. The Controlled Group did not request review of the contingent proof of claim within 90

---

[7] As the supporting documentation shows, the priority calculation was not based on the lump-sum option ($1,577,168) or the installment option (19 payments totaling $1,627,538), but rather a completely different figure ($248,410). (JA102-103); *see also* (Br. 9-10) (conceding same).

days under §1399(b)(2),[8] (JA49 ¶38), or demand arbitration pursuant to §1401(a)(1), (JA49 ¶39), as would have been necessary to avoid waiver of its defenses if the contingent proof of claim truly was a notice and demand under §1399(b)(1). *See* 29 U.S.C. §1401(b)(1).

**D.** Florida Glass continued operating during its Chapter 11 bankruptcy until July 12, 2017, at which point it ceased all business operations and its bankruptcy was converted to Chapter 7. (JA49-50 ¶¶40-41). Dawn Carapella ("Trustee Carapella") was then appointed as the Chapter 7 trustee. (JA50 ¶42).

No party (including Florida Glass or Trustee Carapella) objected to the Fund's contingent proof of claim, resulting in it being deemed "allowed" as a matter of law. (JA50 ¶¶44-45, citing 11 U.S.C. §502(a)). And so in January and October of 2021 (over four years after the Fund filed the contingent proof of claim), the Fund received distributions totaling $48,349.35 (*i.e.,* 3% of the contingent claim). (JA50 ¶46).

In April 2022, Florida Glass's bankruptcy concluded. (JA51 ¶53). Neither Florida Glass nor the Controlled Group received a discharge of

---

[8] This 90-day period "was inserted into the statute to protect" multiemployer plans. *McDonald*, 946 F.2d at 1065. It "insures that when a dispute arises about withdrawal, it will be expeditiously addressed." *Id.*

withdrawal liability. 11 U.S.C. §727(a)(1); *McDonald*, 946 F.2d at 1064.

**E.**    Like Florida Glass, the bulk of the Fund's contributing employers are eligible for MPPAA's special rules for BCI employers. (JA45 ¶19). At the beginning of each year, the Fund's computer system automatically generated a list of hundreds of employers that had not contributed to the Fund over the past five years. (JA46 ¶¶20-21). Jennings Sigmond would then investigate, research, and make recommendations to the Fund's Trustees on whether the employers on the list should be assessed for withdrawal liability. (JA46 ¶22). The Trustees would then vote on the recommendations at their regularly-scheduled meetings. (JA46 ¶23).

In 2021, Florida Glass was identified on the Fund's auto-generated list. (JA51 ¶54). The Fund provided that list to Jennings Sigmond, who then began to investigate the various employers on it. (JA51 ¶55). Jennings Sigmond eventually identified all other Appellants as being in the Florida Glass controlled group, concluded that they triggered liability under the BCI Exemption by engaging in covered work during the five-year period following Florida Glass's withdrawal from the Fund, and recommended to the Trustees in February 2022 that the Controlled

22

Group be assessed with withdrawal liability. (JA51-52 ¶56). The Fund's Trustees voted to adopt the recommendation. (JA52 ¶57).

## IV. Procedural Background

**A.** On March 16, 2022, the Fund sent the Controlled Group a notice and demand letter for withdrawal liability under §1399(b)(1). (JA52 ¶61). This March 2022 letter—unlike the contingent proof of claim—*expressly demanded* that payment be made pursuant to the attached payment schedule:

> [W]e hereby make demand for payment of your withdrawal liability … You are required to begin payment of the installments no later than sixty (60) days after the date of this demand, notwithstanding any request for review or appeal which you have the right to make, as described below. Accordingly, your first payment is due to the Fund 60 days after the date of this letter, in the amount of $86,377.

(JA134). This March 2022 demand letter was sent well within the Controlled Group's proposed limitations period ending on November 10, 2022. (JA53 ¶64).

**B.** On April 14, 2022, the Controlled Group sent a letter to the Fund requesting review of the March 2022 demand letter. (JA53 ¶65); *see also* 29 U.S.C. §1399(b)(2)(A). The Controlled Group "denied" all "factual

23

allegations" that "form the basis of the Trustees' demand" and stated that the Fund "may consider this letter as a denial of the Trustees' demand" for withdrawal liability. (JA146). Nowhere in this letter did the Controlled Group alert the Fund to its now-claimed belief that the contingent proof of claim from years before was a ticking time bomb or a sleeping giant. The letter did not even reference the contingent proof of claim, let alone assert it was a demand for accelerated withdrawal liability under §§1399(b)(1) and 1399(c)(5). (JA53 ¶¶66-67).

C.    The Fund denied the Controlled Group's request for review on November 30, 2022. (JA54 ¶73). In that same letter, the Fund notified the Controlled Group that it was delinquent in its withdrawal liability payments and gave the Controlled Group 60 days to cure, per §1399(c)(5). (JA150).

D.    The Fund initiated a collection action against the Controlled Group in the District Court on January 9, 2023, seeking to collect both past due and future withdrawal liability payments, as well as collateral damages under 29 U.S.C. §1132(g)(2). (JA54 ¶74). The Controlled Group responded by attempting to dispute its withdrawal liability in three separate venues.

24

**1.** On January 20, 2023, the Controlled Group served the Fund with a demand for arbitration. (Dist.Ct.Doc. 6-7). In that letter, the Controlled Group disputed both the fact and amount of the withdrawal liability. (*Id.* at 1). The District Court would later hold that this arbitration demand was untimely. (JA36, JA39). The Controlled Group does not challenge that foundational holding on appeal.

**2.** On February 24, 2023, "[b]efore even answering their complaint in the instant case, a group consisting of all [Appellants] except Florida Glass filed a lawsuit against the Fund and its attorneys in Hillsborough County, Florida," alleging violations for abuse of process and defamation under Florida tort law. (JA167, citing *Am. Prods. Prod. Co. of Pinellas Cnty. v. Armstrong*, Case No. 23-CA-001685 (Fla. 13th Jud. Cir.)). Here, too, the Controlled Group took issue with the Fund's determinations regarding the fact and amount of the liability. (Dist.Ct.Doc. 14-1 ¶¶50, 52). "Eventually, the trial court dismissed the Florida lawsuit with prejudice and the Florida Second District Court of Appeal affirmed the dismissal."[9] (JA168).

---

[9] In doing so, "[t]he Florida state court … properly found that the claims raised in [the Florida] Complaint are substantially the same and involve the same parties as the instant case, thus finding them to be preempted."

25

**3.** On March 9, 2023, the Controlled Group finally turned its attention to the instant matter. Unfortunately, though, it did so with equally bogus tactics—this time, a motion for preliminary injunction against the Fund that, for the third time, disputed the fact and amount of the withdrawal liability and which the District Court promptly denied. (JA23-40). Although the Controlled Group does not challenge that ruling on appeal, a part of it—specifically, the finding that "arbitration has been waived" as to any "withdrawal liability determination[s]" that the Controlled Group may be attempting to raise in the case—is critical to the District Court's subsequent summary judgment ruling. (JA39); *see also* (JA32-33 n.2).

Following discovery, and consistent with that prior waiver ruling, the District Court granted the Fund summary judgment because the Controlled Group waived its §1399 challenges on which its limitations defense is based. (JA161-162). The District Court alternatively held that both §1399 challenges fail on the merits. (JA163-164).

The parties then disputed the amount of attorneys' fees to which

---

(JA168 n.1); *see also Trs. of Plumbers & Pipefitters Nat'l Pension Fund v. Plumbing Servs., Inc.*, 791 F.3d 436, 447 (4th Cir. 2015) ("We have been clear that 'ERISA preempts state law, including state common law.'").

26

the Fund was entitled to recover from the Controlled Group. The District Court sided with the Fund again, (JA166-174),[10] and entered judgment in its favor. (JA175). The Controlled Group does not challenge the amount of the judgment, including the damages awarded under 29 U.S.C. §1132(g)(2).[11] Rather, the only issue is whether the District Court correctly rejected the Controlled Group's limitations defense at summary judgment—which it did.

---

[10] The core dispute was whether the Fund could recover its fees relating to the Florida lawsuit. The Controlled Group argued that such fees were outside the scope of 29 U.S.C. §1132(g)(2)(D) because they related to a separate (albeit facially-preempted) action. However, the District Court overruled that objection, explaining: "To disallow the Fund's fees from the Florida lawsuit would simply encourage the conduct the Fourth Circuit condemned in *Keyes,* when it noted '[i]t is hard to imagine a more flagrant challenge to the district court's authority or a more obvious spur to litigation hither and yon' than allowing a party to avoid ERISA attorney's fees by bringing separate actions challenging the validity of ERISA suits in state courts." (JA169, quoting *Keyes Law Firm, LLC v. Napoli*, 120 F.4th 139, 144 (4th Cir. 2024)).

[11] That said, the Controlled Group confusingly suggests that these damages were never awarded. (Br. 31); *see also infra*, p. 61 (addressing this misconception).

27

## SUMMARY OF THE ARGUMENT

For three separate reasons, the District Court correctly rejected the Controlled Group's limitations defense. *First,* the defense is based entirely on two disputed issues under §1399 that the Controlled Group waived. The limitations defense fails if those waived §1399 issues are excluded. *Second*, the contingent proof of claim was not a notice and demand for withdrawal liability within the meaning of §1399(b)(1), in that it did not expressly demand payment but rather marked the liability as *contingent*. *Third*, the contingent proof of claim was not an acceleration within the meaning of §1399(c)(5), in that it attached a monthly installment option alongside the lump-sum option, and it did not state that the Fund was exercising the acceleration option (because no vote to accelerate ever occurred).

To obtain reversal, the Controlled Group must establish that *each* of these holdings is wrong. In attempting to do so, however, the Controlled Group misstates the relevant law, presents argument as though it is fact, and relies on unwarranted inferences that it would undoubtedly oppose had it not waived all other defenses. The Court should affirm.

28

# ARGUMENT

## I. The limitations defense cannot survive without considering waived issues.

Under MPPAA's mandatory arbitration provision, "[a]ny dispute between an employer and the plan sponsor of a multiemployer plan concerning a determination made under sections 1381 through 1399 of this title shall be resolved through arbitration." 29 U.S.C. §1401(a)(1). It is undisputed that the Controlled Group's limitations defense turns solely on whether the contingent proof of claim was *both* (a) a notice and demand under §1399(b)(1), *and* (2) an acceleration of withdrawal liability under §1399(c)(5). (JA161). Thus, these predicate disputes are subject to arbitration in the first instance. *See Steelworkers Pension Trust v. Renco Group, Inc.*, 694 Fed. App'x 69, 74-75 (3d Cir. 2017) ("Renco I") (dispute about whether a bankruptcy proof of claim was a notice and demand under §1399(b)(1) must be arbitrated); *Van Sant v. Nu-Way Printing*, 2020 U.S. Dist. LEXIS 119755, *13-20 (D. Ore. 2020) (dispute about default and acceleration under §1399(c)(5) must be arbitrated).

An employer that fails to exhaust such disputed determinations through arbitration waives them and will be subject to "a failure-to-

29

exhaust defense" if it later tries to raise them in a federal action. *BES*, 469 F.3d at 375. Because that is what occurred here, the Controlled Group cannot rely on the unexhausted and waived §1399 issues in this action. (JA162). And because the limitations defense rises or falls based on those excluded issues, the defense fails as a matter of law. (JA162).

The Controlled Group ridicules this conclusion as "nonsensical," as creating a "Catch-22," and as rendering the statute "nonfunctional" because (a) "courts routinely resolve the very issues the district court believed it could not reach," (b) the §1399 issues are not arbitrable anyway, and (c) the Controlled Group had no limitations defense to raise when the arbitration deadline expired. (Br. 16-21). Each of these criticisms is misplaced.

**A.**     In support of its contention that courts routinely resolve the very issues the District Court claimed it could not reach, the Controlled Group mainly relies on cases in which there was *no dispute* about whether the plan's correspondence was a valid notice and demand under §1399(b)(1) and/or a valid acceleration under §1399(c)(5). (Br. 3 n.1, 17).[12]

---

[12] *See Bd. of Trs. of Trucking Emps. of N. Jersey Welfare Fund, Inc.-Pension Fund v. Kero Leasing Corp.*, 377 F.3d 288, 295 (3d Cir. 2004) ("The parties here apparently do not dispute the fact that the letter sent

That line of cases is "inapposite" to the present situation, where the Fund and the Controlled Group dispute those §1399 issues. *Renco I*, 694 Fed. App'x at 75. "Also distinguishable are cases in which the parties consented to have a federal court determine issues that may instead be arbitrable." *Id.* The Seventh Circuit's *El Paso* decision (which the Controlled Group refers to as *Truck Drivers*) falls into that camp.[13] *Id.* at

---

to Kero by the Fund in March of 1991 accelerated the liability by demanding payment in full."); *Bd. of Trs. of Dist. No. 15 Machinists' Pension Fund v. Kahle Eng'g Corp.*, 43 F.3d 852, 855 (3d Cir. 1994) (no dispute that the plan's letter dated April 23, 1984, which the employer requested review of in July 1984 and demanded arbitration on in December 1984, was a sufficient notice and demand under §1399(b)(1)); *Joyce*, 871 F.2d at 1121-22, 1126 n.6 (the dispute involved the "purely legal issue" of whether the cause of action accrued from the date of the employer's withdrawal, not whether the plan's letter was a sufficient demand under §1399(b)(1)); *I.L.G.W.U. Nat. Ret. Fund v. Meredith Grey, Inc.*, 190 F.R.D. 324, 327-28 (S.D.N.Y. 1999) (no dispute as to when the first payment was due or that the proposed amended complaint was timely under the relation-back doctrine even if the proof of claim was an acceleration); *Bd. of Trs. of Trucking Emps. of N. Jersey Welfare Fund, Inc.-Pension Fund v. Gotham Fuel Corp.*, 860 F. Supp. 1044, 1047-48 (D.N.J. 1993) (no dispute that the plan's November 1984 letter was "a notice and demand for payment … under the provisions of the MPPAA").

[13]  The only case the Controlled Group cites which does not neatly fit into these inapposite and distinguishable categories is *Cent. States Pension Fund v. Basic American Indus,* 252 F.3d 911 (7th Cir. 2001), a rogue decision that erroneously analyzed the limitations period from the date it concluded the plan *should have* or *could have* accelerated against the employer. *See infra,* pp. 53-54, 57.

75 & n.5 (citing *Chi. Truck Drivers Pension Fund v. El Paso, CGP, Co.*, 525 F.3d 591 (7th Cir. 2008)).

The Third Circuit's analysis in *Renco I* is on point. There, the key issue was whether a bankruptcy proof of claim constituted sufficient notice under §1399(b)(1). In holding that the issue was subject to arbitration, the district court "looked to the essence of the parties' dispute," rather than broadly viewing it as a non-arbitrable dispute about the timeliness of arbitration under §1401(a)(1). 694 Fed. App'x at 75. The Third Circuit affirmed. As it reasoned, "[t]o hold that a dispute regarding the sufficiency of notice [under §1399(b)(1)] … can always be wrapped into a determination about the timeliness of arbitration would ignore 'the expressed congressional preference for arbitration under the MPPAA.'" *Id.*

Ditto here. The present case involves the same arbitrable notice issue as *Renco I*, plus a separate arbitrable dispute about whether the contingent proof of claim was an acceleration under §1399(c)(5). Both sides agree that the limitations defense fails unless each §1399 issue is decided in the Controlled Group's favor. (JA161). So, of course, these §1399 issues are the "essence of the parties' dispute," notwithstanding

32

the Controlled Group's failed effort to reframe the dispute as a non-arbitrable limitations defense under §1451(f). *Renco I*, 694 Fed. App'x at 75. It follows that the §1399 issues are statutorily committed to arbitration in the first instance before they may be invoked in federal court. (JA161, citing *Giroux Bros. Transp. v. New England Teamsters & Trucking Indus. Pension Fund*, 73 F.3d 1, 4 (1st Cir. 1996));[14] *see also Flying Tiger Line v. Teamsters Pension Tr. Fund,* 830 F.2d 1241, 1247-48 (3d Cir. 1987) (an employer may not circumvent arbitration by offering a "broad-brush description of a specific issue" if the parties' "central dispute" falls under §§1381-1399); *Americold Log., LLC v. New England Teamsters & Trucking Indus. Pension Fund,* 2023 U.S. Dist. LEXIS 15849, *9 (D. Mass. 2023) (focusing on what the "parties' baseline disagreement" was, not the employer's conclusory contract-theory label).

That the District Court had jurisdiction to consider the §1399 issues

---

[14] The Controlled Group contends that *Giroux* is distinguishable because it dealt with the "timeliness of a notice/demand," not a lawsuit, and "'turn[ed] *solely*' on section 1399." (Br. 20-21). But that distinction does not help the Controlled Group because, as noted, the Controlled Group's limitations defense here also turns *solely* on §1399. (JA161). For the same reason, the Controlled Group's reliance on *In re Centric Corp.,* 901 F.2d 1514 (10th Cir. 1990) is misplaced. (Br. 16, 19). In *Centric*, unlike here, the employer's timeliness defense (laches) did not turn solely (or even partially) on a dispute under §§1381-1399.

changes nothing. (Br. 17-18). This case is not about jurisdiction but *judicial restraint. See Flying Tiger,* 830 F.2d at 1248. Just because a district court has jurisdiction to consider certain threshold issues does not mean that it should if, as here, Congress has expressly assigned them to arbitration in the first instance. 29 U.S.C. §1401(a)(1). "To hold otherwise would, as a practical matter, leave the arbitrability of MPPAA disputes to the unfettered discretion of the district court, a result which Congress plainly did not intend in directing that disputes involving sections 1381-1399 '*shall* be resolved through arbitration.'" *Crown Cork & Seal Co. v. Cent. States Pension Fund*, 881 F.2d 11, 19 (3d Cir. 1989). By any measure, the District Court's should be commended, not derided, for its judicial restraint and humility in respecting this statutory scheme.

**B.** The Court should also reject the notion that §1401(a)(1) does not apply to the Controlled Group's determination that the contingent proof of claim was a "*valid*" demand for accelerated withdrawal liability under §§1399(b)(1) and 1399(c)(5). (Br. 17-18). This argument proceeds from three premises:

- That §1401(a)(1) only applies to determinations made by the Fund,

34

- That the Controlled Group determined the contingent proof of claim was an accelerated demand for withdrawal liability during the relevant period, and

- That the Fund never made any determinations regarding the validity (or invalidity) of the contingent proof of claim.

The argument fails if any of the premises is faulty, which they all are.

**1.** Section 1401(a)(1) is not limited to determinations made *by plan sponsors*. But its neighbor is. *See* 29 U.S.C. §1401(a)(3)(A) ("[A]ny *determination made by a plan sponsor* under sections 1381 through 1399…") (emphasis added). Accordingly, "this Court may not narrow" §1401(a)(1)'s "reach by inserting words Congress chose to omit," *Lomax v. Ortiz-Marquez*, 590 U.S. 595, 600 (2020), especially given that "Congress … knows how to make such a requirement manifest" when it so desires, as evidenced by §1401(a)(3)(A). *Jama v. ICE,* 543 U.S. 335, 341 (2005). "The *subject* of the dispute"—not the party who made the determination giving rise to it—"defines the scope of arbitration." *BES*, 469 F.3d at 375 (emphasis added). The Court therefore should reject the Controlled Group's naked assertion that its determination regarding the validity of the contingent proof of claim is not arbitrable.

**2.** The Controlled Group also fails to cite any record evidence in support of its averment that it ever, in fact, considered the contingent

proof of claim to be a "*valid* notice/demand/acceleration" within the relevant period. Instead, it relies solely on "legal conclusions couched as facts," "unwarranted inferences," and "unreasonable conclusions"—an insufficient strategy at the summary judgment stage. *United States ex rel. Taylor v. Boyko*, 39 F.4th 177, 189 (4th Cir. 2022).

Indeed, if the Controlled Group truly believed the contingent proof of claim was a valid demand for accelerated withdrawal liability, it would have had no reason or basis to challenge the fact or amount of withdrawal liability in 2022 or 2023. The entire liability would have already been "due and owing" as a matter of law, given that the Controlled Group never demanded arbitration on the contingent proof of claim. 29 U.S.C. §1401(b)(1). Tellingly, the Controlled Group has never attempted to explain this logical hole in its position. Nor has it ever tried to explain why it would have decided *not* to challenge an *accelerated* demand for liability from 2016 but then inconsistently decide to fight tooth and nail over a less extreme demand for monthly installments from 2022. And that is because it has no legitimate explanation. *See infra*, p. 38-39.

**3.** At the same time, the Controlled Group ignores that by issuing the March 2022 demand and filing the complaint in this action without

mentioning the contingent proof of claim, the Fund necessarily determined that the contingent proof of claim was *not* a notice and demand under §1399(b)(1) or an acceleration under §1399(c)(5). This is common sense.

Had the Fund been of a different view, there would have been no need for its Trustees to vote to assess the Controlled Group in February 2022 or for the Fund to send the Controlled Group the March 2022 demand at all. Liability would have already been "due and owing" under §1401(b)(1), such that the Fund could and would have just filed a collection action in the District Court prior to the expiration of the Controlled Group's proposed limitations period of November 2022. That the Fund instead sent the formal demand letter, allowing for the liability to be paid in installments and for the Controlled Group to raise defenses to the assessment, dispels the notion that the contingent proof of claim was a demand for accelerated withdrawal liability. *See El Paso*, 525 F.3d at 602 n.4 (questioning why the plan would have sent a subsequent notice to the employer if it had already accelerated the liability against the employer years before).

**C.**    The Controlled Group also misses the mark in asserting that

37

it had no reason to raise its §1399 issues within the limitations period. (Br. 18-20). Because acceleration "creates an immediate, and larger, liability," an employer "is much less likely to delay raising a dispute concerning accelerated withdrawal liability and not initiate arbitration within a reasonable time." *Van Sant*, 2020 U.S. Dist. LEXIS 119755, at *13. That is true regardless of any potential limitations defense. Further, because all parties agree that the March 2022 demand complied with the requirements of §1399(b)(1), the Controlled Group would "have had a reasoned basis" to ask the Fund "to clarify which was the operative document" if it also believed the 2016 contingent proof of claim complied with the requirements of §§1399(b)(1) and 1399(c)(5). (JA162); *accord El Paso*, 525 F.3d at 602 n.4.

More fundamentally, the Controlled Group is attacking a strawman with its "Catch-22" argument. Nowhere did the District Court state or suggest that the Controlled Group was required to seek a ruling from an arbitrator on whether a not-yet-filed complaint was timely under the statute of limitations. (Br. 16). The District Court simply held that the limitations defense may not be based on arbitrable issues that have been *waived*. (JA161-162). That is eminently correct. And, to be clear, there

are only two possible reasons the Controlled Group did not raise the §1399 issues in its April 2022 request for review—neither of which is that it was "impossible." (Br. 19). The first, as discussed, is that the Controlled Group did not actually view the contingent proof of claim as a demand for accelerated withdrawal liability during the relevant period and only made up the defense much later. The other is that its silence was tactical gamesmanship.[15] Regardless, the statute provides no exceptions for afterthoughts or attempted sandbagging, just as it does not ask "whether the issue is factual or legal." *BES*, 469 F.3d at 375.

In the end, the Controlled Group, like the employer in *Kahle*, "overstates its case" when arguing that the District Court's Order "would

---

[15] Because the Controlled Group did not previously demand arbitration on the proof of claim, (JA49 ¶39), and because April 2022 was still within the Controlled Group's now-proposed limitations period of November 2022, it would have been a self-destructive move for the Controlled Group to disclose to the Fund that it viewed the contingent proof of claim as a valid demand for accelerated liability. That would have enabled the Fund to sue the Controlled Group directly in federal court for the entire liability, plus other mandatory damages, well within the Controlled Group's proposed limitations period. 29 U.S.C. §1401(b)(1). Accordingly, under this scenario, the Controlled Group would have been incentivized to stay quiet in the hopes that the clock would soon run out and then try to sandbag the Fund with the defense if a lawsuit were later initiated against it.

give the Fund 'limitless time to file a complaint[.]'" *Kahle,* 871 F.2d at 1127; *see also Bay* Area 522 U.S. at 210 (disagreeing that its holding "turn[s] six years into twenty-six"). The Order does no such thing. The Order merely prevents the Controlled Group from blindsiding the Fund with a limitations defense that turns solely on arbitrable issues under §1399 that the Controlled Group, for whatever reason, never raised with the Fund during its now-proposed limitations period. Far from being "nonsensical," (Br. 3, 14, 17), the District Court's conclusion fully accords with the statute's structure, which creates separate timelines for arbitration and collection actions. By anchoring the predicate notice and acceleration issues to the much shorter arbitration timeline, Congress necessarily intended for them to be resolved *before* the six-year limitations period ever could become an issue.

In arguing otherwise, the Controlled Group assumes that Congress intended for these separate deadlines to be harmonized in favor of employers (the targets of MPPAA). That is wrong. Both deadlines are tailored to protect multiemployer plans and should be construed accordingly. *See BES*, 469 F.3d at 374 (the "streamlined process for resolving disputes over withdrawal liability determinations" via

arbitration "is a significant part of Congress' efforts shore up the financial stability of multiemployer plans"); *McDonald,* 946 F.2d at 1062 (tolling the arbitration deadline "undercuts the purpose of the statute" and "is inapplicable in the MPPAA context"); *Kahle,* 43 F.3d at 860 ("When Congress deems time of the essence, it establishes a statute of limitations considerably shorter than the six-year statute in the MPPAA[.]").[16]

To accept the Controlled Group's position "would create a loophole for employers to bypass the statutory scheme by disguising arbitrable disputes for presentation directly in federal court, as the [Controlled Group] did here[.]" *Giroux*, 73 F.3d at 4; *see also Renco I*, 694 Fed. App'x at 75; *Americold,* 2023 U.S. Dist. LEXIS 15849, at *9; *Flying Tiger*, 830

---

[16] In light of *McDonald*, the Fund agrees that the arbitration deadline could not be tolled in 2022 or any other time, (Br. 20, citing JA162), absent agreement between the parties. *See Renco I*, 694 Fed. App'x at 72. The Controlled Group, however, did not seek a tolling agreement from the Fund, nor did it avail itself of the other obvious workaround to this "practical conundrum." Specifically, it did not demand arbitration within §1401(a)(1)'s deadline and then seek a stay of the arbitration proceedings from either the arbitrator or a federal court. *See Trs. of Colo. Pipe Indus. Pension Tr. v. Howard Elec. & Mech.*, Inc., 909 F.2d 1379, 1386 (10th Cir. 1990) (MPPAA arbitrators have discretion to stay arbitration proceedings); *Bd. of Trs. of Trucking Empl's of N. Jersey Pension Fund v. Centra*, 983 F.2d 495, 507 (3d Cir. 1992) (an employer may seek to have a district court enjoin an arbitration that it initiates).

41

F.2d at 1247-48. It would also, as discussed, "leave the arbitrability of MPPAA disputes to the unfettered discretion of the district court, a result which Congress plainly did not intend[.]" *Crown Cork*, 881 F.2d at 19. The District Court thus properly rejected the Controlled Group's position that arbitration under §1401(a)(1) may be freely bypassed as to issues under §1399. This Court should too, and it should affirm for this reason alone.

## II.    The limitations defense fails when considering the merits of the waived issues.

The District Court also correctly held, in the alternative, that the contingent proof of claim was not a demand for accelerated withdrawal liability under §§1399(b)(1) and 1399(c)(5). None of the Controlled Group's arguments undermine this conclusion.

### A.    The continent proof of claim was not a valid notice and demand under §1399(b)(1).

As "the statute makes clear," "the withdrawing employer owes nothing until its plan demands payment." *Milwaukee Brewery Workers' Pension Plan*, 513 U.S at 423. A cause of action thus cannot accrue until after that event transpires. *Bay Area,* 522 U.S. at 202.

Here, although the Controlled Group repeatedly asserts that the

Fund "demanded" payment in the contingent proof of claim, (Br. 24, 27, 28), the reality is that the word "demand" is nowhere to be found in the document. (JA99-104). And that makes sense when considering that the Fund expressly marked the liability as "contingent"—an objective signal that the Fund had not yet determined that liability had in fact been triggered. *See Grady*, 839 F.2d at 202. Because the contingent proof of claim did not demand payment within the meaning of §1399(b)(1), it never triggered MPPAA's six-year limitations period, *Bay Area*, 522 U.S. at 202, and the limitations defense fails for this independent reason.

In seeking to avoid this obvious conclusion, the Controlled Group asserts that (1) according to Seventh Circuit precedent, all proofs of claim for withdrawal liability, no matter the context, are "by definition" demands under §1399(b)(1), (2) the Fund is estopped from denying that it demanded payment under §1399(b)(1) because it received a nominal distribution on the contingent proof of claim more than four years after filing it, and (3) the District Court improperly relied on various facts (all of which were undisputed) in rejecting the Controlled Group's position. (Br. 21-27). These criticisms are devoid of merit.

**1.** The Seventh Circuit case the Controlled Group relies upon, *El*

*Paso*, misconstrued its own circuit precedent when asserting that "we have held that a proof of claim is, by definition, a demand for payment." 525 F.3d at 598. Neither case that *El Paso* cites for that proposition did so. Rather, in both cases, the plans demanded withdrawal liability in letters that they sent to the employers *outside the bankruptcy*, and the courts deemed those letters, not the proofs of claim, to be the operative document for purposes of §1399(b)(1). *See Slotky*, 956 F.2d at 1375 ("[T]he notice and demand that the plan mailed Stevens" seven months after filing the proof of claim "makes the bankruptcy filing academic"); *Chi. Truck Drivers Pension Fund v. Cent. Transport, Inc.*, 888 F.2d 1161, 1163 (7th Cir. 1989) (the operative notice was the plan's October 1984 letter "demanding estimated withdrawal liability," not the subsequent January 1985 proof of claim).

In fact, the *Slotky* court went on to recognize, consistent with the Fund's position herein, that the plan filed the proof of claim "in order to preserve its rights against" the contributing employer. 956 F.3d at 1377; *see also Manhattan Jeep*, 599 B.R. at 253-54 (criticizing a plan for not following this approach). Moreover, these non-binding Seventh Circuit cases did not involve *contingent* proofs of claim like the one here. But this

44

Court's decision in *Teamsters 83* did, and the Court there did not blindly assume it was the operative demand for purposes of §1399(b)(1). *See Teamsters 83*, 947 F.2d at 117 (the operative MPPAA demand was the letter that the plan sent outside the bankruptcy, not any of the "contingent" and "fixed" proofs of claim that it filed with the bankruptcy court). There is no reason for the Court to conclude otherwise now.

**2.** The Controlled Group also is unable to cite any authority suggesting that the receipt of a nominal distribution, over four years after a contingent proof of claim is filed, somehow operates to "convert" it "into something it was not—a notice and demand for withdrawal liability[.]" (JA164). As the District Court explained, the reason the Fund received this small distribution is that the *Bankruptcy Code* expressly states that *all* claims, including contingent claims, are deemed allowed by operation of law if not objected to. 11 U.S.C. §502(a). The receipt of that payment pursuant to the Bankruptcy Code thus has no bearing on the issue in this *MPPAA* case, *i.e.,* whether the contingent proof of claim satisfied the criteria of §1399(b)(1). Indeed, according to Trustee Carapella, the MPPAA issue was irrelevant to her, and she offered no opinion on it. (JA121). These are separate issues, under separate federal statutes, that

45

should not be conflated.

**3.** The Controlled Group's criticism of the District Court's reliance on certain undisputed facts should meet the same fate. The District Court concluded that the contingent proof of claim was not a notice and demand for payment under §1399(b)(1) because: (a) the Fund did not directly send a copy of it to the Controlled Group; (b) the Fund "expressly marked" the liability as "contingent"; and (c) the Controlled Group did not treat it as a notice and demand. (JA163). Notwithstanding the Controlled Group's arguments to the contrary, the conclusion that the District Court drew from these undisputed facts is clearly correct.

**a.** The Controlled Group points out that plans are not obligated to send separate letters to each member of a controlled group to effectuate proper notice under §1399(b)(1). (Br. 23-24). While that is true, it is a red herring, especially when considering the surrounding circumstances.

At the time of the filing of the November 2016 proof of claim, the Fund had not investigated or determined that withdrawal liability had been triggered or that Florida Glass had any controlled group members. (JA48 ¶ 31; JA52 ¶¶54-56). The Fund's Trustees did not vote to assess the Controlled Group for withdrawal liability, which they always did

46

when formally assessing employers. (JA46 ¶23; JA48 ¶30). And the Fund, undisputedly, filed the contingent proof of claim to *preserve* its rights, just as it had done hundreds of other times in similar circumstances. (JA46 ¶24; JA81-84).

When viewed through that lens, the Controlled Group is grasping at straws in arguing that it is "irrelevant" that the Fund did not send it the notice directly. (Br. 23). This fact certainly "undermine[s]" any notion that the contingent proof of claim "was either intended as a 'notice' or a 'demand,'" as the District Court found. (JA163).

**b.** Perhaps more importantly, the Fund "expressly marked" the withdrawal liability as "contingent." (JA163). The Controlled Group attempts to downplay the significance of this designation, describing it as an "offhand comment" that, at most, reflected the "unstated," "idiosyncratic," and "subjective" belief of the Fund's lawyers and which "would have been impossible for any observer to glean." (Br. 4, 10, 15, 24-25, 29). Nonsense. The contingent label was *prominent*, and it put everyone—including Trustee Carapella and Florida Glass—on *objective* notice that the Fund had not yet determined that liability had been

47

triggered.[17] *See Grady*, 839 F.2d at 202.

The Fund was not, as the Controlled Group implies (Br. 24-25), required under the applicable rules to explain why it labeled the claim as contingent. Fed.R.Bankr.P. 3001(c). In fact, the proof of claim form neither requests nor includes space for such an explanation. (JA99-101). In any event, if "any observer" was confused about why the Fund labeled the claim as "contingent" or otherwise disagreed with the label, the observer had at least three viable options:

 (i) Contact the Fund's attorney and request an explanation, as Trustee Carapella admitted she did when reviewing proofs of claim filed by *other* parties, (JA130);

 (ii) Research MPPAA's statutory scheme and quickly learn that withdrawal liability for a BCI employer (like Florida Glass) depends on a "post hoc (and belated) determination" that may "occur as much as five years after what the parties eventually determine to have been the date of complete withdrawal," *Joyce*, 871 F.2d at 1123-24; and/or

---

[17] The Controlled Group is the only party in this case relying on an unstated, idiosyncratic, and subjective belief about the contingent proof of claim that no observer could possibly glean from the surrounding circumstances. *See supra,* pp. 36, 39 (discussing the Controlled Group's citationless assertion that it has always secretly believed the contingent proof of claim was a "valid" demand for accelerated withdrawal liability). Further, the Controlled Group should be estopped from now speculating that the contingent label "referred instead to something else, such as the amount owed." (Br. 26). In the District Court, it took the opposite potion, claiming "there was nothing 'contingent' about the *amount* of Florida Glass's liability." (Dist.Ct.Doc. 49-1 at 21-22) (emphasis in original).

> (iii) Object to the contingent proof of claim, *see* 11 U.S.C. §502(b), which would have prompted the Fund to investigate whether liability had in fact been triggered and respond accordingly, *see* (JA77) (former Fund attorney testifying about this established practice).

The only other option would be to do nothing, which is what Florida Glass and Trustee Carapella did. (JA50 ¶44). But, fundamentally, an observer cannot bury his head in the sand and then disclaim being on objective notice about a red flag he chose not to explore.[18] *See Heavenly Hana LLC v. Hotel Union & Hotel Indus. of Haw. Pension Plan,* 891 F.3d 839, 847 (9th Cir. 2018).

**c.** The Controlled Group's attempt to minimize the import of its "decision" not to challenge the contingent proof of claim is similarly baseless. (Br. 24). That inaction, when considered together with the

---

[18] Contrary to the Controlled Group's repeated assertion (Br. 4, 10, 25), the Fund never admitted in the District Court that the "contingent" designation was inaccurate or erroneous. Instead, in the footnote to which the Controlled Group refers, the Fund made clear that it did not learn of the triggering conduct until "years later through subsequent investigation, which, again, is why the Proof of Claim was filed as contingent." (Dist.Ct.Doc. 52 at 22 n.13); *Manhattan Jeep*, 599 B.R. at 253 (endorsing this practice and providing a stark warning to those who do otherwise). Ironically, the Fund included that footnote to clear up the Controlled Group's prior mischaracterization of the Fund's position, which the Controlled Group is now mischaracterizing again.

49

Controlled Group's subsequent decision to vigorously oppose the fact and amount of its withdrawal liability in connection with the 2022 demand, confirms the obvious: The Controlled Group did not construe the contingent proof of claim as a valid notice and demand during the relevant period. *See supra*, pp. 36, 39; *see also Local No. 499, Bd. of Trs. Of the Shopmen's Pension Plan v. Art Iron, Inc.,* 2021 U.S. Dist. LEXIS 12082, *17-18 (S.D. Ohio 2021) (examining the parties' conduct and finding it significant that the defendants did not raise their §1399(b)(1) challenge in their request for review but rather asserted it for the first time in response to the plan's collection action). The only other possibility would be that the Controlled Group stayed quiet about the belief for the purpose of sandbagging the Fund, *see supra*, p. 39 n.15, which would be far worse.

In short, the District Court correctly found that the contingent proof of claim was not a valid notice and demand under §1399(b)(1). The Court may affirm for this reason alone.

**B.  This action is timely under the general limitations framework even if the contingent proof of claim was a valid notice and demand under §1399(b)(1).**

In any event, it is not enough for the Controlled Group to convince

the Court that the contingent proof of claim was a valid notice and demand under §1399(b)(1). Even if it was, no payment claimed in the Fund's complaint is time-barred under MPPAAs general limitations framework.

When a demand does not specify the date by which the first payment is due, "MPPAA's 60-day default deadline applie[s]." *Steelworkers Pension Trust v. Renco Group, Inc.*, 2021 U.S. App. LEXIS 25748, *13 (3d Cir. 2021) (citing 29 U.S.C. §1399(c)(2)); *see also El Paso*, 525 F.3d at 598 n.2 (recognizing same). Because the calculations attached to the contingent proof of claim did not set a date for the initial payment, the first payment would have been due 60 days later, on January 9, 2017, if it was a §1399(b)(1) demand.[19] (JA47 ¶27; JA49 ¶36). The Fund filed its complaint on January 9, 2023, which is not more than six years after January 9, 2017. (JA49 ¶37; JA54 ¶74). Thus, all payments are timely under the general framework even if the contingent proof of claim demanded payment under §1399(b)(1). *See Bay Area*, 522 U.S. at 195.

---

[19] The Fund specifically argued this point in its District Court briefing. (Dist.Ct.Docs. 48-1 at 27; 52 at 13-14). It is thus puzzling that the Controlled Group would suggest the Fund "conceded" in that briefing that only the lump-sum option could have applied if the contingent proof of claim were construed as a §1399(b)(1) demand. (Br. 9, 28).

51

That is why the Controlled Group is forced to argue that the contingent proof of claim was *separately* an acceleration under §1399(c)(5), which is an even steeper hurdle for it to clear.

### C. The contingent proof of claim was not an acceleration of withdrawal liability under §1399(c)(5).

As the District Court found, the Fund's inclusion of the 19-month installment schedule in the contingent proof of claim "directly contradicts the notion that it was meant to demand accelerated payment of the total sum," as does the fact that "[t]he Fund did not take the steps required by §11.28(e) of its Rules and Regulations to accelerate Florida Glass's withdrawal liability in the 2016 period." (JA163); *see also PACE Indus. Union-Mgmt. Pension Fund. v. Singer,* 2011 U.S. Dist. LEXIS 22875, *10 (E.D.N.Y. 2011) (proof of claim obviously not an acceleration under §1399(c)(5) where it attached installment option); *Bay Area*, 522 U.S. at 202 (no acceleration unless "the plan properly exercises the acceleration option"). In challenging the District Court's reasoning, the Controlled Group urges the Court to (1) adopt the Seventh Circuit's limitations framework, and (2) find that the contingent proof of claim constitutes an acceleration on its face, regardless of its inclusion of the payment schedule. (Br. 27-31). The Court should reject these arguments as well.

**1.** The Controlled Group's reliance on Seventh Circuit case law is misguided. That "on-point" and non-binding "[out-of-]circuit precedent" conflicts with on-point *and controlling* Supreme Court precedent. The Controlled Group also loses under the Seventh Circuit's flawed framework anyway.

**a.** In *Basic American*, the Seventh Circuit measured the limitations period from the date the plan "*should … have concluded*" the employer repudiated its withdrawal liability—even though the court acknowledged that the evidence showed the plan "*didn't think [the employer] had defaulted.*" 252 F.3d at 918. (emphasis added). In other words, as *El Paso* later summarized, "whether the plan sponsor in that case effectively exercised its right to accelerate under the statute was *not relevant.*" 525 F.3d at 602 (emphasis added); *see also* (Br. at 29) (quoting this very excerpt). However, that analysis is definitely wrong. As *Bay Area* teaches, whether the plan sponsor exercises its right to accelerate under §1399(c)(5) is not just relevant; it is *dispositive*. *See Bay Area,* 522 U.S. at 208-09.

To be sure, *Bay Area* did not involve a bankruptcy. (Br. 27). But so what? Nothing in *Bay Area's* discussion suggests it should not apply in

the bankruptcy context. *See Singer,* 2011 U.S. Dist. LEXIS 22875, at *10 (stating "[t]he Supreme Court ruled on this precise issue in *Bay Area Laundry*" when evaluating whether a proof of claim was an acceleration under §1399(c)(5)). And the Seventh Circuit's case law, including *Basic American* and *El Paso*, provides that even in the bankruptcy context, the provisions of §1399 must be followed to trigger obligations under MPPAA. *See Basic American*, 252 F.3d at 917 (proof of claim did not count as a notice and demand under §1399(b)(1)); *El Paso*, 525 F.3d at 602 ("The filing of a proof of claim does not absolve the Fund of its responsibility to comply with the statutory requirement [under §1399(c)(5)] of serving notice on the employer before accelerating the debt."); *see also*, *e.g., Slotky*, 956 F.2d at 1375 ("There must be adequate notice to the [controlled group member under §1399(b)(1)] even if the unfortunate position of the [contributing employer] as a bankrupt makes it less than interested in the details of its liability.").[20]

---

[20] *Basic American* also overlooked that the statute of limitations does not begin to run on the date of the anticipatory breach if the injured party disregards the anticipatory breach. *See Lane v. Nationwide Mut. Ins. Co.*, 321 Md. 165 (1990) (adopting 4 *Corbin on Contracts*, § 989 (1951)); *Strategic Outsourcing, Inc. v. Cont'l Cas. Co.*, 274 Fed. App'x 228, 231 (4th Cir. 2008).

**b.** Besides, this lawsuit is not even time-barred even under *Basic American*. The court there measured the limitations period from two possible events: (i) the date the employer ceased all business operations during the bankruptcy (June 2), and (ii) the date the plan sent the employer "a formal demand for payment of the withdrawal liability set forth in the proof of claim" following that cessation (June 18). 252 F.3d at 917-18. Here, those two dates are: (i) July 12, 2017, (JA49-50, ¶¶40-41), and (ii) March 16, 2022. (JA52 ¶61). The Fund filed its complaint on January 9, 2023, (JA54 ¶74), within six years of each date, making this action timely under *Basic American's* backwards analysis as well.[21]

**2.** The Controlled Group is also wrong that the contingent proof of claim was "an acceleration on its face." (Br. 30). Put simply, no reasonable

---

[21] Inexplicably, the Controlled Group discusses *Basic American* as if it measured the limitations from (i) the employer's filing of bankruptcy, and (ii) the plan's filing of the proof of claim. (Br. 27). However, *Basic American* clearly states that "[t]he statute of limitations … did not begin run on either [of those] date[s]." 252 F.3d at 917; *see also El Paso*, 525 F.3d at 602 (confirming same about *Basic American*). And even more strange, the Controlled Group borrows *Basic American's* "jumped the gun" language when misapplying its limitations framework. *Compare Basic American*, 252 F.3d at 917 ("So by filing a proof of claim for the entire withdrawal liability that Allied would owe if it withdrew … Central States was *jumping the gun*.") (emphasis added), *with* (Br. 29-30) ("A claim can accrue for limitations purposes … [even] if the Fund's lawyers *jumped the gun* in demanding full payment[.]") (emphasis added).

employer or controlled group member would look at the proof of claim here—which does not reference acceleration, which attaches a monthly installment option, and which states the liability is "contingent"—and agree with the Controlled Group that it "create[d] an immediate, and larger, liability" *by insinuation. See Van Sant*, 2020 U.S. Dist. LEXIS 119755, at *13. Rather, only someone who has waived all other defenses would seek to invoke such a fallacious, uncommunicated-acceleration theory. Either way, that is no reason for the Court to accept this contrived defense that the Controlled Group would certainly oppose in any other circumstance (and probably even sue the Fund over if the roles were reversed). (JA167; Dist.Ct.Doc. 14-1). As remedial legislation, "ERISA/MPPAA … should be liberally construed in favor of protecting the participants in employee benefits plans," *Teamsters 83*, 947 F.2d at 123, not as an escape hatch for the "free riders" who wish to stick others with their bill. *J. Supor*, 30 F.4th at 180.

The express notification that an acceleration is occurring is what matters; and without it, an acceleration "cannot [be] assume[d]." *Bay Area*, 522 U.S. at 208. That is doubly so when the purported demand provides a contradictory option to pay in installments. *Singer*, 2011 U.S.

Dist. LEXIS 22875, at *10. Indeed, even *Basic American* acknowledged that the plan's demand for installment payments "shows that it didn't think [the employer] had defaulted." 252 F.3d at 918.

Nevertheless, the Controlled Group attempts to seize upon *Basic American's* explanation for why it believed an acceleration still could have occurred: that §1399(b)(1) *requires* a plan to attach the payment schedule no matter what. (Br. 28). That does not follow. For one thing, it ignores that acceleration under §1399(c)(5) is more specific than the general provision at §1399(b)(1). *See RadLAX Gateway Hotel, LLC v. Amalg. Bank,* 566 U.S. 639, 645 (2012) (discussing the general/specific canon). For another, it disregards that, as the district courts in the Seventh Circuit have subsequently explained when distinguishing *Basic American*, "nothing [under §1399] requires a 'schedule' to consist of multiple payments, a single payment is possible in several instances, and single payment is consistent with … §1399." *Cent. States Pension Fund v. O'Neill Bros. Transfer & Storage Co.*, 2009 U.S. Dist. LEXIS 44190, *11 (N.D. Ill. 2009), *aff'd* 620 F.3d 766 (7th Cir. 2010); *Cent. States Pension Fund v. Frate Serv.*, 2017 U.S. Dist. LEXIS 187489, *7 (N.D. Ill. 2017). Accordingly, the attachment of an installment option is facially

inconsistent with the notion that an acceleration was underway, as the District Court recognized. (JA163).

The Controlled Group fares no better with its assertion that "because the amount of the Fund's proof of claim matched only the schedule's 'immediate payment' amount," the attachment of the payment schedule is irrelevant. (Br. 28). This argument proceeds from at least three faulty premises: (a) that the Fund "demanded" payment in the contingent proof of claim, *see supra*, p. 43; (b) that an acceleration must have occurred because the Fund did not specify a date by which the initial payment was due, *see supra*, p. 51; and (c) that the Bankruptcy Code "absolve[s] the Fund of its responsibility to comply" with the procedural aspects of §1399(c)(5), including the requirement to clearly notify the employer that it is being accelerated against. *El Paso*, 525 F.3d at 602. The argument, moreover, is based on a selective reading of the contingent proof of claim and related attachments.

The Controlled Group ignores that the Fund checked "Yes" when asked if the "amount include[s] interest or other charges." (ECF 47-7 at 2; SOF ¶ 27). That is significant because employers do *not* pay interest on the lump-sum option (here, the $1.577 million figure); they only pay

interest under the installment option (here, the $1.626 million figure). *See Milwaukee Brewery Workers' Pension Plan*, 513 U.S. at 424 (an employer is entitled to avoid statutory interest that §1399(c) "would otherwise cause to accrue" by prepaying its withdrawal liability in a lump sum rather than installments). So if, as the Controlled Group maintains, the Fund was scrapping the payment schedule and only demanding payment on the lump-sum $1.577 million figure, the Fund obviously would have checked the "No" box when asked if the amount "include[s] interest or other charges," because interest is not due under the lump-sum option.

The Controlled Group also plucks the term "Immediate payment" out of context. (Br. 28). At least three other items on the same page rebut the notion that only an "Immediate payment" was available: (a) the line just above "Immediate payment," which states: "*Choices for payment from*"; (b) the "**OR**" between the "Immediate payment" option and the monthly installment option, and (c) the explanation of what the "interest charged would be" under the monthly payment option. (JA102). Again, only someone that waived all other defenses would disregard these three other items and conclude that the Fund "claimed only the immediate

59

payment amount" against it. (Br. 28).

The fact that a portion of the contingent liability was claimed as a priority does not alter the analysis. (Br. 30). Both the priority claim and the resulting distribution were calculated based on formulas from the Bankruptcy Code, not MPPAA, which have nothing to do with either (a) the $1.577 lump-sum option, or (b) the 19-month installment option. (JA102-103); *see also* (Br. 9-10) (acknowledging the priority amount is based on a *different* "$248,410 figure" that is independent of these two payment options). Therefore, and as the District Court explained, the priority claim is legally irrelevant to the parties' §1399 disputes. (JA161).

In sum, the District Court correctly found that the contingent proof of claim was not an acceleration under §1399(c)(5), and the Controlled Group's convoluted arguments to the contrary only serve to reinforce that these are precisely the type of disputes that should be resolved by expert pension arbitrators in the first instance. The Court may affirm for this reason alone.

## III.  No refund is due, but an offset would be necessary if so.

Finally, the Controlled Group argues that it should be entitled to a full refund of the interim payments and interest paid to the Fund during

60

the pendency of the District Court action. (Br. 31-32). To the extent that the Court affirms the District Court's judgment, the argument will be moot, and the Fund will be entitled recover additional fees and costs from the Controlled Group relating to this appeal. *Bldg. Serv. Local 47 Cleaning Contractors Pension Plan v. Grandview Raceway,* 46 F.3d 1392, 1404 (6th Cir. 1995). But even if the Court were to reverse, the Controlled Group's argument here makes no sense.

The Controlled Group reasons that if the Court concludes the suit is time-barred, then a judgment cannot be awarded to the Fund under §1132(g)(2). (Br. 31). That ship has sailed. The District Court *already* entered judgment in favor of the Fund under §1132(g)(2). (JA175). And the only reason it did so is that the Controlled Group refused to make its interim payments voluntarily and on schedule. Significantly, the Fund would not have been awarded any §1132(g)(2) damages had the Controlled Group simply complied with the statute's "pay now, dispute later" regime, which the Controlled Group admits is mandatory. (Br. 32 n.7).

Under these circumstances, and according to an unbroken line of cases that the Controlled Group does not challenge, the Fund's success in

61

compelling the Controlled Group to make these payments constitutes a standalone victory "that cannot be undone by a loss at the merits stage." *Cent. States Pension Fund v. Nitehawk Exp., Inc.,* 223 F.3d 483, 496 (7th Cir. 2000); *see also, e.g., Trs. of I.A.M. Nat'l Pension Fund v. M & K Emple. Sols., LLC,* 2023 U.S. Dist. LEXIS 165893, *57-58 (D.D.C. 2023); *Cent. States Pension Fund v. Lady Baltimore Foods,* 960 F.2d 1339, 1347 (7th Cir. 1992). Any refund to the Controlled Group thus would need to be offset by the §1132(g)(2) damages that the District Court awarded. *Id.* But, again, this is a moot issue if the Court affirms, which it should.

## CONCLUSION

The Court should affirm the District Court's judgment.

July 14, 2025                    Respectfully submitted,

                    *s/ Brian A. Pepicelli*
                    Brian A. Pepicelli
                    Neil J. Gregorio
                    TUCKER ARENSBERG, P.C.
                    1500 One PPG Place
                    Pittsburgh, PA  15222
                    (412) 566-1212
                    bpepicelli@tuckerlaw.com
                    ngregorio@tuckerlaw.com

                    *Counsel for Appellees International Painters and Allied Trades Industry Pension Fund*

62

## <u>CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT</u>

On this 14th day of July, 2025, the undersigned certifies that:

1.    This brief complies with type-volume limits because, excluding the parts of the document exempted by Fed. R. App. R. 32(f), it contains 12,919 words.

2.    This brief complies with the typeface and type style requirements because this brief or other document has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Century Schoolbook font.

*s/ Brian A. Pepicelli*
Brian A. Pepicelli
*Counsel for Appellees*

## <u>CERTIFICATE OF SERVICE</u>

On this 14th day of July, 2025, the undersigned certifies that this brief was electronically filed using the Court's CM/ECF system, which automatically generates notices of electronic filing to all counsel of record at the e-mail addresses on file with the Court.

<u>*s/ Brian A. Pepicelli*</u>
Brian A. Pepicelli
*Counsel for Appellees*
